<u>Colon v. LaValley</u>
10-cv-2173 (NGG)
<u>EXHIBIT A</u>

Defendant's Appellate Division Brief

*Denneny*

*Due 11/17*

*257 803*

*To be argued by*
WAYNE B. WISEMAN, ESQ.
*Time Requested: 10 minutes*

RECEIVED
KINGS COUNTY SUPREME
APPEALS BUREAU

8  SEP -9  P3:27

*(mins 9/16/08)*

STATE OF NEW YORK

# Supreme Court

## Appellate Division - Second Department

---

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

-against-

DENNIS COLON,

*Defendant - Appellant.*

---

*On Appeal from the Supreme Court for the County of Kings*

---

## BRIEF ON BEHALF OF DEFENDANT-APPELLANT
## DENNIS COLON

---

WISEMAN & HOFFMANN
*Attorney for Defendant-Appellant*
*Dennis Colon*
~~460 Park Avenue~~ 450 7th Ave.
~~4th Floor~~ Suite 1400
New York, NY ~~10016~~ 10123
~~(212) 686-2110~~
disconnected. 212-679-0400
cell - 917-940-8065

---

*APPEAL RITE PRINTING*
237 Main Street • Buffalo, New York 14203 • (716) 842-3110

TABLE OF CONTENTS

**Table of Contents** ........................................................... **i**

**Table of Authorities** ........................................................ **ii**

**Preliminary Statement** ..................................................... **iv**

**Issues Presented** ............................................................ **iv**

**Statement of Facts** .......................................................... **1**

**At Trial** ..................................................................... **2**

**Argument** ................................................................... **3**

I   **The Defendant's Right to a Speedy Trial was Violated** .............. **3**
    A.   The Prosecution's Delay in Turning Over Grand Jury Minutes Should Be
         Chargeable Time Under Section 30.30 . . . . . . . . . . . . . . . . . . . .   4
    B.   The Trial Judge Erred in Charging Only 14 Days from June 10, 2004 to
         February 4, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
    C.   The Three-Year Delay Denied the Defendant of His Constitutional Right
         to a Speedy Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

II  **The Trial Judge Erred in Admitting Evidence Related to the Photograph of a
    Knife** ..................................................................... **9**

III **Defendant's Counsel Was Constitutionally Ineffective** .............. **11**

IV  **The Trial Court Erred in Admitting the Expert Testimony of a Midwife** ... **15**

V   **The Sentence was Excessive** ............................................ **17**

**Conclusion** ................................................................. **20**

TABLE OF AUTHORITIES

*Anderson v. Butler,* 858 F.2d 16 (1st Cir. 1988) . . . . . . . . . . 12–15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 US 579 (1993) . . . . 15

*Frye v. United States,* 293 F. 1013 (C.A.D.C. 1923) . . . . . . . . 15

*Goins v. Angelone,* 52 F.Supp.2d 638 (E.D.Va. 1999) . . . . . . . . 13

*Hampton v. Leibach,* 290 F.Supp.2d 905 (N.D.Ill. 2001) . . . . . . . 13

*Harris v. Reed,* 894 F.2d 871, 878–79 (7th Cir. 1990) . . . . . . . . 12

*Massaro v. United States,* 538 U.S. 500 (2003) . . . . . . . . . . 11

*McAleese v. Mazurkiewicz,* 1 F.3d 159, 166–67 (3rd Cir. 1993) . . . . . 13

*Ouber v. Guarino,* 293 F.3d 19 (1st Cir. 2002) . . . . . . . . . . 12

*Parker v. Mobil Oil Corp.,* 7 N.Y.3d 434 (2006) . . . . . . . . . 15

*People ex rel. Franklin v. Warden,* 31 N.Y.2d 498 (1973) . . . . . . . 4

*People v. Anderson,* 66 N.Y.2d 529 (1985) . . . . . . . . . . . 5

*People v. Brothers,* 50 N.Y.2d 413 (1980) . . . . . . . . . . . 4

*People v. Brown,* 24 A.D.3d 812 (3rd Dept. 2005) . . . . . . . . 18

*People v. Close,* 103 A.D.2d 970, 971 (3rd Dept. 1984) . . . . . . . 10

*People v. Cronin,* 60 N.Y.2d 430 (1983) . . . . . . . . . . . 15

*People v. Durrette,* 222 A.D.2d 692 (1995) . . . . . . . . . . 5–6

*People v. Fuentes,* 290 A.D.2d 563 (2nd Dept. 2002) . . . . . . . 18

*People v. Hassler,* 53 A.D.2d 738 (3rd Dept. 1976) . . . . . . . . 18

*People v. Kelly,* 62 N.Y.2d 516, 520 (1984) . . . . . . . . . . 9–10

*People v. Kendzia,* 64 N.Y.2d 331, 337 (1985) . . . . . . . . . . 4

ii

*People v. Littlejohn*, 184 A.D.2d 790 (1992) . . . . . . . . . . . .   6

*People v. Mack*, 81 A.D.2d 925 (2nd Dept. 1981) . . . . . . . . .   18

*People v. McKenna*, 76 N.Y.2d 59, 62 (1990) . . . . . . . . . .   3–6

*People v. Saddy*, 84 A.D.2d 175 (2nd Dept. 1981) . . . . . . . .   9

*People v. Samuels*, 185 A.D.2d 903, 904 (2nd Dept. 1992) . . . .   10

*People v. Taranovich*, 37 N.Y.2d 442, 445 (1975) . . . . . . . .   8–9

*People v. Terrell*, 185 A.D.2d 906 (2nd Dept. 1992) . . . . . . .   10

*People v. Wesley*, 83 N.Y.2d 417, 422 (1994) . . . . . . . . . .   15

*People v. Williams*, 163 Misc.2d 212 (N.Y.Co.Ct. 1994) . . . . .   7–8

*People v. Williams*, 120 A.D.2d 630 (2nd Dept. 1986) . . . . . .   18

*People v. Woodhouse*, 35 A.D.3d 968 (3rd Dept. 2006) . . . . . .   9

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . .   11

*Tavares v. O'Brien*, 2007 WL 2908828 (D.Mass. 2007) . . . . . .   14

*U.S. ex rel. Schlager v. Washington*, 887 F.Supp. 1019 (N.D.Ill. 1995) . . . .   15

*United States v. Shaw*, 824 F.2d 601 (8th Cir. 1987) . . . . . . . .   16

*United States v. Withorn*, 204 F.3d 790 (8th Cir. 2000) . . . . . .   15–17

*United States v. Yousef*, 327 F.3d 56 (2nd Cir. 2003) . . . . . . .   11

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003) . . . . . . .   14

## PRELIMINARY STATEMENT

Appellant appeals from a judgment of the Supreme Court, Kings County, rendered on June 8, 2006, convicting him after a jury trial, of Burglary in the First Degree, Rape in the First Degree, Sexual Abuse in the First Degree, and Assault in the Second Degree and sentencing him to a determinate 30 years incarceration (James P. Sullivan, J. at trial and sentencing).

Appellant filed a Notice of Appeal, and this appeal followed. Appellant is currently incarcerated pursuant to this judgment. No stay has been sought.

## ISSUES PRESENTED

I. Did the trial court err in finding that defendant's right to a speedy trial was not violated, when the prosecution delayed for over three years prior to going to trial?

II. Did the trial court err in admitting a photograph of a knife in place of the knife itself, which had been lost during the long delay?

III. Did defense counsel provide ineffective assistance, where he promised in his opening statement to establish that an alleged rape was, in fact, consensual sex, and failed to elicit any testimony or present any evidence at trial in support of this theory?

IV. Did the trial court err in qualifying a nurse midwife as an expert of the sexual examination of rape victims, where, at the time of the examination, the midwife had little, if any experience in that area beyond a basic training course?

V. Was the sentence of thirty years excessive, when this was defendant's first offense?

## STATEMENT OF FACTS

On March 26, 2003, Vera Krioutchkova received a telephone call from a man who claimed to have been sent by Vera's landlord to fix a leak about which she had complained. Tr. 539–542. A few minutes later, a man came to her door, and she let him into the apartment. He was wearing a black leather jacket, blue jeans with a brown belt, and a khaki shirt. Tr. 543. He smelled of alcohol and was not carrying anything. Tr. 544. Nevertheless, she let him in.

Vera told the man about her plumbing problems, and he looked under the sink where she had identified a leak. He then looked at the bathtub, and at the ceiling. Tr. 545. He then asked Vera for a pen and paper, which she provided, and he made some notes. Tr. 545–546. The man indicated to Vera that he would return in the evening to repair the problems, and Vera led him to the door. Tr. 546.

The rest of her story reads like bad pulp fiction. As they were walking out, the man abruptly turned; in his hand he held a knife! Tr. 546. His face draped in anger, he ordered Vera to lie down, or he would kill her. Tr. 546. Vera tried to run to the door, screaming "Help me!" and "Get out!" but the man pushed her very hard. Tr. 547–548. She then pleaded to him that she was sick, but he laughed in disbelief. Tr. 549.

The man took Vera to a bed, spread her legs and placed his hand into her vagina. Tr. 550. She complained that his hands were dirty, and asked him to wash them. The man complied, taking Vera into the bathroom with him to the sink. Tr. 550. They returned to the bed, and the man had sexual intercourse with Vera. Tr. 551.

1

Afterwards, he commanded that she take a shower and not call the police, and then left the apartment. Tr. 553.

Ms. Krioutchkova neither showered nor refrained from phoning the police. Tr. 553. Shortly thereafter, police arrived and an ambulance took Vera to the hospital. Tr. 553. Hospital staff performed a rape kit on Ms. Krioutchkova.

When Vera returned to her apartment, she discovered that the man had left a message on her answering machine. The message said "Sorry." Tr. 562.

After midnight on April 5, 2003, Vera received another telephone call from the man. Tr. 563. During this call, the man told Vera that he loved her body and wished to see her again. Tr. 563–564. He daughter called the police, then instructed Vera to invite the man to the apartment. Tr. 565. The man declined the invitation. Tr. 565.

Later that day, police arrested Dennis Colon and asked Vera to view him in a line-up. Tr. 566–567. She identified Colon as the man who had raped her. Tr. 567.

## AT TRIAL

Following jury selection, trial commenced on June 1, 2006, more than three years after the alleged criminal act. Tr. 500. Defense counsel gave a brief opening statement, in which he promised the jury that "the sexual encounter between the complainant and Mr. Colon was consensual and that the complainant agreed to have sex with him." Tr. 531. The prosecution then called a number of witnesses, including Ms. Krioutchkova, various police officers, and a nurse midwife. During that three-year delay, the prosecution or the police managed to lose the knife allegedly used to men-

2

ace Vera. The trial judge, however, allowed the prosecutor to substitute a picture of the alleged knife. Also, the trial judge allowed the midwife to testify as an expert on the examination and physical characteristics of rape victims. Finally, despite promising the jury that it would find evidence that the sexual encounter was consensual, defense counsel elicited no testimony and presented no evidence to establish consent.

On June 8, 2006, the jury rendered a guilty verdict, and this appeal followed.

## ARGUMENT

### I   THE DEFENDANT'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to a "speedy and public trial." To further this right, the Legislature has enacted two statutory provisions, Criminal Procedure Law §§ 30.20 and 30.30. Section 30.20 states generally that "the defendant is entitled to a speedy trial," while section 30.30 delineates the time at which the prosecution must declare readiness for trial.

Under section 30.30(1)(a), the prosecution must be ready for trial within six months of the commencement of a felony action. *People v. McKenna,* 76 N.Y.2d 59, 62 (1990). Section 30.30(4) identifies the periods to be excluded from the computation of the time within which the prosecution must be ready, and section 30.30(3)(b) relieves the prosecution of the consequences of unreadiness when it was ready for trial prior to the expiration of the specified period and the present unreadiness is due to some exceptional fact or circumstance. *Id.,* at 62–63. The prosecution must sat-

3

isfy two elements to establish readiness under the statute: first, the prosecution must communicate its readiness on the record, and second, that statement must be made when the prosecution is in fact ready to proceed. *People v. Kendzia,* 64 N.Y.2d 331, 337 (1985).

The Court of Appeals has determined that section 30.30 was intended only to address delays occasioned by prosecutorial inaction. *McKenna, supra* at 63. Thus, when the prosecution is ready to proceed within the applicable time period and trial is delayed due to court congestion, a defendant cannot avail himself of section 30.30. *People ex rel. Franklin v. Warden,* 31 N.Y.2d 498 (1973). On the other hand, the prosecution cannot rely upon court congestion as a defense to an otherwise valid 30.30 claim, because the key to compliance is prosecutorial readiness and the court congestion in no way operates to prevent the district attorney from being ready. *People v. Brothers,* 50 N.Y.2d 413 (1980).

A. *The Prosecution's Delay in Turning Over Grand Jury Minutes Should Be Charge-able Time Under Section 30.30*

In *McKenna,* the Court established a strict rule that a failure by the prosecution to provide grand jury minutes for months after making a statement of readiness vitiates that statement when a CPL 210.30 motion is pending. 76 N.Y.2d at 64–65. Because the prosecution's "dilatory conduct in failing to provide the minutes necessary to that decision was a direct, and virtually insurmountable, impediment to the trial's very commencement," the trial simply could not go forward. *Id.* The Court distinguished cases in which prosecutorial inaction "affected defendant's ability to

4

proceed with trial" noting that the conduct in those cases did not directly impede the commencement of the trial nor effect a prosecutorial inability to proceed. See, e.g., *People v. Anderson,* 66 N.Y.2d 529 (1985). The prosecution suggested that 30.30 "readiness" should be evaluated from the narrow perspective of the prosecution's preparedness to present its own case; the Court rejected this as a "gross overreading of the *Anderson* decision." *McKenna, supra* at 65, footnote.

In this case, the prosecution negligently delayed providing the grand jury minutes from May 1, 2003 until August 8, 2003, a period of 99 days. The trial judge recognized that *McKenna* "may, therefore, render the People's trial readiness an empty declaration insufficient to satisfy CPL 30.30." Decision and Order dated July 26, 2005 at 3. The trial judge then attempted to carve an exception to *McKenna,* holding that "the period is not properly charged to the People as they had a motion pending during this period." *Id.* This finding constitutes error.

As the Court of Appeals noted in *McKenna,* just because some situation, not properly chargeable to the prosecution, delays the commencement of trial, the prosecution does not receive an exception to the trial-readiness mandates of section 30.30. 76 N.Y.2d at 63. In *McKenna,* the example discussed was court congestion—while such congestion would ordinarily not be time chargeable to the prosecutor, that congestion also does not function as a defense to prosecutorial unreadiness. As a matter of law, the prosecution was unready from May 1, 2003 until August 8, 2003, because its conduct presented an insurmountable barrier to commencement of trial.

Furthermore, the cases relied upon by the trial judge are inapposite. *People v.*

5

*Durrette,* 222 A.D.2d 692 (1995); *People v. Littlejohn,* 184 A.D.2d 790 (1992). Both these cases involved motions made by the defendants, not the prosecution; in *Littlejohn,* in fact, the Court stated that "[t]his is not a case where some action on the part of the People prevented the determination of the pretrial motion." 184 A.D.2d at 790 (citing *McKenna*). Likewise, in this case the motion at issue was by the prosecution, seeking to compel the defendant to provide a blood sample. While, ordinarily, delays effectuated by the prosecution's quest for additional evidence do not vitiate a statement of readiness, such delays should also not excuse a failure to turn over grand jury minutes. Because the prosecution was, as a matter of law, "un-ready" during the period May 1st through August 8th, any occurrences that would not ordinarily impair an otherwise valid statement of readiness are not relevant, and the prosecution should be charged with that time.

B.   *The Trial Judge Erred in Charging Only 14 Days from June 10, 2004 to Febru-*
       *ary 4, 2005*

On March 18, 2004, the trial judge direct the Office of the Chief Medical Examiner (OCME) to perform DNA testing on various items apparently believed to be in the custody of the OCME. On April 15, 2004, the prosecution advised the court that the order had been served on the OCME. Subsequently, the prosecution advised that these items had been sent back to, and apparently retained by, the police; the prosecution did not advise the court of this confusion until October 21, 2004, stating that the items would be returned to the OCME. Decision and Memorandum at 3.

The case was adjourned repeatedly due to this delay (although one adjournment,

6

from January 14, 2005 to January 21st was due to defense counsel's illness). Finally, on February 4, 2005, the items had been transferred to the OCME and the testing had been completed. Decision and Memorandum at 3–4.

The defendant argued below that the full 239 days should be chargeable to the prosecution, as the delay was caused by the prosecution's failure to ensure that the items for testing were transferred to the OCME. The prosecution countered that the defendant's due process rights were not violated by the lengthy delay because he was not incarcerated during the delay. Oddly, while the trial court agreed with the prosecution, he nonetheless charged a somewhat arbitrary 14-day period, from January 21st through February 5th, to the prosecution. Decision and Memorandum at 4. The decision does not explain why the 14-day charged period was any different from the period between October 21st, when the prosecution first informed the court that the items had been retained by police, and December 2nd, when the testing was not complete, or the period between December 2nd and January 14th. Properly, if the final 14 days were chargeable, then the period between October 21, 2004 and January 14, 2005 should be chargeable as well.

This is not a case such as *People v. Williams,* 163 Misc.2d 212 (N.Y.Co.Ct. 1994), where time for DNA was not charged to the People, as "there ha[d] been no showing that the time consumed by the completion of the tests was other than reasonable and necessary to obtain valid genetic test results." *Id.,* at 221. Clearly the trial court's order to test had been served on or before April 15, 2004; the time consumed here was not reasonable solely due to the negligence of the prosecution. As such,

*Williams* is distinguishable and the prosecution should be properly charged with the 86 days from October 21st through January 14th.

Finally, the prosecution conceded that 10 days from April 6, 2003 through April 15th are chargeable. Tallying the 10-days pre-indictment with the 99 days occasioned by the delay in providing grand jury minutes, the 86 days due to the delay from October 21st through January 14th, and the final 14 days charged by the trial judge totals 209 days, more than the maximum six months allowable under section 30.30. As such, the Court should reverse the conviction and dismiss the indictment.

C.   *The Three-Year Delay Denied the Defendant of His Constitutional Right to a Speedy Trial*

Above and beyond section 30.30's mandate of the prosecution's trial readiness, the U.S Constitution, the State Constitution and section 30.20 guarantee the right to a speedy trial. In New York, courts apply the *Taranovich* factors in determining whether the defendant's rights have been violated. *People v. Taranovich,* 37 N.Y.2d 442, 445 (1975). In determining whether a defendant has been denied his constitutional right to a speedy trial, the court must consider the following factors: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay. *Id.*

Initially, the Court should note that the trial judge erred in blending the *Taranovich* factors into his 30.30 analysis. These factors apply to the 30.20 speedy trial

8

analysis, a separate issue as to whether time is excludable under 30.30. See, e.g., *People v. Woodhouse*, 35 A.D.3d 968 (3rd Dept. 2006) ("Defendant, by pleading guilty, waived his right to appellate review of his argument regarding his CPL 30.30 speedy trial right... Although defendant's claim of denial of his constitutional right to a speedy trial survives his guilty plea, considering the factors set forth in *People v Taranovich* (37 NY2d 442, 445 [1975])..."); see Decision and Order at 4 (apparently only applying *Taranovich* factors to 6/10/04–02/0405 delay, rather than to entire delay).

Here, the overwhelming extent of the three-year delay, as well as the reasons for delay—a prosecution that repeatedly stalled matters, by not giving up grand jury minutesand by not providing items to OCME—weigh heavily in the defendant's favor. While the second and third factors do not balance toward the defendant, the trial court also erred in finding that the delay did not impair the defense. Decision and Memorandum at 4.

In light of the foregoing, the defendant's constitutional right to a speedy trial was violated, and the Court should reverse and dismiss the indictment.

II   THE TRIAL JUDGE ERRED IN ADMITTING EVIDENCE RELATED TO THE PHOTOGRAPH OF A KNIFE

A prosecutor has an obligation to preserve all evidence that may be subject to disclosure. *People v. Kelly*, 62 N.Y.2d 516, 520 (1984); *People v. Saddy*, 84 A.D.2d 175 (2nd Dept. 1981). Thus, when the prosecutor fails to preserve potential evidence the court may fashion an appropriate response to eliminate any prejudice to the de-

fendant while protecting the interests of society. *People v. Kelly, supra,* 62 N.Y.2d at 520; see also, CPL 240.70(1); *People v. Close,* 103 A.D.2d 970, 971 (3rd Dept. 1984). The remedy of dismissal, however, should not be invoked where less severe measures can rectify the harm done. *People v. Kelly, supra,* 62 N.Y.2d at 521. When the defendant is deprived of potentially valuable material for his affirmative defense as to a charge, and instructions to the jury cannot rectify the prejudice, it would be unfair to subject the defendant to a new trial on the charge. *People v. Samuels,* 185 A.D.2d 903, 904 (2nd Dept. 1992).

In *Samuels,* "[t]he gun allegedly used during the robbery was destroyed by the police before trial. No tests were performed on the gun prior to its destruction. Therefore, the defendant was foreclosed from establishing that the gun was inoperable as an affirmative defense to the charge of robbery in the first degree." *People v. Samuels, supra,* at 903–04. Inasmuch as instructions to the jury at a new trial would not have rectified the prejudice, the Court "reduce the conviction of robbery in the first degree to robbery in the third degree" as a sanction because defendant "was deprived of potentially valuable material as to an affirmative defense, [and] he is entitled to an appropriate remedy." *Id.* In *People v. Terrell,* 185 A.D.2d 906 (2nd Dept. 1992), which arose from the same criminal acts, the Court dismissed "first count of the indictment charging the defendant with robbery in the first degree."

In this case, the prosecution improperly destroyed a knife that had been seized from the defendant's home. Tr. 589–94 (objection to photos and voir dire). The defendant lost the opportunity to have the knife fingerprinted, or to demonstrate, for

example, that the knife was ornamental or otherwise harmless. Since the defendant wished to contest the consent issue, the missing knife affected his defense adversely. Tr. 531.

III   DEFENDANT'S COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court formulated a two-part test for ineffective assistance of counsel under the Sixth Amendment. To establish a constitutional claim for ineffective assistance of counsel, a convicted defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's errors, there was a reasonable probability that the outcome of the proceeding would have been different. 466 U.S. at 687-696. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.,* at 694. However, an act or omission that might be considered "sound trial strategy" does not constitute ineffective assistance. *Id.,* at 689.

Of course, the Court reviews the district court's factual findings for clear error and reviews questions of law *de novo. See, e.g., United States v. Yousef,* 327 F.3d 56 (2nd Cir. 2003). In addition, while ineffectiveness claims are ordinarily review on a motion pursuant to 28 U.S.C. § 2255, if the record is fully developed, they may be reviewed on direct appeal. Compare *Massaro v. United States,* 538 U.S. 500 (2003).

Here, the defense attorney promised, in his opening statement, to establish that "the sexual encounter between the complainant and Mr. Colon was consensual and that the complainant agreed to have sex with him." Tr. 531. Defense counsel in no

11

way lived up to that pledge. The defense put on no proof whatsoever to suggest that the encounter was consensual, and elicited nothing from the prosecution witnesses tending to demonstrate an agreement to have sex on the part of the complaining witness.

In *Ouber v. Guarino,* 293 F.3d 19 (1st Cir. 2002), the First Circuit Court of Appeals held that defense counsel's decision to withhold the defendant's testimony after promising jurors during opening statement that they would hear it constituted ineffective assistance of counsel.  There, the court concluded, "in the absence of unforeseeable events forcing a change in strategy, the sequence constituted an error in professional judgment." 293 F.3d at 27. And in *Anderson v. Butler,* 858 F.2d 16 (1st Cir. 1988), the court dismissed the argument that counsel was keeping his options open in his opening statement by mentioning psychiatrists he intended to call to testify. The court reasoned that

> There was thrown into the scales the heavy inference the jurors would draw from the non-appearance of the doctors. In those circumstances it was a very bad decision, or, if it was still wise because of the damaging collateral evidence, it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise.

858 F.2d at 18.  See also *Harris v. Reed,* 894 F.2d 871, 878–79 (7th Cir. 1990) ("Counsel tempted the fates when he decided to rest on the perceived weakness of the prosecution's case. His decision not to present [an alternative theory of the crime] through the testimony of Carter or Riles—a decision made without interviewing the witnesses, after preparing the jury for the evidence through the opening, and without consultation with Harris—was unreasonable professional conduct." ); *An-*

12

*derson v. Butler*, 858 F.2d 16, 18 (1st Cir. 1988) (finding ineffective assistance of counsel and prejudice as a matter of law where counsel failed to present promised expert medical testimony that defendant acted "without feeling, without any appreciation of what was happening ... like a robot programmed on destruction," even though the principal defense remained throughout the trial to establish the defendant had an impaired mental condition); *Hampton v. Leibach*, 290 F.Supp.2d 905 (N.D.Ill. 2001) (counsel's performance in failing to present petitioner's testimony at trial, or witness testimony showing that he was not gang member, which counsel promised during opening statement, was objectively unreasonable, as required to support claim of ineffective assistance; nothing happened during prosecution's case-in-chief that made presentation of promised testimony unnecessary or unreasonable, and counsel failed to explain in his closing argument why he had not presented testimony he had promised.); *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166–67 (3rd Cir. 1993) ("The rationale for holding such a failure to produce promised evidence ineffective is that when counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the testimony he promised.")

When trial counsel's opening statement explicitly promises to present certain evidence during trial, if the decision not to present the promised evidence is motivated in any way by tactical considerations or strategy, it is highly unlikely to be held ineffective. *Goins v. Angelone*, 52 F.Supp.2d 638 (E.D.Va. 1999). This is not the

13

case here. Defense counsel gratuitously set up the jury for a consent defense, and did not deliver. Nothing in the record indicates that, for example, witnesses became unavailable in an unforeseen manner, or that counsel reconsidered calling particular witnesses for sound strategic reasons. See, e.g., *Williams v. Bowersox,* 340 F.3d 667 (8th Cir. 2003) ("Williams's defense counsel interviewed the two un-called witnesses before trial, and he knew what their testimony would be. With this likely testimony in mind, defense counsel told the jury they would soon know it too. Once the trial was underway, however, defense counsel reconsidered. He subsequently gave a number of reasons for his decision."); *U.S. ex rel. Schlager v. Washington,* 887 F.Supp. 1019 (N.D.Ill. 1995) ("Gillespie's unfulfilled promises were not of the Anderson 'speaking silence' type. Here, the State put on its entire case after Schlager's opening statement, thus affording Gillespie an opportunity to reevaluate the decision to put Dr. Ehrenpreis and Schlager on the stand, as well as diminishing the impact of the small portion of Gillespie's opening statement where the unfulfilled promises where mentioned"). In *Tavares v. O'Brien,* 2007 WL 2908828 (D.Mass. 2007), "counsel failed to call alibi witnesses after having told the jury in his opening statement that he would do so." This claim failed "on the grounds that the failure to call the alibi witnesses was not a product of inattention, inadequate preparation, or incompetency; rather, the decision was forced upon counsel by events over which he had no control and could not anticipate." *Id.,* at *3. In Mr. Colon's case, in contrast, no such reason exists. Rather, his case is much like *Anderson,* where " it was inexcusable to have given the matter so little thought at the outset as to have made

14

the opening promise." 858 F.2d at 18.

IV   THE TRIAL COURT ERRED IN ADMITTING THE EXPERT TESTIMONY OF A MIDWIFE

In passing upon the admissibility of expert testimony New York's State courts continue to adhere the principles set forth in the venerable case of *Frye v. United States*, 293 F. 1013 (C.A.D.C. 1923). The threshold question whenever expert testimony is offered is whether the proposed testimony lies "within the ken of the typical juror." If it does, then expert testimony will generally not be permitted. *People v. Cronin*, 60 N.Y.2d 430 (1983). If the testimony concerns matters outside the typical juror's knowledge, then the trial court must further consider the degree of "acceptance of such evidence as reliable by the relevant scientific community." *People v. Wesley*, 83 N.Y.2d 417, 422 (1994). Notably, the New York courts have not adopted the more liberal federal *Daubert* test. *Parker v. Mobil Oil Corp.*, 7 N.Y.3d 434 (2006); see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993).

New York appellate courts do not appear to have decided when the testimony of a midwife would satisfy *Frye* in a rape case. Only rarely have courts faced this issue. See, e.g., *United States v. Withorn*, 204 F.3d 790 (8th Cir. 2000). In *Withorn*, the court applied the more liberal *Daubert* standard in finding that the trial court had not abused its discretion in qualifying as an expert a midwife with "a four-year bachelor's degree in nursing, two years of post-graduate work to receive her degree as a midwife, and more than five years of practice as a clinical and hospital nurse midwife. [She also] testified that she had received special training in conducting

15

examinations of rape victims, that she had provided emergency coverage for obstetrics and gynecology in the past, and that a significant part of her practice consisted of treating young teenage girls." 204 F.3d at 797. That court relied upon one other federal case in allowing the testimony. *United States v. Shaw*, 824 F.2d 601 (8th Cir. 1987). In *Shaw*, however, the admission of the testimony of the midwife drew no objection and thus was not an issue for the circuit court.

In contrast to the witness in *Withorn*, the midwife in the instant case had minimal credentials. Alice Olosunde described herself as a "certified nurse midwife" at Coney Island Hospital. Tr. 803. Through her career, her responsibilities have included "gynecology and obstetrics, [taking] care of [women] through pregnancy [and] deliver[ing] their babies at times." Tr. 804. She also helped women with "family planning[.]" *Id.*

Nurse Olosunde first received some training in examining women who had been sexually assaulted in 2002, the year before the alleged rape in this matter. Tr. 807; compare Tr. 539–42 (March 26, 2003 date of alleged crime). Between 2002 and the date of her testimony, June 6, 2006, she had only treated about twenty patients who chief complaint was rape. Tr. 807. She did not testify whether she had *ever* examined a patient who had been raped prior to the complaining witness in this matter.

Defense counsel objected to qualification of Nurse Olosunde as an expert, but the trial court overruled the objection, allowing the nurse to give an opinion as to sexual assault examination. Tr. 811. She testified that a bruise, which she observed, at

the entry to the vagina was consistent with forceable vaginal sexual penetration. Tr. 815–16. She also testified that she performed a rape kit on the complaining witness on March 26, 2003. Tr. 817–21. On cross-examination, she conceded that the one-centimeter bruise she had observed outside the complaining witness' vagina could happen "as a result of forceful and vigorous sex[.]" Tr. 823. On redirect, she expressed the opinion that the bruise was "more" consistent with forceable penetration than with vigorous (consensual) sex. Tr. 825.

The lower court erred in allowing Nurse Olosunde to express these opinions. Unlike the midwife in *Withron*, Olosunde had minimal credentials *at the time of the examination,* which occurred in the year after she first received training. Nothing in the record establishes that she had examined even one single rape victim prior to seeing this complaining witness. As the prosecution did not establish any facts supporting that she had actual experience in examining victims at the time of the examination, she should not have been permitted to express an opinion regarding the bruise outside of the complaining witness' vagina. As this testimony went a long way to establishing that the sex act between the complaining witness and the defendant was non-consensual, it clearly prejudiced the defendant, and requires a new trial.

V   THE SENTENCE WAS EXCESSIVE

The trial judge sentenced Mr. Colon to thirty years (determinate), despite this being defendant's first offense. Of course, the maximum sentence for each violent B felony is twenty-five years. See Penal Law § 70.02(3)(a) (no less than eight and

one-third nor no more than twenty-five years).  Mr. Colon received 25 years for the rape first degree and the burglary first degree (concurrent), and an additional consecutive five years for sex abuse first degree (concurrent with five years for assault second degree).  See Penal Law § 70.02(3)(c) (sentence no less than two nor more than seven years for violent class D felony).  This sentence is excessive and should be reduced in the interests of justice.  See, e.g., *People v. Brown*, 24 A.D.3d 812 (3rd Dept. 2005); *People v. Hassler*, 53 A.D.2d 738 (3rd Dept. 1976); *People v. Mack*, 81 A.D.2d 925 (2nd Dept. 1981); *People v. Williams*, 120 A.D.2d 630 (2nd Dept. 1986); *People v. Fuentes*, 290 A.D.2d 563 (2nd Dept. 2002).

In *Brown*, the defendant had a "long criminal record" and was convicted for "burglary in the first degree, … rape in the first degree, assault in the second degree and unlawful imprisonment in the first degree."  After trial, "[d]efendant was sentenced to four concurrent prison terms, the longest of which was 24 1/2 years on the rape conviction."  Taking into account the nature of the crimes and the defendant's long criminal record, the Court found the sentence not excessive.  In this case, Mr. Colon was convicted of similar crimes (without the false imprisonment), and had "led an exemplary life but for this event."  Sentencing Minutes at 7.  Yet the trial judge sentenced him to a total of *thirty* years, more than career criminal Brown received on similar convictions.  In *Hassler*, the facts were similar—rape using threats with a knife—and the defendant received twenty years.  In *Mack*, another first-degree-rape and first-degree-burglary case, the Court reduced the sentence "to concurrent terms of imprisonment of from three to nine years."  These cases demonstrate that

18

Mr. Colon's thirty-year sentence—imposing the maximum for the B felonies and two years short of the maximum for the D felonies—was excessive in light of the circumstances and should be reduced in the discretion of the Court.

Additionally, the trial judge should not have imposed the five years for assault/sexual abuse as a consecutive term. "Consecutive sentences may be imposed for crimes committed by disparate and separate acts." *Williams, supra.* In that case, "the crimes committed against each victim are disparate and separate acts that permit[ted] the imposition of consecutive sentences." Here, on the other hand, all the counts on which Mr. Colon was convicted come from the same act, the rape of March 26, 2003. In *Fuentes,* "the defendant broke into the complainant's house, taped her eyes, bound her hands, beat her, raped and sodomized her, and stole her jewelry as well as other valuables." The Court reduced the sentence, "by making the sentences imposed on the convictions of assault in the second degree run concurrently with the sentences imposed on the convictions of burglary in the first degree, rape in the first degree, and sodomy in the first degree[.]" At minimum, the Court should do the same here.

## CONCLUSION

Based on the foregoing, the Court should reverse Mr. Colon's conviction and dismiss the indictment, or, in the alternative, remand for a new trial, or reduce his sentence in the interests of justice, and grant such further relief as the Court deems just and proper.

Dated: New York, New York
            April 1, 2008

                                            Respectfully submitted,

                                            WISEMAN & HOFFMANN
                                            Wayne B. Wiseman, Esq.
                                            *Attorney for Defendant-Appellant*
                                            460 Park Avenue, 4th Floor
                                            New York, New York 10016
                                            (212) 686-2110

Jason H. Sterne, Esq.
*Of counsel on the brief*

20

<u>Colon v. LaValley</u>
<u>10-cv-2173 (NGG)</u>
<u>EXHIBIT B</u>

The People's Appellate Division Brief

To be argued by:
MORGAN J. DENNEHY
(10 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                -against-

DENNIS COLON,

                    Defendant-Appellant.

Appellate Division
Docket Number
2006-7319

Kings County
Indictment Number
2518/2003

RESPONDENT'S BRIEF

LEONARD JOBLOVE
MORGAN J. DENNEHY
Assistant District Attorneys
      of Counsel

December 16, 2008

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................... 1

STATEMENT OF FACTS ............................................ 2
    Introduction ............................................. 2
    The Trial ................................................ 3
        The People's Case .................................... 3
        Defendant's Case ..................................... 8
    The Verdict and the Sentence ............................. 9

POINT I -

    THE LOWER COURT PROPERLY DENIED DEFENDANT'S CRIMINAL
    PROCEDURE LAW § 30.30 MOTION. ........................... 10

POINT II -

    DEFENDANT'S CLAIM REGARDING THE ADMISSION OF EVIDENCE
    CONCERNING THE KNIFE THAT WAS RECOVERED FROM HIS
    APARTMENT IS UNPRESERVED FOR APPELLATE REVIEW.
    MOREOVER, the CLAIM IS MERITLESS.  IN ANY EVENT, ANY
    ERROR WAS HARMLESS. ..................................... 20

POINT III -

    DEFENDANT'S TRIAL COUNSEL PROVIDED HIM WITH MEANINGFUL
    REPRESENTATION. ......................................... 25

POINT IV -

    THE ADMISSION OF THE EXPERT TESTIMONY PROVIDED BY THE
    MIDWIFE THAT TREATED THE VICTIM AT THE HOSPITAL WAS
    PROPER.  IN ANY EVENT, ANY ERROR WAS HARMLESS ............ 30

POINT V -

    DEFENDANT'S SENTENCE WAS PROPER AND APPROPRIATE .......... 34

CONCLUSION -

    FOR THE AFOREMENTIONED REASONS, DEFENDANT'S JUDGMENT OF
    CONVICTION SHOULD BE AFFIRMED. .......................... 38

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                     Respondent,

           -against-

DENNIS COLON,

             Defendant-Appellant.

Appellate Division
Docket Number
2006-7319

Kings County
Indictment Number
2518/2003

RESPONDENT'S BRIEF

PRELIMINARY STATEMENT

Defendant Dennis Colon appeals from a judgment of the Supreme Court, Kings County, rendered on July 20, 2006, convicting him, after a jury trial, of one count each of Rape in the First Degree (P.L. § 130.35[1]), Burglary in the First Degree (P.L. § 140.30[3]), Assault in the Second Degree (P.L. § 120.05[6]), and Sexual Abuse in the First Degree (P.L. § 130.65[1]). Defendant was sentenced to concurrent prison terms of twenty-five years for the rape, twenty-five years for the burglary, and five years for the assault, to run consecutively to a five-year prison term for the sexual abuse (Sullivan, J., at trial and sentence).

Defendant is incarcerated pursuant to this judgment of conviction. There were no co-defendants in this case.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

On March 26, 2003, at 8:00 a.m., Vera Krioutchkova was in her Brooklyn apartment when she received a telephone call from a man who claimed that he was a plumber who had been hired to fix her pipes. Krioutchkova was relieved, because she had persistent leaks in her bathroom, and had complained about them to her landlord. About fifteen minutes later, defendant appeared at the apartment and looked at the leaky pipes. Defendant said that he would return later that day to make the repairs, and as he was leaving the apartment, he turned around, brandished a knife, threatened to kill Krioutchkova, and brought her to a bedroom. Defendant threw Krioutchkova on the bed, spread her legs, and put his hand inside her vagina. Defendant then put his penis inside Krioutchkova's vagina, slapped her in the face, and ejaculated.

While Krioutchkova was being treated at the hospital hours after the rape, defendant left a message on her answering machine saying that he was sorry. Defendant called a second time about a week later and told Krioutchkova that he loved her body and asked her if she was wearing the same nightgown from the morning of the rape. The police traced the calls to defendant's apartment and, after his arrest, recovered a knife from defendant's bedroom that Krioutchkova identified as the same one that was used in the

attack.   In addition, the police procured a saliva sample from defendant, and the DNA from the sample was the same as the DNA that was extracted from the semen that was present on Krioutchkova's comforter and on a swab from her rape kit.

For these acts, defendant was charged, under Kings County Indictment Number 2518/2003, with one count each of Rape in the First Degree (P.L. § 130.35[1]), Assault in the Second Degree (P.L. § 120.05[6]), and Criminal Possession of a Weapon in the Fourth Degree (P.L. § 265.01[2]), and two counts each of Burglary in the First Degree (P.L. §§ 140.30[2], [3]) and Sexual Abuse in the First Degree (P.L. § 130.65[1]).

The Trial

The People's Case

On March 26, 2003, at 8:00 a.m., VERA KRIOUTCHKOVA was in her apartment at 1711 East 16th Street in Brooklyn when she received a telephone call from a man who claimed that he was a plumber who had been hired to fix her pipes.   Krioutchkova had recurring problems with leaks in her apartment, and she recently had complained about them to her landlord (Krioutchkova: 537-41, 586, 599-600, 606).[1]   Krioutchkova explained to the man that she was on her way out, but the man insisted that the repair would

---

[1]   Numbers in parentheses refer to pages of the trial transcript; names preceding page numbers identify the witnesses whose testimony is cited.   Numbers preceded by "S." refer to the transcript pages of the sentencing proceedings.

only take a short time.   Because Krioutchkova was eager to have the leak fixed, she agreed to wait home for the man (Krioutchkova: 541-42).

About fifteen minutes later, someone was at Krioutchkova's front door.  When she asked who it was, the man said that he was the one who had called her (Krioutchkova: 542-43, 600). Krioutchkova opened the door and defendant was standing there. He smelled of alcohol.  Krioutchkova had never seen him before (Krioutchkova: 543-45, 601).  Krioutchkova led defendant to the leaky bathroom sink, and defendant looked around and asked for a pen and paper.  Defendant took some notes and said that he would return later in the evening to repair the leaks (Krioutchkova: 545-46, 601-05).  As Krioutchkova was walking defendant to the front door, defendant turned around, brandished a knife, and demanded that Krioutchkova lie down or he would kill her (Krioutchkova: 546).  Krioutchkova ran for the door and screamed, "Help me," but defendant pushed her back (Krioutchkova: 547-48, 606-08).

Krioutchkova pleaded with defendant for her life, and defendant pushed her into a bedroom and onto a bed.  As she lay on her back, defendant climbed on top of her, making it impossible for her to get up (Krioutchkova: 548-49, 609). Defendant spread Krioutchkova's legs and inserted his hand in her vagina.  Krioutchkova felt pain.  She told defendant that his

hands were dirty and asked him to wash them, because she thought that this might provide her with an opportunity to escape. However, defendant brought Krioutchkova to the bathroom with him to wash his hands (Krioutchkova: 550, 609).

Defendant then pushed Krioutchkova back on the bed, unzipped his zipper, pulled out his penis, and inserted it in Krioutchkova's vagina. She felt "excruciating pain" (Krioutchkova: 551). Defendant slapped Krioutchkova in the face, and, once again, she begged defendant not to kill her. Defendant then stood up and held a paper towel on his penis. He told Krioutchkova to take a shower, warned her not to call the police, then left (Krioutchkova: 551-53, 610).

Krioutchkova did not shower. Instead, she locked her door and called the police (Krioutchkova: 553, 611). Sergeant GERALD ESPOSITO and his partner, Police Officer MICHAEL GUINAN, responded to Krioutchkova's 911 call, and they arrived at her apartment at 8:45 p.m. (Esposito: 646-47; Guinan: 652). Krioutchkova recounted the details of her ordeal to Officer Guinan (Guinan: 653). An ambulance arrived shortly thereafter and took Krioutchkova to the hospital where she underwent a series of tests (Krioutchkova: 553-54, 611-15; Esposito: 648). The tests, which were performed by ALICE OLOSUNDE, a certified nurse midwife, included a pelvic examination which revealed a bruise on Krioutchkova's vaginal wall (Olusunde: 803, 813-15,

822-23).    According to Olusunde, the bruise was consistent with
forcible vaginal intercourse (Olusunde: 815-16, 823).

Other officers responded to the apartment, including members
of the detective squad, the crime scene unit, and the special
victim's unit (Guinan: 654).    Officer Guinan secured the crime
scene and was given several bags of evidence, including a white
comforter, a sheet, paper towels, and a robe (Guinan: 656-59).
This evidence was vouchered, and the rape kit that was prepared
at the hospital was forwarded to the police department's lab for
testing (Guinan: 660-61).

Detective JOYCE HARVIN went to the hospital and interviewed
Krioutchkova, who explained that she had been raped by a stranger
who had threatened her with a pocket knife with a "funny design"
(Harvin:   742-44,   779-80).      Detective   Harvin   went   to
Krioutchkova's apartment building and spoke with neighbors, the
landlord, and the landlord's business partner (Harvin: 745-47).
The detective was unable to develop any leads (Harvin: 748).

When Krioutchkova returned to her apartment later that
night, she noticed that defendant had left a message on her
answering  machine.     Defendant  said  that  he  was  sorry
(Krioutchkova: 562, 615).

On April 5, 2003, Krioutchkova received a telephone call
from defendant shortly after midnight.    Krioutchkova motioned to
her daughter that it was defendant on the phone, and her daughter

called Detective Harvin on her cellular telephone. The detective instructed Krioutchkova to keep defendant on the line for as long as possible, then drove to Krioutchkova's apartment (Krioutchkova: 563-64; Harvin: 749-50). Defendant told Krioutchkova that he loved her body, and asked her if she was wearing the same gown from the night of the rape. At her daughter's urging, Krioutchkova told defendant to come over (Krioutchkova: 564-66). Detective Harvin waited in the apartment for two hours, but defendant never showed (Harvin: 750).[2]

Several hours later, Detective Harvin obtained from Verizon the name and address of the man who had called Krioutchkova. Other officer's went to defendant's apartment and brought him to the precinct stationhouse (Harvin: 750-51). Detective Harvin read defendant his Miranda warnings and explained why he had been taken from his home. Defendant said that he understood his rights and that he wanted to make a statement (Harvin: 754-59, 776). Defendant said that he did not know the victim, but he patronized Russian massage parlors in the area. Defendant then consented to provide a DNA sample, and Detective Harvin took a

---

[2] SILVANA DIDONNA, an investigator employed by Verizon Corporation, viewed Krioutchkova's telephone records and noted that the telephone number that had been assigned to defendant appeared twice on the records -- once on March 26, 2003 at 8:00 a.m., and another on April 5, 2003 at 12:38 a.m. (Didonna: 733, 737-40).

swab of defendant's saliva (Harvin: 762-65, 776, 796).[3]
Defendant also consented to the police's search of his apartment.
During the search, Detective Harvin recovered two black caps and
a knife from on top of the dresser in defendant's bedroom
(Harvin: 765-69, 777, 795-96).

Later that day, at 9:00 p.m., Krioutchkova went to a police
precinct stationhouse and viewed a lineup (Krioutchkova: 566;
Harvin: 769-74).   She identified defendant as her attacker
(Krioutchkova: 567).   Krioutchkova also viewed photographs of the
hats and the knife that were recovered from defendant's
apartment, and she identified them as items that she recognized
from the day of the rape (Krioutchkova: 567, 588, 595-97; Harvin:
774-75).   Detective Harvin explained that the hats and the knife
were destroyed prior to the trial because, on the property
voucher, "investigation evidence," rather than "arrest evidence,"
was checked off (Harvin: 775).

<u>Defendant's Case</u>

Defendant did not present any witnesses on his behalf (844).

---

[3] KYRA KEBLISH, a forensic scientist employed by the Office
of the Chief Medical Examiner, and several of her colleagues
performed tests on the swabs in Krioutchkova's rape kit, the
evidence collected from the apartment, and the saliva sample
provided by defendant.   The tests revealed that the semen that
was on the anal swab from the rape kit and on the comforter from
Krioutchkova's apartment had the identical DNA profile as
defendant's saliva (Keblish: 682-83, 692-93, 703-04, 711-16,
720).

<u>The Verdict and the Sentence</u>

On June 8, 2006, the jury convicted defendant Rape in the First Degree, Burglary in the First Degree, Assault in the Second Degree, and Sexual Abuse in the First Degree (948-50).

On July 20, 2006, defendant was sentenced to concurrent prison terms of twenty-five years for the rape, twenty-five years for the burglary, and five years for the assault, to run consecutively to a five-year prison term for the sexual abuse (S. 8).

POINT I

THE LOWER COURT PROPERLY DENIED DEFENDANT'S
CRIMINAL PROCEDURE LAW § 30.30 MOTION.

Defendant claims that the court incorrectly denied his
C.P.L. § 30.30 motion because more than six months of chargeable
time had elapsed since the commencement of the criminal action.
Defendant's C.P.L. § 30.30 motion was meritless because only 52
days were chargeable to the People.

Because defendant was charged with felonies, the People had
to be ready for trial within six months of chargeable time after
April 6, 2003 -- the day on which the felony complaint was filed.
See C.P.L. §§ 1.20(17), 30.30(1)(a); People v. Sinistaj, 67
N.Y.2d 236, 239 (1986).  The six-month period from April 6, 2003
to October 6, 2003, consisted of 183 days.  Therefore, the People
had to be ready for trial within 183 days following April 6,
2003, as computed after subtracting the periods excludable under
Criminal Procedure Law § 30.30(4).  See People v. Cortes, 80
N.Y.2d 201, 207 n.3 (1992); People v. Allen, 172 A.D.2d 542, 544
(2d Dep't 1991).

Defendant now claims that the lower court erroneously failed
to charge the People with the 99 days from May 1, 2003 to August
8, 2003, because during that time, the People had failed to turn
over to the court the Grand Jury minutes.  Defendant also
contends that the court should have charged the People with the

10

86 days from October 21, 2004 to January 14, 2005, because the adjournments during this period were caused by the People's failure satisfy the defense's request to have DNA testing performed on certain evidence.   Defendant argues that these periods (99 days and 86 days), when added to the period of pre-Indictment delay that the People had conceded was chargeable to them (10 days - April 6, 2003 to April 16, 2003) and the period charged by the court in its decision denying the C.P.L. § 30.30 motion to dismiss (14 days - January 21, 2005 to February 4, 2005), amounts to 209 days -- 26 days beyond the 183-day limit. See Defendant's Brief at 8.   Finally, defendant claims that the three-year delay from the filing of the felony complaint to the commencement of trial violated his state and federal constitutional rights to a speedy trial.   Defendant's claims are entirely meritless.

The **10 days** from April 6, 2003, when defendant was arraigned on the felony complaint in Criminal Court, to April 16, 2003, when the People filed the Indictment and served and filed a statement of readiness for trial, were chargeable to the People.[4]

---

[4] This assertion and all subsequent assertions regarding the events that transpired during the pendency of defendant's case are based upon defendant's C.P.L. § 30.30 motion to dismiss, the People's opposition to the motion, and the court's decision and order denying the motion.   In addition, the respondent has obtained transcripts of most of the relevant court dates.   The aforementioned documents are being forwarded to the Court and to defendant's appellate counsel under separate cover.

On May 1, 2003, defendant was arraigned on the Indictment and the case was adjourned for the People to provide discovery. In addition, the court directed the People to turn over the Grand Jury minutes by June 9, 2003. The court stated that it would render a decision on the sufficiency of the Grand Jury presentation on the next adjourn date -- June 19, 2003. The period from May 1, 2003 to June 19, 2003 was not chargeable to the People because that post-readiness delay occurred for a reason that did not undermine the People's readiness. See People v. Stirrup, 91 N.Y.2d 434, 439-40 (1998); People v. Goss, 87 N.Y.2d 792, 797-98 (1996).

Moreover, the 49 days from May 1, 2003 to June 19, 2003 would be excludable regardless of the People's readiness, because it constituted a reasonable period resulting from the pendency of a discovery motion. See C.P.L. § 30.30(4)(a); People v. McCray, 238 A.D.2d 442, 444 (2d Dep't 1997); People v. Durette, 222 A.D.2d 692 (2d Dep't 1995).

On June 19, 2003, the case was on for the court's decision on the sufficiency of the Grand Jury Minutes. However, the People did not have the minutes and requested an adjournment to July 17, 2003. The **28 days** from June 19, 2003 to July 17, 2003 was chargeable to the People.

On July 17, 2003, the People failed to produce the Grand Jury minutes, but in anticipation of receiving the results from

12

the DNA testing of the evidence in the victim's rape kit, they filed a motion to take a blood sample from defendant.  The case was adjourned to August 7, 2003, for the court's decision on the motion and for the People to submit the Grand Jury minutes for inspection.  Thus, because there a motion before the court, the 21 days from July 17, 2003 to August 7, 2003 was excludable as a reasonable period of delay resulting from the pendency of the motion.  See C.P.L. § 30.30(4)(a).

On August 7, 2003, the People did not have the Grand Jury minutes, and the case was adjourned to September 4, 2003.  However, on August 8, 2003, the People forwarded to the court the Grand Jury minutes, and on September 4, 2003, the court concluded that, after an in camera review of the minutes, the Indictment was properly obtained.  The case was adjourned to September 17, 2003, for a decision on the People's motion to obtain from defendant a blood sample, and on that date, the motion was granted.  The period from August 7, 2003 to September 17, 2003 was excludable because during that time the People's motion for a blood sample had not been decided.  See C.P.L. § 30.30(4)(a).

Defendant claims that the exclusion set forth in C.P.L. § 30.30(4)(a) was inapplicable during the period when the People failed to timely disclose the Grand Jury minutes to the court, because the People were not ready for trial at that time.  Defendant's claim is meritless.  Even though the People cannot be

13

ready for trial when they have failed to provide Grand Jury minutes which are necessary to decide a defendant's motion to inspect and dismiss, "adjournments which were otherwise excludable pursuant to CPL 30.30(4) are not chargeable to the People despite their failure to produce the [Grand Jury] transcripts." People v. Taylor, 217 A.D.2d 404, 404-05 (1st Dep't 1995) (citation omitted); see also People v. Dunn, 272 A.D.2d 624 (2d Dep't 2000) (see briefs on appeal); People v. Jones, 235 A.D.2d 297 (1st Dep't 1997). Therefore, the statutory exclusions to which the People were otherwise entitled were fully applicable during the pendency of the motion to compel a blood sample, regardless of when the Grand Jury minutes were disclosed.

Defendant next challenges the court's exclusion of the 86 days from October 21, 2004 to January 14, 2005, claiming that the entire period should have been charged to the People, because the delay was caused by the People's failure to timely comply with the defense's request to have DNA testing performed on certain evidence. Defendant's claim is meritless.

To facilitate the defense's desire to have certain items that were recovered from the victim's apartment tested for DNA, the court issued an order on March 18, 2004, directing the

medical examiner's office to conduct the testing.[5]   The case was adjourned to April 15, 2004, at which time the People stated that the order had been served upon the medical examiner's office and the test results were not available.   The case was adjourned to June 10, 2004, for an update on the progress of the testing. Defendant conceded below that this period was not chargeable to the People, and he does not allege otherwise on appeal.

On June 10, 2004, the People had not received the test results, and the case was adjourned to July 15, 2004.   The court referred to this adjournment as a "[c]onsent adjournment," and defense counsel did not object to the reference.   On July 15, 2004, the People reported that the assigned assistant had contacted the lab three days earlier, and the testing had still not been completed.   Defense counsel requested a date in September, and the case was adjourned to September 16, 2004, for the test results.

On September 16, 2004, defense counsel did not appear in court due to a religious holiday.   Per counsel's request, the case was adjourned to September 23, 2004.   On September 23, 2004, the test results were unavailable, and the case was adjourned to October 21, 2004.   The court again referred to the adjournment as

---

[5] The People had testing performed on the evidence from the victim's rape kit, but they did not test this other evidence, which consisted of a napkin, a dish towel, and a comforter holder.

a consent adjournment, and defense counsel did not state otherwise.[6]

On October 21, 2004, the prosecutor explained that the assigned assistant had spoken with the medical examiner's office and had learned that the medical examiner's office had inadvertently returned the evidence to the police department's property clerk's office without conducting the ordered DNA testing. The court stated that it would adjourn the case to December 2, 2004 on consent, but that after that date the People were going to be charged with additional adjournments if the testing was not completed.

The period between October 21, 2004 and December 2, 2004, was not chargeable to the People for three reasons. First, the adjournment occurred for a reason that did not undermine the People's readiness. People v. Stirrup, 91 N.Y.2d at 439-40; People v. Goss, 87 N.Y.2d at 797-98. Moreover, the period was excludable because the adjournment was consented to by the defense so that the defense-requested testing could be completed. See C.P.L. § 30.30(4)(b); People v. Almonte, 267 A.D.2d 466 (2d Dep't 1999); People v. Sainvil, 214 A.D.2d 625, 626 (2d Dep't

_____

[6] On appeal, defendant does not challenge the court's determination that the period from March 18, 2004 to October 21, 2004, was not chargeable to the People. Indeed, the court's decision was correct, because the delay occurred for a reason that did not undermine the People's readiness, and, in any event, the time was excludable because defense counsel consented to the adjournments. See C.P.L. § 30.30(4)(b).

1995). Third, the period necessary to obtain the results of DNA testing in a rape case is excludable under C.P.L. § 30.30(4)(g) as a "delay occasioned by exceptional circumstances." See People v. Robinson, 47 A.D.3d 847, 848 (2d Dep't 2008); People v. Williams, 244 A.D.2d 587, 588 (2d Dep't 1997).

On December 2, 2004, the People did not have the test results and the case was adjourned to January 14, 2005. Even though defense counsel did not consent to this adjournment, and the exclusion set forth in See C.P.L. § 30.30(4)(b) does not apply, the period from December 2, 2004 to January 14, 2005 was not chargeable to the People because the delay occurred for a reason that did not undermine the People's readiness, and C.P.L. § 30.30(4)(g) was still applicable.[7]

On January 14, 2005, defense counsel was ill and failed to appear in court. The case was adjourned to January 21, 2005. This time was not chargeable because the delay was unrelated to the People readiness, and, in any event, was consented to by the defense when counsel did not appear in court.

On January 21, 2005, the People again announced that the test results had not been received. The court adjourned the case

---

[7] Even if this Court concludes that the 43 days from December 2, 2004 to January 14, 2005 are chargeable to the People, the addition of those days does not entitle defendant to the requested relief because the number of chargeable days is well within the 183 days allotted.

to February 4, 2005, and correctly charged the People with **14 days**.[8]  Thus, because a total of **52 days** (April 6, 2003 to April 16, 2003; June 19, 2003 to July 17, 2003; and January 21, 2005 to February 4, 2005) were chargeable to the People, the court's denial of defendant's C.P.L. § 30.30 motion to dismiss was correct.

Finally, defendant claims that the three-year delay from the filing of the felony complaint to the commencement of trial warranted the dismissal of the Indictment because it violated his federal and state constitutional right to a speedy trial. Defendant's claim is meritless.

Under state law, when determining whether a defendant's constitutional right to a speedy trial has been violated, a court must weigh the following factors:  (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether the defendant was incarcerated during the delay for an extended period of time; and (5) whether the delay actually prejudiced the defendant.  People v. Taronovich, 37 N.Y.2d 442, 373 N.Y.S.2d 79 (1975).  Similarly, under federal law, the court must consider:  (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his

---

[8]  The period from February 4, 2005 to the commencement of defendant's trial is not discussed herein, because defendant does not claim that any portion of that period is chargeable to the People.

right to a speedy trial; and (4) the prejudice to the defendant.
Barker v. Wingo, 407 U.S. 514, 530 (1972); Rayborn v. Scully, 858
F.2d 84, 89 (2d Cir. 1988), cert. denied, 488 U.S. 1032 (1989).

Here, each factor supports the conclusion that defendant's
constitutional right to a speedy trial was not violated.  First,
even though a three-year delay is not insignificant, much of the
delay was caused by defendant's own request to have evidence
tested for DNA, presumably in the hope that the testing would
inculpate another perpetrator.  Moreover, defendant was accused
of tricking his way into the victim's apartment and violently
raping her, and he was at liberty for almost the entire three-
year period.  Finally, defendant can not articulate any prejudice
suffered as a result of the delay.  Indeed, he has never even
alleged any specific prejudice, either in his motion papers below
or in his brief on appeal.  Thus, defendant's claim alleging a
constitutional violation should be rejected.  See People v.
Philip, 205 A.D.2d 714 (2d Dep't 1994); People v. Penna, 203
A.D.2d 392 (2d Dep't 1994) (each holding that where a defendant
can not demonstrate prejudice resulting from a delay in the
commencement of the trial, no constitutional speedy trial
violation).

Accordingly, defendant's claims alleging a violation of his
constitutional and statutory rights to a speedy trial should be
rejected and his judgment of conviction affirmed.

## POINT II

DEFENDANT'S CLAIM REGARDING THE ADMISSION OF EVIDENCE CONCERNING THE KNIFE THAT WAS RECOVERED FROM HIS APARTMENT IS UNPRESERVED FOR APPELLATE REVIEW.   MOREOVER, THE CLAIM IS MERITLESS.   IN ANY EVENT, ANY ERROR WAS HARMLESS.

Defendant claims that the court improperly admitted a photograph of, and testimony about, a knife that was recovered by the police from defendant's bedroom which was identified by the victim as the knife that was used during the rape.   Defendant contends that preclusion of evidence concerning the knife was warranted because the actual knife was destroyed, and the defense was prejudiced by the destruction because "defendant lost the opportunity to have the knife fingerprinted, or to demonstrate, for example, that the knife was ornamental or otherwise harmless."   Defendant's Brief at 10-11.   Defendant also argues that "the missing knife affected his defense adversely" because consent was an issue at trial.

Defendant's entire claim regarding the admission of evidence concerning the knife is unpreserved for appellate review because defendant never raised any of these arguments below.   Moreover, the contested evidence was properly admitted.   In any event, any error was harmless in light of the overwhelming evidence of defendant's guilt.

20

During the prosecutor's direct examination of the victim, Vera Krioutchkova, the prosecutor sought to introduce into evidence a photograph of the knife that was recovered from defendant's bedroom (589). The photograph had been shown to Krioutchkova at the police precinct stationhouse, and she had identified the knife as the same one that had been used by her attacker (Krioutchkova: 587-89). After conducting a brief voir dire, defense counsel objected to the admission of the photograph due to the People's alleged failure to lay a proper foundation, because, according to counsel, Krioutchkova had not recognized the unique design on the knife's handle (presumably because defendant had his hand wrapped around that portion of the knife) and, therefore, did not adequately identify the knife (590-92). Defendant never claimed that the photograph of the knife, or any testimony relating thereto, should be precluded because the knife's destruction was prejudicial to the defense. Therefore, because he is raising his claim for the first time on appeal, the claim is unpreserved. See C.P.L. § 470.05(2).

Moreover, the admission of evidence concerning the knife was proper, because defendant failed to establish how he was prejudiced by the knife's destruction. On the contrary, in his summation, defense counsel used the police's destruction of the knife to bolster the defense, because counsel argued that the destruction was an example of incompetence and was a reason why

the jury should find reasonable doubt (870). Thus, because defendant suffered no prejudice, the admission of the evidence concerning the knife was proper. See People v. Cannonier, 236 A.D.2d 619, 619-20 (2d Dep't 1997) (the People's failure to preserve a pocket that was ripped from a shirt during a robbery did not warrant a sanction because defendant failed to show prejudice); People v. Bailey, 215 A.D.2d 676, 677 (2d Dep't 1995) (an adverse inference charge for a destroyed chemist's label that had been affixed to a drug sample was not required because the possibility of prejudice to the defense was "remote").

Defendant now claims, for the first time, that he was prejudiced by the destruction of the knife because it deprived him of the ability to check the knife for fingerprints or show that the knife was "ornamental or otherwise harmless." Defendant's claims are meritless. First, the results of a fingerprint analysis would have been meaningless because the knife was recovered from defendant's bedroom and there was no question that it belonged to defendant. Second, even assuming that the knife was "ornamental" or "harmless," the testimony established that defendant used the knife in a threatening way making the knife's ability to actually inflict injury irrelevant. Finally, defendant claims that the missing knife had a detrimental effect on his ability to show that the sexual contact between himself and the victim was consensual. However,

defendant does not explain how the knife's destruction impacted upon his ability to develop this defense. Indeed, had the knife been preserved, it is difficult to discern how defendant would have proceeded differently.

In support of his claim, defendant cites People v. Samuels, 185 A.D.2d 903 (2d Dep't 1992), but that case has no applicability here. In Samuels, this Court reversed defendant's first-degree robbery conviction because the gun that defendant had allegedly used during the crime had been destroyed without being tested, thereby preventing defendant from testing the gun in attempt to establish inoperability. The Court held that the destruction was significantly prejudicial because it precluded defendant from developing an affirmative defense to the robbery charge. Here, in contrast, defendant has failed to allege any legitimate prejudice whatsoever, let alone prejudice that directly undermined a defense.

In any event, any error in the admission of evidence concerning the knife was harmless in light of the overwhelming evidence of defendant's guilt. See People v. Crimmins, 36 N.Y.2d 230, 240-43 (1975). Vera Krioutchkova testified clearly and consistently about her harrowing ordeal. She described how defendant gained entry into her apartment by tricking her into believing that he was a repairman who had been hired by her landlord. Once inside the apartment, defendant pulled out a

23

knife, threatened to kill Krioutchkova, then violently raped her. Krioutchkova's testimony was corroborated by the medical evidence, which was consistent with forcible vaginal intercourse. In addition, after the rape, defendant called Krioutchkova twice, and the police obtained the phone records which showed that the calls had been placed from defendant's apartment. Finally, the DNA evidence established that defendant was the rapist, because DNA from the semen recovered from Krioutchkova's bedspread and from a swab in the rape kit matched the DNA from the saliva sample that defendant had provided to the police. Thus, even without the admission of evidence concerning the recovered knife, the verdict would have been the same.

Accordingly, defendant's claim should be rejected and his judgment of conviction affirmed.

POINT III

DEFENDANT'S TRIAL COUNSEL PROVIDED HIM WITH
MEANINGFUL REPRESENTATION.

Defendant claims that his counsel was ineffective because he told the jury in his opening statement that defendant and the victim had had consensual sex, but counsel failed to adduce any evidence to support this defense.   Defendant's claim is meritless.   Defense counsel provided meaningful representation throughout the course of the entire trial.

Under the New York State Constitution, a defendant's right to effective assistance of counsel is satisfied when, under the totality of the circumstances existing at the time of representation, counsel provided defendant with "meaningful representation."   People v. Benevento, 91 N.Y.2d 708 (1998); People v. Satterfield, 66 N.Y.2d 796, 798-99 (1985); People v. Baldi, 54 N.Y.2d 137, 146-47 (1981).   Similarly, under the federal constitution, a defendant is entitled to "reasonably effective assistance," which, in light of all the circumstances, does not fall "outside the wide range of professionally competent assistance."   Strickland v. Washington, 466 U.S. 668, 687, 690 (1984).

Additionally, under federal constitutional law, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate prejudice, i.e., a reasonable probability that the

25

result of the trial would have been different but for counsel's unprofessional errors. Id. at 694. Although, under the state constitution, a defendant need not show a reasonable probability that he would be acquitted but for counsel's errors, defendant nevertheless must show that counsel's errors deprived him of a fair trial. Benevento, 91 N.Y.2d at 711. Defendant here has failed to show that his trial counsel's performance was deficient, or that any alleged deficiency deprived him of a fair trial.

Contrary to defendant's assertion, defendant's attorney, Harlan Greenberg, Esq., effectively advanced the defense of consent -- the only defense that was available to him in light of Krioutchkova's phone records containing defendant's telephone number and the DNA evidence recovered from Krioutchkova and the crime scene. Counsel previewed the defense in his opening statement (531), then arguing extensively and persuasively during his summation that the victim, Vera Krioutchkova, was an unstable and manipulative person who lied about the rape because she had an acrimonious relationship with her landlord and wanted to extract money from him in civil court (865-72). In support of this argument, counsel referenced portions of his cross-examination of Krioutchkova during which he skillfully elicited from her that: (1) she had previously sued her landlord (Krioutchkova: 619); (2) she had been involved in two car

26

accidents and had sued people in connection with the accidents (Krioutchkova: 624-26); (3) she had admitted in a deposition taken in connection with one of the lawsuits that she had problems remembering things (Krioutchkova: 620-22); (4) at the time of the rape, she was under psychiatric care and taking three different prescription drugs (Krioutchkova: 626-29); and (5) she already had seen a lawyer about suing her landlord for the rape (Krioutchkova:631-33).

In addition to attacking Krioutchkova's credibility, counsel recounted the testimony about the attack and the aftermath, and argued that defendant had not acted like a man who had raped a woman, but rather more closely resembled a man who had had consensual sex with a willing partner. Counsel pointed out that defendant did not seek to hide his identity, and his telephone call to Krioutchkova was not the act of a guilty man. Moreover, counsel argued that defendant's cooperation with the police was strong evidence of his innocence (872-75).

The fact that counsel ultimately was unsuccessful does not mean that counsel was ineffective. See People v. Baldi, 54 N.Y.2d at 144. Indeed, counsel had to contend with significant evidence of defendant's guilt which seriously undermined his defense. Not only was Krioutchkova convincing in her consistent testimony about the attack, but the medical evidence which suggested forcible intercourse and the recovery of the knife

provided significant corroboration of Krioutchkova's account. Thus, defendant received meaningful representation because counsel did everything he could, in the face of this overwhelming evidence, to develop an alternative theory which would have enabled the jury to acquit defendant of the charged crimes. See People v. Hewlett, 71 N.Y.2d 841, 842 (1988) (defense counsel who, inter alia, delivered opening and closing statements, cross-examined People's witnesses, and made appropriate objections provided meaningful representation).

In support of his claim, defendant cites to several federal cases which hold that a defense counsel is ineffective when counsel promises a jury that he will produce a certain witness but fails to do so during the course of the trial. Defendant's Brief at 12-14. However, these cases do not apply here because counsel never promised the jury that he would produce any witnesses. Rather, counsel told the jury in his opening statement to scrutinize the credibility of the People's witnesses, and, after all of the witnesses testified, counsel would ask for a verdict of not guilty and "put it all together for you [the jury] in a nice neat package" (531-32). Counsel delivered on this promise.

Accordingly, because defendant's counsel provided him with meaningful representation, defendant's ineffective assistance of

counsel claim should be rejected and his judgment of conviction affirmed.

POINT IV

THE ADMISSION OF THE EXPERT TESTIMONY
PROVIDED BY THE MIDWIFE THAT TREATED THE
VICTIM AT THE HOSPITAL WAS PROPER.  IN ANY
EVENT, ANY ERROR WAS HARMLESS.

Defendant claims that the court's qualification as an expert

witness of Alice Olosunde, the midwife who treated Vera

Krioutchkova at the hospital, was erroneous because Olosunde was

unqualified.[9]  Defendant's claim is meritless.  In any event, any

error was harmless.

In qualifying a witness as an expert, the trial court must

determine whether the witness possesses "the requisite skill,

training, education, knowledge or experience from which it can be

assumed that the information imparted or the opinion rendered is

reliable."  Matott v. Ward, 48 N.Y.2d 455, 459 (1979); People v.

Burt, 270 A.D.2d 516, 518 (3d Dep't 2000).  "The qualification of

a witness as an expert is a determination which rests within the

sound discretion of the trial court and its determination will

not be disturbed in the absence of a serious mistake, an error of

law, or an improvident exercise of discretion."   People v.

_____

[9] In his brief, defendant cites Frye v. United States, 293
F. 1013 (C.A.D.C. 1923), and the legal standard cited therein for
when expert testimony, in general, is admissible in a trial.
However Frye and the many cases which refer to Frye do not
discuss the adequacy of an expert's qualifications and are,
therefore, inapplicable here.

<u>Rivera</u>, 236 A.D.2d 428, 429 (2d Dep't 1997); <u>People v. Jones</u>, 171 A.D.2d 691 (2d Dep't 1991).

Here, the court's determination that Olosunde possessed the requisite skill, training, education, knowledge, or experience to render reliable opinions was a proper exercise of the court's discretion.  Before asking the court to qualify Olosunde as an expert, the prosecutor elicited from her the following credentials:

(1)    she received a Bachelor of Science Degree from Long Island University and a Master of Arts Degree in teaching of nursing and a Master of Science Degree in midwifery from Columbia University;

(2)    she completed an internship at Downstate Medical Center;

(3)    from 1979 through 1984, she worked at the University of Medicine and Dentistry in New Jersey, where she taught midwifery for five years;

(4)    she worked as a midwife at the Columbia University Family Care Center where she provided care for women through pregnancy, including delivering their babies;

(5)    she was licensed and certified in New York State as a nurse practitioner in 1990, and was board certified as a midwife;

(6)    from 1988 to 1991, she worked at Coney Island Hospital as a certified nurse midwife providing OB-GYN care;

(7)    she then worked at St. Mary's Hospital as chief midwife performing the same OB-GYN care;

(8)   she received training for sexual assault
       forensic examination in 2002, and was
       certified by New York State as an expert in
       the field of nurse midwifery and sexual
       assault forensic examination;

(9)   she presently is the director of midwife
       services at Coney Island Hospital, where she
       had worked since 1994 (for twelve years).
       Her duties as the midwife director include
       training and supervising the other midwives
       and attending to patients; and

(10)  since 2002, she has examined approximately
       twenty rape victims.

(Olosunde: 803-08).

In light of the fact that, at the time of the trial,
Olosunde had been a nurse practitioner and a midwife for twenty-
seven years, and considering her high academic achievement and
applicable training, certification, and recent experience in
sexual assault forensic examination, the trial court properly
concluded that Olosunde was qualified to render reliable opinions
about the results of her examination of Krioutchkova. See People
v. Menendez, 50 A.D.3d 1061 (2d Dep't 2008) (court properly
exercised discretion to qualify as an expert witness the
registered nurse who examined the rape victim, "[g]iven [her]
education and employment history"); People v. Morehouse, 5 A.D.3d
925, 928 (3d Dep't 2004) (training and experience supported the
conclusion that a registered nurse was qualified as an expert
witness to render reliable opinions about her examination of the
rape victim).

In support of his claim, defendant cites to one case -- United States v. Withorn, 204 F.3d 790 (8th Cir. 2000). Defendant's Brief at 15-16. However, as defendant points out, Withorn holds that the midwife witness was properly qualified as an expert. Defendant seeks to distinguish Withorn by claiming that the midwife in that case was more qualified than the midwife in this case. Defendant is wrong. The witness here had more than five times the amount of experience in midwifery than the witness in Withorn, and their training on and experience with sexual assault forensic examination appears nearly identical. Thus, Withorn does not support defendant's claim.[10]

In any event, any error in qualifying Olosunde as an expert and admitting her opinion that the bruise on Krioutchkova vagina was consistent with forcible or rough intercourse was harmless in light of the other overwhelming evidence of defendant's guilt. See supra at 23-24.

Accordingly, defendant's claim should be rejected and his judgment of conviction affirmed.

---

[10] Defendant appears to have confined his research to cases involving the expert qualifications of midwives. However, because Olosunde was also a registered nurse practitioner, cases involving the expert qualification of registered nurses are clearly relevant. See cases cited supra at 32-33.

33

POINT V

DEFENDANT'S     SENTENCE     WAS     PROPER     AND
APPROPRIATE.

Defendant claims that this Court should reduce his sentence
of thirty years in prison because this was his first conviction.
Defendant also claims that the five-year prison term for the
sexual abuse count was improperly imposed consecutively to the
other concurrent prison terms because that crime was not a
separate and distinct act.   Defendant's claims are meritless.
Defendant's sentence was proper in every respect.

Sentencing is within the sound discretion of the trial
court.   People v. Felix, 58 N.Y.2d 156, 161 (1983).   Thus, only
the extraordinary circumstance of a clear abuse of judicial
discretion or a failure to observe sentencing principles would
warrant reducing a defendant's sentence.   See People v. Suitte,
90 A.D.2d 80, 86 (2d Dep't 1982); People v. Roman, 84 A.D.2d 851
(2d Dep't 1981).   This is so because the trial court is in the
best position to assess the appropriate sentence based on its
observation of the defendant and its knowledge of the facts and
circumstances of the underlying conviction.   See People v. Junco,
43 A.D.2d 266 (1st Dep't), aff'd, 35 N.Y.2d 419 (1974), cert.
denied, 421 U.S. 951 (1975).

In the instant case, defendant's sentence of thirty years is
completely appropriate considering the severity of defendant's

crime.   In the instant case, defendant was convicted upon overwhelming evidence as provided by the victim, the telephone records, and the DNA evidence.   The victim recounted how defendant had tricked his way into her apartment, convincing her that he was hired to make a repair.   Defendant then pulled out a knife, threatened to kill the victim, and dragged her to a bedroom where he slapped her in the face and violently raped her. After ejaculating, defendant told the victim to take a shower, then left.   This violent and selfish act, which undoubtedly had a profound and lifelong effect on the unsuspecting victim, warranted the severe sentence that was imposed.

As the sole ground in support of his claim that his sentence should be reduced, defendant claims that he is entitled to a sentence reduction because this rape conviction was his first criminal conviction.   However, this fact, while relevant, does not entitle defendant to the requested relief, nor should this Court reduce the sentence in the interest of justice.   Indeed, justice requires that the lower court's well-considered and appropriate sentence be undisturbed.

Finally, defendant claims that the imposition of a consecutive sentence for the sexual assault count was unauthorized because that crime was not a separate and distinct act.   Defendant's claim is meritless.   Penal Law § 70.25(2) states that "when more than one sentence of imprisonment is

35

imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences, except if one or more of such sentences is for a violation of section 270.20 of this chapter, must run concurrently."

As the Court of Appeals stated in People v. Laureano, 87 N.Y.2d 640 (1996):

> [I]n determining whether concurrent terms of imprisonment are required, the sentencing court must first examine the statutory definitions of the crimes for which defendant has been convicted....Because both prongs of Penal Law § 70.25(2) refer to the "act or omission," that is, the "*actus reus*" that constitutes the offense (*see*, Penal Law § 15.00[1] [bodily movement]; Penal Law § 15.00[3] [failure to act]), the court must determine whether the *actus reus* element is, by definition, the same for both offenses (under the first prong of the statute), or if the *actus reus* for one offense is, by definition, a material element of the second offense (under the second prong). If it is neither, then the People have satisfied their obligation of showing that concurrent sentences are not required....If the statutory elements do overlap under either prong of the statute, the People may yet establish the legality of consecutive sentencing by showing that the "acts or omissions" committed by defendant were separate and distinct acts."

Id. at 643; see also People v. Brown, 80 N.Y.2d 361 (1992); People v. Day, 73 N.Y.2d 208 (1989).

Defendant claims that consecutive sentences are unlawful because the crimes were all part of the same act. Defendant is incorrect. Defendant committed two sexual acts upon Krioutchkova

36

by means of forcible compulsion. The first act involved defendant's insertion of his hand in Krioutchkova's vagina. After committing this act, there was a pause in the attack, and defendant complied with Krioutchkova's request to wash his hands (a hopeful ploy on Krioutchkova's part to enable an escape attempt). At this point, the first-degree sexual abuse was complete. Defendant then returned to the bed and forcibly inserted his penis in Krioutchkova's vagina -- a separate act that warranted the imposition of a consecutive sentence.

Accordingly, defendant's challenge to the length and legality of his sentence should be rejected and his sentence and judgment of conviction affirmed.

CONCLUSION

FOR THE AFOREMENTIONED REASONS, DEFENDANT'S
JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:  Brooklyn, New York
        December 16, 2008

                              Respectfully submitted,


                              CHARLES J. HYNES
                              District Attorney
                              Kings County



LEONARD JOBLOVE
MORGAN J. DENNEHY
Assistant District Attorneys
    of Counsel

38

Certificate of Compliance
Pursuant to 22 NYCRR § 670.10.3(f)

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

    Name of typeface:  Courier New
    Point size:  12
    Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 7,992.

                    Morgan J. Dennehy
                    Assistant District Attorney