Colon v. LaValley
10-cv-2173 (NGG)
EXHIBIT D

The trial transcript

500

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS - CRIMINAL TERM - PART:  3
 2  ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3
 4                                       INDICTMENT NO.
             -against-                   2518/2003
 5
    DENNIS COLON,
 6
                        Defendant.
 7  ------------------------------------------X
 8                                 320 JAY STREET
                                   BROOKLYN, NEW YORK 11201
 9                                 JUNE 1, 2006
10
11  B E F O R E:
12                  HONORABLE JAMES P. SULLIVAN,
                            Justice and jury
13
14  A P P E A R A N C E S:
                        CHARLES J. HYNES, ESQ.
15                      District Attorney, Kings County
                        BY:  ANITA CHANNAPATI, ESQ.
16                      BY:  LOUISE COHEN, ESQ.
                        Assistant District Attorneys
17
18                      HARLAN GREENBERG, ESQ.
                        DENNIS PETRE
19                      30 Vesey Street, 15th Floor
                        New York, New York
20                      Attorneys for the defendant.
21                                 William Cardenuto
                                   Senior Court Reporter
22
23                                 Rozalia Melnick
                                   Official Russian Interpreter
24
25
```

- Proceedings -

501

```
 1                THE COURT:  Do we have anything that needs to
 2     be brought to the Court's attention with regard to the case
 3     on trial?
 4                All the parties are here.  It's approximately
 5     10:20 a.m.  The jury is all here.  The defendant can step
 6     up.
 7                Is there any preliminary matters that need to
 8     be brought to the Court's attention now?
 9                MR. GREENBERG:  Yes, your Honor.  I'm not sure
10     if you recall, but prior to the hearing, the former
11     prosecutor that was assigned to this case, Debra Cohen, and
12     I had a bench conference with you, and I believe some of
13     your notes may reflect that and at least part of it is on
14     the record in the transcript from the hearing, that Ms.
15     Cohen had indicated to me, and I believe to the Court, that
16     the knife which was recovered in Mr. Colon's apartment was
17     never positively identified by the complainant.
18                At the hearing, Detective Harvin testified
19     that she did positively identified the knife.  Ms. Cohen
20     all along had indicated to me that the knife was never
21     positively identified by the complainant.
22                Ms. Channapati indicated to me that the
23     complainant has positively identified the knife, and I
24     believe, I can't -- she will speak for herself, but I had
25     the thought all along that the knife wasn't identified.
```

- Proceedings -

502

1        They are intending to introduce it, which

2   certainly they have the right to do; however, I'm going --

3   if that's the case, I'm going to need to subpoena Ms.

4   Cohen.

5        THE COURT:  Well, let me hear from the People.

6        MS. CHANNAPATI:  Your Honor, the testimony

7   from Detective Harvin during the hearing, which it came out

8   during the cross of Mr. Greenberg, is that the detective

9   showed Ms. Krioutchkova the knife and the hat and that she

10  identified them.

11       So my understanding is that he was on notice

12  that there was an identification by the victim of the

13  property and that was on November 14th, 2005, and,

14  moreover, there was discussion, of course, I wasn't there

15  for what happened off the record, your Honor, but what

16  happened on the record, and I'm just referring to the

17  minutes, was that, you know, there was a question as to

18  whether or not it was going to be introduced, and the

19  People at that point decided that they wanted to do the

20  hearing, because there was a possibility that we would

21  introduce that into evidence, and that's why it was left

22  open.

23       As to whether or not, in fact, the Court even

24  said -- I'm referring to the hearing minutes.  Page 4, Line

25  12, the Court said, "Well, at this time they intend to use

William Cardenuto, Senior Court Reporter

- Proceedings -

503

1     it.  That's the way I understand it.  They are not

2     duty-bound to continue in that position.  So this is on for

3     a Huntley, Wade, Mapp hearing."

4                 MR. GREENBERG:  Your Honor, the problem is

5     that there's been a change in how the People believe the

6     knife was recovered and identified.

7                 THE COURT:  Let me hear what you're saying.

8     There's a change as to what?

9                 MR. GREENBERG:  All along Ms. Cohen and her

10    predecessor Ms. Mason told me that the knife was never

11    identified by the complainant, never identified.

12                THE COURT:  You say that both Ms. Mason, who

13    was on the case before, and then Ms. Debra Cohen told you

14    that the complainant had not identified the knife?

15                MR. GREENBERG:  Correct.

16                THE COURT:  However, the People say when we

17    got to the hearing, the suppression hearing, that was not

18    their position.

19                MR. GREENBERG:  No.  When we got to the

20    hearing, Ms. Cohen said, let's do the hearing, because I

21    would like to keep my options open, even though she

22    believed that the knife was never positively identified.

23                THE COURT:  Did she say she believes that on

24    the record, Ms. Cohen?  I don't have what you're saying,

25    and I don't recall any of it.


William Cardenuto, Senior Court Reporter

- Proceedings -

504

1           Obviously, we can all look at what's on the

2    record.  I'll look at the court file, but I pretty much

3    remember what I write in terms of what I would have written

4    on the court action sheet.  I don't think I wrote anything

5    to any of this effect.

6           I would be happy to look, but I have reviewed

7    my court action sheet.  So, obviously, what's on the

8    record -- actually, I do say here, I wrote, "5/13 2005;

9    everybody was present;" I wrote, "Huntley, slash, Wade

10   hearing."  I wrote, "Was knife recovered, question."  Then

11   it was put over for the hearing on 5/24.  I wrote, "People

12   believe knife was recovered and consented to a Mapp."

13           MR. GREENBERG:  Well, your Honor, the People

14   all along believed that a knife was recovered.  The

15   question was whether or not this was the knife that was

16   used on the day and time of the incident, and it was their

17   position all along that she had never identified the knife.

18           The question was at that point for the hearing

19   was whether or not the knife was recovered, you know,

20   within the constitutional limits and whether or not it was

21   suppressive, not whether or not it was ever identified.

22           If you bear with me, I'm going to find it.  I

23   believe the initial Voluntary Disclosure Form --

24           THE COURT:  Let's look for that.

25           MR. GREENBERG:  I believe it says it was not

William Cardenuto, Senior Court Reporter

- Proceedings -

505

1    identified.

2              THE COURT:  As we all know, this is an old

3    case.  So we have to hunt for it on paper.

4              I have a Voluntary Disclosure Form in these

5    papers.  It says, "Prepared by ADA Heidi Mason, dated April

6    14, 2003."  With regard to Page 2, "Type of weapons, if

7    any, involved, knife,"  it says.

8              That's all it says.

9              MR. GREENBERG:  I know there's some DA notes.

10   I have to find it.

11             MS. CHANNAPATI:  Your Honor --

12             THE COURT:  People, let him search.

13             MS. CHANNAPATI:  I was going to say, do you

14   have a copy of the hearing minutes with you?  Would you

15   like to refer to the People's copy?

16             THE COURT:  I want to go one step at a time.

17             MS. CHANNAPATI:  Okay.

18             THE COURT:  While he's looking, I'll go over

19   here and see if I have it.

20                       (Pause.)

21             THE COURT:  All right.  The defense counsel is

22   handing up a Voluntary Disclosure Form which has a little

23   different language than what I was looking at.  So let's

24   see.

25             All right.  I'll give this back to Counsel,

William Cardenuto, Senior Court Reporter

1    because it's there.  I missed it.  Underneath the part that

2    says, "type of weapons involved, if any, a knife," it says,

3    "weapon was recovered," then in parenthesis, "a folding

4    knife was recovered at the time of arrest, but was not

5    identified by the complainant."

6            So defense has found that.

7            Now, People.

8            MR. GREENBERG:  Your Honor, I believe there's

9    another document, a DA generated document which was

10   disclosed to me which I can't find this second which also

11   indicates that the knife wasn't identified.

12           THE COURT:  Let's say, with what we know so

13   far, we know a suppression hearing was held and that the

14   Court held that the knife is not suppressed.  We know that

15   much.  We also know now that the Voluntary Disclosure Form,

16   which is prepared by the People and served on the defense

17   says the knife was not identified.

18           Counsel believes there's another document

19   existing prepared by the People and sent to him that says

20   the knife was not identified by the complaining witnesses.

21           So, all of that the defense has established.

22           MS. CHANNAPATI:  Your Honor, however, I'm

23   nonetheless referring to the minutes of the hearing where

24   on cross examination Detective Harvin was asked:

25           "QUESTION:  As a result of your search, what

William Cardenuto, Senior Court Reporter

- Proceedings -

507

1    did you find?

2              "ANSWER:  Two hats and a knife.

3              "QUESTION:  Could you describe the hats that

4    you found.

5              "ANSWER:  I have the photos here.  Do you want

6    me to take a look at them?

7              "QUESTION:  Sure.

8              "ANSWER:  I have the photos somewhere here in

9    the case.  It is a folding knife, a black knit cap, and a

10   black wool hat with a front piece to it.

11             "QUESTION:  And you have a fourth photograph

12   there.

13             "ANSWER:  It is the same picture.

14             "QUESTION:  Same picture.  Where did you take

15   these photographs?

16             "ANSWER:  Where did I take them at?

17             "QUESTION:  Yes.

18             "ANSWER:  My office."

19             I'm going to just jump down, your Honor.

20             MR. GREENBERG:  Your Honor, suffice it to say

21   Detective Harvin indicated that the knife was identified by

22   the complainant --

23             MS. CHANNAPATI:  Page 51, Line 6:

24             "QUESTION:  She identified the knife?

25             "ANSWER:  Yes.

William Cardenuto, Senior Court Reporter

- Proceedings -

508

1                "QUESTION:  What did she say about the knife?

2                "ANSWER:  There was a particular design of the

3       knife, and she identified that knife.

4                "QUESTION:  Did she specifically tell you that

5       that was the knife used?

6                "ANSWER:  That's the knife he displayed.

7                "QUESTION:  By the defendant?

8                "ANSWER:  Yes.

9                "QUESTION:  When did she do that?

10               "ANSWER:  After I came back from the residence

11      with the photos, she was still present at the precinct, and

12      I had showed her the photos of the objects, and she

13      identified them.

14               "QUESTION:  Where was she when she identified

15      them?

16               "ANSWER:  At Brooklyn Special Victims Squad.

17               "QUESTION:  In your office?

18               "ANSWER:  Yes.

19               "QUESTION:  And you showed her the

20      photographs?

21               "ANSWER:  Yes.

22               "QUESTION:  And which photograph did you show

23      her?

24               "ANSWER:  I showed her all four."

25               I mean, it goes on, your Honor and --


William Cardenuto, Senior Court Reporter

- Proceedings -

509

1        MR. GREENBERG:  Your Honor, the reason for

2  that inquiry is quite clear -- that I was told that there

3  was no knife, that the knife, although recovered, was never

4  identified.  I was told on numerous occasions.

5        Obviously, at that point I was preparing to

6  cross examine Detective Harvin with respect to her memory

7  and the fact that whether or not the knife was identified.

8  The fact that she -- I mean, the People's direct case at

9  the hearing, they don't go into the identification of the

10  knife, and there was a reason for that.

11        MS. CHANNAPATI:  Nonetheless, your Honor, the

12  hearing was in November 2005.  It's now May.

13        THE COURT:  What's your point?

14        MS. CHANNAPATI:  May of 2006, Counsel has been

15  on notice.

16        MR. GREENBERG:  I've been on notice that there

17  are -- Detective Harvin, although pretty much through her

18  testimony recalls very little with respect to the specifics

19  and the details surrounding this case, and when asked

20  direct questions with respect to a knife, I believe, and I

21  submit to the Court that she was not truthful.

22        THE COURT:  But then the question is --

23        MR. GREENBERG:  I base that, basically, on the

24  fact that all the way back in the date of his Voluntary

25  Disclosure Form, which, your Honor, is not dated by the

- Proceedings -

510

1    People --

2                    THE COURT:  I put a date on the top where it

3    says -- next to Ms. Mason, there's a date.

4                    MR. GREENBERG:  April 14, 2003, that the knife

5    was never identified.

6                    Where did the District Attorney's Office get

7    this information from?

8                    THE COURT:  Counsel, I guess my question now

9    is if, A, the issue is the detective's credibility,

10   clearly, you have the ability to challenge that in cross

11   yourself, if that's the issue.

12                   If the issue is the People didn't disclose it

13   to you, the People say it was.  It was disclosed to you

14   during the course of the hearing.  So you have the

15   disclosure.  So I'm not sure what the legal issue is.

16                   MR. GREENBERG:  What it comes down to, your

17   Honor, is someone told the District Attorney's Office prior

18   to April 2003 that the weapon was never identified.

19                   THE COURT:  Somebody told them that or

20   somebody got it wrong.  That's a possibility.

21                   MR. GREENBERG:  Your Honor --

22                   THE COURT:  I'm just giving you the

23   possibilities.

24                   MR. GREENBERG:  It's also possible that

25   Detective Harvin two and a half -- three and a half years

William Cardenuto, Senior Court Reporter

- Proceedings -

511

1    later was also mistaken.

2                    THE COURT:  At this point, Counsel, let me

3    hear if there's any application.

4                    MR. GREENBERG:  No. 1, first, I would like to

5    review the documents to find the second sheet of paper that

6    indicates --

7                    THE COURT:  I'll give you time to do that.

8                    MR. GREENBERG:  That indicates, who indicated

9    on a sheet of paper, who said that the items were never,

10   that the items was never identified.

11                   THE COURT:  I'll give you time for that.

12                   MR. GREENBERG:  Okay.  Secondly -- and I don't

13   know whether or not -- I believe it was Ms. Mason at that

14   point that provided that information, and I would need to

15   know the whereabouts of Ms. Mason to subpoena her.

16                   THE COURT:  The People can provide that to

17   you, the whereabouts of Ms. Mason and Ms. Cohen.  That will

18   take care of that.

19                        Is there anything else?

20                        Then we'll break for a few minutes to let you

21   inquire or search regarding that document, but then we're

22   ready to go.

23                   MR. GREENBERG:  Okay.

24                   THE COURT:  All right.

25                        (Recess taken.)


                 William Cardenuto, Senior Court Reporter

- Proceedings -

512

1                THE COURT:  Counsel, I presume you're still

2      searching.

3                People, with regard to your premarking, would

4      you just put it on the record.

5                MS. CHANNAPATI:  Yes, your Honor.

6                I have premarked for identification only a

7      sketch of an apartment.  It's been shown to defense

8      counsel, premarked as People's Exhibit No. 1 for

9      identification.

10               THE COURT:  The sketch is an apartment?

11               MS. CHANNAPATI:  Yes.

12               People's Exhibit No. 2, premarked for

13     identification, is the exterior or photographs of the

14     exterior of 1711 East 15th Street as well as photographs of

15     the hallway and --

16               THE COURT:  Say the address again.

17               MS. CHANNAPATI:  1711 East 15th Street.

18               THE COURT:  The exterior hallway?

19               MS. CHANNAPATI:  Yes, before the apartment.

20               THE COURT:  Go ahead.

21               MS. CHANNAPATI:  Also, that's been shown to

22     defense counsel.

23               What's been premarked as People's Exhibit No.

24     3 for identification are interior photographs of the

25     bathroom and the kitchen of Apartment 1-A of 1711 East 15th

William Cardenuto, Senior Court Reporter

- Proceedings -

513

1      Street.

2                      THE COURT:  How many photographs?

3                      MS. CHANNAPATI:  A through H.

4                      THE COURT:  How many?

5                      MS. CHANNAPATI:  Eight.

6                      THE COURT:  How many were on the --

7                      MS. CHANNAPATI:  No. 2 was five photographs, A

8      through E.

9                      THE COURT:  Thank you.

10                     MS. CHANNAPATI:  And what's been premarked

11     People's Exhibit No. 4 are interior photographs of the

12     bedroom of 1711 East 15th Street, Apartment 1-A, and

13     there's six photographs of the bedroom.

14                     THE COURT:  All right.

15                     MS. CHANNAPATI:  That's it, your Honor.

16                     THE COURT:  All right.

17                     MS. CHANNAPATI:  A through F.

18                     THE COURT:  Counsel, we are ready to go.

19                     MR. GREENBERG:  Okay.

20                     THE COURT:  Obviously, you can search for

21     that, but the points have been made, and we've got all of

22     that on the record.

23                     Now, the jury is ready, and they are here.

24     What we're going to do this morning is we're going to have

25     our openings, and then we're going to have witnesses called

- Proceedings -

514

1    by the People.

2              MR. GREENBERG:  Your Honor, with respect to

3    instructing the jury, can you instruct them that the

4    defense does not have to open, although they may.

5              THE COURT:  Let me tell you what I say.

6              "Once the People's opening statement has been

7    concluded, the defense counsel has the option to make an

8    opening statement, if defense counsel chooses to do so, but

9    defense counsel has no obligation to do so."

10             There's that same clause that I mentioned

11   before in our earlier instruction being -- "The defense is

12   not required to put on a defense or call any witnesses,

13   because of the presumption of innocence.  If the defendant

14   chooses not to take the stand in his behalf, you may not

15   draw any negative inference from that.  In other words, you

16   may not hold that against the defendant."

17             Do you want that, Counsel?

18             MR. GREENBERG:  Yes.

19             THE COURT:  All right.  With regard to --

20   there's a reference that tells the jury I'm going to give

21   them detailed instructions regarding the law towards the

22   end.  I say, "As I told you before, the defendant is

23   charged with" -- and what I'm going to say is what I've

24   already said, seven counts under the indictment, including

25   burglary in the first, rape in the first, assault in the

William Cardenuto, Senior Court Reporter

1    second, and criminal possession of a weapon

2    in the fourth; regarding note taking, the Court allows it.

3    I believe the court of appeals encourages it, and I have a

4    charge for jury note taking.

5         Is there anything?  Otherwise, we're ready.

6         THE COURT OFFICER:  Jury entering.

7         (Whereupon, the jury enters the courtroom and

8    is properly seated.)

9         THE CLERK:  All jurors are present.

10        Do both sides waive the reading of the roll?

11        MS. CHANNAPATI:  So waived.

12        MR. GREENBERG:  Yes.

13        THE COURT:  Good morning, ladies and gentlemen

14   of the jury.  We are beginning to go forward.  Just give me

15   a moment.

16        Ladies and gentlemen of the jury, it is

17   customary at the beginning of every trial that the Court

18   instruct you as to your basic functions, duties, and

19   conduct.

20        I'll also introduce you in a general way to

21   the procedure of the trial.  This trial, the People of the

22   State of New York versus Dennis Colon, commenced with the

23   selection of the jury which we concluded yesterday.

24        As you can see, our jury is composed of 12

25   members.  In addition, there are three alternate jurors.

1    If you are an alternate, you must pay as close attention to

2    the evidence as the jury.  If, for any reason, any one or

3    more members of the jury is unable to serve, the alternate

4    would be required to step into the place of that juror.

5              The second part of the trial is about to

6    begin.  This part is the opening statement by the Assistant

7    District Attorney who is representing the People of the

8    State of New York.  In this opening statement by the

9    Assistant District Attorney, she's required to indicate to

10   you what the People intend to prove by way of evidence to

11   support the charges against the defendant.

12             Once the People's opening statement has been

13   completed, the defense counsel has the option to make an

14   opening statement, if the defense counsel chooses to do so,

15   but the defense counsel has no obligation to do so.

16             Now, what the lawyers say in an opening

17   statement is not evidence.  An opening statement is, in a

18   sense, a preview of what that attorney expects the evidence

19   will show.

20             Next, the Assistant District Attorney will

21   present witnesses whom the Assistant District Attorney will

22   question.  That is called direct examination.  Once the

23   Assistant District Attorney completes her questions, the

24   defense counsel will be given an opportunity to question

25   that witness.  That is called cross examination.  This

Judge's Opening Charge

517

1   process will continue for each witness that the Assistant

2   District Attorney will present to give testimony.

3          When the Assistant District Attorney finishes

4   calling all of her witnesses, the defendant will be given

5   an opportunity to present witnesses in his defense.

6   Remember, however, the defense does not have to prove

7   anything.  Therefore, they do not have to cross examine any

8   of the People's witnesses, and the defense does not have to

9   offer their own witnesses.

10         Once both sides have finished presenting

11  witnesses, the defense and the Assistant District Attorney

12  will be given the opportunity to make closing remarks to

13  you.  These closing arguments by the lawyers will not be

14  evidence.  They are just arguments made by the lawyers to

15  discuss the facts and circumstances in the case, and those

16  arguments should be confined to the evidence and to

17  reasonable inferences to be drawn from the evidence.

18         As I indicated earlier, neither opening

19  statements nor closing arguments are evidence, and any

20  statement or argument made by the lawyers which is not

21  based on the evidence should be disregarded by you, the

22  jury.

23         After the closing arguments, I'll give you

24  detailed instructions on the law as it relates to this

25  particular case.  After I finish those instructions, you,

William Cardenuto, Senior Court Reporter

1    the jury, will retire to deliberate to reach a verdict.

2          Now, I'll instruct you regarding evidence.

3    First, let me tell you what evidence is.  Basically,

4    evidence consists of oral testimony under oath, any

5    stipulation by the parties, if we have any stipulations,

6    and physical exhibits which during the trial are introduced

7    by either Assistant District Attorney or by the defense and

8    which the Court allows into evidence.  If an exhibit is

9    given to you to examine, you should examine it carefully,

10    individually, and without any comment.

11          Questions asked by either lawyer or even a

12    question asked by me are not, in and of themselves,

13    evidence.  Only questions which are coupled with answers

14    are evidence.  Therefore, you may not infer any fact from

15    the mere asking of a question.

16          The reason I point this out to you is simple.

17    During the course of questioning, the Assistant District

18    Attorney and the defense attorney may exercise their right

19    to object to the other's questions or to an answer to be

20    given to a question or to the introduction of an exhibit on

21    the ground that that lawyer believes it is somehow legally

22    improper or inadmissible.

23          At that point I'll either sustain or overrule

24    the objection.  If I sustain an objection to a question,

25    you must disregard the question and any answer, if one has

1    been given.  You must also draw no inference from the

2    question or from any answer, nor are you to speculate as to

3    what the witness would have said if permitted to answer.

4          Evidence which the Court orders stricken from

5    the record must, likewise, be disregarded.  On the other

6    hand, if I overrule an objection, the question will be

7    allowed to be answered or the answer will stand and it will

8    remain as evidence.  When I overrule an objection to any

9    evidence, you must not give such evidence any more weight

10   than if the objection had not been made.

11         Please, bear in mind that my rulings on the

12   law are simply that and under no circumstances are my

13   rulings to be considered by you as indicating that the

14   Court has an opinion as to the guilt or innocence of the

15   defendant.  Under our law, the Court may not and will not

16   entertain any opinion as to the guilt or non-guilt of the

17   accused.

18         Members of the jury, it is you and you alone

19   who are the sole and exclusive judges of the facts in this

20   case.

21         Now, you must understand that objections from

22   the lawyers may come quickly and at times either lawyer

23   might even seem rude.  Please, do not resent this or

24   penalize either party, because of it.  Understand, it is

25   their job and my job to monitor that.


William Cardenuto, Senior Court Reporter

1    As I stated to you at the beginning of the

2  trial, you, the jury, are the triers of the facts;

3  therefore, it will be up to you, the jury, to decide which

4  witness to believe and which witness not to believe.

5    Furthermore, you will decide how much of each

6  witness' testimony to accept and how much to reject.

7  Please, use your common sense in evaluating all testimony.

8  All that is asked of you is that you apply the same common

9  sense rules that you would apply in your everyday lives to

10  determine who is telling you the truth, who is not, and who

11  is telling you something less than the full truth.

12    Please, remember that it is the quality of the

13  evidence which controls, not the quantity of the evidence

14  or the number of witnesses called by either side.

15    While you, the jury, are the sole judges of

16  the facts, my job is to be the sole judge of the law.  You

17  must accept the law as I give it to you without any

18  hesitation or reservation.  You must accept the law as I

19  give it to you even if you privately disagree with me or

20  the law.

21    There are three basic principles of law which

22  apply to this and to all criminal cases.  They are the

23  presumption of innocence, the People's burden of proof,

24  and, finally, the standard of proof.

25    First, there is a presumption of innocence.

William Cardenuto, Senior Court Reporter

1    The defendant is presumed innocent.  That presumption

2    remains with the defendant throughout the trial, and the

3    presumption is not removed unless and until the defendant's

4    guilt is proven to you, the jury, beyond a reasonable

5    doubt.

6            The accusatory instrument containing the

7    charges against the defendant which I have already referred

8    to is only an accusation, nothing more.  That accusatory

9    instrument is not proof of guilt or anything else;

10   therefore, since no evidence has been presented to you as

11   of this moment, if you were to deliberate right now, you

12   would have to find the defendant not guilty.

13           Second, there's the People's burden.   The

14   burden of proof is on the People.  The defense has no

15   burden, and the defense is not required to do anything to

16   prove the defendant's innocence.

17           Why?

18           Because the defense has the option of sitting

19   back and doing nothing, because they have no burden of

20   proof, and the defendant is presumed innocent.  The

21   defendant is not required to put on a defense.  The

22   defendant is not required to call any witnesses, because of

23   this presumption of innocence.  If the defendant chooses

24   not to take the stand to testify in his behalf, you may not

25   draw any negative inference from that.  In other words, you

Judge's Opening Charge

1    may not hold that against the defendant.

2              Third, there is the standard of proof.  The

3    People are required to prove the defendant's guilt beyond a

4    reasonable doubt.  This standard does not require the

5    People to prove the defendant's guilt beyond all doubt or

6    to a mathematical certainty.

7              The People do, however, have to prove the

8    defendant's guilt beyond a reasonable doubt.  A doubt is

9    not reasonable if instead of being based on the nature and

10   quality of the evidence or on the insufficiency of the

11   evidence the doubt is based on a guess, a whim, or

12   speculation unrelated to the evidence.

13             As I told you at the beginning, the defendant

14   in this case is charged with seven counts, including

15   Burglary in the First Degree, Rape in the First Degree,

16   Assault in the Second Degree, and Criminal Possession of a

17   Weapon in the Fourth Degree.

18             In my final instructions to you at the end of

19   the trial, I'll give detailed instructions on the law as it

20   relates to these specific charges.  These instructions then

21   are intended to guide you through your deliberation and to

22   enable you to reach your decision.

23             Finally, now, I'll instruct you as to how you

24   must conduct yourselves during this trial.  First, you must

25   keep an open mind throughout the trial.  You are not


                William Cardenuto, Senior Court Reporter

1    allowed to talk amongst yourselves or with anyone else

2    about any subject connected with this trial.

3              You are not allowed to offer or express an

4    opinion as to the defendant's guilt or innocence until I

5    finally give you the case for your deliberation.  You are

6    not allowed to read or listen to any accounts or

7    discussions of the case if it were to be reported in the

8    newspapers or any other news media.  You're not allowed to

9    visit the premises or place where the offense was charged

10   or allegedly committed or any other place or premises

11   involved in this case.

12             You may, but are not required, to take notes

13   during these proceedings.  If you wish to take notes, we'll

14   provide you with materials for that purpose.

15             If you decide to take notes, you must follow

16   these rules:  You must not permit note taking to distract

17   you from the proceeding.  Any notes which were taken are

18   only an aid to your memory and must not take precedence

19   over your independent recollection.

20             Those jurors who choose not to take notes must

21   rely on their own independent recollection and must not be

22   influenced by any notes that another juror might take.  Any

23   notes which are taken are only for personal use in

24   refreshing the juror's recollection.

25             A juror's notes are not a substitute for the

William Cardenuto,  Senior Court Reporter

recorded transcript of the testimony or for any exhibit received into evidence.   If there is a discrepancy between a juror's recollection and his or her notes regarding the evidence, you should ask to have the relevant testimony read back to you or to have the exhibit produced in the jury room.

In addition, a juror's notes are not a substitute for the detailed explanation that I have given and will give to you concerning the principles of law which govern this case.

If there is a discrepancy between a juror's recollection and his or her notes regarding those principles, you should ask me to explain those principles again, and I will be happy to do so.

Each juror who intends to take notes shall print his or her name on the top of the book.   At the end of each trial day until the jury retires to deliberate, the notes will be collected from each juror who takes notes.   A juror may refer only to his notes during the proceedings and during the deliberations.

Any notes which are taken are confidential and shall not be available for examination or review by any party or other person.   After the jury has rendered it's verdict in this case, we'll collect the notes and destroy them.

William Cardenuto, Senior Court Reporter

1          Prior to your discharge as a juror, you may

2  not request, accept or agree to accept any payment of

3  benefit in consideration for supplying any information

4  concerning this trial.  Further, you may not have a

5  discussion with any person regarding the receiving or

6  payment of any benefit in consideration for supplying any

7  information concerning this trial, and then you must

8  promptly report to me any incident to your knowledge

9  involving any attempt by any person to influence any member

10  of this jury.  I have just told you that you must report to

11  me any attempt by anyone to improperly influence you.

12         The lawyers in the case are not permitted to

13  have any contact with you ladies and gentlemen of the jury,

14  other than what takes place on the record during the course

15  of this trial; therefore, if you were to see either of the

16  lawyers outside in the hallway or outside on the street and

17  if that lawyer doesn't say hello to you or even make eye

18  contact, you may not hold that against the lawyer.

19         It is their job not to have contact, and I can

20  assure you that there have been many cases where somebody

21  said, I saw that juror laughing with that lawyer, and that

22  came up a lot in civil.  So one party thought the other

23  party had made friends.  You can't have that.  So that's

24  why we don't have contact and that applies to me as well.

25  So it all takes place on the record.

1    Now, ladies and gentlemen, the Assistant

2   District Attorney will make her opening statement.

3    MR. GREENBERG:  Your Honor, may I have a

4   sidebar?

5    THE COURT:  Come up.

6    (The following proceedings were had outside

7   the presence of the jury:)

8    MR. GREENBERG:  Just to go back a little bit

9   before the People start, I am concerned that they will

10   introduce evidence of the knife without themselves knowing

11   what happened previously in this case and either putting

12   themselves in a position where their conduct can be

13   considered prosecutorial misconduct at the minimum, at the

14   maximum suborning perjury.

15    Early in this case there was a clear

16   indication that the knife was never identified by the

17   complainant.  They can put the complainant on the stand,

18   and that complainant is going to identify that knife in

19   direct contradiction to the disclosures close in time to

20   the incident, and I think, personally, that they are

21   setting themselves up for a huge problem without first

22   investigating whether or not what was in that disclosure

23   was correct.

24    By not knowing that disclosure existed before

25   coming into this courtroom today is a problem, and the fact

1      that I haven't seen them make a phone call to

2   determine whether or not that disclosure is correct or even

3   trying to determine whether that disclosure is correct is

4   of huge concern to the fairness of this trial.

5          THE COURT:  All right.  People.

6          MS. CHANNAPATI:  Your Honor --

7          THE COURT:  Are you covering the knife in your

8   opening?

9          MS. CHANNAPATI:  No.

10         THE COURT:  The Court rules that Counsel had

11   ample opportunity to raise this before bringing this to my

12   attention in the presence of the jury, and I am not happy

13   with that.  I am ruling that we proceed with the opening.

14         I'll take it up later.

15         MR. GREENBERG:  That's all I wanted.

16         (The following proceedings were held in open

17   court and in the presence of the jury:)

18         THE COURT:  The People will proceed with their

19   opening.

20         MS. CHANNAPATI:  Good morning.

21         You are going to hear about what happened to

22   Vera Krioutchkova in March of 2003 when she was 56 years

23   old.  A retired teacher and medical assistant, she

24   immigrated from Russia in 1995 and became a citizen of this

25   country in 2001.

Opening Statements

528

1    In March of 2003 she was living in a one

2    bedroom apartment at 1711 East 15th Street, Apartment 1-A,

3    here in Brooklyn, Kings County, with her daughter and her

4    10 year old granddaughter.

5    You will hear that Vera was having problems

6    with her apartment.  There were huge leaks in the bathroom.

7    There was a leak in the kitchen, and she had told her

8    landlord repeatedly about them, and overtime different

9    repair men had come to the apartment to repair the leaks.

10   The week before March 26th, 2003, you're going

11   to hear that she informed her landlord, again, that there

12   was a leak in the bathroom and that it needed to be fixed,

13   and she was told that someone was going to come and take

14   care of it.

15   On March 26th, 2003, at approximately 8:00 in

16   the morning, Vera got a phone call from a man who said that

17   he was sent by the landlord to fix a leak and that he would

18   be over in a few minutes to take a look at it.  This was a

19   phone call that Vera was hoping for.  She wanted the leak

20   fixed.

21   A man came to the door, and she let him in.

22   He walked around the apartment.  He was looking at the

23   bathroom fixtures, looking at the kitchen, looking under

24   the sink, turning faucets on and off, doing all the things

25   that you would expect a plumber to do.  He took some notes

William Cardenuto, Senior Court Reporter

Opening Statements

529

1    and Vera followed him as he started walking towards the

2    door.

3              That's when Vera's nightmare started.  Vera

4    looked up and saw the man had a knife in his hand, and he

5    said to her, "Lay down or I'll kill you.  Lay down or I'll

6    kill you."  The man backed her up into her bedroom, pushed

7    her on the bed where her daughter slept, knife still in his

8    hand, and he forced her on the bed, put her arms behind

9    her, spread her legs, and forcibly put his penis in her

10   vagina, and that, ladies and gentlemen, that man was Dennis

11   Colon, the defendant.

12             The defendant left the apartment telling Vera

13   to take a shower.  Vera didn't listen.  She called the

14   police immediately and was taken in an ambulance to Coney

15   Island Hospital.

16             There, she was seen by a sexual assault nurse

17   examiner who performed a sexual assault examination and

18   complete sexual offense evidence collection kit.  You will

19   hear that they took swabs of Vera from all different parts

20   of her body.

21             Now, the People did an extensive investigation

22   part of which was looking at Vera's phone records, because

23   the defendant called her before he came to her apartment.

24   They traced that phone number to the defendant, to the

25   defendant's home on East 16th Street, and there he was

William Cardenuto, Senior Court Reporter

1    apprehended by the police.

2          The police did a lineup and Vera identified

3    the defendant as her attacker, and the sexual offense

4    evidence collection kit that the nurse performed in the

5    hospital, there was male semen found on Vera, and when that

6    semen was testified for DNA, that DNA matched the DNA of

7    the defendant.

8          Ladies and gentlemen, you were all selected to

9    be jurors in this case, because you said you could convict

10   on the testimony of one witness, that you could keep an

11   open mind, and that you could follow the judge's

12   instruction.

13         I'm going to ask that you listen to the

14   evidence, that you remember that, and I am confident that

15   at the end of the case you will render the only just

16   verdict and find the defendant guilty beyond a reasonable

17   doubt of Burglary in the First Degree, Rape in the First

18   Degree, Sexual Abuse in the First Degree, Assault in the

19   Second Degree, and Criminal Possession of a Weapon in the

20   Fourth Degree.

21         Thank you very much.

22         THE COURT:  Thank you, People.

23         The People have made their opening statement.

24         Does the defense wish to make on an opening?

25         MR. GREENBERG:  Yes, briefly.


                 William Cardenuto, Senior Court Reporter

1    THE COURT:  All right.

2    MR. GREENBERG:  Good morning.

3    This is my first opportunity to address you as

4  a whole unit.  Some of you were in one panel; some of you

5  were in another.  I'm just briefly going to tell you that

6  once you've heard all of the evidence in this case, you

7  will determine that the sexual encounter between the

8  complainant and Mr. Colon was consensual and that the

9  complainant agreed to have sex with him.

10    Quite simple, I'm going to ask again that you

11  wait to hear all the evidence before you make your

12  determination.  Also, I want you to hesitate and listen to

13  the evidence, because you're going to see there's going to

14  be a lot of items introduced into evidence.

15    The Judge has previously instructed you that

16  it's the quality of the evidence and not quantity.  You're

17  going to need to listen to the critical portions of this

18  case and not just a mass of evidence.

19    I, specifically, direct you to examine the

20  credibility of the complainant, the detectives involved,

21  and the police officers involved, the credibility, the

22  believability, whether or not you trust them.

23    At the close of this case, I'm going to come

24  to you and I'm going to ask you to render a verdict of not

25  guilty.  At that time, I'll pull it all together for you in

William Cardenuto,  Senior Court Reporter

1        a nice neat package.

2                        Thank you.

3                        THE COURT:   Thank you, defense.

4                        Let's approach over here again.

5                        (The following proceedings were held at

6        sidebar.)

7                        THE COURT:   Logistically, are we ready to

8        start right now?   The interpreter is here.

9                        MS. CHANNAPATI:   Yes.

10                       THE COURT:   Okay.

11                       (The following proceedings were held in open

12       court and in the presence of the jury:)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS - CRIMINAL TERM - PART: 3
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3
                                      INDICTMENT NO.
 4              -against-            2518/2003
 5
     DENNIS COLON,
 6                     Defendant.
     ----------------------------------------X
 7                            320 JAY STREET
                              BROOKLYN, NEW YORK 11201
 8                            JUNE 1, 2006
 9
     B E F O R E :
10
                    HONORABLE JAMES P. SULLIVAN,
11                        Justice and jury
     A P P E A R A N C E S :
12

13                  CHARLES J. HYNES, ESQ.
                    District Attorney, Kings County
14                  BY:  ANITA CHANNAPATI, ESQ.
                    BY:  LOUISE COHEN, ESQ.
15                  Assistant District Attorney

16

17                  HARLAN GREENBERG, ESQ.
                    DENNIS PETRE
18                  30 Vesey Street, 15th Floor
                    New York, New York
19                  Attorneys for the Defendant

20
                         William Cardenuto
21                       Senior Court Reporter

22                       Rozalia Melnik
                         Official Russian Interpreter
23

24

25
```

1          THE COURT:  People.

2          MS. CHANNAPATI:  Your Honor, at this time the

3    People call Vera Krioutchkova.

4          THE COURT:  All right.  The witness will come

5    up.  The interpreter is with the witness.  That is a court

6    interpreter.

7    V E R A   K R I O U T C H K O V A,  called as a witness, after

8    being duly sworn, testified as follows:

9          THE COURT:  She has been sworn in.  Now, the

10   People may proceed.  Let me say, regarding the interpreter,

11   obviously, this is a logistical thing.  So we take a little

12   more time, because she has to interpret everything said.

13          Now, the People will begin by asking their

14   questions.

15   DIRECT EXAMINATION

16   MS. CHANNAPATI:

17   Q.  Ms. Krioutchkova, how old are you?

18   A.  59.

19   Q.  Where were you born?

20   A.  In Russia.

21   Q.  When did you move to the United States?

22   A.  1995.

23          MR. GREENBERG:  Excuse me?

24          THE COURT: 1995.

25          MR. GREENBERG:  Can we have the witness speak

-WC-

Direct - Krioutchkova/Channapati

536

1    up.  I can't hear her.

2              THE COURT:  Let me try it this way.  You've

3    got an interpreter, and you've got to hear.  So we really

4    have to hear the interpreter.

5              MR. GREENBERG:  Well, we also need to hear the

6    witness.

7              THE COURT:  I'm hearing.  If I think you're

8    not hearing, I'll rule then.  Please sit down, Counsel.

9    Q.   Ms. Krioutchkova, are you a citizen of the United

10   States?

11   A.   Yes.

12   Q.   When did you become a citizen?

13   A.   2001.

14             MS. CHANNAPATI:  Ms. Krioutchkova, could you

15   face me when you answer the questions and speak into the

16   microphone.

17             THE COURT:  We have a microphone.  Speak into

18   the microphone.

19             Proceed.

20   Q.   Are you married?

21   A.   No.

22   Q.   Do you have any children?

23   A.   Yes.

24   Q.   Were you married at one point?

25   A.   Yes.

Direct - Krioutchkova/Channapati

541

1    Q.    Now, did you pick up the phone when the phone rang?

2    A.    Yes.

3    Q.    Did you recognize the voice on the other line?

4    A.    I heard a man's, not familiar, voice.

5    Q.    Did the man say who he was?

6    A.    No.  He asked me my name and my last name.

7    Q.    Did he ask you your name and your last name?

8    A.    He asked my first name and last name, and after, he

9    says, "It's you?"  And I was saying, "Yes."

10   Q.    What else did he say?

11   A.    He was saying, I'm a plumber and Guy send me.

12   Q.    What did you say?

13   A.    He asked if I have a problem with the water, and I was

14   saying, "Yes."

15   Q.    What else did he say?

16   A.    He was saying, Guy send me to fix it.

17   Q.    What did you say?

18   A.    I was telling him, I cannot do now, because I am

19   preparing myself to go to a doctor.

20   Q.    What did he say?

21   A.    He was saying, I'll not take a lot of time.  I would

22   like only to see and the job I'll do in the evening.

23   Q.    What did you say to that?

24   A.    I was saying, again, "I cannot do it now," but he was

25   insisting, and he was saying, "It will be fast."

-WC-

Direct - Krioutchkova/Channapati

542

1    Q.    So what did you say then?

2    A.    After I was saying, "Okay, come in," and I was happy

3    to hear someone was coming and fix the problem.

4    Q.    When you received that phone call, was anyone else in

5    the apartment?

6    A.    No, I was by myself.

7    Q.    Where were your daughter and granddaughter?

8    A.    They left.  My daughter went to college, and my

9    granddaughter went to school.

10   Q.    What time did they leave?

11   A.    It was approximately a quarter to 8:00.

12   Q.    Now, when you received the phone call, what were you

13   wearing at that time?

14   A.    I was wearing a gown after the shower.

15   Q.    Now, after the phone call, did there come a point

16   where someone came to your door?

17   A.    Yes.

18   Q.    How much time passed between when you got off the

19   phone with the man and when someone came to your door?

20   A.    Approximately -- approximately, 10, 15 minutes, and

21   probably less, maybe five minutes.

22   Q.    Now, when someone came to your door, did you say

23   anything?

24   A.    I heard a noise.  I cannot recall if it was the bell

25   ring or a knock to the door.

Direct - Krioutchkova/Channapati

537

1   Q.   How many children do you have?

2   A.   Two.

3   Q.   Do you currently work?

4   A.   No.

5   Q.   Did you previously work?

6   A.   Yes, I was working.

7   Q.   What did you do before?

8   A.   I was an assistant physical therapist.

9   Q.   Did you work when you were in Russia?

10  A.   Yes, I was working.

11  Q.   What did you do there?

12  A.   I was a teacher.

13  Q.   Now, Ms. Krioutchkova, how is your English?

14  A.   Not bad.

15  Q.   Are you more comfortable speaking through an

16  interpreter?

17  A.   I understand better when I have an interpreter.

18  Q.   I'm going to direct your attention to March of 2003,

19  where were you living at that time?

20  A.   1711 East 16th Street.

21  Q.   I'm sorry.  What was the address?

22  A.   1711 East 16th street.

23  Q.   Is it East 16th Street or East 15th Street?

24  A.   15th.

25  Q.   Were you living alone -- excuse me.  Was that in

-WC-

Direct - Krioutchkova/Channapati

538

1    Brooklyn?

2        A.    Brooklyn, yes, in Brooklyn.

3        Q.    Were you living alone?

4        A.    I was living with my daughter and my granddaughter.

5        Q.    How old was your daughter at that time?

6        A.    33.

7        Q.    How old was your granddaughter at that time?

8        A.    10.

9        Q.    What apartment did you live in?

10       A.    Apartment number?

11       Q.    Yes.

12       A.    1-A.

13       Q.    When did you first move into that apartment?

14       A.    In 1995.

15       Q.    Did you ever have problems with the apartment?

16       A.    Yes, I was having problems.

17       Q.    What kind of problems?

18       A.    The pipes were old and the water was leaking, and the
19   ceiling was falling apart, because of wet, and the wall was
20   falling apart between the kitchen and the bathroom.

21       Q.    How long did you have these problems?

22       A.    I got for a long time, like, around three years.

23       Q.    Who was your landlord?

24       A.    Guy Gasibson (phonetic).

25       Q.    Did you pay your rent to him?

Direct - Krioutchkova/Channapati

1    A.   Yes, regularly.

2    Q.   Who was Guy Schebovitz?

3    A.   It was two men, one is landlord, and after the second

4  was like his co-worker who was getting assignments.

5    Q.   Who did you pay your rent to?

6    A.   I was bringing to the office, and whoever was in the

7  office I was leaving the money.

8    Q.   When you had problems with your apartment, whom did

9  you tell?

10    A.   I was talking to the landlord and to his co-worker.

11    Q.   Were you having problems with your apartment in March

12  of 2003?

13    A.   Yes.

14    Q.   Directing your attention to the week before March

15  26th, 2003, did you tell your landlord about the problems in

16  your apartment?

17    A.   Yes.

18    Q.   What problems did you tell him about?

19    A.   The water was leaking in the bathroom where you wash

20  the hands and the water was leaking from the ceiling in the

21  kitchen.

22    Q.   Did you have a conversation with him about the water

23  problem?

24    A.   Yes.

25    Q.   Did the landlord say he was going to send someone to

Direct - Krioutchkova/Channapati

540

1    fix it?

2        A.    Yes.

3        Q.    Did you believe that the landlord was going to send

4    someone to fix it?

5        A.    Very seldom I was complaining to him, and always I was

6    believing -- or trusted him.

7                    MS. CHANNAPATI:  Could you repeat that?

8                    THE COURT:  Let the interpreter repeat what

9        she said.

10                   What did you say?  Repeat it.

11                   THE INTERPRETER:  Always I was complaining,

12       and the landlord was -- I trusted him.

13       Q.    Now, did you have -- when you told him about the

14   problems with your apartment before March 2003, did he send

15   someone to come and fix those leaks?

16       A.    Yes, he was sending.

17       Q.    Did he send the same person each time to fix the

18   leaks?

19       A.    No.  It was different people.

20       Q.    Now, I'm going to direct your attention to

21   approximately 8:00 a.m. on March 26th, 2003.  Did there come a

22   point where you received a phone call?

23       A.    Yes.

24       Q.    What was your phone number at that time?

25       A.    718-787-1125.

Direct - Krioutchkova/Channapati

543

1    Q.   Did you see who was at the door?

2    A.   I looked, yes, and I saw a man.

3    Q.   Did you say anything when you saw it was a man?

4    A.   I asked who, and he was saying, "I'm the one who was

5    calling."

6    Q.   Now, the man that you saw, had you ever seen him

7    before?

8    A.   No.

9    Q.   Did he tell you his name?

10   A.   No, he didn't say.

11   Q.   Did you later learn what his name was?

12   A.   Yes.

13   Q.   What name did you learn?

14   A.   Dennis Colon.

15   Q.   Now, did you let that man in?

16   A.   Yes.

17   Q.   Describe what you saw Dennis Colon wearing.  Describe

18   what you saw Dennis Colon wearing at that time.

19   A.   He was wearing on his head a hat and a black leather

20   jacket and the shirt was Khaki color and with buttons in front.

21   Q.   Do you know what else he was wearing?

22   A.   He was wearing blue jeans and brown belt, and he was,

23   the face was round, and he got facial hairs from the ear around

24   his --

25            THE INTERPRETER:  What she's showing.

-WC-

Direct - Krioutchkova/Channapati

544

1        MS. CHANNAPATI:  Let the record indicate --

2        THE COURT:  The interpreter cannot speak to

3    me.  There is a gesture which the witness has made, and you

4    and the witness will have to figure that out from Russian

5    to English.

6        MS. CHANNAPATI:  If the record could indicate

7    that the victim is indicating from her ear across her chin

8    up to her other ear.

9        THE COURT:  The complaining witness is making

10   a gesture from the ear to other ear on the face, but we

11   don't know the word that has been used.

12       THE WITNESS:  He got a narrow beard which

13   started from one ear to the other.

14   Q.   Now, did you notice anything about how he smelled?

15   A.   You can smell alcohol from him.

16   Q.   Was he carrying anything with him?

17   A.   I didn't see anything.

18   Q.   Ms. Krioutchkova, I'm going to ask, with the Court's

19   permission, for you to look around the courtroom, and if you

20   see the person that came to your apartment that day, if you

21   could please point to him and describe an article of clothing

22   that he's wearing.

23   A.   Yes, I can see.

24   Q.   Could you please point to him and describe an article

25   of clothing that he's wearing.

Direct - Krioutchkova/Channapati

545

1    THE COURT:  What is he wearing?

2    THE WITNESS:  A dark gray jacket.  He has a

3    light shirt, but a little bit greenish.

4    THE COURT:  The witness has identified the

5    defendant.

6    Q.  What did you do when the defendant came into your

7    apartment?

8    A.  He came in.  I pointed to him with my hand on the

9    right side.  This was very close to the entrance door and the

10   door to the bathroom.

11   He asked me, "What is the problem?"

12   I told him.  He started looking very carefully.  He

13   opened the faucet, and after he was standing on his knee and

14   looked under the sink.

15   Q.  The sink?

16   A.  Yes.  And he looked on the bathtub and was asking,

17   "You have a problem here, too," and I was saying him, "Yes," to

18   him, and he asked, "Do you have another problem?"  And I was

19   showing him to the ceiling.  At this moment I was thinking,

20   like, maybe he will fix it now.

21   Q.  Okay.

22   A.  And after he asked for a pen or a pencil and a piece

23   of paper, because he have to write down.

24   Q.  Did you give him a pen and paper?

25   A.  Yes.

Direct - Krioutchkova/Channapati

546

1    Q.   Did you see him do anything with it?

2    A.   He was writing down one line.

3    Q.   How long did he take to look around?

4    A.   Not long, maybe five minutes, maybe ten minutes.

5    Q.   After he took some notes, what happened next?

6    A.   I didn't see what he did with the paper.  He was

7    saying he will come in the evening to do the repair, and he was

8    walking toward the door to leave.

9    Q.   What were you doing as he was walking toward the door?

10   A.   I went after him to let him out.

11   Q.   What happened as you were walking out, as you were

12   following him out?

13   A.   When I was walking after him, I looked down, and in

14   front of me, it was his back.  When I pulled my eyes up, I saw

15   his face.  He turned around facing me, and his right arm was

16   up, and he was holding a knife.

17   Q.   What did he say to you?

18   A.   I saw his very mad face, and he start repeating, "Lie

19   down.  I'll kill you.  Lie down.  I'll kill you."

20   Q.   What were you thinking at that point?

21   A.   I was so fearful, I cannot describe.  I couldn't

22   imagine this could happen.  Right away in my mind was my

23   daughter and my children and my grandchild.  I couldn't

24   imagine, like, this was the end of my life.  I thought my life

25   just begin, and I was remembering the incident when near the

-WC-

Direct - Krioutchkova/Channapati

1   subway a Russian man was killed.

2                   MR. GREENBERG:  Objection, your Honor.

3                   THE COURT:  Overruled.

4                   THE WITNESS:  He was meeting his wife, and he

5       was an officer.

6           Q.   Now, when you saw the defendant with the knife, at

7       that point did you want him in your apartment?

8                   THE INTERPRETER:  Excuse me?

9           Q.   When you saw the defendant with the knife, did you

10      want the defendant in your apartment?

11          A.   I -- right away I realize what is going on, and I was

12      screaming, "Help me," and I was running to the door, but he was

13      pushing me.  He didn't let me open the door and started

14      repeating, "Lie down.  I'll kill you.  Lie down.  I'll kill

15      you."

16          Q.   Ms. Krioutchkova, did the defendant have your

17      permission to stay in your apartment at that point?

18          A.   When I saw this, I was saying, "Get out," and I was

19      screaming for help.

20          Q.   How did he look to you?  How did the defendant look to

21      you?

22          A.   I didn't look.  I was afraid to look at him, but, in

23      general, his face was scary and mad.

24          Q.   How were you positioned when he first pulled out the

25      knife?  How were your bodies positioned?

-WC-

Direct - Krioutchkova/Channapati

548

1   A.   I didn't see when he pulled out the knife, but when I

2   pull my eyes up, I saw, I was sawing him turn around facing me,

3   and the right arm was up, and the hand was with the knife.

4   Q.   You said he pushed you.  How did he push you?

5   A.   I was saying, "Get out from here.  Help me.  Help me."

6   And he pushed me very hard.  He pushed me, and I was falling,

7   like, backwards.  He was following me.

8   Q.   Where on your body did he push you?

9   A.   He pushed me with his left hand in my chest.  He

10   pushed me, like, with all his body.  I was trying to get out

11   from him, and I wasn't able to.

12   Q.   What happened after he was pushing you?

13   A.   He pushed me from him, and he started following me and

14   was moving his hands up and down with the arm -- with the knife

15   in his hand up and down and was saying, "Lie down.  Lie down.

16   I'll kill you."

17   Q.   Were you still facing him?

18   A.   Yes.

19   Q.   What happened next?

20   A.   When he was doing this, he was moving his arm, and

21   little by little, I was stepping backwards, but he was, like,

22   after me.

23   Q.   Were you saying anything at that point?

24   A.   I was begging, "Don't kill me.  Don't kill me."  I was

25   begging him, "You can take whatever you want, but don't kill

-WC-

1    me."

2         Q.   What happened next?

3         A.   After when I realized what he wants from me, I was

4    saying, "Don't touch me.  I am sick."

5         Q.   Why did you tell him that you were sick?

6         A.   I was hoping if he will hear, he will leave me alone.

7         Q.   Did he leave at that point?

8         A.   No.  He was laughing, and he was saying, "You're sick?

9    No.  No."

10        Q.   What happened next?

11        A.   After we crossed, he closed the door with the kitchen

12   on the second room.

13        Q.   What happened when you got into the second room?

14        A.   A bed was staying nearby, and he pushed me to the bed.

15        Q.   Did you fall on the bed?

16        A.   Yes.

17        Q.   What happened next?

18        A.   After, he put my hands behind me, and he pushed me

19   with his body.

20        Q.   How was he positioned with respect to you?

21        A.   I was lying on my back, and my leg was on the floor.

22   He was with his body -- he squeezed my body.

23        Q.   Were you able to get up?

24        A.   No.

25        Q.   Why not?

Direct - Krioutchkova/Channapati

550

1 A. He's strong.

2 Q. Did he do anything with your legs?

3 A. Yes.  He spread my legs, and he, with his hand, he

4 entered my vagina.

5 Q. What happened at that point?

6 A. I experienced pain, and I was saying, "Your hand are

7 so dirty, maybe you will go and wash your hand."

8 Q. Why did you say that?

9 A. I thought that maybe if he will go, I'll have a chance

10 to get out to the door.

11 Q. What happened after you said that?

12 A. After, he stand up, and he grabbed me from my clothes,

13 and he embraced me, he embraced me, and he walked to wash his

14 hands together with me.

15 Q. So where were you when he was washing, when the

16 defendant was washing his hands?

17 A. He came to the faucet, and he pushed me to the table,

18 and he start washing his hands, but his body was so tight with

19 my body, I couldn't move.

20 Q. Was your body in between him and the sink?

21 A. All together.  This is, like, a table, but this is the

22 sink with the table.  My body was between the sink and between

23 him.

24 Q. What happened after -- did he finish washing his

25 hands?

1    A.   He washed his hands, and he dragged me again to the

2  bed.

3    Q.   What happened when you got to the bed?

4    A.   He pushed me toward the bed, and he squeezed me, and

5  he spread my legs.

6    Q.   How was your body positioned when you were on the bed

7  this time?

8    A.   I was on my bed, and my legs on the floor.

9    Q.   Where was his body?

10   A.   He was on top of me.

11   Q.   What happened next?

12   A.   He open his zipper of his pants.

13   Q.   What did he do next?

14   A.   He pull out his penis, and he put inside of my vagina.

15   Q.   Did you feel any pain at that point?

16   A.   I was feeling excruciating pain.

17   Q.   Where were you feeling it?

18   A.   In my vagina.

19   Q.   Did he say anything at that point?

20   A.   He was repeating all the time, "I'll kill you," and I

21  was begging him, "Don't kill me."

22   Q.   What happened next?

23   A.   All the time he was saying, "Close your eyes."  He

24  slapped me in the face so I'll turn my head.

25   Q.   What happened next?

Direct - Krioutchkova/Channapati

552

1   A.   And he stand up and he was holding in his hand a paper

2   towel, and he was holding for long time this paper on his

3   penis.

4   Q.   What did he do at that point?

5   A.   And with disgusting expression on his face looked at

6   me.

7   Q.   What happened next?

8   A.   And after he was saying, telling, "Take a shower," and

9   he ran away.

10   Q.   Before he left the apartment, did you see him

11   ejaculate?

12   A.   He was holding the paper for long time, covering his

13   penis.

14   Q.   When this happened in the apartment, what was the

15   lighting like in the apartment?

16   A.   It was light, and it was daylight.

17   Q.   How close were you to the defendant when this

18   happened?

19   A.   Very close, nose to nose.

20   Q.   Was there anything covering his face?

21   A.   Nothing, it was open.

22   Q.   Was there anything blocking your view of the defendant

23   when this was happening?

24   A.   I very well saw his disgusting face.

25   Q.   Now, you said there came a point when he left?

-WC-

Direct - Krioutchkova/Channapati

553

1    A.    Yes.

2    Q.    What happened -- withdrawn.

3          What did he say to you before he left?

4    A.    He was saying, "Take a shower," and "Don't call the

5    police."

6    Q.    Did you take a shower?

7    A.    No.

8    Q.    Ms. Krioutchkova, the bed where this happened, who

9    sleeps in that bed?

10   A.    My daughter.

11   Q.    Do you sleep in that bed ever?

12   A.    No.  I have a separate bed.

13   Q.    After he left, what did you do?

14   A.    I came to the door, I locked the door, and I called

15   the police.

16   Q.    Did the police arrive?

17   A.    Yes, arrived.

18   Q.    Did you speak with them?

19   A.    Yes, I spoke.

20   Q.    Did there come a point where an ambulance came?

21   A.    Yes.

22   Q.    Did the ambulance take you anywhere?

23   A.    Yes.  Yes.  They took me to the hospital.

24   Q.    What hospital did they take you to?

25   A.    Coney Island Hospital.

Direct - Krioutchkova/Channapati

554

1    Q.    What happened when you went to the hospital?

2    A.    They brought me to the emergency room; they took

3    tests; two police officers came; they took tests; and after

4    they took from my mouth and from my vagina and they took from

5    my hands also tests; and they took the gown which I was

6    wearing; and after they got something down in, they shake this

7    before they took with them.

8    Q.    What did they shake?

9            THE INTERPRETER  Night gown.

10   A.    And after, they set up an appointment to go to the

11   gynecologist, and in the same time, the gynecologist examined

12   me in another cabinet, and he prescribed a medicine for me for

13   HIV.

14   Q.    When you had a gynecological exam, were you examined

15   inside?

16   A.    Yes.

17   Q.    Did there come a point when you returned to your

18   apartment?

19   A.    Yes, I came to my apartment.

20   Q.    What happened when you came home?

21   A.    The police were there.  They took some things from my

22   daughter's -- some things, some things from the bed.

23            THE COURT:  Sinks or things from the bed?

24            THE INTERPRETER:  Yes, things.

25   Q.    Could you describe what they took from your daughter's

-WC-

Direct - Krioutchkova/Channapati

1    bed?

2    A.    Sheets.

3                    THE INTERPRETER:  She told already me before.

4                    MS. CHANNAPATI:  Can we approach for a second?

5                    THE COURT:  Come over here.

6                    We're going to have a conference.  So we're

7    going to let the witness step off the witness stand.  All

8    right.  The witness can step off the witness stand.

9                    Tell her she's still under oath and do not

10   discuss anything.  You will be outside in the hall.  We'll

11   call you back, and the interpreter will be with you, but

12   don't discuss the case.

13                   THE INTERPRETER:  I have to come out here with

14   her?

15                   THE COURT:  You don't have to.  You can get

16   her to the door and don't discuss the case.

17                   (The following proceedings were held at

18   sidebar:)

19                   THE COURT:  Now, we're on the record in front

20   of the jury, but in a position where the jury cannot hear.

21                   MS. CHANNAPATI:  Your Honor, the interpreter

22   is having a little bit of a conference between the question

23   and the answers, and I'm asking that she be instructed on

24   the record outside the presence of the jury that she should

25   not be doing that.

-WC-

1          MR. GREENBERG:  I also object.  It's my

2     understanding that she told the witness that, "Just tell

3     them it's the sheets."

4          We speak Russian.

5          THE COURT:  Here's the thing.  Your speaking

6     Russian is irrelevant.  Under the law, it's irrelevant.

7          MR. GREENBERG:  We know what she's saying.

8          THE COURT:  Under the law, it's irrelevant,

9     because I don't know you speak Russian.  This business of

10    interpreters will have to have a discussion out of the

11    presence of the jury, period.

12          MS. CHANNAPATI:  Okay.

13          THE COURT:  So we'll let the jury go for a

14    moment.

15          Ladies and gentlemen, there's some legal

16    issues that we need to discuss out of your presence.  So,

17    therefore, you will go to your jury room.  You will not

18    discuss the case and form no opinions, and we'll see you

19    back in a few minutes.

20          Leave your books on the seats.  That's the way

21    we do that.

22          (Whereupon, the jury exits the courtroom.)

23          THE COURT:  Let the record show that the jury

24    has exited the courtroom, but all parties are present.  The

25    witness is outside of the courtroom.  The interpreter is

-WC-

Direct - Krioutchkova/Channapati

557

1          present.

2                    Now, at the conference, which we had which was

3          on the record, but the jury was not able to hear, the

4          People raised an issue, and the People's issue I should let

5          them put on the record themselves now.

6                    MS. CHANNAPATI:  Your Honor, I'm just a little

7          concerned with how the interpretation of the witness's

8          testimony is going.  I'm sensing there's a discussion

9          between the two of them before an answer is given, and I

10         don't speak Russian, but I feel it's, like, I feel, like,

11         whatever is coming from the witness should be interpreted,

12         and if I need to ask another question, I'll ask another

13         question.

14                   THE COURT:  Now, that's what the People,

15         that's the thrust of what the People say.  The defense also

16         had something to say.

17                   MR. GREENBERG:  Well, your Honor, it's my

18         understanding that the interpreter prompted and discussed

19         with the witness what item, or we'll say that was sheets,

20         obviously, that's inappropriate.

21                   THE COURT:  Now, defense is commenting with

22         regard to one particular event or piece of testimony.  What

23         the People are raising is something a bit more general.  So

24         let's try to take them separately.

25                   The People's point is that they believe, and

Direct - Krioutchkova/Channapati

558

1    let me say that I don't speak Russian, as the Court, and

2    let me say, secondly, if anybody else speaks Russian, as

3    far as I understand, the Court's decision here is that's

4    irrelevant, whether it was Russian, Spanish, or anything

5    else.  That's why we have court interpreters.

6                Now, the business of what goes on between the

7    interpreter and the person on the stand, it's been

8    discussed over and over, and this is New York City, and

9    there's several languages.

10               So there are different styles, and this Court

11   has been observant.  I have not observed anything that I

12   would call out of the ordinary, in general, period, and I

13   have put that on the record.

14               Now, with regard to the sheets, it was I who

15   said, what was that word.  I was asking the interpreter

16   what is that word, and I didn't understand the first time

17   what the interpreter said.

18               Ultimately, the interpreter said, "things,"

19   t-h-i-n-g-s.  I'm here with a computer, and I wrote it, and

20   I'm closer.  "Things from the bed."  That's what I took as

21   my note.

22               MR. GREENBERG:  That's not --

23               THE COURT:  I'm not asking you what you heard.

24   I'm saying what I heard.

25               MR. GREENBERG:  That's not the specific item

-WC-

Direct - Krioutchkova/Channapati

559

1    that we were --

2         THE COURT:  That's a different story.

3         MR. GREENBERG:  It was when Ms. Channapati

4    stopped the examination just prior to that.  That's where

5    it occurred.

6         THE COURT:  Well, then I'm on a

7    different specific.  Now, I move in a different direction.

8    If there is a point at which an interpreter is, and it has

9    to be observed by the Court, if there is a point at which

10   the interpreter is testifying, then we cannot allow that,

11   but the interpretation process is one where there is

12   latitude.

13        So, now, I instruct the interpreter, please,

14   listen to what the witness is saying.  Please, do not, what

15   would I say, independently give us any words.  Just give us

16   the words that the witness is saying.

17        If on the other hand the witness has said

18   something that you don't understand, then you can ask her

19   what you said.

20        THE INTERPRETER:  Can I explain?

21        THE COURT:  You may say something.

22        THE INTERPRETER:  Okay.  She was saying in

23   Russian, "Pododayalnik."

24        THE COURT:  The reporter is giving me the eye.

25   He doesn't know how to spell that word.

-WC-

1          There's a word in Russian that she said.

2          THE INTERPRETER:  And this is like you have a

3    pillow case, and this is a cover, bed cover case, like you

4    put your cover in this case, but the Americans actually are

5    not using.  So we are using, like, sheets.

6          THE COURT:  The interpreter is saying in that

7    discussion which related to a bed and what's on the bed,

8    the interpreter is saying the witness was using language

9    that, if I'm understanding her correctly, in America, it's

10   not normally going to be found, the thing she was saying.

11         THE INTERPRETER:  You could find, but maybe

12   seldom, but she knows the name, duvet.

13         MS. CHANNAPATI:  Duvet is what the victim

14   said.  It's a cover for a blanket.

15         THE COURT:  That's an English word or a word

16   we understand.

17         Here, again, I repeat, having sat at 100

18   Centre Street where there are, I don't know how many

19   official interpreters, this comes up all the time, all the

20   time, but in a trial, we still have to have our proceeding,

21   and I say, once again, if it reaches the level where the

22   Court believes that the interpreter is testifying on her

23   own as opposed to interpreting, then the Court will stop

24   that, but we have had the discussion.  We have had the

25   People raise their issue with regard to their witness, and

Direct - Krioutchkova/Channapati

561

1   we have had the defense raise what it observed, and so

2   we're all being more observant.

3                    MS. CHANNAPATI:  Thank you, your Honor.  I

4   appreciate it.

5                    THE COURT:  I'll take a moment and be right

6   back.

7                          (Brief recess taken.)

8                    THE COURT:  The Court notes that the witness

9   has returned to the witness stand.

10                   Ms. Interpreter.

11                   THE INTERPRETER:  Yes.

12                   THE COURT:  The Court notes that the witness

13  has returned to the witness stand.  She may sit.  She is

14  still under oath.

15                   Now, well ask the jury to return.

16                   THE COURT OFFICER:  Ready for the jury, your

17  Honor?

18                   THE COURT:  Yes.

19                   THE COURT OFFICER:  Jury entering.

20                   (Whereupon, the jury enters the courtroom and

21  is properly seated.)

22                   THE CLERK:  All jurors are present.  Do both

23  sides waive the reading of the roll?

24                   MR. GREENBERG:  So waived.

25                   MS. CHANNAPATI:  So waived.

-WC-

1    THE COURT:  Ladies and gentlemen, we are back,

2    and we will continue.

3         People.

4    Q.   Ms. Krioutchkova, when you came back to your

5    apartment, did you notice if anything was missing?

6    A.   Nothing was missing, except the duvet the police took.

7    Q.   Could you explain what a duvet is?

8    A.   In Russian this is Pododayalnik.

9         THE COURT:  It is what in Russian?

10         THE INTERPRETER:  Pododayalnik.  This is the

11    name.

12         THE WITNESS:  This is two sheets.

13         THE COURT:  Two sheets.

14         THE WITNESS:  Sewn together.

15         THE COURT:  Two sheets sewn together.

16         THE WITNESS:  Inside you put the blanket.

17         THE COURT:  Inside you put a blanket.

18    Q.   Did you notice anything else when you came home?

19    A.   Like, concrete.

20    Q.   Did you check your messages?  When you came home, did

21    you check your messages when you came home?

22    A.   Yes, I checked.

23    Q.   Did you have any messages when you came home?

24    A.   Yes.  There was one message, and it was Dennis Colon's

25    voice, and he was saying, "Sorry."

-WC-

1    Q.   Now, I'm going to direct your attention to April 5th,

2    2003, approximately after midnight.  Did you receive a phone

3    call at that time?

4    A.   Yes, I received.

5    Q.   Did you recognize the caller?

6    A.   Yes, I recognize.  This was the voice of Dennis

7    Colon's.

8    Q.   What did he say to you?

9    A.   He asked, "Do you remember what happened?"

10        And I'm asking, "Who is calling?  Who is this?"

11        He answered, "You know who is calling."

12        I start saying, "I don't know who are you."

13        He's saying and was asking the same many times, "Do

14   you remember what happened?  Did you call the police?"

15        I was saying, "No.  I didn't call to the police," and

16   after, my daughter, she heard me talking on the phone.  She

17   came out, and she was showing with her gesture, with her head,

18   who is this, and I was showing to her to the receiver, and I

19   was gesturing to her, like, it's him; and prior to this, the

20   detective told my daughter, If someone will call, right away

21   they have to call to the police, and the detective was

22   instructing, she says, "You have to pick up the telephone," and

23   my daughter right away, she called to the detective.  I was

24   feeling not well, and I didn't want to talk to him, and my

25   daughter was telling me, "Hold him on the line as long as it's

-WC-

Direct - Krioutchkova/Channapati

564

1    possible."

2         Q.    How did your daughter call?

3         A.    She got a cellular telephone, and she was using her

4    cellular telephone.

5         Q.    What else did Dennis Colon say?

6         A.    After my daughter was telling me, "Hold him on the

7    line," I got very nervous, because I didn't want to talk to

8    him, and after we were talking like a question, answer,

9    question, answer; and I asked him, I asked him, "Why you did

10   this?"

11        He was laughing, and he was saying, "I love your

12   body," and I was telling him, "I was afraid, I was afraid you

13   will kill me," and he asked me, "Do you like my body?"

14        I told him, "I didn't see your body.  You didn't took

15   off your clothes."

16        He was laughing.  He was saying, "not this body," and

17   after I asked him how he got my name, my telephone number, and

18   he was saying, "In the telephone book," and I asked, "Which

19   telephone book, in Russian telephone book?"

20        And he was laughing, and I asked him also, "What is

21   your name?  You know everything about me."

22        He was saying, "My name is Jack, and I asked him,

23   "You're black or Spanish?"

24        I don't remember what he was answering.  Spanish, he

25   was answering, and after I was saying, "Jack is not a Spanish

-WC-

Direct - Krioutchkova/Channapati

565

1    name."  I was talking just to talk, and he was also laughing.

2        Q.   What else did you say to him, if anything?

3        A.   I don't remember what else.  We were talking, we were

4    talking about everything, and after, he's asking, "What are you

5    doing?  How you dressed up?  Are you wearing the same gown?"

6        Q.   Who asked that question?

7        A.   Colon was asking me, "Where are you now?  How you are

8    laying?"

9             And after, my daughter came out from the other room,

10   and she was telling me, "Invite him here.  Invite him."

11            I was saying -- he was saying, "I would like to see

12   you."

13            So I was telling him, "Come in now," and he was asking

14   me, "Are you by yourself?"

15            I was saying, "No, my son is with me in the

16   apartment."

17       Q.   Ms. Krioutchkova, was your son with you at that time?

18       A.   No, he wasn't.  I was afraid when he will come.  I was

19   afraid he will come.  Maybe my son can stop him, and he will

20   defend me.

21            After, he was laughing.  He was saying, "No.  No."

22   And after, he was saying, "I will be there in half an hour,"

23   and after a pause and something else we were talking about, but

24   I cannot recall now.  "No.  No.  I'm not coming now.  I'll come

25   next time."

1    Q.   Then what happened?

2    A.   He was the one who put the receiver.

3    Q.   After you got off the phone with him, what happened

4  next?

5    A.   Very quick, two detectives arrived.

6    Q.   Did the police stay at your apartment?

7    A.   They were staying in my apartment, talking among

8  themselves.

9    Q.   For how long did they stay?

10   A.   I cannot say how long they were in the apartment.

11  They were staying in the apartment, but how long, I couldn't

12  say.

13   Q.   I'm going to direct your attention to later that day

14  into the evening at 9:00 o'clock p.m.  Did there come a point

15  where you went to the Brooklyn Special Victims Squad building,

16  Brooklyn Special Victims Squad building?

17   A.   Yes.

18   Q.   What did you do when you got there?

19   A.   When I came over, there this was room with a huge

20  window, and a policeman came to me and was saying, Look in the

21  window, and if you will see someone familiar, you tell us.

22   Q.   Did you recognize anyone?

23   A.   I recognized a man.  It was Dennis Colon.

24   Q.   What number was he?

25   A.   No. 5.

Direct - Krioutchkova/Channapati

567

1    Q.   Where did you recognize him from?

2    A.   I recognized his face very well, but his beard was a

3    different style.  He got the beard thin, but it started under

4    the chin from one side and was going on the upper lip near the

5    nose, and it end up on the other side of the chin.

6    Q.   Ms. Krioutchkova, from where did you recognize Dennis

7    Colon from?

8    A.   I identified him, because he came to my apartment, and

9    he raped me.

10    Q.   Did you tell the detective this or the police officer

11    this that was with you?

12    A.   I told him I recognized this man, and I pointed to the

13    number.

14    Q.   Now, did a detective show you any property that day?

15    A.   We went to another room, and she brought a hat and the

16    knife.

17    Q.   Did you recognize the hat and the knife?

18    A.   Yes, I recognized.

19    Q.   Where did you recognize them from?

20    A.   The hat was Dennis Colon was wearing, the hat when he

21    came to my apartment, and the knife was in his hand.

22          MS. CHANNAPATI:  Your Honor, at this time, if

23    the witness could be shown what's been previously marked as

24    People's No. 1 for identification.

25          THE COURT:  Yes.  The witness will be shown

-WC-

Direct - Krioutchkova/Channapati

568

1       that.  It's been shown to the defense and has been marked,

2       previously, for identification, People's Exhibit 1.

3       Q.  Ms. Krioutchkova, do you recognize that?

4       A.  I recognize this.

5       Q.  What do you recognize it to be?

6       A.  This is the draft of my apartment.

7       Q.  It is what?

8       A.  Draft.

9       Q.  Is it drawn to scale?

10      A.  No scale.

11              THE INTERPRETER:  Say it again.

12      Q.  Is the drawing drawn to scale?

13              THE COURT:  She may not understand what you

14      mean, People.

15      Q.  Ms. Krioutchkova, is the drawing directly

16      proportionate --

17      A.  I understand.

18              THE COURT:  At this time the question is not

19      finished.  So let's finish the question and then interpret.

20      Q.  Is the drawing directly proportionate to the

21      measurements of your actual apartment?

22      A.  It looks like this is my apartment, and everything is

23      here like it was in my apartment, but about the measurements,

24      it's not the same.

25      Q.  Other than that, does it fairly and accurately depict

Direct - Krioutchkova/Channapati

569

1    your apartment?

2        A.    Yes, this is my apartment.

3                    MS. CHANNAPATI:  Your Honor, at this time I

4    ask what has been previously marked as People's No. 1 for

5    identification be moved into evidence as People's No. 1 in

6    evidence.

7                    THE COURT:  Is there any objection?

8                    MR. GREENBERG:  No.

9                    THE COURT:  All right.  Then that item is

10   admitted into evidence as People's Exhibit 1.

11                   MS. CHANNAPATI:  Could it be posted for the

12   jury?

13                   THE COURT:  It may be posted.

14                   MS. CHANNAPATI:  Your Honor, I would ask if

15   the witness could be handed this marker.

16                   THE COURT:  You may ask the court officer once

17   he gets everything else set up to approach the witness.

18                   MS. CHANNAPATI:  With the Court's permission,

19   may the witness approach the exhibit?

20                   THE COURT:  Now, the witness may step towards

21   the exhibit.

22       Q.    Ms. Krioutchkova, could you please point first where

23   the entrance to your apartment is.

24       A.    This is the corridor, and this is my door.

25       Q.    Could you please put the letter "D" for door to the

-WC-

Direct - Krioutchkova/Channapati

1    entrance of your apartment.

2        A.    (Witness complies.)

3        Q.    Could you please point as to where the bathroom is

4    located in your apartment, just point, and could you put a

5    letter "B" there, please.   Could you please just point and

6    indicate where you sleep in the apartment.

7        A.    (Witness complies.)

8        Q.    Ms. Krioutchkova, what kind of bed is that?

9        A.    Sofa bed.

10       Q.    Could you please put a "V" for Vera as to where you

11   sleep.

12       A.    (Witness complies.)

13       Q.    Now, could you please indicate where your daughter

14   sleeps, just point, and is that the same bed that Dennis Colon

15   attacked you on?

16                    MR. GREENBERG:   Objection.

17                    THE COURT:   Sustained as to the form of the

18   question.

19       Q.    Is that the same bed where Dennis Colon --

20                    THE COURT:   Where the event occurred.   Is that

21   what you're saying?

22       Q.    Where the event occurred?

23       A.    Yes.

24       Q.    Could you put an "X" on that.

25       A.    (Witness complies.)

Direct - Krioutchkova/Channapati

571

1    Q.   What kind of bed is that?

2    A.   Sofa bed.

3    Q.   Thank you.  You could have a seat.

4         Ms. Krioutchkova, on the day that this happened, on

5    March 26th, 2003, the sofa bed where this all occurred, was it

6    open, or was it closed?

7    A.   It was open.

8              MS. CHANNAPATI:  Your Honor, at this time I

9    would like if the witness could be shown what's been

10   previously marked and shown to defendant's counsel as

11   People's No. 2 for identification.

12             THE COURT:  All right.  It has been previously

13   marked for identification, People's 2.  The defense has

14   seen it.

15             Is that correct?

16             MR. GREENBERG:  Correct.

17             MS. CHANNAPATI:  Yes, your Honor.

18             THE COURT:  So, it's now being shown to the

19   witnesses.

20             MS. CHANNAPATI:  Your Honor, I'm just going to

21   stand closer.

22             THE COURT:  You may approach.

23             MS. CHANNAPATI:  Thank you.

24   Q.   Ms. Krioutchkova, do you recognize these five photos?

25   A.   I recognize.

-WC-

1      Q.    What do you recognize them to be?

2      A.    Which picture?

3      Q.    Well, just start with the first one, start with 2-A.

4      A.    This is the view from outside on the street.  This is

5  the entrance door.  On the right side, this is my window on the

6  first floor.

7      Q.    It is the entrance to what?

8      A.    This is the entrance from the street to the corridor

9  on the ground floor.

10     Q.    Of what building?

11     A.    The building, my building where I used to reside.

12     Q.    Now, looking at Photo 2-B, could you please describe

13  what that is?

14     A.    This is the door, the second door, from in the

15  building where I lived on the first floor.

16     Q.    Could you please describe what's in Photo 2-C.

17     A.    On this picture I see my door from the right side.

18     Q.    Could you please describe what you see in Photo 2-D?

19     A.    On D this is the door, the exit door, from my

20  building, and my door is on the left side.

21     Q.    What is in Photo 2-E?

22     A.    This is the entrance door to my apartment.

23            MS. CHANNAPATI:  Your Honor, at this time I

24  would ask -- I'm sorry.  One more question.

25     Q.    Do these photos fairly and accurately depict what your

Direct - Krioutchkova/Channapati

573

1  apartment looked like, the entrance to your apartment, the

2  corridor before your apartment door, does it fairly and

3  accurately depict the way it looked on March 26th, 2003?

4      A.   Yes, exactly.

5              MS. CHANNAPATI:  Your Honor, at this time I

6  would ask what's been previously marked as People No. 2-B

7  be offered into evidence as People's No. 2 in evidence.

8              THE COURT:  Any objection?

9              MR. GREENBERG:   No.

10             THE COURT:  That is now placed in evidence or

11 admitted into evidence as People's 2.

12             MS. CHANNAPATI:  Your Honor, could we post it

13 for the jury, please?

14             THE COURT:  It will be posted.

15             MS. CHANNAPATI:  If the witness could be

16 allowed to approach the exhibit.

17             THE COURT:  All right.  It has been posted.

18 The witness may, again, approach with the exhibit.

19             People.

20             MS. CHANNAPATI:  Yes, thank you.

21     Q.   Vera, could you point to the photo that depicts the

22 entrance to your building?

23     A.   (Indicating.)

24     Q.   In that photo is your apartment window also shown?

25     A.   This one.

Direct - Krioutchkova/Channapati

574

1    Q.    Now, that entrance door, did the lock on that door --

2    well, withdrawn.

3          Was there a lock on that door?

4    A.    The lock was there, but didn't work.

5    Q.    Now, directing your attention to Photo 2-B, was there

6    a lock on that door?

7    A.    The lock was there, but didn't work.

8    Q.    Directing your attention to Photo 2-C, could you

9    please point to where your apartment door is?

10   A.    (Indicating.)  Okay.

11   Q.    If you could put a "V" on the door.

12   A.    (Witness complies.)

13   Q.    Photo 2-D, indicate, if it's shown, where your

14   apartment door is?

15   A.    (Indicating.)

16   Q.    What is shown in Photo 2-E?

17   A.    This is the door of my apartment.

18   Q.    Just going back to Photo 2-B, what door is shown in

19   that photo?

20   A.    This is the entrance door between the first corridor

21   and the second corridor.

22              MS. CHANNAPATI:  Your Honor, the witness can

23         sit down.

24              THE COURT:  The witness may now get back to

25         the seat.

Direct - Krioutchkova/Channapati

575

1          This might be a good time to break.

2         MS. CHANNAPATI:  Okay.

3         THE COURT:  So, it is a good time to break for

4 lunch.  Again, my same instruction, I must repeat them each

5 time.  Do not discuss the case, and we'll see you back at

6 2:15.  Please leave your books on the seat.  That's the way

7 we keep them.

8         (Whereupon, the jury exits the courtroom.)

9         THE COURT:  Now, the jury has left the

10 courtroom.  The witness will also now be leaving from the

11 witness stand to return at 2:15.  The witness is instructed

12 to have no discussions with the People during the lunch

13 break, and we'll see you back at 2:15.

14         THE COURT:  Thank you.

15         The witness may step down.

16         THE COURT:  The record will show that the

17 witness has now left the courtroom.

18         Do either of the attorneys have anything to

19 discuss at this point?

20         MR. GREENBERG:  Not at this time.

21         THE COURT:  They do not.  So we'll be back at

22 2:15.

23         (Luncheon recess taken.)

24

25

Direct - Krioutchkova/Channapati

576

1          THE COURT:  All right.  The witness has taken

2     the stand.  We have been informed that the jury is ready.

3     We can let the jury in.

4          THE COURT OFFICER:  Jury entering.

5          (Whereupon, the jury enters the courtroom and

6     is properly seated.)

7          THE CLERK:  All jurors are present.

8          Do both sides waive the reading of the roll?

9          MR. GREENBERG:  So waived.

10         MS. CHANNAPATI:  So waived.

11         THE COURT:  Ladies and gentlemen of the jury,

12    we're back after lunch.  We're back right where we left

13    off.

14         People, you may proceed.

15         MS. CHANNAPATI:  Thank you, your Honor.

16         At this time I would ask that if the witness

17    could be shown what's been previously marked and shown to

18    defense counsel as People's No. 3 for identification.

19         THE COURT:  Defense, you have seen that?

20         MR. GREENBERG:  Yes.

21         THE COURT:  That is being handed to the

22    witness.

23    Q.   Ms. Krioutchkova, do you recognize that?  Do you

24    recognize those photos?

25    A.   Yes, I recognize.

-WC-

Direct - Krioutchkova/Channapati

577

1    Q.    What do you recognize those photos to be generally?

2    A.    This is my apartment.

3    Q.    Do those photos fairly and accurately depict what your

4    apartment looked like on March 26th, 2003?

5    A.    Yes.

6              MS. CHANNAPATI:  Your Honor, at this time I

7    would ask what's been previously marked as People's No. 3

8    for identification be moved into evidence as People's No.

9    3 in evidence.

10              THE COURT:  Any objection?

11              MR. GREENBERG:  No.

12              THE COURT:  Into evidence as People's 3.

13              MS. CHANNAPATI:  If it could be posted for the

14    jury to see.

15              THE COURT:  Again, it will be posted by the

16    court officer.

17              MS. CHANNAPATI:  With the Court's permission,

18    could the victim approach the exhibit?

19              THE COURT:  One at a time.  Let him post it.

20              All right.  Now, the witness may get up and

21    approach.

22              People, you must use the word, "complaining

23    witness."

24              MS. CHANNAPATI:  I apologize.  Complainant,

25    okay.

Direct - Krioutchkova/Channapati

578

1      Q.   Ms. Krioutchkova, could you please look at Photo A.

2   Could you describe what is in that photo.

3      A.    The kitchen, this is the door, the entrance to the

4   bathroom, and this is the piece of door, this is the entrance

5   door to the apartment.

6      Q.   Now, looking at Photo B, could you please describe

7   what is in that photo?

8      A.   This is the door which is going to the bathroom.

9      Q.   In that photo, is the leak in your bathroom depicted

10  in that photo?

11     A.   Yes.  This part was leaking and down.

12     Q.   Could you circle the places where it was leaking.

13     A.   (Witness complies.)

14     Q.   Now, looking at Photo C, could you please describe

15  what's in that photo?

16     A.   This is the bathtub.

17     Q.   Is there a leak depicted in that photo?

18     A.   Yes.

19     Q.   Could you please point first where that leak is?

20     A.   This part.

21     Q.   Could you circle that, please, with your marker.  Now,

22  looking at Photo D, could you please describe what is in that

23  photo.

24     A.    This is the door between the rooms, the kitchen and

25  the other room.

Direct - Krioutchkova/Channapati

579

1    Q.    Could you describe what's in Photo E?

2    A.    This is the kitchen, and this is my sofa bed where I

3    was sleeping, and this is the table which he was writing, and

4    this is the faucet where the leak was.

5    Q.    Could you circle that, and could you put a "V" where

6    that indicates where your bed is.

7    A.    (Witness complies.)

8    Q.    Could you please describe what's in Photo F.

9    A.    This is the entrance door.  It is the kitchen, and

10   where he washed his hands, and you cannot see, but over there,

11   the door to the bathroom.

12   Q.    Now, directing your attention to Photo G, could you

13   please describe that.

14   A.    This is the table where he was writing with his pen.

15   This is the door between the rooms from the kitchen to the

16   room.

17   Q.    Could you please describe what's in Photo H?

18   A.    I'm calling this kitchen.  This is my bed, and this is

19   the table which he was writing on, and this was the pen.

20   Q.    Is the pen depicted in the photo?

21   A.    Yes, here.

22   Q.    Thank you very much.  You can have a seat?

23            MS. CHANNAPATI:  Your Honor, at this time I

24   would ask what's been previously marked as People's No. 4

25   for identification and shown to defense counsel, if it

-WC-

Direct - Krioutchkova/Channapati

1    could be shown to the witness.

2                THE COURT:  That has been marked previously.

3    The defense has seen it.  It's now being shown to the

4    witness, People's 4 for identification.

5    Q.   Ms. Krioutchkova, do you recognize that?

6    A.   Yes, I recognize.

7    Q.   What do you recognize them to be?

8    A.   This is the room in my apartment where my daughter and

9    my granddaughter were sleeping.

10   Q.   Do these photos, do they fairly and accurately

11   depict --

12   A.   Yes.

13   Q.   -- what your apartment looked like on March 26th,

14   2003?

15   A.   Yes.

16               MS. CHANNAPATI:  Your Honor, at this time I

17   would ask that they be moved into evidence?

18               THE COURT:  Any objection?

19               MR. GREENBERG:  No.

20               THE COURT:  Into evidence without objection as

21   People's 4.

22               MS. CHANNAPATI:  Thank you.

23               If it could be posted for the jury.

24               THE COURT:  Again, the court officer will do

25   that.

Direct - Krioutchkova/Channapati

1        MS. CHANNAPATI:  With the Court's permission,

2    if the witness could --

3        THE COURT:  Again, the witness may approach

4    the exhibit.

5    Q.   Looking at Photo A, could you please describe what's

6    in that photo.

7    A.   This is the place where my granddaughter was sleeping.

8    This is the place where my daughter was sleeping.

9    Q.   The place where your daughter was sleeping, is that

10   the place where you had the incident with Mr. Colon, the

11   defendant?

12   A.   Yes, this place.

13   Q.   Could you put an "X" at that place?

14   A.   (Witness complies.)

15   Q.   Looking at Photo B, what is that?

16   A.   This is the place where my daughter was sleeping, and

17   this is the place where my granddaughter was sleeping.

18   Q.   Could you please indicate, if it's depicted in that

19   photo, where you had the incident with the defendant?

20        THE INTERPRETER:  Repeat it.

21   Q.   If you could please, if it's depicted in that photo,

22   please indicate with a letter "X" where you had the incident

23   with the defendant?

24   A.   (Witness complies.)

25   Q.   Could you please describe what's in Photo C?

-WC-

Direct - Krioutchkova/Channapati

582

1     A.   This is the place where my daughter was sleeping, and

2  this door is to the kitchen.

3     Q.   And in Photo D.

4     A.   This is the desk where my daughter was studying, and

5  this is our computer.

6     Q.   What is in Photo E?

7     A.   This is the place where my granddaughter was sleeping.

8     Q.   What kind of bed is that?

9                THE INTERPRETER:  In Russian, this is a chair

10  bed.

11               THE COURT:  A what, chair bed?

12               The interpretation is a chair bed.

13     Q.   In Photo F, could you describe what that is?

14     A.   This is the place where my daughter was sleeping.

15     Q.   Could you please indicate with an "X" where you had

16  the incident with the Defendant Colon?

17     A.   (Indicating.)

18               MS. CHANNAPATI:  Thank you very much.  You can

19  have a seat.

20               Your Honor, at this time I ask if this can be

21  marked as People's No. 5 for identification.

22              THE COURT:  What is that?

23              THE WITNESS:  It's the duvet, your Honor.

24              THE COURT:  It's the duvet.  Very good.  Let's

25  see what it looks like.  I don't know what it looks likes.

Direct - Krioutchkova/Channapati

583

1    Let defendant's counsel see it.

2              MS. CHANNAPATI:  Your Honor, I would ask if

3    this could be shown to the witness.

4              THE COURT:  You may show it.

5              It has not been premarked?

6              MS. CHANNAPATI:  No, it has not.

7              THE COURT:  All right.  It will be shown to

8    the witness.

9              MS. CHANNAPATI:  And if it could be marked for

10   identification.

11             THE COURT:  It will be marked as what, People?

12             MS. CHANNAPATI:  People's No. 5 for

13   identification.

14             THE COURT:  It will be marked as People's No.

15   5 for identification.

16   Q.   Ms. Krioutchkova, do you recognize that?

17   A.   I recognize it.

18   Q.   What do you recognize it to be?

19   A.   This is the --

20   Q.   Is it the duvet that was on --

21   A.   Yes.

22   Q.   The duvet, is it in the same or substantially the same

23   condition as it was on March 26th, 2003?

24   A.   I only was seeing a portion.

25             MS. CHANNAPATI:  Your Honor, could it be --

-WC-

1    THE COURT:  Well, if the court officer can

2  take it out.

3    There cannot be discussion off the record.

4    THE WITNESS:  I don't understand the word

5  "condition."

6    THE COURT:  She doesn't understand the word,

7  "condition."

8    Explain the word, "condition."

9    The word, "condition" -- I'll explain it.

10  Condition means the state it was in.

11    Is that the same state as it was that day?

12    THE WITNESS:  Yes, in the same state.

13    THE COURT:  She says, yes, it's in the same

14  state.

15    The court officer is struggling to get it out

16  of the bag, and she sees it, and she says, "Yes."

17    MS. CHANNAPATI:  Your Honor, at this time I

18  would ask what's been previously marked as People's No. 5

19  for identification be received and marked into evidence as

20  People's 5 in evidence.

21    THE COURT:  Any objection?

22    MR. GREENBERG:  Yes, at this time, subject to

23  connection.

24    MS. CHANNAPATI:  Subject to connection.

25    THE COURT:  Yes, subject to connection.

Direct - Krioutchkova/Channapati

585

1          MS. CHANNAPATI:  Thank you very much.

2     Q.   Ms. Krioutchkova, you saw what's been marked as

3 People's No. 5 in evidence; correct?

4     A.   Yes.

5     Q.   How do you recognize that?

6     A.   I was buying.  I know the price.

7     Q.   Where was that duvet on March 26th, 2003?

8     A.   This was outside of the blanket where my daughter was

9 sleeping.

10    Q.   What happened on that duvet?

11    A.   On this duvet Dennis Colon raped me.

12          MS. CHANNAPATI:  Okay.  Thank you.

13          Your Honor, at this time I ask if this robe

14 could be marked for identification.

15          THE COURT:  Again, has the defense counsel

16 seen it?

17          MS. CHANNAPATI:  I'm showing it to defense

18 counsel.

19          THE COURT:  It's being premarked as No. 6 for

20 identification.  It's being shown to the witness.

21    Q.   Ms. Krioutchkova, do you recognize that?

22    A.   Yes.

23    Q.   What do you recognize that to be?

24    A.   This is my gown which I loved.

25    Q.   Which?

-WC-

Direct - Krioutchkova/Channapati

586

1    A.    Loved, but not now, I loved.

2    Q.    Loved.  Okay.

3          Where do you recognize it from?

4    A.    This is my gown.  I was buying, and I was wearing.

5    Q.    When were you wearing it last?

6    A.    March 26th, 2003.

7    Q.    As you look at it today, is it in the same or

8  substantially same condition or state as it was on that date?

9    A.    Yes, in the same condition.

10         MS. CHANNAPATI:  Your Honor, at this time I

11  ask that People's No. 6 be received into evidence.

12         THE COURT:  Any objection?

13         MR. GREENBERG:  Yes, subject to connection,

14  custody.

15         THE COURT:  Again, into evidence subject to

16  connection, custody.

17         MS. CHANNAPATI:  If it could be taken out of

18  the bag and shown to the witness.

19    Q.    Ms. Krioutchkova, was that what you were wearing when

20  Dennis Colon came to your apartment?

21    A.    Yes.

22    Q.    Did you have anything else on?

23    A.    No, I didn't have.

24    Q.    Why were you wearing only this robe?

25    A.    I came out from the bathtub, and I was wearing this,

Direct - Krioutchkova/Channapati

587

1    and I was wearing always when I'm in my apartment.

2         Q.   When did you get the phone call from Dennis Colon?

3         A.   In the morning.

4         Q.   Was it after you were taking your shower?

5         A.   After.

6         Q.   How soon after was it when you took your shower?

7         A.   Maybe half an hour.

8         Q.   Where were you going before Dennis Colon called?

9         A.   I was going to see my doctor by appointment.

10             MR. GREENBERG:  Your Honor, can I have the

11   court officer bring the robe over?

12             THE COURT:  The defense would like to see the

13   robe.  It's being observed by the defense and the People.

14   It's been exhibited to the defense.

15             MS. CHANNAPATI:  At this time I ask that the

16   following three photos be marked as People's No. 7-A, B,

17   and C for identification.  I'm showing them to the defense

18   attorney.

19             THE COURT:  It's being shown to the defense.

20   The People are asking that it be marked People's

21   Exhibit 7-A, B, and C for identification.

22        Q.   Vera, do you recognize that?

23        A.   Yes.

24        Q.   What do you recognize them to be?

25        A.   I recognize the hat, and I recognize the knife.

-WC-

Direct - Krioutchkova/Channapati

588

1    Q.    Where do you recognize them from?

2    A.    I saw.

3    Q.    Where did you see them?

4    A.    Dennis Colon was wearing this hat when he came in, and

5    this knife I saw in his hands, and this part, this part was

6    covered with his hand.

7    Q.    When you say "this part," what part do you mean?

8              THE INTERPRETER:  Now I have a problem.

9              THE COURT:  What did she say?

10             THE INTERPRETER:  She has, I have a problem,

11   like, you have the handle, and you have the part which is

12   the --

13             THE COURT:  What did the witness say?  She was

14   saying --

15             THE INTERPRETER:  I don't know the

16   interpretation of this word.  I forgot.

17   Q.    Is it the blade?

18   A.    The blade, yes.

19             THE COURT:  She said, "the blade."

20             THE INTERPRETER:  Sorry.

21   Q.    Now, what part of that knife do you recognize?

22   A.    I recognize the blade and a small piece here.

23   Q.    When you say "a small piece here," what do you mean?

24   A.    His hand was covering a portion of the knife, and I

25   saw the blade and this part.

-WC-

Direct - Krioutchkova/Channapati

589

1    Q.    Is that part of the handle?

2    A.    Yes.

3              MS. CHANNAPATI:  I would ask what's been

4    previously marked as People's No. 7-A and B for

5    identification be moved into evidence.

6              THE COURT:  Well, you said --

7              MS. CHANNAPATI:  Excuse me.  7-A, B, and C.

8              THE COURT:  Any objection?

9              MR. GREENBERG:  No.

10             Yes, Judge.  Can I voir dire?

11             THE COURT:  Yes, you may.

12   VOIR DIRE

13   BY MR. GREENBERG:

14   Q.    Are you able to identify the handle of that knife?

15   A.    Yes.

16   Q.    The handle, the designs?

17   A.    A portion of the handle.

18   Q.    Which portion?

19   A.    Between the blade and this part.

20             THE COURT:  We have to know what "this part"

21   means.

22             The witness can say what she's seeing on the

23   photograph.

24             What does she mean by, "this part"?

25             THE WITNESS:  I can identify the blade and

# SCHEDULE FOR S.T.A.R.

The following schedule is for all S.T.A.R. participants.  You are required to attend all six session.  Sessions begin at 9:30AM and end at 12:30PM. BE ON TIME!  Late comers will not be allowed into the session and will have to repeat the cycle the next time it is offered.  Please note that Session 5 is on a Thursday, not a Tuesday.  If you have a court appearance scheduled for any of these days, you must come to the session first and you will be provided a letter for court as to why you are appearing in the afternoon.

**1) Tuesday, June 22, 2010 at 9:30 a.m.**
**2) Tuesday, June 29, 2010 at 9:30 a.m.**
**3) Tuesday, July 6, 2010 at 9:30 a.m.**
**4) Tuesday, July 13, 2010 at 9:30 a.m.**
**5) Thursday, July 22, 2010 at 9:30 a.m.**
**6) Tuesday, July 27, 2010 at 9:30 a.m.**

Direct - Krioutchkova/Channapati

1   portion of the handle, the one which wasn't covered by his

2   hand.

3   Q.   Can you identify the handle of that blade, of that

4   knife?

5              MS. CHANNAPATI:  Objection, your Honor.

6   Asked and answered.

7              THE COURT:  It is asked and answered, Counsel,

8   and she has given you an answer.

9              MR. GREENBERG:  Your Honor, I'm going to

10  object to the introduction of the photographs.

11             THE COURT:  On what grounds?

12             MR. GREENBERG:  She can't identify that that

13  is the knife, the particular knife.  She can identify that

14  that blade -- that it's a blade and the handle.  She cannot

15  identify the specific designs.

16             THE COURT:  I think if we're going to have an

17  argument about that, we're going to let the jury out of the

18  room.  The jury can now go to the jury room.

19             Leave your books, and I'll have this

20  discussion out of your presence.

21             (Whereupon, the jury exits the courtroom.)

22             THE COURT:  Also, the witness needs to now

23  step down.  Please, do not discuss the case or any other

24  matters with the People, and you will be in the hall.

25             (Whereupon, the witness exits the courtroom.)

-WC-

Direct - Krioutchkova/Channapati

591

1          THE COURT:  Let record show that the jury

2    exited first, and now the witness has exited.

3          Beginning with the discussion regarding

4    whether the photographs are to be admitted, you might as

5    well let me see them.

6          The defense had conducted it's voir dire, and

7    the defense had asked certain questions, and then at the

8    end of that, the defense objected, and so now you can

9    continue, defense.

10         MR. GREENBERG:  Your Honor, the witness cannot

11   positively identify that entire knife.  There certainly is

12   better evidence than that, which would be the knife itself,

13   No. 1, which I understand is not here.

14         Secondly, she can only identify the bottom

15   portion of it, and the blade.  Certainly, there are

16   numerous types of knives out there that would have similar

17   blades, similar bottoms of handles.

18         I believe that the design on the handle is

19   rather unique, and I don't believe that she has identified

20   that as the knife that was used, according to her

21   testimony, used in the attack.

22         THE COURT:  People.

23         MS. CHANNAPATI:  It goes to the weight, not

24   the admissibility.  She says she recognized it.  She says

25   how she recognizes it.  The rest is up for argument, but as

Direct - Krioutchkova/Channapati

592

1   far as the admissibility of the knife, she says she

2   recognizes it, and she's somehow recognized it.  It's not

3   the way the defendant's attorney might have recognized it.

4          She recognizes that knife.

5          MR. GREENBERG:  It's not how I recognize it

6   It's how the witness identifies it.

7          THE COURT:  I agree that the defense counsel

8   doesn't have to recognize it.

9          The Court is looking at 3 photographs.  One of

10  these photographs, it says 7-C, as in Charley, is of a cap,

11  a black cap.  I think it's called a watchman's cap, but

12  it's a black cap, and we're not talking about it.

13         MR. GREENBERG:  I have no objection to 7-C.

14         THE COURT:  The other two photographs which

15  are marked on the back A, as in Adam, and B, as in boy,

16  depict a knife, and they are color photographs, and they

17  are of a pocket knife with the blade extended, and in both

18  photographs the knife is on some sort of plain mat colored

19  medium, and the knife is above a wooden ruler, and the

20  wooden ruler has inch marks; and so looking at the wooden

21  ruler, it appears that the knife is approximately seven and

22  a half inches long, extended in that fashion, and 7-A, the

23  blade is pointed to the left, and in 7-B, the blade is

24  pointed to the right.

25         In each case one can see that there is,

-WC-

Direct - Krioutchkova/Channapati

593

1    indeed, a distinctive design on the handle of this knife.

2    It's a pocket knife, and that design appears to be an

3    alligator or something like that, and that design covers,

4    well, it's as if in the part where the blade swings out,

5    that's in the metal, and, of course, the blade would come

6    back inside of that.  So that's metal, and it doesn't have

7    that particular design at the end of the knife.

8              In other words, the alligator, presuming

9    that's what it is, is on a black surface, and the alligator

10   is silver or metal covering behind that, in other words,

11   the end of that black medium on which the alligator is

12   placed, there's another portion which is silver or silver

13   colored, which is approximately the same size as that front

14   portion where the knife would fold back, and that appears

15   to have some sort of design on it as well in the back.

16             Now, I said all that just to let us know

17   what's on the photographs.  The question is whether these

18   photographs can be admitted in view of the objection of the

19   defense, and the Court rules that these photographs, and

20   the defense is objecting to the knife, not the hat, they

21   may be admitted.

22             The Court agrees with the People's argument.

23             Now, we can get the witness back first, and

24   then the jury.

25             (Whereupon, the witness resumes the stand.)

1          THE COURT:  The witness has taken the stand.

2    The interpreter is next to the witness.  Please advise the

3    witness, Ms. Interpreter, that she's still under oath.

4          No cross talk.  I agree.  The interpreter held

5    up her hand as the witness was saying something.  There's

6    no cross talking.  It must be on the record.

7          THE COURT OFFICER:  Ready for the jury?

8          THE COURT:  Yes, we are.  Thank you.

9          THE COURT OFFICER:  Jury entering.

10         (Whereupon, the jury enters the courtroom and

11   is properly seated.)

12         THE COURT:  Both parties acknowledge the

13   presence of all the jurors?

14         MS. CHANNAPATI:  So waived.

15         MR. GREENBERG:  So waived.

16         THE COURT:  We're back.  We had the

17   discussion.  The Court rules that those photographs are

18   into evidence as People's Exhibit 7-A, B, and C.

19         Go ahead.

20         MS. CHANNAPATI:  May I approach the witness?

21         THE COURT:  Yes, People.

22         MS. CHANNAPATI:  Let the record reflect that

23   I'm holding Photo 7-B in my hand.

24         THE COURT:  Go ahead.  You're holding up the

25   photograph.

-WC-

Direct - Krioutchkova/Channapati

595

```
1  DIRECT EXAMINATION (Resumed.)

2  BY MS. CHANNAPATI:

3       Q.   What particular portion of the handle of the knife do

4  you recognize?

5                      THE COURT:  Let the record show that the

6  witness has taken up a ballpoint pen and pointed on the

7  photograph.

8                      MS. CHANNAPATI:  And has pointed to the

9  base --

10                     THE COURT:  Well, the witness has to say that.

11 You can't say what she pointed to.

12      Q.   What part did you point to?

13      A.   The end of the design, and this part, this part has

14 white color.  I remember this.

15      Q.   Were you able -- where did you first see this knife?

16      A.   I saw in Dennis Colon's hands.

17      Q.   What was the defendant doing with the knife?

18      A.   He made a move like he will hit me.

19                     MS. CHANNAPATI:  With the Court's permission,

20 could the witness stand up and demonstrate, your Honor?

21                     THE COURT:  The witness may stand up.

22                     THE WITNESS:  He was in the --

23                     THE COURT:  Let the record show that the

24 witness has stood up.  She's holding her right hand up.

25 Her fist is balled up.
```

-WC-

1          Go ahead.

2          THE WITNESS:  He make this move, and he was

3     saying, "I'll kill you.  I'll kill you."

4          THE COURT:  Let the record show that the

5     witness had her hand up and made those oral statements and

6     put her hand down in downward motions.

7          MS. CHANNAPATI:  Thank you, your Honor.

8          At this time, your Honor, I would ask that

9     this CD be pre-marked as People's -- I'm sorry, your Honor.

10    Withdrawn.

11         THE COURT:  Withdrawn.

12    Q.   Directing witness to look at Photo 7-A.

13         THE COURT:  Photograph 7-A?

14         MS. CHANNAPATI:  7-C.

15         THE COURT:  What are you asking her to look

16    at?

17         MS. CHANNAPATI:  7-C.

18         THE COURT: 7-C, as in Charley.

19    Q.   What is that?

20    A.   This is a cap which Dennis Colon was wearing.

21    Q.   And when did you first see that cap?

22    A.   On his head on March 26th.

23    Q.   Did he have that hat on his head the entire time?

24    A.   Yes.

25         MS. CHANNAPATI:  Now, I would ask if this

Direct - Krioutchkova/Channapati

597

1    could be premarked as People's No. 8?

2                    THE COURT:   What is it again, People?

3                    MS. CHANNAPATI:   It's a CD.

4                    THE COURT:   The People have a CD, and you're

5    asking that it be marked as what?

6                    MS. CHANNAPATI:   People's 8.

7                    If it could be shown to the witness.

8                    THE COURT:   Yes.

9                    This is being shown.

10   Q.   Vera, do you recognize that CD?

11   A.   Yes.

12   Q.   How do you recognize it?

13   A.   I recognize it, because I saw it today.

14   Q.   When was the last time you listened to that CD?

15   A.   Today.

16   Q.   Are your initials on that CD?

17   A.   Yes, this is my initials.

18                   MS. CHANNAPATI:   Your Honor, at this time I

19   would ask what's been previously marked as People's No. 8

20   for identification be received into evidence as People's 8.

21                   THE COURT:   Counsel.

22                   MR. GREENBERG:   I don't know what it is, your

23   Honor.   I know what it is, but it hasn't been explained to

24   the jury.

25                   THE COURT:   People, I don't think you have

Direct - Krioutchkova/Channapati

598

1    laid the foundation.

2    Q.   Did you listen to that CD -- withdrawn.

3         When was the last time you listened to that?

4    A.   Today.

5    Q.   Was it this morning?

6    A.   Yes.

7    Q.   When you listened to it, what was it?

8    A.   My voice when I was calling to 911.

9              MS. CHANNAPATI:  Your Honor, at this time the

10   People would ask that what's been marked as People's No. 8

11   for identification be moved into evidence.

12             THE COURT:  Counsel.

13             MR. GREENBERG:  No objection.

14             THE COURT:  No objection.

15             Into evidence as People's 8, was it?

16             MS. CHANNAPATI:  Yes, your Honor.

17             THE COURT:  Into evidence as People's 8.

18             MS. CHANNAPATI:  I would ask at this time if

19   the CD could be played.

20             THE COURT:  Any objection, Counsel?

21             MR. GREENBERG:  No.

22             THE COURT:  Now, the People have brought their

23   electronic equipment, and we'll put the CD in there, and

24   let's see what happens.

25

-WC-