Cross - Krioutchkova/Greenberg

599

1          MS. CHANNAPATI:  May I approach, your Honor?

2          THE COURT:  You may now.

3          (Whereupon, People's Exhibit No. 8, a CD of

4     the 911 call, was played in open court for the jury.)

5          MS. CHANNAPATI:  Your Honor, the People have

6     nothing further.

7          THE COURT:  Thank you.

8          The People have concluded their direct.

9          Defense, any questions?

10          MR. GREENBERG:  Yeah.

11   CROSS EXAMINATION

12   BY MR. GREENBERG:

13     Q.   Ma'am, my name is Harlan Greenberg, and I represent

14   Dennis Colon.

15          The first time you heard from Dennis Colon was by a

16   phone call; was that correct?

17     A.   Yes.

18     Q.   That phone call was approximately 8:00 a.m., March

19   26th, 2003; correct?

20     A.   Yes.

21     Q.   That phone call was approximately more than two

22   minutes; is that correct?

23     A.   Yes.

24     Q.   That conversation was held in English; is that

25   correct?

Cross - Krioutchkova/Greenberg

1    A.    Yes.

2    Q.    The person on the other end spoke English to you; is

3 that correct?

4    A.    Yes.

5    Q.    It's fair to say that you understand English fairly

6 well?

7    A.    I understand English.

8    Q.    At the time that you received the phone call, you were

9 in your robe; is that correct?

10    A.    Yes.

11    Q.    Underneath the robe you had no clothing; is that

12 correct?

13    A.    Yes.

14    Q.    How long after the phone call was there a knock at

15 your door?

16    A.    Not long.

17    Q.    15, 20 minutes?

18    A.    Probably, I don't know.   Probably, I'm not sure

19 exactly.

20    Q.    As a result of the phone call that you received, you

21 became aware that someone was going to come to your apartment;

22 is that correct?

23    A.    Yes.

24    Q.    There was a knock on the door -- withdrawn.

25          Is your apartment equipped with a peephole?

Cross - Krioutchkova/Greenberg

601

1      A.   Yes.

2      Q.   Did you look through the hole to see who was on the

3  other side?

4      A.   Yes.

5      Q.   The person you saw through the peephole was Dennis

6  Colon; isn't that correct?

7      A.   Yes.

8      Q.   You let him into the apartment; correct?

9      A.   Yes.

10     Q.   He had a conversation with you when he entered the

11 apartment?

12     A.   He asked, "What is the problem?"

13     Q.   He spoke with you?

14     A.   He asked only one question, and I was showing to him.

15     Q.   As a result of speaking with him, when you spoke back

16 to him, did you look at him?

17     A.   I was looking in his face.

18     Q.   Shortly thereafter, did Mr. Colon go into the

19 bathroom?

20     A.   Right away.

21     Q.   Did you accompany him into the bathroom?

22     A.   No.

23     Q.   Did he ask you any questions while he was in the

24 bathroom?

25     A.   No, he was looking.

-WC-

Cross - Krioutchkova/Greenberg

602

1   Q.   At some point he came out of the bathroom?

2   A.   He came out.  Eventually, he came out.

3   Q.   You saw him come out?

4   A.   Yes.

5   Q.   When you saw him come out, where were you?

6   A.   I was three steps from him, three steps from him.

7            MR. GREENBERG:  Actually, it might be helpful

8   if we take People's Exhibit --

9            THE COURT:  Counsel has approached and is

10   asking for one of the exhibits, and the court officer is

11   handing that exhibit or mounting that exhibit.

12            MR. GREENBERG:  No. 3.

13            THE COURT:  And that is Exhibit 3.

14   Q.   Can you show on Exhibit 3, which has photographs from

15   A through H, can you indicate which photograph would show where

16   you were when Mr. Colon came out of the bathroom?

17   A.   I could show on the first photograph.

18   Q.   First photograph.  Okay.

19            Would it be somewhere in the center of the photograph;

20   fair to say?

21   A.   Yes.

22   Q.   When he came out, was there any conversation between

23   the two of you?

24   A.   He asked me for a pen, and he wants to write on a

25   piece of paper.

1    Q.    You got him a pen?

2    A.    I gave him the pen.

3    Q.    You gave him a piece of paper?

4    A.    Yes.

5    Q.    At that point did he sit down at a table and chair?

6    A.    No, he was standing.

7    Q.    He was standing?  He didn't sit at the table marked in

8  People's Exhibit 3, Letter H?  He did not sit at that table?

9    A.    No.  He didn't sit down.

10    Q.    Did he lean the paper on anything in the apartment?

11    A.    On the table.

12    Q.    Did he lean the paper on the table?

13    A.    Yes.  He leaned the paper on the table.

14    Q.    He stood there writing?

15    A.    Yes, he was standing.

16    Q.    He wrote on a piece of paper while he was standing at

17  that table; correct?

18    A.    Yes.  He was writing on the piece of paper.

19    Q.    You observed him while he was doing that; correct?

20    A.    I was standing.

21    Q.    You spoke with him about other damage in the

22  apartment, didn't you?

23    A.    He asked me, and I was showing to him, to the ceiling.

24    Q.    During that time you were talking with him while you

25  were showing, while you were showing him the damage to the

-WC-

1   apartment; correct?

2              THE INTERPRETER:  Can you repeat, please.

3                     (Record read.)

4              THE WITNESS:  I didn't talk to him.  He asked

5   me, "What else?"  And I was showing to him.

6      Q.    So there was no conversation?  You didn't discuss what

7   was wrong?  You just showed him?

8      A.    No, no, conversation.

9      Q.    Did you discuss with him what type of problem you had

10  in the bathroom?

11     A.    I didn't discuss.  He was seeing.

12     Q.    You didn't direct him where to go?

13     A.    He stepped in, and I was showing with my arm, and I

14  didn't come with him to the bathroom.  I was standing outside.

15     Q.    You didn't tell him what type of leak, what type of

16  leak you had and where the leak was coming from?

17     A.    I didn't say a word.  It was leaking, and he was

18  seeing.

19     Q.    So you only uttered a few words to him?

20     A.    When he stepped in, I was showing to him, and after he

21  asked, after he asked for a pen and paper and asked what else,

22  and I was showing to him, and nothing else I was saying.

23     Q.    Did you explain to him the length of time that this,

24  that you had these problems?

25              MS. CHANNAPATI:  Objection, your Honor.

                        -WC-

1        THE COURT:  Overruled.

2        THE WITNESS:  I didn't say anything.

3    Q.   Did you discuss with him that the landlord has been

4  allowing your apartment to be in disrepair?

5        MS. CHANNAPATI:  Objection, your Honor.

6        THE COURT:  Overruled.

7        THE WITNESS:  No.  No.  We didn't discuss

8    anything.

9    Q.   During the time that he was in the apartment, you did

10  look at him; correct?

11   A.   Yes.  I was looking at him.

12   Q.   Prior to the time that you claim Mr. Colon became

13  aggressive towards you, how long was he in the apartment?

14   A.   He was writing down and not long, but I cannot figure

15  out the time.

16   Q.   What does "not long" mean?  Please explain.

17   A.   He wrote down, asked, "What else?"  I was showing to

18  him; and nothing else; and he was walking towards the exit

19  door; and he was saying, "I'll come in the evening to work."

20   Q.   When he was leaving, you saw him start to leave?

21   A.   He was walking; he was walking; I was walking after

22  him; I was following him; and I was looking down.

23   Q.   When he turned around, you looked at his face?

24   A.   When I put up my head, because I came closer to him.

25   Q.   Did you look at him?

-WC-

Cross - Krioutchkova/Greenberg

1  A.  I was looking in his face.

2  Q.  You looked at his face?

3  A.  I was looking in his face.

4  Q.  At that point he was in the apartment for some time;

5  correct?

6  A.  Yes.

7  Q.  I want to go back to the initial phone call.  You

8  heard Mr. Colon say that he was a plumber?

9  A.  Yes.

10  Q.  You heard him say that he was being sent by Guy?

11  A.  Yes, I heard.

12  Q.  And Guy is the landlord; correct?

13  A.  Yes.

14  Q.  How long have you lived in that building?

15  A.  Eight years.

16  Q.  Over the eight years -- withdrawn.

17  When you claim that Mr. Colon pointed the knife at

18  you, you claim that he had it up in his hand like this;

19  correct?

20  A.  I saw him with his hand up.

21  Q.  With his hand up like this; correct?

22  Indicating my hand straight in the air.

23  A.  Yes.

24  Q.  And the point was down?

25  A.  The knife was parallel to the --

Cross - Krioutchkova/Greenberg

607

1    THE COURT:  Let the record show the witness

2    has held her hand up and is making some sort of gesture to

3    indicate how the knife would have been held.

4    Q.  Are you saying that the knife was held parallel to the

5    ground and not perpendicular?

6    A.  I don't know parallel or perpendicular, but he was

7    holding in his hand and this is how it was.

8    MS. CHANNAPATI:  Your Honor, if the record

9    could reflect that the victim was indicating, as she had

10    her right hand up in the air, she was indicating with her

11    left hand and drawing a horizontal line from her other

12    hand.

13    THE COURT:  The witness was doing that when

14    she was speaking, but the record should show she wasn't

15    saying that.

16    Q.  Now, at that point it's your testimony that Mr. Colon

17    told you to "lay down or I'll kill you"; is that correct?

18    A.  He repeated a few times, "lay down," but I didn't

19    understand what he meant, and after he was saying, "I'll kill

20    you.  I'll kill you" and was repeating himself many times.

21    Q.  How many times did he say, "I'll kill you"?

22    A.  Many times.  More than once.

23    Q.  Five times?

24    A.  I didn't count.

25    Q.  Two times?

-WC-

Cross - Krioutchkova/Greenberg

608

1          MS. CHANNAPATI:  Objection, your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  I didn't count.  Many times.

4     Q.    After he said that, you testified that he pushed you

5     onto the bed; correct?

6     A.    In the beginning he didn't push me to the bed, and in

7     the beginning, when I understood what is going on, I was

8     screaming, "Help me.  Help me."  And I was trying to -- and I

9     was trying to reach the door to get out from the apartment.

10    Q.    Was there a struggle between the two of you?

11    A.    Yes.

12         THE COURT:  All right.  Just a minute,

13    Counsel.

14         Can we approach.

15         (Brief discussion held off the record.)

16         THE COURT:  Continue, Counsel.

17    Q.    A physical struggle between the two of you?

18    A.    I was trying to reach the door, and he pushed me with

19    his left arm.

20    Q.    Was he still yelling, "I'll kill you," at that point?

21    A.    Yes.  He was continuing saying, telling, "Lie down.

22    I'll kill you."

23    Q.    And you struggled with him?

24         MS. CHANNAPATI:  Objection, your Honor.

25    Asked and answered.

-WC-

Cross - Krioutchkova/Greenberg

1        THE COURT:  Overruled.

2        THE WITNESS:  It's not a -- this is not a

3    struggle, but I was trying to get out, and he pushed me

4    with his left arm.

5        Q.    Did he push you onto the bed where you claim that he

6    raped you?

7        A.    No.  This wasn't the bed in this time.  This was near

8    the exit door.

9        Q.    Eventually, he pushed you onto the bed?

10       A.    This time he pushed me, and after he start, like,

11   walking after me and saying, "I'll kill you.  I'll kill you."

12       Q.    So he repeated it, "I'll kill you.  I'll kill you"?

13       A.    Yes, he was repeating.

14       Q.    So that was the second group of times that he said,

15   "I'll kill you"?

16       A.    He was walking towards me, and I was going backwards,

17   and he was continuing to say, "I'll kill you," and I didn't

18   count how many times.

19       Q.    When eventually he got you on the bed, he touched you

20   with his hands; correct?

21       A.    Yes.

22       Q.    You asked him to wash his hands; is that correct?

23       A.    It's correct.

24       Q.    And he stopped?

25       A.    Yes.  He stopped and he stand up and went to wash his

Cross - Krioutchkova/Greenberg

610

1   hands.

2       Q.   Even after yelling, "I'm going to kill you," he

3   stopped and washed his hands?

4       A.   After he was saying, "I'll kill you," yes.

5       Q.   Now, you testified that while you were on the bed, he

6   slapped you in the face; is that correct?

7       A.   Yes.  He was saying, "Don't look.  Close your eyes."

8       Q.   He told you not to look?

9       A.   He was saying, "Close your eyes.  Close your eyes."

10      Q.   Did he hit you hard?

11      A.   I didn't weigh it.

12      Q.   Did it hurt?

13      A.   It was painful.  Everything was painful for me.

14      Q.   How many times did he hit you in the face?

15      A.   Once.

16      Q.   That's it?

17      A.   Yes.  He hit me once, and after, he was repeating,

18  "Close your eyes.  Close your eyes."

19      Q.   When he left, did he walk out the front door?

20      A.   Yes.

21      Q.   You watched him walk out?

22      A.   When he walked out from my apartment?

23      Q.   Yes.

24      A.   I saw.

25      Q.   You saw him.  Did he run?

-WC-

Cross - Krioutchkova/Greenberg

611

1      A.    I have a small room.  He was walking fast, because he

2   wasn't able to run.

3      Q.    Because he wanted to get away.  Was that why he was

4   running?

5                   MS. CHANNAPATI:  Objection.

6                   THE COURT:  Sustained.

7      Q.    After he left, you called the police; correct?

8      A.    Yes.

9      Q.    Eventually, the police came to your apartment;

10  correct?

11     A.    Yes.

12     Q.    You spoke with a police officer at the scene?  The

13  first officers that arrived, did you speak with them?

14     A.    Not only one police officer arrived.

15     Q.    You spoke with many police officers that day; correct?

16     A.    I don't understand the question.  When they stepped

17  into my room?

18     Q.    Yes.

19     A.    They asked what happened, and they asked if I needed

20  an emergency.

21     Q.    Did you speak with a Police Officer Guinan, do you

22  recall?

23                  THE INTERPRETER:  Diamond?

24                  MR. GREENBERG:  Guinan with a G.

25                  THE WITNESS:  I cannot say, because maybe

-WC-

Cross - Krioutchkova/Greenberg

612

1       he --

2       Q.    Did you speak with him?

3       A.    Maybe he was telling his name, but I don't remember.

4       Q.    You did speak with a number of police officers at the

5    scene; correct?

6       A.    I was answering every question they asked me.

7       Q.    When they asked you questions, you tried to be as

8    accurate as possible; is that correct?

9       A.    Yes.  I was trying to, yes.

10      Q.    Because it was important for them to get the

11   information; correct?

12                  MS. CHANNAPATI:  Objection, your Honor.

13                  THE COURT:  Overruled.

14                  THE WITNESS:  I was trying to say --

15      Q.    Isn't it true that you never told Police Officer

16   Guinan or any other officer that Mr. Colon said that "I'll kill

17   you"?

18                  MS. CHANNAPATI:  Objection, your Honor.

19                  THE COURT:  Overruled.

20                  THE WITNESS:  I don't remember.

21      Q.    You don't remember telling the police that; is that

22   correct?

23      A.    I don't remember exactly what I was telling, but I was

24   telling what happened.

25      Q.    It's your testimony that Mr. Colon raised a knife up

Cross - Krioutchkova/Greenberg

613

1    over his head and yelled, "I'll kill you," many times; correct?

2        A.    Yes.

3        Q.    But you don't recall telling the police that?

4                    THE COURT:  Just a moment.

5                    There was something that the witness said.

6                    THE WITNESS:  The testimony to whom?

7                    THE COURT:  Her question was, "testimony to

8    whom?"

9                    MR. GREENBERG:  I'm not going to answer her

10   question, because I don't have to answer.

11                   THE COURT:  You don't have to answer.  I just

12   told you what she said.

13       Q.    After the police arrived, shortly after you went to

14   the hospital; is that correct?

15       A.    Yes.

16       Q.    When you went to the hospital, you saw a number of

17   doctors and nurses; is that correct?

18       A.    Number?

19             I don't understand the word "many."

20       Q.    Did you see more than one person?  Did more than one

21   person examine you at Coney Island Hospital?

22       A.    More.

23       Q.    Do you recall being examined by a nurse by the name of

24   Olosunde?

25       A.    She got, like, her name, but I didn't look, like, she

-WC-

Cross - Krioutchkova/Greenberg

1    got insignia.

2        Q.   When you were examined by Nurse Olosunde, isn't it

3    true that you denied a physical assault on your face or body

4    during this attack?

5                    MS. CHANNAPATI:  Objection, your Honor.

6                    The witness says she doesn't recall speaking

7        to Nurse Olosunde.

8                    THE COURT:  Overruled.

9                    THE WITNESS:  I don't remember what I was

10   saying, but I was saying the reason what happened.  This is

11   not like an injury.

12       Q.   Do you recall denying being assaulted in the face and

13   body?

14       A.   This is not like an injury.  He slapped me in the face

15   to turn my head.

16       Q.   So when somebody asked you whether or not you had been

17   hit in the face, you denied that?

18                   MS. CHANNAPATI:  Objection.

19                   THE COURT:  Overruled.

20                   The question was, so when somebody asked you

21       if you were hit in the face, you denied that?

22                   Is that correct?

23                   THE WITNESS:  I deny now how to understand.

24                   THE COURT:  She says she doesn't understand.

25       Q.   You don't understand the question?

-WC-

Cross - Krioutchkova/Greenberg

615

1    A.    I don't understand the question.

2              MR. GREENBERG:   Let's ask the question again.

3              THE COURT:   I read it.   She says she doesn't

4    understand it.   I don't have to read it again.

5              MR. GREENBERG:   I'll ask it another way.

6    Q.    When you were in the hospital and they asked you if

7    you had been assaulted in the face, you denied being assaulted

8    in the face; correct?

9    A.    In the hospital, this is not how they asked me.   If

10   you have marks on your face, they ask me, they asked me if I

11   have some marks on my body or on my face.

12   Q.    So you're saying that she didn't ask you whether or

13   not you were assaulted in the face?

14   A.    I don't remember which question I was asked.   She

15   wants to know if I have marks on my body.

16   Q.    You remember her asking whether or not there were

17   marks on your body, or did she ask you whether or not you were

18   hit in the face and body?

19             THE COURT:   Sustained.

20             MS. CHANNAPATI:   Objection, your Honor.

21             THE COURT:   Sustained.

22   Q.    How long after this incident were you at Coney Island

23   Hospital?   How long after?

24   A.    After the emergency room, they send me for an

25   appointment to a doctor right away.

-WC-

1          THE COURT:  All right.  Let me intervene.

2          That wasn't the question.  The question was:

3     How long was it between when this happened in your

4     apartment and you were taken to Coney Island Hospital?

5          THE WITNESS:  Maybe an hour.

6     Q.   When you arrived back -- withdrawn.

7          When you left your apartment, were there police

8     officers still in your apartment?

9     A.   I don't remember.

10    Q.   When you left, did you lock the door to the apartment?

11    A.   No.  When I left, the police was in the apartment.

12    Q.   So they were still there?

13    A.   Yes, they were staying.

14    Q.   So you do remember that?

15    A.   I remember.

16    Q.   When you got back from the hospital, were they still

17    in the apartment?

18    A.   This I don't recall.

19    Q.   You said that you received another phone call that day

20    from Mr. Colon; is that correct?

21    A.   Yes, it's correct.

22    Q.   He left a message on your answering machine; is that

23    correct?

24    A.   Yes.

25    Q.   Did you call the police to let them know that he left

-WC-

Cross - Krioutchkova/Greenberg

617

1    a message on your machine?

2         A.    Yes.

3         Q.    You did?

4         A.    Yes.

5         Q.    Did you save the tape?

6         A.    No.

7         Q.    Did you give them the answering machine?

8         A.    Yes.  I was showing to him, and I play the message to

9    the police.

10        Q.    Which police officer did you do that with?

11        A.    I don't remember the name.

12        Q.    Was it a male or a female?

13        A.    A male.

14        Q.    Did you give them the answering machine?

15        A.    No.  I was telling him, "Look, whatever you want to

16   do, do with it.

17        Q.    They didn't take it?

18        A.    No.

19        Q.    Just to backtrack, what year did you come to this

20   country?

21        A.    In 1995.

22        Q.    Was this your first apartment in the United States?

23        A.    Yes.

24        Q.    How would you describe the condition of the apartment?

25        A.    When we moved in, the apartment wasn't bad.  It was

1    satisfactory to us by the size and by the price.   And after we

2    got a new landlord, and after the second time it was another

3    landlord, and this Guy took over.

4        Q.   The landlord is Guy?

5        A.   He got in his office two person's by name Guy, one was

6    the landlord Guy, and the second one who worked with him was

7    Guy.

8        Q.   While they ran that building, your apartment became in

9    disrepair?

10       A.   Not because they took over, because the apartment was

11   getting worse, in bad condition.

12       Q.   Did they correct the condition?

13       A.   Yes.   They were repairing, yes.

14       Q.   In fact, they repaired it, because a ceiling fell in

15   that apartment; is that correct?

16       A.   Yes.

17       Q.   Was anybody hurt when the ceiling fell?

18       A.   Yes, the ceiling fell on me.

19       Q.   Where were you when the ceiling fell?

20       A.   In the toilet.

21       Q.   What part of the ceiling hit you?

22       A.   A big piece of the ceiling fell down.

23       Q.   Where did it hit you?

24       A.   I was hit in my head and my shoulder.

25       Q.   Did you go to the hospital?

Cross - Krioutchkova/Greenberg

619

1      A.    Yes.

2      Q.    Did you have any problems as a result of being hit in

3  the head?

4                  MS. CHANNAPATI:  Objection, your Honor.

5                  THE COURT:  Overruled.

6                  THE WITNESS:  No, I don't now.  I don't have.

7      Q.    So there were no more problems with any injury that

8  you had from being struck in the head; is that correct?

9      A.    No.  I don't have problems.

10     Q.    Did you sue the landlord?

11     A.    Yes.  I brought papers to an attorney.

12     Q.    Have you ever testified at -- been questioned by the

13 lawyers as a result of that lawsuit?

14     A.    The lawsuit, which one?

15     Q.    Which lawsuit?  Which lawsuit?  The one where the

16 ceiling fell on your head?

17     A.    Yes, I was giving.

18     Q.    Yes, you were giving --

19                 THE COURT:  The lawyer is saying -- you didn't

20 finish your answer -- yes, you were giving, giving what?

21                 THE WITNESS:  I was answering the question.

22     Q.    Did you give testimony on the lawsuit?

23     A.    No.  I didn't testify.  I was answering the questions.

24     Q.    You went to a lawyer, and you went to a lawyer's

25 office, and there were other lawyers asking you questions; is

                           -WC-

1    that correct?

2         A.    Yes.

3         Q.    There was a fellow like that or a woman taking down

4    your words?

5         A.    Yes.

6         Q.    You put up your hand, and you swore to tell the truth;

7    is that correct?

8         A.    Yes.

9         Q.    Did you tell the lawyers that were asking you

10   questions about your injuries?

11        A.    Yes.

12        Q.    Was that testimony given on January 21st, 2005?

13        A.    I don't remember the date.

14        Q.    During those questions, were you asked these

15   questions, and did you give these answers:

16             "QUESTION:  Do you have any problems with your memory?

17             "ANSWER:  Yes, I do now.

18             "QUESTION:  Has anyone diagnosed you with any

19        condition that affects your memory?

20             "ANSWER:  I don't know what to say about that."

21             Were you given those questions, and did you give those

22   answers?

23        A.    I don't know what to say.  I don't know which

24   question.  I don't understand the question.

25        Q.    I'll read you the questions.  I'll read them again for

Cross - Krioutchkova/Greenberg

621

1    you, and these were the answers that you gave on January 21st,

2    2005.  Would you like me to read those questions and answers

3    again?

4        A.    Yes.

5        Q.    "QUESTION:  Do you have any problems with your memory?

6              "ANSWER:  Yes, I do now.

7              "QUESTION:  Has anyone diagnosed you with any

8        condition that affects your memory?

9              "ANSWER:  I don't know what to say about that."

10             Were you asked those questions, and did you give those

11   answers on January 21st, 2005?

12       A.    No one diagnosed me like I have problems, memory

13   problems.

14       Q.    Were you asked those questions, and did you give those

15   answers when you were sworn to tell the truth?

16       A.    Probably I was asked, but I don't remember.  It's

17   written down which means I was asked this question.

18       Q.    Do you have problems with your memory?

19       A.    I don't have problems with my memory, but I don't

20   remember which questions they asked me.

21       Q.    But at the time you were asked questions, and you

22   indicated that you had problems with your memory; isn't that

23   correct?

24       A.    Sometimes I'm forgetful, like --

25       Q.    But you were testifying, because you were hit in the

-WC-

Cross - Krioutchkova/Greenberg

622

1    head with a piece of wood; correct?

2       A.   Correct.

3       Q.   They asked you if you had memory problems, because you

4    were hit in the head with a piece of wood; correct?

5       A.   Probably.

6       Q.   You answered that you did have memory problems;

7    correct?

8       A.   Yes.  I answered I have problems with the memory.

9       Q.   Do you have problems with your memory?

10      A.   Now, I don't have.  No one diagnosed me I have

11   problems with my memory.

12      Q.   But on January 21st, 2005, a little more than a year

13   ago you testified that you had memory problems; correct?

14              MS. CHANNAPATI:  Objection, your Honor.

15              THE COURT:  Overruled.

16              THE WITNESS:  Yes.  I have problems with my

17      memory, but I don't know where is the boarder, this is a

18      problem or this is age.

19      Q.   So you have memory problems when it relates to that

20   lawsuit; is that correct?

21              MS. CHANNAPATI:  Objection, your Honor.

22              THE COURT:  Sustained.

23      Q.   Do you have any memory problems when it comes to what

24   happened on March 26th, 2003?

25      A.   No.  I don't have problems.  I remember everything

-WC-

Cross - Krioutchkova/Greenberg

623

1    very good.

2        Q.   When the ceiling fell on your head, do you recall what

3    date that was?

4        A.   No, I cannot recall.

5        Q.   Does June 23rd or 24th of 2002 --

6               MS. CHANNAPATI:  Objection, your Honor.

7               THE COURT:  Overruled.

8        Q.   -- sound about right?

9        A.   I cannot exactly recall the date.

10       Q.   It was before this incident; correct?

11       A.   Yes, it was before.

12       Q.   Since June 2000 -- I'm sorry.  Since January of 2005

13   when you gave this testimony until today, is your memory

14   better?

15       A.   Better.

16       Q.   Better?

17       A.   Better.

18       Q.   Did you have an accident before 2002?

19               MS. CHANNAPATI:  Objection, your Honor.

20               THE COURT:  Overruled.

21               THE WITNESS:  In my apartment?

22       Q.   No.  Did you have a car accident?

23       A.   Yes.

24       Q.   Do you recall when that was?

25       A.   It was a long time ago.  I don't remember.

Cross - Krioutchkova/Greenberg

1    Q.    Did you bring a lawsuit as a result of that car

2    accident?

3    A.    Yes.

4    Q.    Was that accident approximately the year 2000?

5    A.    Yes.

6    Q.    Do you recall it was an automobile accident; correct?

7    A.    Yes.  I remember this was a car accident.

8    Q.    Were you a driver or a passenger?

9    A.    Passenger.

10    Q.    You remember that?

11    A.    I don't remember.

12    Q.    You don't remember whether you were a driver or a

13    passenger in that car accident?

14    A.    I don't remember.

15    Q.    Were you injured in that car accident?

16    A.    Yes.

17    Q.    What kind of injuries did you sustain from that

18    accident?

19    A.    My neck.

20    Q.    Anything else?

21    A.    The lower back.

22    Q.    Did you hurt your knee?

23    A.    Yes.

24    Q.    Did you have surgery as a result of that knee injury?

25    A.    Yes, knee.

Cross - Krioutchkova/Greenberg

625

1    Q.   You had knee surgery?

2    A.   Yes.

3    Q.   Which knee was this?

4    A.   Left.

5    Q.   So in that car accident you hurt your back, your neck,

6    and your knee; correct?

7    A.   I don't remember.

8    Q.   You had knee surgery as a result of a car accident,

9    and you don't recall?

10   A.   I don't understand the question.

11              THE COURT:  We'll have the question read back.

12                   (Record read.)

13              THE WITNESS:  Yes.

14   Q.   And you had a car accident that was serious enough

15   that required you to have knee surgery, and you don't recall

16   whether you were driving the car or a passenger in that car; is

17   that correct?

18   A.   I was a passenger.

19   Q.   So now you remember?

20   A.   Yes.  I think I was a passenger.

21   Q.   So in the last few minutes your memory as come back?

22              MS. CHANNAPATI:  Objection, your Honor.

23   Q.   Is that correct?

24              THE COURT:  Overruled.

25   Q.   Is that correct?

-WC-

Cross - Krioutchkova/Greenberg

626

1    A.   I don't remember.  I don't remember.

2    Q.   So you don't remember?

3    A.   I don't remember.

4    Q.   So when you said you were a passenger --

5    A.   I don't remember.  I don't remember.

6    Q.   On March 26th, 2003, were you employed?

7    A.   I didn't work.

8    Q.   How did you support yourself?

9              MS. CHANNAPATI:  Objection, your Honor,

10   relevance.

11             THE COURT:  Overruled.

12             THE WITNESS:  I'm collecting SSI.

13   Q.   And SSI is a payment that you receive from Social

14   Security, the government; correct?

15   A.   No, this is disability.

16   Q.   Do you get a payment from the government for a

17   disability?

18   A.   Yes.

19   Q.   Is that disability a psychiatric disability?

20             MS. CHANNAPATI:  Objection, your Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.

23   Q.   On March 26th, 2003, you were under a doctor's care;

24   correct?

25   A.   Correct.

-WC-

Cross - Krioutchkova/Greenberg

627

1    Q.    And that was a psychiatrist; correct?

2    A.    Yes.

3    Q.    How often do you see --

4              MS. CHANNAPATI:  Objection, your Honor.

5              Can we approach?

6              THE COURT:  You may approach.

7              Why don't we make it easy.  Let the jury go

8    outside the room, and don't discuss the case, and then I

9    can have a discussion fully.

10             (Whereupon, the jury exits the courtroom.)

11             THE COURT:  The jury has exited the room.  The

12   witness must also exit.

13             You will still be under oath.  Please do not

14   discuss anything with the People.  You will go out in the

15   hall again.

16             (Whereupon, the witness exits the courtroom.)

17             THE COURT:  Let the record show that the

18   witness has left the room and previously the jury left the

19   room.

20             The People were raising an objection with

21   regard to defense counsel's questioning about the witness's

22   medical history.

23             Go ahead, People.

24             MS. CHANNAPATI:  I don't see how it's

25   relevant.

-WC-

Cross - Krioutchkova/Greenberg

628

1          THE COURT:  It is relevant.

2          MS. CHANNAPATI:  Under what theory?

3          THE COURT:  It is relevant.  The defense is

4    absolutely able to inquire into her state of mind and

5    whether she's under any medication and all of those issues.

6          MS. CHANNAPATI:  All right.  Your Honor,

7    just --

8          THE COURT:  It's relevant, Counsel.  There's

9    no prohibition.  This is not rape shield.

10          The record can show the interpreter is not (Now)

11    here.

12          THE COURT OFFICER:  Jury entering.

13          (Whereupon, the jury enters the courtroom and

14    is properly seated.)

15          THE CLERK:  All jurors are present.

16          Do both sides of waive the reading of the

17    roll?

18          MR. GREENBERG:  Yes.

19          MS. CHANNAPATI:  So waived.

20          THE COURT:  Ladies and gentlemen, we had our

21    discussion regarding that objection.  The objection is

22    overruled.

23          Continue, Counsel.

24    Q.    The psychiatrist prescribed medication for you?

25    A.    Yes.

-WC-

Cross - Krioutchkova/Greenberg

629

1    Q.   No?

2    A.   Yes.

3    Q.   How many medications on March 26th, 2003, were you on?

4    A.   In the morning?

5    Q.   All day.

6    A.   I'm taking three tablets; one tablet in the morning;

7    three during the day; and two in the middle of the day; and two

8    in the evening.

9    Q.   That's five.

10   A.   Yes.

11   Q.   Three separate medications?

12   A.   Yes, three separate.

13   Q.   On March 26th, 2003, were you taking any other

14   medication?

15   A.   No.

16   Q.   Were you required to take any medication that you

17   didn't take?

18   A.   No, I didn't require.

19   Q.   Now, it's your psychiatric condition, that's the

20   reason you're on SSI; correct?

21   A.   Yes, it's correct.

22   Q.   Did you go to see an attorney to help you get Social

23   Security benefits?

24   A.   Yes.

25   Q.   How long did it take you from when you first saw the

-WC-

Cross - Krioutchkova/Greenberg

630

1    lawyer until you received your Social Security benefits?

2        A.    One and a half years.

3        Q.    What year did you start collecting?

4        A.    From 2002.

5        Q.    So you applied in approximately mid-2000, 2001?

6        A.    Yes.

7        Q.    Approximately the same time as the automobile

8    accident; is that correct?

9        A.    Yes.

10       Q.    Prior to the automobile accident, did you have any

11   other lawsuits?

12                   MS. CHANNAPATI:   Objection, your Honor.

13                   THE COURT:   Overruled.

14                   THE WITNESS:   What?

15                   THE COURT:   Prior to the automobile accident

16   case, did you have any other lawsuits?

17                   THE WITNESS:   Yes.

18       Q.    And what was that?

19       A.    This was car accident.

20       Q.    Before -- another car accident?

21       A.    Yes.

22       Q.    What year was that?

23       A.    This was in 1999.

24       Q.    What did you injure in that accident?

25       A.    I don't remember.

-WC-

Cross - Krioutchkova/Greenberg

631

1    Q.   Was that case settled?

2    A.   How settled?  With whom settled?

3    Q.   Did you receive any money through your lawyer?

4    A.   I received.

5    Q.   Do you recall what you injured?

6              THE COURT:   Overruled.

7    A.   I cannot recall.

8    Q.   On March 7th, 2006, you started a lawsuit against your

9    landlord and Dennis Colon; isn't that correct?

10   A.   Not together.

11   Q.   Not together.  Are you sure?

12   A.   When the ceiling fell.

13   Q.   No.  No.  Do you have any recollection of your

14   attorneys filing a lawsuit against the landlord and Mr. Colon

15   for this incident?

16   A.   When they spoke to me, they took this case, because

17   this is what happened.

18   Q.   So you saw them, you saw lawyers as a result of this

19   case; correct?

20   A.   Yes.

21   Q.   Is it that -- do you know whether or not a lawsuit was

22   filed on your behalf?

23   A.   I don't know how to answer what this means.

24             THE COURT:   The lawyer is asking you, do you

25       know if a suit was filed in your behalf against the

-WC-

Cross - Krioutchkova/Greenberg

1    landlord and Dennis Colon.

2              THE WITNESS:  I don't know about it, because

3    they didn't say anything to me.

4              THE COURT:  The answer was, "I don't know

5    about it, because they didn't say anything to me."

6              MR. GREENBERG:  Can I have that marked?

7              THE COURT:  The defense has a piece of paper

8    that he's asking to be marked for identification as Defense

9    Exhibit A.

10             MR. GREENBERG:  Can we show it to the witness.

11             THE COURT:  It has been marked, and he's

12   asking that the witness be shown that paper.

13   Q.   I would ask that you look at the front page, and I

14   believe the second or third page.

15   A.   What I should look for?

16   Q.   Do you recognize that?

17   A.   I have to read.

18             THE COURT:  She's reading.

19             THE WITNESS:  Can I answer?

20             THE COURT:  Yes, you may answer.

21             THE WITNESS:  I gave to the lawyer the papers

22   which are confirming what happened to me.  I cannot say I

23   saw these papers or not.  I cannot say.  I don't know.

24   Q.   Is it fair to say that you went to a lawyer, correct,

25   as a result of this incident?

Redirect - Krioutchkova/Channapati

633

1    A.   Yes.  I brought to the lawyer the papers.

2    Q.   Is your lawyer's name on that paper on the front page?

3              THE COURT:  On the front page.  The lawyer

4    asks look at the front page.

5              THE WITNESS:  Yes, here.

6    Q.   Is your name on that page?

7    A.   Yes.

8    Q.   Is your landlord's name on that page?

9    A.   Yes.

10   Q.   Is Mr. Colon's name on that page?

11   A.   Yes.

12             MR. GREENBERG:  I have no further questions.

13             THE COURT:  Thank you.

14             People, anything on redirect?

15             MS. CHANNAPATI:  Very brief, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. CHANNAPATI:

18   Q.   Ms. Krioutchkova, on March 26th, 2003, okay, was the

19   bathroom leaking when the defendant showed up at the apartment?

20   A.   Yes.

21   Q.   Could you see it leaking at this time?

22   A.   Yes.

23   Q.   So in your opinion, was it obvious where the leak was?

24   A.   Yes, it's obvious.

25   Q.   Is that why you didn't follow the defendant into the

1   bathroom?

2       A.   I didn't follow him to the bathroom.

3       Q.   Right.  But is that why you didn't follow  him into

4   the bathroom?

5       A.   Yes.  You can see it's leaking.

6       Q.   Now, over the eight years that you lived in that

7   apartment, how many different repair men came to the apartment

8   to fix?

9       A.   It was lot of people.  Now, I'll say when they

10  repaired the apartment above me, a man came to check in which,

11  the condition in my apartment, and he asked me if he can use my

12  telephone to make a call, and he was calling and he left.

13       I left my apartment, and I locked the door, and 15

14  minutes later I came back, and I wasn't able to open the lock,

15  and after when I came in, I can see the video camera

16  disappeared and $600 which I prepared to pay rent.

17      Q.   Vera, my question to you was -- I don't know if you

18  heard it.  My question to you was:  Over the years, over the

19  eight years that you lived in that apartment, if you can give

20  me a number of how many, how many different men came to the

21  apartment?

22      A.   A lot, maybe ten.  A lot different people, different

23  people, were doing the repairs, a lot.  They take care of the

24  walls, the electric wires, and when the ceiling fell, there was

25  a hole between two floors and was a lot of people coming and

-WC-

Redirect - Krioutchkova/Channapati

635

1    repairing, different ones.

2        Q.   When the police came to your apartment, after the

3    incident happened with the defendant, were you upset?

4              MR. GREENBERG:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  I was very upset.

7        Q.   Were you crying?

8        A.   I was crying.

9        Q.   How else were you feeling?

10             MR. GREENBERG:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  This was very painful for me

13   inside.  I couldn't describe how.  It was terrible.  I got

14   feeling everything is falling apart and nothing exists.

15       Q.   Now, when the attorney for the defendant was reading

16   to you some questions and answers that had to do with a civil

17   case, do you remember him asking you those questions?

18       A.   Yes, I remember.

19       Q.   When you answered those questions on the civil case,

20   was there a translator present?

21       A.   Yes.

22       Q.   There was.  Okay.

23             When the ceiling fell in June of 2002, and that's in

24   your bathroom; right?

25       A.   Yes.

Redirect - Krioutchkova/Channapati

636

1    Q.    Do you know what caused that ceiling to fall?

2    A.    I know the cause.

3    Q.    What is it?

4    A.    Inside of the ceiling the pipes were leaking, and it

5    was wet, and the ceiling was almost hanging, and when they

6    start renovating the apartment, one above me, this ceiling

7    which was hanging, fell down.  I was showing to the landlord

8    very often.

9    Q.    Now, do you remember the defendant's attorney asking

10   you about seeing a psychiatrist?

11   A.    Yes.

12   Q.    Did something happen to you that made you start seeing

13   a psychiatrist?

14   A.    Yes, it happened.

15   Q.    What happened?

16   A.    I got cancer, and I got the surgery.

17   Q.    What kind of surgery did you get?

18   A.    Hysterectomy.

19   Q.    When did that happen?

20   A.    January 20, 2000.

21   Q.    How did that make you feel after you had your surgery?

22              MR. GREENBERG:  Objection.

23              THE COURT:  Overruled.

24              THE WITNESS:  I thought my -- this is the end

25   of my life, and that's that, and after I start recovering.

-WC-

Recross - Krioutchkova/Channapati

637

1    Q.   Now, the medication that you take, does that make you

2  see things?

3                    THE INTERPRETER:  See things?

4                    MS. CHANNAPATI:  See things.

5                    THE WITNESS:  No.

6    Q.   What is the medication for?

7    A.   This is antidepressant.

8                    MS. CHANNAPATI:  Nothing further, your Honor.

9                    THE COURT:  Anything further from the defense?

10                   MR. GREENBERG:  Yes.

11  RECROSS EXAMINATION

12  BY MR. GREENBERG:

13    Q.   Isn't it true that the current landlord has only three

14  men that do work in the building -- Hollis Christopher, Robert

15  Meade, and a fellow by the name of Gary; isn't that true?

16                   MS. CHANNAPATI:  Objection, your Honor.

17                   THE COURT:  Counsel, it hasn't been covered.

18                   MR. GREENBERG:  She was inquiring about the

19  people that came to her apartment.

20                   THE COURT:  Overruled.

21                   Go ahead.

22                   THE INTERPRETER:  I couldn't remember the

23  names.

24                   MR. GREENBERG:  Hollis Christopher, Robert

25  Meade, and a fellow by the name of Gary.

-WC-

Recross - Krioutchkova/Channapati

638

1      THE WITNESS:  He didn't introduce them, and he

2   didn't say those are the people who were working for him.

3      Q.   Are those the only three men that ever came to your

4   apartment to do work after these landlords came into possession

5   of the building?

6      MS. CHANNAPATI:  Objection, Your Honor.

7      THE COURT:  Overruled.

8      THE WITNESS:  Among those people, do you have

9   a female name?

10     Q.   No.

11     A.   The ceiling was repaired by a male and a female.

12     Q.   I'm talking about the regular people that worked in

13   the building?

14     MS. CHANNAPATI:  Objection, your Honor.

15   Asked and answered.

16     THE COURT:  Overruled.

17     A.   He didn't send any letter, and I cannot say they are

18   working for us or not

19     Q.   Isn't it also true that the only plumber used by that

20   building was Hollis Christopher?

21     MS. CHANNAPATI:  Objection, your Honor.  It's

22   beyond of the witness's knowledge.

23     THE COURT:  The objection is sustained.  The

24   question has been asked and answered.  The witness has

25   answered it.

-WC-

Recross - Krioutchkova/Channapati

1  Q.    When you receive your Social Security disability, that

2  was not for a physical condition; correct?

3              MS. CHANNAPATI:  Objection.

4              THE COURT: Overruled.

5              THE WITNESS:  No, it wasn't.

6  Q.    It was for your psychiatric condition; correct?

7  A.    Yes.

8              MR. GREENBERG:  All right.

9              THE COURT:  People?

10             MS. CHANNAPATI:  Nothing further, your Honor.

11             THE COURT:  The witness may step down, and I

12  thank the interpreter.

13             Ladies and gentlemen of the jury, we don't

14  have other witnesses today, and I do thank you for your

15  attention.  You certainly have done well today.

16             Now, tomorrow is Friday.  We're not going to

17  be on this case tomorrow.  So you are off tomorrow.  Off

18  means you do whatever you want to do with regard to your

19  lives, except with regard to this case.

20             I have to now give you my admonitions, the

21  same ones you already have.  The law requires the jurors to

22  follow certain instructions in order to help assure us of a

23  just and fair trial.

24             I'll give them to you.  One, do not converse

25  either among yourselves or with anyone else anything about

-WC-

1    this case.

2           Two, do not at any time during the trial

3    request, accept, or agree to accept or discuss with any

4    person the receipt or acceptance of any payment or benefit

5    in return for supplying any information concerning the

6    trial.

7           Three, you must promptly report to me directly

8    any incident within your knowledge involving any attempt by

9    any person improperly to influence you or any member of

10   this jury.

11          Four, do not visit the premises or place where

12   the charged crime was allegedly committed or any other

13   premises or place involved in the case.  Do not read or

14   listen to any accounts or discussions of the case if it

15   were to be reported by the newspaper, television, radio,

16   Internet, or any other news media.

17          Do not attempt to research any fact or issue

18   of law about this case whether by discussion or with others

19   or by research in the library or Internet or by any other

20   means or source.

21          Everybody understands those?

22          That's fine.  So that means everybody will

23   follow them on Monday.  We start at 9:30 a.m., and you will

24   report into your jury room.

25          Do the lawyers have anything they want to

1    bring to my attention?

2                    MS. CHANNAPATI:  No.

3                    MR. GREENBERG:  No.

4                    THE COURT:  See you Monday.  Have a good long

5    weekend.  See you Monday at 9:30.  The court officers want

6    to collect your books.

7                    (Whereupon, the jury exits the courtroom.)

8                    THE COURT:  Let the record show the jury has

9    left the room, and, of course, the witness previously

10   exited.

11                   As we have previously agreed, the case is

12   adjourned.  In terms of tomorrow, we will not be meeting on

13   the case tomorrow.  We have previously gone over your

14   tentative schedule for next week, and the Court assumes we

15   are able to hold to that, and so that's where we are.

16                   Are there any other issues that I need to know

17   about?

18                   If not, everyone have a good weekend and

19   shabbos.

20                   (Whereupon, the case on trial was adjourned

21   to June 5th, 2006.)

22

23

24

25

642

```
1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS - CRIMINAL TERM - PART:  3
2    -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
3

4                                      INDICTMENT NO.
              -against-                2518/2003
5
     DENNIS COLON,
6                    Defendant.
     -------------------------------------------X
7                              320 JAY STREET
                               BROOKLYN, NEW YORK 11201
8                              JUNE 5, 2006

9
     B E F O R E:
10
                       HONORABLE JAMES P. SULLIVAN,
11                            Justice and jury
     A P P E A R A N C E S:
12

13                     CHARLES J. HYNES, ESQ.
                       District Attorney, Kings County
14                     BY:  ANITA CHANNAPATI, ESQ.
                       BY:  LOUISE COHEN, ESQ.
15                     BY:  RACHEL SCHMIDT, ESQ.
                       Assistant District Attorneys
16

17
                       HARLAN GREENBERG, ESQ.
18                     DENNIS PETRE
                       30 Vesey Street, 15th Floor
19                     New York, New York
                       Attorneys for the Defendant
20

21                            William Cardenuto
                              Senior Court Reporter
22

23                            Rozalia Melnik
                              Official Russian Interpreter
24

25
```

-WC-

- Proceedings -

643

1    THE COURT:  This is the case on trial, People

2    versus Dennis Colon, and the People have an issue they want

3    to bring up.

4        MS. CHANNAPATI:  Your Honor, first, I have two

5    officers here today ready to testify.  That would be

6    Sergeant Esposito and Officer Guinan.

7        I was anticipating to put on Detective Harvin

8    today.  She was here on Thursday.  I was, you know, I

9    thought there would be a chance she would be able to

10   testify on Thursday, your Honor.

11       Unfortunately, the length of the testimony of

12   the complainant went so long that we weren't able to put

13   her on the stand.  She was given instruction that she will

14   be notified and that she should be here Monday to testify,

15   and the notification was -- our office checked to see if

16   the notification went through, it did, indeed; however,

17   Detective Harvin is not here.  She has not appeared.

18       THE COURT:  You will put on your other

19   witnesses, and then hopefully she shows up.

20       MS. CHANNAPATI:  I want to make the record.

21       THE COURT:  You have.  That's what delayed

22   you.  You have other people in your office, get them on it,

23   and try to get that missing person here, and put your other

24   witnesses on.

25       MS. CHANNAPATI:  I don't anticipate Officer

1    Guinan and Officer Esposito to take the duration of the

2    morning.

3              THE COURT:  If they are finished, and she's

4    not here, then we'll take it up then.

5              The jury is all present.

6              Anything else?

7              MS. CHANNAPATI:  No, your honor.

8              THE COURT:  If not, we'll put the witnesses on

9    that you have.

10             Do we need these gloves up here now?  They are

11   not going to have to handle anything?

12             MS. CHANNAPATI:  No.

13             THE COURT:  While we're waiting for the jury,

14   there's one thing in the transcript of June 1, 2006, at

15   Page 628, Line 10, it says, "The record can show the

16   interpreter is not here," n-o-t.  I've discussed it with

17   the reporter.  It should be now, n-o-w.

18             Either side have any objection?

19             MR. GREENBERG:  No, your Honor

20             MS. CHANNAPATI:  No.

21             MR. GREENBERG:  Just for the record, it's

22   clear to both sides that the interpreter was here for all

23   proceedings.

24             MS. CHANNAPATI:  Yes, your Honor.

25             THE COURT:  Thank you.

Direct - Sgt. Esposito/Channapati

645

1              Okay.

2              THE COURT OFFICER:  Jury entering.

3              (Whereupon, the jury enters the courtroom and

4    is properly seated.)

5              THE CLERK:  All jurors are present.  Both

6    sides waive the reading of the roll?

7              MS. CHANNAPATI:  So waived.

8              MR. GREENBERG:  Yes.

9              THE COURT:  Good morning, ladies and

10   gentlemen.  I hope you had a good weekend.  We'll take up

11   again.

12             People.

13             MS. CHANNAPATI:  At this time, the People call

14   Sergeant Gerald Esposito.

15   SERGEANT  G E R A L D   E S P O S I T O,  Shield No. 479, Transit

16   District 34, called as a witness, after being duly sworn,

17   testified as follows:

18             THE COURT:  You may proceed.

19             MS. CHANNAPATI:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. CHANNAPATI:

22   Q.   Sergeant Esposito, by whom are you currently employed?

23   A.   New York City Police Department.

24   Q.   How long have you been employed by the New York City

25   Police Department?

-WC-

Direct - Sgt. Esposito/Channapati

646

1      A.   Nine years.

2      Q.   What is your current assignment?

3      A.   I'm a sergeant in Transit District 34.

4      Q.   Could you please tell the jury what your previous

5  assignments were with the New York City Police Department?

6      A.   I did sector patrol in the confines of the 61 Precinct

7  for the past eight years, eight and a half years.

8      Q.   What are the duties and responsibilities of sector

9  patrol?

10      A.   Responding to 911 calls.

11      Q.   I'm sorry?

12      A.   Responding to 911 calls.

13      Q.   I'm going to direct your attention to March 26th,

14  2003, were you working that day?

15      A.   Can I refer to my notes?

16           Yes, I was working.

17      Q.   Were you working alone?

18      A.   I was working with my partner.

19      Q.   What's your partner's name?

20      A.   Police Officer Mike Guinan.

21      Q.   What was your assignment?

22      A.   We sector George, John, Mike.

23      Q.   What does that mean?

24           MR. GREENBERG:  Objection, your Honor.

25           THE COURT:  Yes, Counsel?

-WC-

Direct - Sgt. Esposito/Channapati

647

1          MR. GREENBERG:  It appears to me that Officer

2    Esposito is testifying directly from his notes.

3          THE COURT:  Well, Officer, you may look at

4    your notes to refresh your recollection, and then just

5    respond.  That's all.

6          THE WITNESS:  Okay.

7          MR. GREENBERG:  His notes are open.

8          THE COURT:  Well, his notes can be open.  He

9    can have them and glance at them.  He just can't read word

10   for word.

11   Q.   Were you on foot or in a vehicle?

12   A.   Vehicle.

13   Q.   Directing your attention to approximately 8:45 a.m. on

14   March 26th, 2003, what, if anything, happened at that time?

15   A.   We responded to a 34, which is an assault in progress.

16   Q.   Did you respond to a particular location?

17   A.   Yes.

18   Q.   What location did you respond to?

19   A.   That would be 1711 East 15th Street.

20   Q.   Did you speak to anyone at that location?

21   A.   At the time when we walked in, there was a woman

22   there.  I don't remember interviewing her.

23   Q.   Do you remember the woman's name?

24   A.   Vera Krioutchkova.

25          THE COURT:  He's looking at his notes to

-WC-

Direct - Sgt. Esposito/Channapati

648

1    refresh his recollection regarding the name.

2                    Go ahead.

3                    THE WITNESS:  Vera Krioutchkova.

4    Q.   Krioutchkova?

5    A.   Yes, Krioutchkova.

6    Q.   When you responded to 1711 East 15th Street, did you

7    stay at that location?

8    A.   No.

9    Q.   Where did you go?

10   A.   I escorted the victim to the hospital.

11   Q.   What hospital did you go to?

12   A.   Coney Island Hospital.

13   Q.   Now, when you were at Coney Island Hospital, did you

14   receive any property there?

15   A.   Yes.

16   Q.   What were you given?

17   A.   A rape kit.

18                    MS. CHANNAPATI:  Your Honor, at this time I'm

19   going to show this to the defense attorney.  I'm going to

20   ask that it be marked as People's No. 9 for identification.

21                    THE COURT:  Marked as People's 9 for

22   identification.

23                    Any objection?

24                    MR. GREENBERG:  No.

25   Q.   Sergeant Esposito, do you recognize this?

-WC-

Direct - Sgt. Esposito/Channapati

649

1    A.    Yes, I do.

2    Q.    What do you recognize it to be?

3    A.    It's a rape kit.

4    Q.    Do you know which rape kit it is?

5    A.    The victim's rape kit.

6              MR. GREENBERG:   Objection.

7              THE COURT:   Sergeant, we don't use the word

8    "victim" during the trial.   We will use the word

9    "complainant."

10             The complainant's rape kit?

11             THE WITNESS:   It's the complainant's rape kit.

12   Q.    How do you recognize it to be the complainant's rape

13   kit?

14   A.    Her name is on it.

15   Q.    Does it differ in any way in its appearance from when

16   you received it at Coney Island Hospital?

17   A.    Yes.

18   Q.    How does it differ?

19   A.    There's a lot more seals on it.

20   Q.    Other than that, is it in substantially the same

21   condition as it appeared on March 26th, 2003?

22   A.    Yes.

23             MS. CHANNAPATI:   Your Honor, at this time I

24   would ask what's been previously marked as People's No. 9

25   for identification be received into evidence as People's

Direct - Sgt. Esposito/Channapati

650

1    No. 9, subject to connection.

2                    THE COURT:  Any objection?

3                    MR. GREENBERG:  No.

4                    THE COURT:  Into evidence subject to

5    connection as People's 9.

6    Q.    After you were given the sexual assault kit, what did

7    you do?

8    A.    I went back to my command with it.

9    Q.    What did you do with the sexual assault kit when you

10   got back to your command?

11   A.    I handed it to my sergeant.

12   Q.    Was anybody else present when you gave it to your

13   sergeant?

14   A.    Yes.

15   Q.    Who else was present?

16   A.    My partner, Mike Guinan.

17   Q.    When you say your command, what command was that?

18   A.    61.

19                   MS. CHANNAPATI:  Thank you very much?

20                   THE COURT:  All right.

21                   The defense.

22                   MR. GREENBERG:  I have no questions, your

23   Honor.

24                   THE COURT:  No questions.

25                   The witness may step down.

-WC-

Direct - PO Guinan/Channapati

651

1          THE WITNESS:  Thank you.

2          MS. CHANNAPATI:  Your Honor, at this time the

3     People call Police Officer Michael Guinan.

4  POLICE OFFICER  M I C H A E L  G U I N A N,  Shield No. 29228,

5  61st Precinct, called as a witness, after bein duly sworn,

6  testified as follows:

7          THE COURT:  People, you may proceed.

8          MS. CHANNAPATI:  Thank you, your Honor.

9  DIRECT EXAMINATION

10 BY MS. CHANNAPATI:

11    Q.    Officer Guinan, by whom are you currently employed?

12    A.    The City of New York.

13    Q.    In what capacity?

14    A.    Police officer.

15    Q.    How long have you been employed as a New York City

16 police officer?

17    A.    For 11 years.

18    Q.    What is your current assignment?

19    A.    Criminal Analysis of the 61st Precinct.

20    Q.    Can you briefly tell the jury what your previous

21 assignments were?

22    A.    Patrol of the 61st Precinct.

23    Q.    What were your responsibilities as patrol officer in

24 the 61 Precinct?

25    A.    We get called to 911 jobs.

-WC-

Direct - PO Guinan/Channapati

652

1      Q.    I'm going to direct your attention to March 26th,

2   2003.  Were you working that day?

3      A.    Yes.

4      Q.    What was your assignment?

5      A.    We were doing patrol as George, John, Mike on that

6   day.

7      Q.    Officer, are you referring to anything as you testify?

8   Right now, are you referring to any notes?

9      A.    Yes, my memobook.

10              THE COURT:  All right.  The Court instructs

11      the officer he may look at the memobook to refresh his

12      memory, but do not read from it word for word.

13              THE WITNESS:  Yes.

14      Q.    Were you working alone?

15      A.    I was working with Sergeant Esposito.

16      Q.    Were you on foot or in a vehicle?

17      A.    In a vehicle.

18      Q.    Directing your attention to approximately 8:45 a.m. on

19   March 26th, 2003, what, if anything, happened at this time?

20      A.    We responded to a 1034 which is an assault in

21   progress.

22      Q.    Now, what location did you respond to?

23      A.    We responded to, according to my notes, 1711 East 15th

24   Street, Apartment 1-A.

25      Q.    Now, did you speak to anyone when you got there?

Direct - PO Guinan/Channapati

653

1    A.    Yes, the victim.

2              MR. GREENBERG:  Objection.

3              THE COURT:  Yes.

4              Officer, we use the word "complainant" versus

5    victim of the crime.

6              THE WITNESS:  The complainant

7    Q.    Do you remember the complainant's name?

8    A.    Her name was Vera -- it's hard for me to pronounce the

9    last name.

10   Q.    Can you attempt.

11   A.    Krioutchkova.

12   Q.    It's Krioutchkova?

13   A.    Yes, sorry.

14   Q.    After speaking to her, what did you learn?

15   A.    The complainant stated to me that --

16             MR. GREENBERG:  Objection.

17             THE COURT:  Overruled.

18   A.    -- that she received a phone call from the

19   perpetrator, and he stated he was a plumber, and the door

20   bell -- that he was coming over, and the doorbell rang.  When

21   he got there, he pulled out a knife, and he stated to her to

22   lay on her bed, and then he forcibly inserted his penis into

23   her vagina.

24   Q.    Did she describe anything else about him?

25   A.    She also stated he smelt like alcohol.

Direct - PO Guinan/Channapati

654

1      Q.    Did she give you a description of the man who came to

2   her apartment?

3      A.    Yes.

4      Q.    Okay.

5      A.    According to my notes, it was a male white Hispanic,

6   five feet eleven, approximately 230, 230 pounds.

7      Q.    Did she give a clothing description?

8                  THE COURT:  The officer is refreshing his

9   recollection by looking at his notes.

10                 THE WITNESS:  I'm sorry.  Yes, he had a

11  leather suede fur trim black jacket, a baseball hat that

12  was black, and that's pretty much all I got from my notes.

13     Q.    Did she describe any facial hair?

14     A.    Not that I see here.

15                 MS. CHANNAPATI:  One moment, your Honor.

16     A.    I'm sorry.  I just found it.  She stated he had a

17  beard.

18     Q.    Thank you.

19     A.    Sorry.

20     Q.    Now, did anyone else respond to 1711 East 15th Street?

21     A.    Yes.  We had the Crime Scene respond and our Detective

22  Squad from the 61 squad, our squad, and also my captain and the

23  patrol supervisor, and I think that was it

24     Q.    Did someone from Special Victims respond?

25     A.    Yes, Special Victims, a sergeant from Special Victims

-WC-

Direct - PO Guinan/Channapati

655

1    came.

2       Q.    Now, what did you do at that point at 1711 East 15th

3    Street?

4       A.    I secured the crime scene.

5       Q.    What does it mean to secure the crime scene?

6       A.    Just to make sure that no one entered the crime scene

7    and contaminated the evidence.

8       Q.    While you were securing the crime scene, were you

9    given any property or items while you were at the apartment?

10      A.    Yes, from Detective Forte, the crime scene detective.

11   He gave me several bags.

12              MS. CHANNAPATI:  At this time I'm going to ask

13         if this could be marked as People's No. 10 for

14         identification.

15              THE COURT:  The People are pulling a large bag

16         from another bag, and you're asking that be marked as 10

17         for identification.  It's being shown to the defense.

18              MS. CHANNAPATI:  If it could be marked and

19         shown to the witness.

20              THE COURT:  It's going to be marked as 10 for

21         identification.

22      Q.    Officer Guinan, do you recognize that bag?

23      A.    Yes.

24      Q.    What do you recognize it to be?

25      A.    It was the bag given to me by Detective Forte.

-WC-

Direct - PO Guinan/Channapati

656

1    Q.   How do you recognize that to be the bag that was given

2  to you by Detective Forte?

3    A.   Because it has the voucher number that I went and

4  vouchered that day.

5    Q.   What voucher was that?

6    A.   L-692723.

7           MS. CHANNAPATI:  I would ask what's been

8  previously marked as People's No. 10 for identification be

9  received and marked into evidence as People's No. 10 into

10  evidence.

11           THE COURT:  Any objection?

12           MR. GREENBERG:  No.

13           THE COURT:  People, you have a bag into

14  evidence.  We have no idea what's in that bag.

15           MS. CHANNAPATI:  Testimony is coming.

16           THE COURT:  Go ahead.

17    Q.   Officer Guinan, when you were given that bag, what was

18  in it?

19    A.   It was a white comforter/holder with a reindeer

20  design.

21           THE COURT:  White comforter, a holder?  You

22  said "holder"?

23           THE WITNESS:  Well, I guess it was, it's like

24  a comforter.

25           THE COURT:  This is one thing or two things?

Direct - PO Guinan/Channapati

657

1      The comforter is a holder, or it's a comforter plus a

2      holder?

3                      THE WITNESS:  I think it's all one thing.

4                      THE COURT:  And it has a reindeer design?

5                      THE WITNESS:  Yes.

6      Q.    Officer, this comforter holder that was in the bag, is

7  it also known as a duvet?

8      A.    I would assume so.  I don't know.

9      Q.    Could you please explain to the jury what vouchering

10  is.

11     A.    Vouchering is just taking the evidence from the scene,

12  and we bring it back to the precinct to make sure it's safe,

13  safeguarded.

14     Q.    What is the voucher number?

15     A.    The voucher number for the comforter?

16     Q.    What is a voucher number, generally speaking?

17     A.    That's the number.  We have a voucher slip, and we put

18  the voucher number onto the property so we can easily identify

19  it.

20     Q.    So what is the voucher number for the comforter/holder

21  that was in that bag?

22     A.    It's L-692723.

23     Q.    Now, was any other property given to you?

24     A.    Yes.  There was another brown bag containing a black

25  robe.

-WC-

Direct - PO Guinan/Channapati

658

1    Q.    Under what number was that vouchered?

2    A.    L-692724.

3              MS. CHANNAPATI:  At this time I would ask if

4    the witness could be shown People's No. 6.

5              THE COURT:  All right.  The officer will get

6    that.  The officer is getting a bag which has previously

7    been marked as People's 6.

8              The contents, People, you may tell us.

9              MS. CHANNAPATI:  The contents are the black

10   robe.

11             THE COURT:  So the contents is the black robe

12   the officer referred to.

13             THE WITNESS:  Yes, that's it.  That's the

14   property.

15             THE COURT:  He says, "that's it."

16   Q.    How do you recognize it?

17   A.    From the number on the bag.

18             MS. CHANNAPATI:  Your Honor, at this time I

19   would ask what's been previously put into evidence subject

20   to connection as People's No. 6 be received into evidence.

21             THE COURT:  Any objection?

22             MR. GREENBERG:  No.

23             THE COURT:  It's into evidence now.

24   Connection has been established.

25   Q.    Officer, what other property, if any, did you receive

-WC-

Direct - PO Guinan/Channapati

659

1    from the Crime Scene Unit?

2         A.   I received a sexual offense evidence kit.

3         Q.   And any other property?

4         A.   Yes, also a brown paper bag containing four paper

5    towels.

6         Q.   Was this vouchered?

7         A.   It was vouchered.

8         Q.   Under what number was that vouchered?

9         A.   L-692722.

10        Q.   Any other property?

11        A.   There was also two Marlboro cigarette filters in a

12   yellow envelope.

13        Q.   Was that vouchered?

14        A.   It was also vouchered, L-692725.

15        Q.   Who gave you all this property?

16        A.   This is the crime scene detective, Detective Forte.

17        Q.   Now, in addition to the comforter/holder that was

18   vouchered under L-692723, was anything else vouchered under

19   that number?

20        A.   The comforter -- oh, yes, a Dunkin Donuts napkin in a

21   brown bag, and a dish towel that it was also in a brown bag.

22                  THE COURT:  I didn't understand.

23                  A Dunkin Donuts napkin?

24                  THE WITNESS:  Yes.

25                  THE COURT:  What else?

-WC-

Direct - PO Guinan/Channapati

660

1    THE WITNESS:  Also a dish towel.

2    THE COURT:  Dish towel?

3    THE WITNESS:  Yes.

4    THE COURT:  Okay.

5    Q.    At this time if you could look at what's been marked

6  as People's No. 9 for identification.

7         Do you recognize that?

8    A.    Yes, that's a sexual evidence kit.

9    Q.    How do you recognize it?

10   A.    By the number on the box and also the name of the

11  complainant.

12   Q.    When you say "the number on the box," what number?

13   A.    The voucher number.

14   Q.    What is the voucher number on that box?

15   A.    It's L-692721.

16   Q.    Now, did there come a point when you left 1711 East

17  15th Street?

18   A.    Yes.  I took the property back to my precinct.

19   Q.    Did you have the rape kit with you at that point?

20   A.    No, I did not.

21   Q.    When you got to your precinct, were you given any

22  property?

23   A.    Yes.  I was given the sexual evidence kit by my

24  partner.

25   Q.    And who gave it to you?

-WC-

Direct - PO Guinan/Channapati

661

1    A.    My partner, Sergeant Esposito.

2    Q.    Now, after you vouchered the sexual assault kit, what

3  happens to it?

4    A.    It goes to a lab.

5    Q.    What lab, do you know?

6    A.    Actually, I really don't know.

7         MS. CHANNAPATI:  Your Honor, at this time I'm

8  going to ask, after a showing to defense counsel, the

9  witness be shown, if it can also be premarked, as People's

10  No. 11 for identification.

11         THE COURT:  All right.  This is a large

12  baseboard item, a schematic of some sort, People's 11 for

13  identification.

14    Q.    Officer, do you recognize that?

15    A.    Yes, I do.  That's a map of the area where the

16  incident happened.

17    Q.    Is it drawn to scale?

18    A.    No.

19    Q.    Other than the fact that it's not drawn to scale, does

20  it fairly and accurately depict the vicinity around 1711 East

21  15th Street?

22    A.    Yes, it does.

23         MS. CHANNAPATI:  Your Honor, at this time I

24  would ask what's been previously marked as People's No. 11

25  for identification be received and marked into evidence as

-WC-

Direct - PO Guinan/Channapati

662

1    People's No. 11?

2                    THE COURT:  Any objection?

3                    MR. GREENBERG:  No.

4                    THE COURT:  That's admitted into evidence as

5    People's 11.

6                    MS. CHANNAPATI:  If it could be posted.  I'm

7    sorry.  Thank you.

8                    THE COURT:  The officer is posting it.

9                    MS. CHANNAPATI:  Could we post it

10   horizontally, and with the Court's permission if the

11   witness could be provided with a marker and approach the

12   exhibit.

13                   THE COURT:  Do we have markers up here today?

14                   He's been given a marker by the court officer.

15   Q.   Officer, could you please circle where 1711 East 15th

16   Street is on the exhibit?

17   A.   It would be right here.

18   Q.   And with an "X" could you please indicate where 1323

19   East 16th Street is?

20   A.   Right here.

21   Q.   Officer, by looking at the exhibit, could you please

22   approximate about how many blocks away 1323 East 16th Street is

23   from 1711 East 15th Street?

24   A.   It's about three and a half blocks.

25                   MS. CHANNAPATI:  Thank you very much.

                           -WC-

Cross - PO Guinan/Greenberg

663

1     You can have a seat.

2                    Nothing further, your Honor.

3                    THE COURT:  All right.

4                    Defense.

5   CROSS EXAMINATION

6   BY MR. GREENBERG:

7     Q.    Good morning.

8     A.    Good morning.

9     Q.    Can you pronounce your name for me?

10    A.    Guinan.

11    Q.    What's your rank?

12    A.    Officer, police officer.

13    Q.    Officer, how long have you been a police officer?

14    A.    11 years.

15    Q.    When you first became a police officer, you went to

16  the police academy; correct?

17    A.    Yes.

18    Q.    You learned at the police academy that it's very

19  important to be accurate and careful when you take notes?

20    A.    Yeah.

21    Q.    Through the years being a police officer, have you had

22  updated training from time to time?

23    A.    Yeah.

24    Q.    During that time, also, it's re-enforced to you that

25  taking notes is important and relevant in your work; correct?

Cross - PO Guinan/Greenberg

664

1    A.   Yes.

2    Q.   You were the first person to arrive at 1711 East 15th

3    Street; is that correct?

4    A.   Yes.

5    Q.   You were the first person to speak with the

6    complainant; is that correct?

7    A.   Yes.

8    Q.   She indicated to you that a knife was used during this

9    incident; is that correct?

10   A.   That's correct.

11   Q.   At any time did she ever give a description of the

12   knife that was used?

13   A.   Not a description of the knife, no.

14   Q.   But she indicated there was knife; correct?

15   A.   Yes.

16   Q.   There was never any followup with respect to what the

17   description of the knife was?

18   A.   No.

19   Q.   Did the complainant ever say to you that the person

20   who attacked her threatened to kill her?

21   A.   Just what I have written down here.  I don't remember

22   any other statement like that.

23   Q.   Do you recall the statement that she said to you?

24   A.   I do.

25   Q.   Withdrawn.

-WC-

1       Was the statement that she said to you that the person

2   who assaulted her said, "lay on the bed"; is that correct?

3       A.   Yes.

4       Q.   That's the only statement that she said that the

5   person who attacked her said; is that correct?

6       A.   That's correct.

7               MR. GREENBERG:  I have no other questions.

8               THE COURT:  People, anything further?

9               MS. CHANNAPATI:  Yes, your Honor, briefly.

10  REDIRECT EXAMINATION

11  BY MS. CHANNAPATI:

12      Q.   Officer Guinan, do you write down everything that

13  happens whenever you respond to a call?

14      A.   We try to write down everything.

15      Q.   But do you write down every single thing?

16      A.   Yeah.

17      Q.   You do?

18      A.   We try, like, you know.

19      Q.   Is it possible that you may have omitted some of

20  the -- some words from what the victim might have said?

21               MR. GREENBERG:  Objection.

22               THE COURT:  Overruled.

23               THE WITNESS:  To be honest, I really don't, I

24      wouldn't be able to tell you.  Like, I wouldn't remember if

25      she said anything else from that incident.

Cross - PO Guinan/Greenberg

666

1      Q.    Why wouldn't you be able to to remember?

2      A.    It was three years ago.

3      Q.    So my question is:  Is it possible that you may have

4  omitted some words that she said to you on that day?

5      A.    It's possible.

6               MS. CHANNAPATI:  Thank you very much.

7               THE COURT:  Anything else, Counsel?

8               MR. GREENBERG:  Yes.

9  RECROSS EXAMINATION

10 BY MR. GREENBERG:

11     Q.    Part of your training is they tell you to take notes,

12 because at some point you may need to testify; is that correct?

13     A.    Yes.

14     Q.    And they tell you to take the notes carefully and

15 accurately, because you're going to need to respond to

16 questions; is that correct?

17     A.    That's correct.

18     Q.    When you're taking the notes, you try to be as careful

19 and accurate as possible; correct?

20     A.    Yes.

21     Q.    Because over time your memory may fade; is that

22 correct?

23     A.    That's correct.

24     Q.    And notes that you take can be used to refresh your

25 recollection; is that correct?

Cross - PO Guinan/Greenberg

1    A.    That's correct.

2              MR. GREENBERG:  Thank you.

3              THE COURT:  People.

4              MS. CHANNAPATI:  Nothing, your Honor.

5              THE COURT:  The witness may step down.

6              The lawyers can approach.

7              (Brief discussion held off the record.)

8              THE COURT:  Ladies and gentlemen of the jury,

9    we're going to have you take a break for a few minutes.

10   We're going to look at some other things.  Please, do not

11   discuss the case while you're in the jury room.  Do not

12   discuss the case at all.  We'll see you back.  We'll call

13   you back.  Please, leave your books.  That way we keep

14   control.  You don't have them in the jury room.

15             (Whereupon, the jury exits the courtroom.)

16             THE COURT:  All right.  With regard to this

17   case, it's the Court's understanding that the People will

18   now reach out and see what they can do with regard to their

19   other witness or witnesses, and we'll then recess until we

20   hear from the people.

21             MS. CHANNAPATI:  Okay.

22                  (Recess taken.)

23             THE COURT:  We can go on the record regarding

24   People versus Dennis Colon.

25             People, any further word regarding your

-WC-

Cross - PO Guinan/Greenberg

668

1    witness?

2                MS. CHANNAPATI:  No, your honor, but I do have

3    a witness that's coming in for this afternoon.

4                THE COURT:  All right.  So you have a witness

5    for this afternoon.

6                MS. CHANNAPATI:  Yes.

7                THE COURT:  It's 11:30 now.  So we would be

8    breaking then until after lunch.

9                Now, do I need to call the jury book back or

10   shall we let the jury have a long break?

11               The clerk says call them back.  We'll let them

12   know it's going to be a long break.

13               THE COURT OFFICER:  Ready for the jury?

14               THE COURT:  I am.

15               THE COURT OFFICER:  Jury entering.

16               (Whereupon, the jury enters the courtroom and

17   is properly seated.)

18               THE CLERK:  All jurors are present.

19               Do both sides waive the reading of the roll?

20               MR. GREENBERG:  Yes.

21               MS. CHANNAPATI:  Yes.

22               THE COURT:  Ladies and gentlemen, we have a

23   scheduling issue in that one of the witnesses who was to

24   appear this morning cannot appear until this afternoon;

25   therefore, you have a long lunch break, if you want to call

-WC-

- Proceedings -

669

1    it that.

2              You will come back at 2:15.  You can stay in

3    the jury room.  You can -- what should I say -- walk around

4    beautiful downtown Brooklyn, but you're to be on break until

5    2:15.

6              Please do not discuss the case and please form

7    no opinion regarding guilt or innocence and leave your

8    books, please.

9              (Whereupon, the jury exits the courtroom.)

10             THE COURT:  The jury has exited the room.

11   We'll be coming back after the lunch break.

12             MS. CHANNAPATI:  Thank you, your Honor.

13             MR. GREENBERG:  Thank you.

14             THE COURT:  See you at 2:15.

15             (Luncheon recess taken.)

16             THE COURT:  All right.  With regard to the

17   case on the trial, the People have something they want to

18   talk about.

19             MS. CHANNAPATI:  Your Honor, the People intend

20   to move into evidence with the testimony of Kyra Keblish,

21   the criminalist --

22             THE COURT:  You've talking too fast in the

23   sense of chairs are moving and I can't hear.

24             MS. CHANNAPATI:  With the testimony of Kyra

25   Keblish, who is a criminalist from the Office of the Chief

-WC-

- Proceedings -

670

1    Medical Examiner, the People intend to move into evidence

2    the copies of her DNA report.

3              THE COURT:  The copies of the complainant's --

4    in other words, the copies, not the complainant's, it

5    relates to the complaint, but Ms. Keblish prepared the DNA

6    items; is that correct?

7              MS. CHANNAPATI:  Right, the file that goes

8    with the suspect's samples, which is the defendant's, and

9    also what was found on the complainant.

10             So we were going to move the entire file into

11   evidence, subject to redaction, should the jury ask to see

12   the files once they are deliberating.

13             THE COURT:  And --

14             MR. GREENBERG:  Your Honor, I haven't had a

15   chance to look at the entire file which Ms. Channapati is

16   intending to introduce.  There's a number of documents in

17   there that are troublesome.

18             There are notes, internal notes, that have

19   nothing to do with the witness testifying, that have gone

20   back and forth; there's a copy of the order which you

21   signed to direct the ME's office to do the testing; there's

22   police reports in there, just to name a few of the

23   documents.

24             I don't think those are appropriate to

25   introduce.  There are also, I believe, from my looking at

-WC-

- Proceedings -

1    the documents that were prepared during the testing of the

2    samples, and then there's also a report, I suggest and I'm

3    asking that the People be limited to introducing the

4    report, and not all of the documentation leading up to that

5    and, especially, the police documents and all the

6    extraneous documents.

7              THE COURT:  Let's hear from the People.

8              MS. CHANNAPATI:  Your Honor, this is -- the

9    entire file is a business record.  It's part of her work

10   product.  We can take out pages that are obviously hearsay,

11   which would be the police report and what not, but the rest

12   of it is part of the file.  It's part of her work product.

13   It's the business record of the DNA file kept by the Office

14   of the Chief Medical Examiner.

15             THE COURT:  Well, I mean, I'll put it this

16   way, you lawyers can confer and see if you can agree on

17   redactions.  If you can't agree on redactions, then I'll

18   rule on them.

19             So you want to confer.

20             It's a business record.

21             People, all they are interested in, I think,

22   is protecting that part of it, that it is a business

23   record.

24             MR. GREENBERG:  Your Honor, like said, and I

25   told them before, the police documents --

- Proceedings -

1    THE COURT:  That was off the record.  Back on

2    the record.

3         MR. GREENBERG:  The police documents, your

4    Honor, are documents prepared not by, you know, their

5    office.  They're prepared by the police department.

6    There's hearsay on it.  There's all kinds of problems with

7    it, and there's internal memos going back and forth between

8    various people of the ME's office contemplating whether or

9    not they are going to do the sampling or not, because there

10   was the second round of samples, I believe, so there's

11   all --

12        THE COURT:  Remind me.

13        Does the second round of sampling --

14        MR. GREENBERG:  There was actually, I believe,

15   three tests, total, conducted on three different times; one

16   was the original test; one was one that was ordered by the

17   Court, where we had them test items that they had not

18   tested previously; and then there was a third, I believe,

19   round of tests when they discovered that their criminalist

20   was not doing the tests appropriately, and --

21        THE COURT:  I'm listening.

22        That's the last part that they're fussing

23   about.

24        MR. GREENBERG:  That was led to believe --

25        MS. CHANNAPATI:  It was the first test of the

-WC-

- Proceedings -

1   rape kit which came back with a semen sample that matched

2   the defendant, and it was second test for the duvet ordered

3   by the Court.

4         THE COURT:  When the Court ordered it, I

5   didn't know we had this duvet issue.  I did order a second

6   round, and then three --

7         MS. CHANNAPATI:  There's a report that goes to

8   the defendant's swab, the sample taken from him.  There was

9   an amended report, because there was a typographical error

10  in the previous reports.

11        So there's four reports total.

12        THE COURT:  Just so we are on the same page,

13  the People say there was a first report which I'll call,

14  "standard."

15        The second report, we did have discussion back

16  and forth, and I did sign an order, so that we're all

17  understanding, and then they say there was a swab, and that

18  was relating to that, and then they say No. 4 is, in their

19  words, a typo, and so there was an amended report, because

20  of a typo.

21        We are not discussing right now this letter

22  that the People gave you and me about this lady that has

23  come up in other trials, the essence of that, and I don't

24  remember her name, but whatever she touched, defense

25  counsel are going to say was contaminated.

-WC-

1          We'll get into that later, but that issue not

2    being discussed right now that I'm aware of, what Counsel

3    is saying is there are, quote, in his words, "extraneous

4    documents" in the report.

5          I suggested that maybe the lawyers could agree

6    on what is extraneous, and I wouldn't have to rule, but if

7    you can't agree, then I'll have to rule.

8          MR. GREENBERG:  I'm asking to take out police

9    documents and all the documents that are not related to the

10   scientific testimony, like, the Judge's order, and the

11   letter that I sent to the ME's office at the direction of

12   the Court.

13         THE COURT:  Off the record.

14         (Brief discussion held off the record.)

15         MS. SCHMIDT:  Rachel Schmidt for the Office of

16   the District Attorney.

17         Thank you, your Honor.

18         Just so everyone is clear, there's two DNA

19   files.  Those files are the work product of the

20   criminalists at the Office of the Chief Medical Examiner.

21   They do contain police reports, and in one of the files,

22   e-mails and your Honor's order which defense counsel has

23   pointed out which can be redacted out of the file.

24         THE COURT:  Let met stop you.  The police

25   report in the order, Ms. Schmidt said, can be redacted.

- Proceedings -

675

1        Continue.

2        MS. SCHMIDT:   The file is voluminous.

3        THE COURT:   I don't care about voluminous.   He

4    specifically raised two things that you just mentioned, the

5    police report and my order.

6        MS. SCHMIDT:   Yes.

7        THE COURT:   That goes a long way.

8        What else, Counsel, is there that's of

9    concern?

10       MR. GREENBERG:   There's a letter from me.

11   There's the e-mails.

12       THE COURT:   Did you take his letter out?

13       MS. SCHMIDT:   Yes.

14       THE COURT:   We'll redact your letter.

15       Then what?

16       MR. GREENBERG:   The e-mails which relate to

17   nothing with respect to the scientific testing.

18       THE COURT:   I don't know who is sending

19   e-mails.

20       Who is sending e-mails?

21       MS. SCHMIDT:   Inter-office e-mails.

22       THE COURT:   You'll look at them.

23       MS. SCHMIDT:   But the point is --

24       THE COURT:   Let's put it this way.

25       What the People are looking to get in is the

-WC-

- Proceedings -

676

1    DNA report.  That we all understand.  So to the extent that

2    it is extraneous, I will be ruling it out.  It seems to me,

3    if you would sit down and work it out, it would be worked

4    out.  If not, I'll have to rule on it.

5              MS. SCHMIDT:  I don't want there to be an

6    issue when Ms. Keblish is on the stand.  The People are

7    going to be asking for the file that is going to be

8    introduced in evidence, because the evidence information in

9    the file is what supports the two or three page report that

10   was turned over to defense counsel.

11             THE COURT:  But the information that would be

12   in there you would be redacting prior to it going to the

13   jury.

14             MS. SCHMIDT:  We would redact a few pages of

15   the entire file.  So as long as --

16             THE COURT:  I want to say, what I'm

17   understanding, he's not saying, the defense is not asking

18   that it not be introduced into evidence.  What he's asking

19   is before it goes, unless I'm misunderstanding you, before

20   it then would be read by the jury, it would be redacted.

21             MS. SCHMIDT:  My understanding was that he

22   just wanted the report introduced.

23             THE COURT:  I didn't hear that.  I heard it's

24   what goes to the jury.

25             MR. GREENBERG:  I said the report and the

- Proceedings -

677

1    scientific --

2              MS. SCHMIDT:   Which would be the file.

3              MR. GREENBERG:   Right, but there's no reason

4    why -- my letter, the order of the Court, and the e-mails

5    have nothing to do with scientific testing.

6              THE COURT:   Off the record.

7              (Brief discussion held off the record.)

8              THE COURT:   Back on the record.

9              It has been agreed that his letter comes out.

10   It has been agreed that the police department report comes

11   out.  I'll rule on the e-mails since you all can't figure

12   it out.

13             I think I agree with the defense in the

14   question of when -- let's get it out of the way now.  We

15   waited all morning.  Why don't we take a little time and

16   get it done.

17             MS. CHANNAPATI:   Your Honor, I'm sorry.  Just

18   so we're clear, it's this copy that's going to be moved

19   into evidence, and the witness is going to be testifying

20   from her originals.

21             THE COURT:   Yes.

22             MS. CHANNAPATI:   Okay.

23             THE COURT:   Now, I don't remember where we

24   have come out on the third item, but as far as the police

25   report, the Court's understanding is that there would be no

- Proceedings -

1   reason for that since we've been able to deal with that in

2   other capacities, that is, through other witnesses.

3               Is that correct?  I mean, there's nothing

4   unique to this report --

5               MS. CHANNAPATI:  That's fine.

6               THE COURT:   -- is there, about the police

7   report?

8               MS. CHANNAPATI:  That's fine, your Honor.

9               THE COURT:  As far as the Court's order is

10  concerned, the Court sees no reason why that would be

11  viewed by the jury, period.  So that will come out.

12              Then, as in regards to e-mails, of course, I

13  would have to look at their content to know if I were to

14  rule.  So to the extent that you all cannot agree, then

15  I'll have to rule.

16              People, I see that the prosecution's table,

17  they have gone through quite a number of documents.

18  Perhaps, there's something that could be agreed upon

19  between you all.

20              MR. GREENBERG:  I think the only thing that's

21  left is the e-mails.

22              THE COURT:  They are looking at the e-mails, I

23  think.

24              All right.

25              MS. SCHMIDT:  Your Honor, the People have

- Proceedings -

1    taken out of the file the letter dated March 19th, 2004,

2    from defense counsel.

3                    THE COURT:   Yes.

4              MS. SCHMIDT:   The order from your Honor dated

5    March 18th, 2004, and I believe six pages of e-mails

6    between the People and the lab.

7                    THE COURT:   All right.

8              MS. SCHMIDT:   As well as the complaint report

9    from the New York City Police Department which is two

10   pages.  So it's the People's position that everything else

11   in the file is relevant and work product and will come in

12   during Ms. Keblish's testimony as a business record.

13             MR. GREENBERG:   Can I just look at the files

14   again?

15                  THE COURT:   Certainly, I'm sure the People

16   will allow you to do that.

17             MR. GREENBERG:   Your Honor, in the larger file

18   that was handed to me, there's still a police report, and

19   there's still my letter.  There's also the copies of the

20   vouchers.

21             MS. CHANNAPATI:   Your Honor --

22             MR. GREENBERG:   I'm just saying what's in

23   there.

24             MS. CHANNAPATI:   With respect to the vouchers,

25   the witness has to testify.

-WC-

- Proceedings -

1            THE COURT:  The vouchers should be in there.

2    He's pointed out two things --

3            MS. CHANNAPATI:  I'm removing --

4            THE COURT:  -- that I thought we had taken

5    care of.

6            THE COURT:  Are we ready to move away from

7    this subject now?

8            MR. GREENBERG:  Yes.

9            THE COURT:  All right.  Now, the only thing

10   that there is in essence a stipulation between the parties

11   with regard to how the report is being packaged, it did not

12   reach the level that these things are not a part of the

13   report.  They are part of the report, but they would not be

14   shown to the jury, because they might be confusing to the

15   jury.  Obviously, if either lawyer, and I can't predict

16   what you will do, if either of you were to open the door

17   with regard to any of these documents, I'm going to have to

18   re-visit it again.

19            Now, the other thing is logistics.  It's

20   almost 3:00 o'clock.  Who are we having this afternoon?

21            MS. CHANNAPATI:  Kyra Keblish.

22            THE COURT:  That's this afternoon.

23            Did you talk to your arresting officer and see

24   if that person is going to be here tomorrow?

25            MS. CHANNAPATI:  She will be here tomorrow.

-WC-

- Proceedings -

1      She will be here tomorrow.

2              THE COURT:  9:30.

3              MS. CHANNAPATI:  Yes, your Honor.

4              THE COURT:  All right.  So that all we have

5      this afternoon is DNA, but it can take a while.  I don't

6      know how long it would take.

7              MS. CHANNAPATI:  I don't want to seem obtuse,

8      but I just want to be clear about the DNA files, that these

9      are going to be marked and moved into evidence at this

10     time, but she's going to testify from her originals.

11             THE COURT:  Well, she has a separate set.

12             MS. CHANNAPATI:  Yes.

13             THE COURT:  That's not what goes in.

14             MR. GREENBERG:  Just the so the record is

15     clear, I did look at the originals and compared them to the

16     documents that are presently in the DA's office.

17             THE COURT:  So the criminalist has her

18     package, but you have that package.

19             MS. CHANNAPATI:  Yes.

20             THE COURT:  And that's what will be introduced

21     into evidence.

22             And with that, unless there's anything else,

23     we'll be calling for the jury.

24             THE COURT OFFICER:  Ready for the jury?

25             THE COURT:  Yes.

Direct - Keblish/Channapati

682

1          THE COURT OFFICER:  Jury entering.

2          (Whereupon, the jury enters the courtroom and

3     is properly seated.)

4          THE CLERK:  All jurors are present.

5          Do both sides waive the reading of the roll?

6          MR. GREENBERG:  So waived.

7          MS. CHANNAPATI:  So waived.

8          THE COURT:  All right.  Ladies and gentlemen,

9     you've had a good long lunch break.  We're ready to start

10    again.

11          People.

12          MS. CHANNAPATI:  At this time the People call

13    Kyra Keblish.

14    K Y R A   K E B L I S H,  Forensic Scientist, Criminalist Level

15    4, called as a witness, after being duly sworn, testified as

16    follows:

17          THE COURT:  People, you may proceed.

18          MS. CHANNAPATI:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MS. CHANNAPATI:

21    Q.   Ms. Keblish, where are you currently employed?

22    A.   I'm employed by the Department of Forensic Biology at

23    the Office of the Chief Medical Examiner in Manhattan.

24    Q.   What is your position there?

25    A.   My title is Criminalist Level 4.

Direct - Keblish/Channapati

683

1    Q.   How long have you been employed there?

2    A.   I've worked there for seven and a half years.

3    Q.   What are the duties and responsibilities of someone

4  who is a Criminalist Level 4?

5    A.   As a Crim 4, as we call ourselves, I'm a supervisor in

6  the lab.  I supervise all DNA testing that goes on in the lab.

7  I review DNA analyses.  I testify in court.  I also discuss

8  evidence that's coming into the laboratory with detectives and

9  ADA's to discuss what types of tests will be done on evidence

10  from homicide and sexual assault cases.  I also supervise

11  people who do DNA analyses, and I write my own reports as well.

12    Q.   What is your educational background?

13    A.   I have a bachelors of science in biological science

14  from Cornell University as well as a masters of arts in

15  biological science from Hunter College.

16    Q.   What is forensic science?

17    A.   It's the field that applies the natural sciences, like

18  biology or physics or chemistry, to matters of the law.

19    Q.   What is forensic biology?

20    A.   It specifically deals with identifying of body fluid

21  and anything that could come from a body, and so identifying

22  hair, if you find hair somewhere, is it human hair and who did

23  that hair come from.  The same thing with any body fluids, like

24  blood, semen, and saliva.  You might find blood somewhere, but

25  you also need to identify whose blood that is.

Direct - Keblish/Channapati

684

1    Q.    Have you taken any special courses or training

2 relating to your field while you've been with the Medical

3 Examiner's Office?

4    A.    Yes.  I took a course in 2001 at the FBI Academy, and

5 that was on a special kind of DNA testing called Mitochondrial

6 DNA testing, and that is a special kind of test that you can do

7 on hair and bone.

8         I also took a blood spatter work shop which is so I

9 learn how to analyze blood spatter patterns, and since I did my

10 masters while I was working in this job, I also took genetics

11 and molecular genetics and molecular biology courses that we

12 need to work in the lab.

13    Q.    How are the analysts trained in the laboratory?

14    A.    Anyone who works in our laboratories, no matter what

15 title, goes through an extensive six-month training period

16 where they have -- they'll observe the techniques they will be

17 doing in the lab; then they practice those techniques while

18 somebody watches them to make sure they do the technique

19 correctly; and then each analyst is given what is called a

20 competency test; and that test is an unknown sample that they

21 test, and they get a result.  They report the result to the

22 supervisor, and if it's a correct result, they pass and then

23 they can do casework.

24    Q.    Have you successfully completed your competency test?

25    A.    Yes, I have.

-WC-

Direct - Keblish/Channapati

685

Q. Have you successfully completed your proficiency test?

A. Yes. A proficiency test is a different type of testing. It's more. A competency test is what you do when you first start work. Proficiency tests I do twice a year. Everyone in the lab does two proficiency tests a year, and it's a test given by an outside agency. So they will send us samples that we need to test, and we report the results back to them, and you need to pass these tests in order to keep working.

Q. What are the consequences of failing a proficiency test?

A. If someone were to fail one, they would have to stop doing casework, and they would have to be re-trained in the area where they had made the mistake and then take another test.

Q. What is an interpreting analyst?

A. An interpreting analyst is somebody who can interpret DNA profiles. So there's some people in the lab who do more technical jobs, like DNA extractions, which is it how we get the DNA out of the cell or DNA quantitation.

However, somebody like myself who has a master's degree and has a certain amount of experience and has taken specific courses and who has been trained in DNA testing is called an interpreting analyst, and therefore, I can sign my own reports where I talk about DNA results as well as

1    testifying in court, whereas other people who are at the

2    technical level do not sign reports and they don't testify.

3         Q.    Approximately how many DNA analyses have you done or

4    supervised since you've been in the Medical Examiner's office?

5         A.    I would say several thousand.

6         Q.    Have you ever testified in court regarding DNA

7    analyses and forensic biology?

8         A.    Yes, I have.

9         Q.    Approximately how many times?

10        A.    About 20 times in Supreme Court, and, like, 30 times

11   in grand juries.

12        Q.    In what jurisdiction?

13        A.    All five boroughs of New York City.

14        Q.    Were you accepted as an expert in areas of DNA

15   analysis and forensic biology each time?

16        A.    Yes, I was.

17             MS. CHANNAPATI:  At this time, your Honor, I

18        would offer Kyra Keblish as an expert in the area of DNA

19        testing analysis and forensic biology.

20             THE COURT:  Just a minute, an expert in DNA

21        testing analysis and forensic biology?

22             MS. CHANNAPATI:  Yes, your Honor.

23             THE COURT:  Any objection?

24             MR. GREENBERG:  May I voir dire, your Honor?

25             THE COURT:  You may voir dire.

1   VOIR DIRE

2   BY MR. GREENBERG:

3       Q.    Have you ever failed to qualify as an expert?

4       A.    No.

5                   MR. GREENBERG:  No further questions.

6                   THE COURT:  No further questions.

7                   She's accepted as an expert in DNA testing and

8       forensic biology.

9   DIRECT EXAMINATION (Resumed.)

10  BY MS. CHANNAPATI:

11      Q.    Ms. Keblish, what is DNA?

12      A.    DNA is the genetic material each one of us receives

13  from both of our parents.  We receive half of it from our

14  mother and half from our father, and like a set of instructions

15  for creating a human being, it's present in most of the cells

16  in your body, which are the small building blocks of your body.

17              We can find it in your hair root; in the cells lining

18  inside your cheek; in your skin; in someone's semen; you can

19  find it in sperm cells; it's present in your white blood cells

20  form your blood; almost everything in your body except for red

21  blood cells.

22      Q.    Does a person's DNA remain constant throughout his

23  life?

24      A.    Yes, they do -- it does.

25      Q.    Is a person's DNA the same throughout his body?

Direct - Keblish/Channapati

688

1      A.    Yes.

2      Q.    Is a man's DNA the same in his saliva as it would be

3   in his semen?

4      A.    Yes.  If you took a sample from someone's blood sample

5   or saliva sample from their mouth, this would have the cells

6   from the inside of their cheek or their semen, you would still

7   get the same profile.

8      Q.    Can DNA be used to identify a specific individual?

9      A.    Yes, it can.

10     Q.    How?

11     A.    Well, if you had an unknown sample, let's say

12  something that was left behind, like a coffee cup in the

13  garbage, if we swab that coffee cup where someone would drink

14  from it and we get a DNA profile, we could compare it to a

15  known sample from a person, let's say you compare it to my DNA

16  profile, and we see the two are the same, and so we know I was

17  the person who drank out of that cup.  So you could identify

18  me.

19     Q.    What is the DNA profile?

20     A.    DNA profile is just a set of numbers.  It's 13

21  different pairs of numbers that describe the DNA at 13 specific

22  locations.  Some people like to call it a serial number for a

23  person.

24     Q.    What is the locus or loci?

25     A.    Locus is a technical term for a location, and loci is

-WC-

1    the plural.  So our lab looks at 13 locations or 13 loci.

2         Q.   What is an allele?

3         A.   An allele is the type of DNA you find at a particular

4    locus.  In the types of testing that I do, our alleles are

5    described using numbers.  So if we're looking at DNA, and we

6    get an allele of 15, which means 15 repeats, so a little DNA

7    fragment is repeated 15 times.  One of my types would be 15,

8    and let's say my other DNA type was 16.  So I would know I

9    would have a 15 from my mom and a 16 from my dad, and my type

10   would be 15/16, and those are the 15 and the 16 that are the

11   alleles.

12        Q.   Please explain how the DNA testing is done at the

13   Medical Examiner's Office?

14        A.   There's a series of steps that we do for DNA testing.

15   The first step is actually finding the body fluid or a

16   substance from a body.  So evidence would be examined, and any

17   stains would be circled and highlighted and tested for either

18   blood, semen, or saliva, or if it's a hair, it would be

19   examined for the hair root, and then the DNA needs to be

20   extracted.

21        You, basically, take a cutting of the stain.  Let's

22   say it's a blood stain, take a cutting of the reddish-brown

23   stain, put it in a tube, and you add some chemicals, and you

24   shake it up, and it takes the DNA out of the cell.

25        That's extraction.

1        Then the next step is quantitation, because you don't

2  always get a result.  You don't always get a DNA profile.  It's

3  not guaranteed.  You have whatever it is in your sample.  So

4  you need to see how much DNA you have.  You have to see if you

5  can do more testing.  So then you quantitate the DNA.

6        So assuming you have enough, then you go to the fourth

7  step, which is the amplification, and in that amplification, we

8  are looking at those 13 locations that we're interested in.  We

9  don't go and look at somebody's entire DNA, because DNA, it's a

10  really huge substance.  We only look at 13 small locations, and

11  then the final step is the analysis which is where we assign

12  the allele numbers, and when you put those allele numbers

13  together, you get your DNA profile.

14    Q.   What are some of the things that are tested by the

15  Medical Examiner's Office for the presence of DNA?

16    A.   We test lots of known samples and samples from people.

17  So swabs from their cheeks or blood samples.  We also test

18  unknowns which are, let's say, weapons that were used in

19  different incidents.  We'll swab them or their handle to see if

20  we can tell who used the weapon, and we see if there's blood on

21  the weapon.

22        We look at clothing.  We look at sexual assault kits

23  which are collected in sexual assault cases that take different

24  swabs which are different, like, Q-tip swabs of different parts

25  of thes victim's body.

Direct - Keblish/Channapati

691

1     Q.    Is the extraction the same for all body fluid?

2     A.    No, it's not.  The extraction that you would do for

3  blood is a little bit different than what you would do for

4  semen, because the semen stain may contain not just the semen,

5  it might contain some cells from the victim.

6          Let's say we have a vaginal swab from me, let's say,

7  and it was after I had intercourse, obviously, you're swabbing

8  me.  You're going to get my DNA, but you also might get the

9  other person's semen.

10         So when you do an extraction of semen, it's called a

11  differential.  We want to treat the cells differently.  So we

12  want to separate the sperm from the cells, from me and my cells

13  from the alining of your body, like, one set is called an

14  epithelial cell, if I say that later, and it can come from the

15  inside of your mouth or vaginal cavity, anything like that.

16    Q.    How is that separation done?

17    A.    We add different chemicals at different times, because

18  sperm are really strong.  So the first step in the procedure,

19  first step in the procedure, you're going to remove the sperm

20  cells as well as these epithelial cells from what is called

21  substraight, the material like a Q-tip.  You want to get the

22  cells off the Q-tip.

23         Just from shaking that sample, the epithelial cells

24  will open up, and you can take them out, and you get the DNA.

25  The sperm heads don't open.  They are very strong.  So we need

Direct - Keblish/Channapati

692

1    to add a second chemical that will break open the sperm head,

2    and we can get the DNA.  That way we can remove the epithelial

3    cells and test them separately from the sperm cells

4        Q.   Can you exam clothing or other materials for the

5    presence of DNA?

6        A.   Yes.

7        Q.   How is that done?

8        A.   We visually examine something for the presence of a

9    stain, or we might use an alternate light source to see if

10   anything would flores, which is like glowing in the dark, and

11   we'll test those for the presence of semen or like a

12   reddish-brown stain for the presence of blood.

13       Q.   During your time at the Medical Examiner's Office, did

14   you receive any items relating to Vera Krioutchkova?

15       A.   Yes, I did.

16       Q.   Were they assigned a number?

17       A.   Yes.  Those items were assigned a particular case

18   number.

19       Q.   What was that number.

20       A.   The number is FB, as in forensic biology, so FB-03,

21   for the year 2003, so FB-03, dash, 0513.

22       Q.   Was there a voucher number assigned to that?

23       A.   Can I refer to my notes?

24              THE COURT:  You may look at your notes in an

25          effort to refresh your recollection.

-WC-

THE WITNESS:  A sexual assault kit was submitted under voucher L-692721.  A Dunkin Donut napkin, a dish towel, and comforter/holder was vouchered under L-692723, and a cigarette filter was submitted under L-692725.

Q.   Did you receive other evidence related to this case?

A.   Yes, we did.

Q.   What was that?

A.   We received an oral swab, a swab from the mouth of Dennis Colon.

Q.   Did that receive a number as well?

A.   Yes.  That had a separate case number which is FB-03, dash, S, as in Sam, 165.

Q.   Is there a voucher number that is affiliated with that also?

A.   Yes.  That number is L-790223.

MS. CHANNAPATI:  Your Honor, at this time I'm going to ask that these be shown to defense counsel and that they be marked as People's 12-A and 12-B for identification.

THE COURT:  12-A and 12-B, they are papers in a file folder.  There's two file folders.  That's going to be marked as 12-A and 12-B for identification.

MR. GREENBERG:  As we have discussed before, I've had an opportunity to review those documents.

-WC-

1      THE COURT:  So it's being shown to the

2    witness.

3      Q.   Ms. Keblish, do you recognize those?

4      A.   Yes, I do.

5      Q.   What are they?

6      A.   They are copies, photocopies of the two files I

7    brought with me.

8      Q.   Were these files and the information contained therein

9    prepared in the regular course of business by the Medical

10   Examiner's Office?

11     A.   Yes, they were.

12     Q.   Is it in the regular course of business for the

13   Medical Examiner's Office to make and keep such records?

14     A.   Yes.

15     Q.   Were the entries in the information and reports in

16   your files made at or near the time the testing and analysis

17   was performed?

18     A.   Yes.

19     Q.   Does the person who prepared the information contained

20   in those two files have a business duty to do so truthfully and

21   accurately?

22     A.   Yes.

23          MS. CHANNAPATI:  At this point, your Honor, I

24   would ask that the two files be moved as People's 12-A and

25   12-B into evidence?

Direct - Keblish/Channapati

695

1           THE COURT:  Any objection?

2           MR. GREENBERG:  Just one question, your Honor.

3           THE COURT:  Yes.

4    VOIR DIRE

5    BY MR. GREENBERG:

6        Q.    Do you personally maintain the records?

7        A.    Yes.

8        Q.    They are in your possession at all times.  Are they

9    kept elsewhere?

10       A.    Well, while I was working on the case, it was in my

11   possession, and then once I finished, it goes in the filing

12   cabinet for our department.

13       Q.    Your department, and are you responsible for that

14   filing cabinet?

15       A.    Everyone in the department is.

16           MR. GREENBERG:  I have no objection.

17           THE COURT:  Thank you, Counsel.

18           It's in evidence as People's 12-A and 12-B.

19   DIRECT EXAMINATION (Resumed.)

20   BY MS. CHANNAPATI:

21       Q.    Ms. Keblish, before going into the results, did you

22   perform all the testing on the items that you received for this

23   case?

24       A.    No, not me personally.

25       Q.    Could you please explain the rotation system that

Direct - Keblish/Channapati

1    happens in the Medical Examiner's Office?

2        A.   Sure.   The way our laboratory is set up is, we use a

3    rotation system, in that, since this is my case, it doesn't

4    mean that I received everything and tested everything myself

5    every step of the way.

6             For every procedure we have different

7    responsibilities, each one.   So one week I might examine

8    evidence.   The next week I might extract DNA.   So in this case,

9    the people who are assigned to the extraction task did the

10   extractions on this case as whenever it happened to be needed.

11   The same thing for quantitation or amplification or the DNA

12   detection.

13            My role is, basically, the custodian of the file and

14   the manager of the case.   So after each procedure is done, I

15   get paperwork back, I review that, and then I make the next

16   decision as to what other tests need to be done, and then I

17   interpret all the results at the end and write the report.   So

18   it's a shared effort among our lab to get all the cases done.

19       Q.   Does the Medical Examiner's Office have a quality

20   control program?

21       A.   Yes, we do.

22       Q.   And what is it?

23       A.   Well, the quality control program, the purpose is to

24   ensure the quality in our lab.   We, basically, can't just start

25   testing anything that we want.   We have to have set rules, a

-WC-

Direct - Keblish/Channapati

1   manual that we need to follow, and the quality control program

2   is there to check every single chemical we receive, any

3   solution which is like, like liquid that we make up in the lab.

4          They have to make sure that it's working correctly.

5   They check the instruments or the machines in our lab.  They

6   administer the proficiency tests that I mentioned before, and

7   they review our qualifications and our classes and everything

8   that we need in order to get the jobs.  That's what they are

9   there for.

10      Q.   What do you use to test the DNA?

11      A.   Well, specifically, we use different chemicals that

12  are added during the DNA extraction and the quantitation, and,

13  specifically, to look for at the 13 locations.  It's called a

14  DNA kit.  So in that kit it contains one tube that is the

15  substance we add to our samples.  That will look at those 13

16  locations, and it includes a control which is like a known DNA

17  sample that we need to test with every group of samples to make

18  sure that everything is working correctly.

19          So, basically, we use DNA, we use chemicals, and we

20  use these DNA kits.

21      Q.   How do you know if the kits are okay, if they are

22  working?

23      A.   That's one of the jobs of the quality control job.

24  They will take each kit which comes in a little box.  It has

25  the tubes in it, and they test it using a known sample, which

-WC-

Direct - Keblish/Channapati

698

1    is like a sample of someone in the labs blood, and they test

2    it, and they make sure we get the same results each time.

3    Every time a new kit comes in, we get the same results.  So we

4    know it works correctly, and it gives good results.

5         Q.   Who does the quality control exams in your lab?

6         A.   Right now there's a quality control team.  So it's a

7    group of, like, eight people, and they are solely dedicated to

8    quality control, but along with that, each analyst in the lab,

9    including myself, does quality control checks which each test

10   that I do.

11        If I'm examining something for the presence of blood

12   and I use this chemical test or a color test for identifying

13   blood, I use a positive and negative control before I even test

14   the sample of the evidence.

15        So I'll take, I'll have a small, like a stain that's

16   in a known blood sample.  I'll swab that, and I'll use my color

17   test and make sure it gives me the correct bright pink result.

18        I'll also test a negative control with nothing in it,

19   and piece of paper I know has blood on it, and it gives me no

20   results, so the swab states clear.

21        So when I talk about blood or semen detected in the

22   DNA, each one of these steps have a positive and negative

23   control.

24        Q.   What happens if a chemical or solution of the DNA kit

25   fails the quality control test?

-WC-