Direct - Keblish/Channapati

699

1    A.    If something fails a quality control test, like a raw

2    material, like those chemicals or the DNA kit, we discard it,

3    and we call the company and tell them and ask for a new one.

4    Q.    Does the quality control group also manage the

5    proficiency test programs?

6    A.    Yes, they do.

7    Q.    Is the Office of the Chief Medical Examiner an

8    accredited lab?

9    A.    Yes, we are.

10   Q.    And what does it mean to be accredited?

11   A.    To be accredited means that we meet a set of standards

12   that are set by the different accrediting agencies, and it

13   means our work is comparable to all other accredited agencies.

14       Basically, they have this list of guidelines that we

15   must meet or exceed, and, usually, our goal is to exceed the

16   guidelines, and we get inspected every five years by this

17   outside agency who comes in and makes sure that we are doing

18   what we say we are.

19       They review our manuals and our personnel files, and

20   they inspect the lab.  They watch us work to make sure we're

21   following the instructions and make sure we are wearing gloves,

22   things like that.

23   Q.    Has OCME always been accredited?

24   A.    As soon as you can get absolutely accredited, which

25   was around 1994, we did become accredited.  It didn't used to

1    be -- actually, they didn't have the process of accreditation

2    way back when in the early days, but as soon as you could have

3    it, our lab got it.

4        Q.    Are you familiar with a woman that used to work in the

5    lab by the name of Maya Saxon?

6        A.    Yes, I am.

7        Q.    Did she do any work on the case that you're here to

8    testify about?

9        A.    Yes, she did.

10        Q.    What was Maya Saxon's position at the lab?

11        A.    Her title was Criminalist Level 2.

12        Q.    What were her duties and responsibilities as a

13    Criminalist Level 2?

14        A.    Maya did DNA extractions.  She did the quantitation

15    tests.  She did the test for semen which is called P-30, and

16    she did the test for ampalius, which is part of the saliva.

17    So, basically, the saliva test.

18        Q.    Did she examine the evidence as part of her duties?

19        A.    No, she didn't.

20        Q.    Did she interpret DNA typing as part of her duties?

21        A.    No, she didn't.

22        Q.    Did she receive the training that you described

23    earlier?

24        A.    Yes.

25        Q.    Did she pass the competency test during her initial

1    training for the types of analyses she did in this case?

2        A.    Yes, she did.

3        Q.    Could you tell the members of the jury what happened

4    to Maya Saxon?

5        A.    She was actually terminated from her employment with

6    the Medical Examiner's Office.  She was observed falsifying a

7    negative control and was subsequently terminated.

8        Q.    What does it mean to falsify a negative control?

9        A.    What she had been observed doing was this negative

10   control is something that should be created at the beginning of

11   the extraction.  It's like an empty tube, and you do the same

12   things to that empty tube as you do with everything else, that

13   is the empty tube and the DNA, and the empty tube should come

14   out negative.  What she was doing was throwing out that

15   negative control and creating new ones with just an empty tube

16   with some -- I'm not sure what was in it, but, basically, it

17   wasn't the original negative control

18       Q.    How was this discovered?

19       A.    Someone had witnessed her doing this while they were,

20   you know, a making an analysis and they observed this

21   happenning.

22       Q.    What happened to her after it was discovered?

23       A.    Well, we began an investigation, but she was

24   terminated.  She wasn't allowed to do anymore work there.

25       Q.    When this was discovered, did you report it to the

-WC-

1    District Attorneys's Office?

2         A.    Yes, we did.

3         Q.    Did the Office of the Chief Medical Examiner review

4    her work?

5         A.    Yes.  Basically, we had to start a full investigation

6    into everything that she had ever touched in the lab.  So all

7    of the different -- every case that she had worked on, we

8    reviewed each individual test within the case to ensure that

9    the results were inherent to the case, meaning that the results

10   made sense to the case itself, and always in the back of our

11   mind, let's say the negative control didn't work or we don't

12   really know if she did this all the time, but just a few times,

13   but we, basically, had to review everything and make sure that

14   not having that negative control would affect the DNA results

15   at the end.

16        Q.    What was the conclusion of the review of her work?

17        A.    We found that all the results of everything were

18   valid.

19        Q.    So, in your opinion, are the DNA typings and the

20   results of this case reliable?

21        A.    Yes.

22        Q.    What did they do -- excuse me.  Withdrawn.

23             Did you review the work that she did on this case?

24        A.    Yes, I did.

25        Q.    What did she do?

Direct - Keblish/Channapati

1    A.    The test that she did in this case on the sample from

2  Dennis Colon on the second cutting, which is, first let me just

3  say, the second cutting of his swab.  She did the extraction

4  and the quantitation on that.

5    Q.    What do you mean by, "second cutting of his swab"?

6    A.    Well, the first cutting was cut, extracted.  We got

7  the DNA profile.  We saw it matched.  We decided we needed to

8  cut it again to verify that result, and what we do is a second

9  cutting to verify the original result, to confirm the original

10  result, and I actually did the cut myself.

11        I put the sample in the tube, and that's Maya's

12  extraction.  So she extracted and quantitated the second

13  cutting.  We found the results were consistent, though.

14    Q.    Do you always do second cuttings?

15    A.    No, only if the suspect sample matches something.

16    Q.    Only if there's a match do you then do another cutting

17  of this suspect sample?

18    A.    Right.

19    Q.    Now, how does the negative control figure in the

20  extraction of DNA from a cutting?

21    A.    Well, as I said, it's that tube, it should have

22  nothing in it, and at the end, if we do a DNA type of that

23  tube, it should have no result.  It should not have a DNA

24  result in it.  It's a measure of possible contamination during

25  the test, because when we do these tests, we're not doing one

1     case and one sample at a time.

2          It's a set of samples.  Let's say, 10 or 15.  You want

3     to make sure that the DNA type from one tube doesn't get in the

4     next step, and that's what the negative control is for.

5          So if you see something in the negative, it leads you

6     to believe that maybe the extraction didn't go so well, but you

7     can also get a competent extract by looking at each sample

8     individually, and if a sample has one profile and it makes

9     sense in the context of the case, then we find the results

10    reliable.

11    Q.    Did Maya Saxon perform the extract on both of the

12    cuttings from the sample from Dennis Colon?

13    A.    No.

14    Q.    Does the same person usually perform both extractions?

15    A.    Not usually.

16    Q.    Why not?

17    A.    It's how the rotation works out.  The first cutting

18    might happen one week, and the second cutting might not happen

19    for two more months.  It just depends who is working what for

20    that particular week.

21    Q.    In your opinion in throwing out a negative control,

22    does that affect the outcome of the results in this case?

23    A.    No.  Not the DNA profile, no.

24    Q.    What other work did she do on the case?

25    A.    She did the quantitation of that second cutting also.

1    Q.   This is the second cutting of the suspect swab from

2  Dennis Colon?

3    A.   Yes.

4    Q.   Were there any discrepancies found in her

5  quantitation?

6    A.   No, there wasn't.  There weren't.

7    Q.   Now, when performing a DNA quantitation, are items of

8  evidence ever being handled by the person who does the

9  quantitation?

10    A.   No.  It's not the item of evidence.  It's part of the

11  extract.  So part of the liquid where the DNA now is, you take

12  a small part of that, and then you use it, and then you throw

13  it out.

14    Q.   Did Maya Saxon ever handle any of the actual evidence

15  in this case?

16    A.   No.

17    Q.   Did Maya Saxon perform any of the DNA typing on this

18  case?

19    A.   No.

20    Q.   So what Maya Saxon did, did that affect the actual

21  profile generated from the evidence presented to the ME's

22  office?

23    A.   No.

24              MS. CHANNAPATI:  Your Honor, at this time if I

25  could have what's been marked as People's No. 9 subject to

1    connection and if it could be shown to the witness.

2                    THE COURT:  The court officer is getting it.

3    It's been shown to the witness.

4    Q.  Ms. Keblish, do you know what this is?

5    A.  Yes.  That is a sexual assault kit.

6    Q.  Whose name is on it?

7    A.  Vera Krioutchkova.

8    Q.  Was it received by the Office of the Chief Medical

9    Examiner?

10   A.  Yes, it was.

11   Q.  How do you know?

12   A.  I see the case number that I mentioned before, FB-03,

13   dash, 0513.

14   Q.  Was this kit tested?

15   A.  Yes, it was.

16                   MS. CHANNAPATI:  Your Honor, at this time I

17   would move what's been previously marked as People's No. 9

18   for identification subject to connection into evidence.

19                   THE COURT:  Defense.

20                   MR. GREENBERG:  No objection.

21                   THE COURT:  Let's approach.

22                   (Brief discussion held off the record.)

23                   THE COURT:  It's admitted into evidence, but I

24   do understand the People will have the contents of the box

25   examined.

Direct - Keblish/Channapati

707

1        MS. CHANNAPATI:  Your Honor, with the Court's

2   permission.

3        THE COURT:  We'll work that out with the court

4   officers.  They have the scissors.

5        THE WITNESS:  You want me to open it?

6        MS. CHANNAPATI:  Yeah.  If you could open it

7   and if you could go through the contents of the kit.

8        THE WITNESS:  This is the oral swabs and

9   smears.  Smears are like slides.  The swab gets swabbed

10  onto a slide, and this is an underwear bag.  It was no

11  underwear.

12       THE COURT:  Let me stop.  The witness has

13  first held up an envelope that has red boarders and that

14  was what she described the first item as swabs and smears.

15  Then the second item, which the witness picked up, is an

16  envelope with writing on it, and what is that?

17       THE WITNESS:  This is a bag that you could put

18  the underwear in if it's collected.

19       THE COURT:  It's contained in that bag?

20       THE WITNESS:  There is no underwear.

21       THE COURT:  What's in there?

22       THE WITNESS:  Nothing.

23       THE COURT:  So it just says "underwear," but

24  there's nothing in it?

25       THE WITNESS:  Yes.  Right.

Direct - Keblish/Channapati

708

1           THE COURT:  Thank you.

2           THE WITNESS:  This is an envelope which does

3   not have red tape on it.  It was not opened.  It says,

4   "debris collection."

5           THE COURT:  Is there any debris?

6           THE WITNESS:  I don't know.  It says, "Sample

7   was collected."  I don't know.

8           THE COURT:  It says, "Sample was collected."

9           All right.

10          THE WITNESS:  This second envelope, which we

11  didn't examine.  There's no red tape, which we would have

12  re-taped it.  It's "fingernail scrapings," which said the

13  sample was collected.  It was checked off.  We did not

14  examine that.

15          The next one is "pulled head hairs."

16          Unopened.

17          The next one is "pubic hair combings" was

18  collected and unopened.  "Pulled pubic hairs" was

19  collected, but was unopened, and the buccal specimen.

20          THE COURT:  What is a buccal specimen?

21          THE WITNESS:  It means a swab from the inside

22  of the mouth.  I should say also that it's the policy in

23  our laboratory to -- at this time the policy was to retain

24  items that contained semen or ampalius.  So I can look at

25  it on my inventory, which was originally in this kit.

-WC-

Direct - Keblish/Channapati

709

1          There was also vaginal swabs and smears and

2    anal swabs and smears.  As you'll see later, since there

3    was semen found on those, we retained those in the sample

4    in case we needed to do further testing.

5          THE COURT:  With regard to the labels which

6    you have been identifying one by one, only two have that

7    red boarder; is that correct?

8          THE WITNESS:  That's correct.

9          THE COURT:  Does that mean those are the only

10   two that you examined?

11         THE WITNESS:  Of these, yes.  That's the way

12   sexual assault kits are approached in our lab.  We don't

13   examine every single envelope.  We examine swabs, because

14   we feel those are the most probative to look for semen at

15   any time.

16         If somebody wanted us to look at something

17   else, we would, but we're not a hair comparison lab.  So we

18   are not experts in hair.  So we're not going to look at

19   hairs.  So the only thing out of these we opened were the

20   buccal specimen, which is a known sample from Ms.

21   Krioutchkova, and then the oral swabs and smears.

22         THE COURT:  People.

23   Q.   Now, prior to the testing of this kit, was the kit

24   secured in anyway?

25   A.   Yes, the kit was sealed.

Direct - Keblish/Channapati

710

1    Q.    When it was examined, then it was opened; correct?

2    A.    Yes.

3    Q.    Now, how do you test for semen and ampalius?

4    A.    Well, the first test that we do for semen, if the

5    sample is there, we look at those slides that I told you are

6    made from the swabs.  We stain the slide, and we look in the

7    microscope to look for special heads, and in this case we saw

8    sperm on the slides for the vaginal and the anal swabs.  So

9    then we concluded there's semen there.

10        On the oral slides, we did not see sperm.  So we go to

11   the next test which is called P-30, and that detects P-30,

12   which is protein found in semen.  So if we find that P-30.

13   That's done.  It's a color test.  If we get a bright yellow

14   color, that tells us semen.

15        There was no semen on those oral swabs.  I realize now

16   there was a third type of swab that we retained in the lab

17   called dried secretion swabs, and we put those to the P-30

18   tests, and they were positive for semen.

19        So those are also retained in our laboratory.  A dried

20   secretion, it's kind of self-explanatory, but I never heard the

21   term.  If you see the woman was at the examination room and if

22   the doctor saw something was, saw something crusty on her or

23   looked like it could be a body fluid, they would have swabbed

24   that, and that would go in the dried secretion envelope.

25   Q.    What was the results of the testing of the rape kit?

Direct - Keblish/Channapati

711

1    A.   We found semen on the anal swabs and the vaginal swabs

2  as well as the dried secretion swabs.   No semen was found on

3  the oral swabs.

4         We also tested the vaginal swabs for the presence of

5  ampalius, which is part of saliva.   There was no ampalius

6  there, and also we tested the dried secretion swabs for that

7  ampalius and it was negative.

8    Q.   What did you do next?

9    A.   We extracted the DNA from the vaginal swabs, anal

10  swabs, and dried secretion swabs.

11    Q.   Were you able to come up with a profile?

12    A.   Yes.  We found one male profile, a single profile on

13  the anal swabs, and the profiles we found on the vaginal and

14  the dried secretion swabs were a mixture of DNA, and those

15  results were existent with the victim's DNA and the semen donor

16  on the anal swab.

17    Q.   In a case where there was also only alleged vaginal

18  intercourse, could there be semen found on an anal swab?

19    A.   I would say so.  It's always possible that since the

20  vaginal cavity and the anal cavity are close together, if semen

21  was present in that area, it could drain or leak down to the

22  anal area, and even though anal sex didn't occur, I, of course,

23  don't know what happened, I can tell you what I observed.

24         MS. CHANNAPATI:  Your Honor, at this time I

25  would ask if the witness could be shown People's No. 5.

-WC-

1          THE COURT:  The court officer will get it.

2          The witness is being shown that exhibit.

3          THE WITNESS:  Do you want me to take it out?

4          MS. CHANNAPATI:  Yes.

5          THE COURT:  The witness is preparing to take

6     the item out of the plastic bag that it's contained in.

7          THE WITNESS:  Do you want me to take it

8     totally out?

9          MS. CHANNAPATI:  Yes.

10         Q.   Do you recognize it?

11         A.   Yes, I do.

12         Q.   What do you recognize it to be?

13         A.   It's a comforter cover or duvet cover, one might call

14    it, with little reindeer pictures on it.

15         Q.   How do you recognize it?

16         A.   I actually recognize it from looking at the pictures,

17    as I remember looking at this, specifically, but it should have

18    a label on here, too.  I also see holes in it that have marks

19    around it which are stains that I cut out.

20         Q.   Is it in substantially the same condition as it was

21    when you tested it?

22         A.   Yes.

23         Q.   When you received the comforter or the cover, what

24    condition was it in?

25         A.   It was in a sealed bag.

-WC-

Direct - Keblish/Channapati

713

1    Q.   Did you change the condition of it whenever you

2    received it?

3    A.   Well, I opened it up, and I looked for stains, and

4    when I had found stains, if any stains tested positive for

5    semen, which some of them did, I cut it out, and I retained in

6    an envelope at the lab.  So I made some holes into it.

7            MS. CHANNAPATI:  You can put it back in the

8        bag at this time.

9            I would ask what's been previously moved into

10       evidence as People's No. 5 subject to connection be moved

11       into evidence as People's No. 5.

12           THE COURT:  Any objection?

13           MR. GREENBERG:  No.

14           THE COURT:  It's into evidence now that the

15       connection has been established.

16   Q.   Ms. Keblish, was testing performed on the comforter

17   cover?

18   A.   Yes, it was.

19   Q.   Prior to the testing, you said it was sealed in a bag?

20   A.   Yes.

21   Q.   What kind of testing was done?

22   A.   I examined it for the presence of semen and saliva.

23   If I saw any blood, I would have tested it also, but I first

24   looked at it visually, and I didn't see any obvious staining.

25   So I looked at it under what he call a crimescope, which is we

1    shut the lights out, and we use the crimescope wearing orange

2    gloves, and we look for any floresing stains, glowing stains.

3    I circled all of those, and I tested them for semen, and one of

4    them came back positive for semen.

5         Q.    Did you test the semen?

6         A.    Yes, I did.

7         Q.    What were the results when you tested the semen?

8         A.    The DNA profile, well, as I explained before when we

9    are looking at semen and how we want to separate the male and

10   the female cells or the sperm cells from the epithelial cells,

11   in the part that just looked at sperm cells, we found one male

12   DNA profile which is the same DNA profile as the anal swab.

13   That was the same semen donor, and in the other sample which

14   contains the epithelial cells, there was a mixture -- oh,

15   actually, let me double check.  Yes, there was a mixture of DNA

16   of at least two people, and the victim's DNA was there as well

17   as the semen's donor.

18        Q.    Did there come a time when your lab received

19   additional evidence for this case?

20        A.    Yes.  The other sample we received was the swab from

21   Dennis Colon.

22        Q.    When was it received?

23        A.    It was received on April 12th of 2003.

24        Q.    From whom was that received?

25        A.    I'm looking at our chain of custody, which is lists

-WC-

Direct - Keblish/Channapati

715

the evidence, and who had the custody of the evidence at the

time.   I see that Detective Harvin signed her name.   This

person brought the sample to our evidence unit.

Q.   What was the voucher number for the evidence that you

received?

A.   The voucher was L-790223.

Q.   What was it that you actually received?

A.   There are two cotton swabs that were obtained from

Dennis Colon.

Q.   What did you do with those two cotton swabs?

A.   The swab was cut and DNA extracted.   The DNA was

extracted from it, and we got the DNA profile of Dennis Colon.

Q.   What were the results of comparing Dennis Colon's

profile from the swab that was provided to the male DNA profile

found on the anal swab?

A.   They were the same profile.

Q.   What were the results of comparing Dennis Colon's

profile given to you -- taken from his oral swab found compared

to what was found on the comforter cover?

A.   The semen donor on the comforter cover was the same as

Dennis Colon.   It was the same.   The comforter cover, the anal

swab, and the Dennis Colon profile are all the same.

                MS. CHANNAPATI:   At this time I would ask this

     to be shown to the witness?

                THE COURT:   All right.   The People are holding

1       up a large baseboard item.   It's been shown to the defense.

2                    MS. CHANNAPATI:   If it could be marked as

3       People's No. 13 for identification.

4                    THE COURT:   Marked as People's 13 for

5       identification and being shown to the witness.

6       Q.   Ms. Keblish, do you recognize that?

7       A.   Yes, I do.

8       Q.   What is it?

9       A.   It's an enlarged copy of one page in the report for

10      Dennis Colon's sample.

11      Q.   Does it exactly reflect the results that were achieved

12      by the work done by the Medical Examiners' Office?

13      A.   Yes.

14      Q.   Did you have a chance to compare this chart with the

15      information that you have in your files to make sure everything

16      is accurate?

17      A.   Yes, I did.

18      Q.   Is it accurate?

19      A.   It is accurate.

20                   MS. CHANNAPATI:   Your Honor, at this time I

21      would ask that People's No. 13 be moved into evidence.

22                   THE COURT:   Any objection?

23                   MR. GREENBERG:   No.

24                   THE COURT:   Into evidence.

25                   MS. CHANNAPATI:   If it could be posted for the

1    jury, your Honor.

2                 THE COURT:  It will be posted.

3        Q.   Ms. Keblish, is this a summary of the findings in your

4    report?

5        A.   Yes.

6                 MS. CHANNAPATI:  Now, with the Court's

7        permission, may the witness approach the exhibit, your

8        Honor?

9                 THE COURT:  Yes.

10       Q.   Ms. Keblish, what are the items, if you could describe

11   the items, at the top of the chart?

12       A.   Well, in this row, these are the column header items.

13   These are the different items that were testified.  This is the

14   case number; Dennis Colon was tested; this is the case number

15   for Vera Krioutchkova; this is the anal swab, sperm fraction,

16   and duvet cover; these titles are -- here are the locus names;

17   these are the different locations; these are the fancy locus

18   for the locations; D-3, 3 tells us it's on the third

19   chromosome; this AMEL for Amelogenin; then the next determining

20   location; these are the results under here, XY, XY; men have a

21   X and Y; woman only have an X.

22                 So, if we were looking at the neighboring female

23   types, it would have one X there, but looking at these results,

24   you see an X and Y.  Then you go all the way down the line.

25   These are the 13 different locations.  You can see the

1    comparison of the suspect's profile to the semen from the anal

2    swab from the sperm cells, and then the duvet cover from the

3    sperm cells, and 15/16; same here, 15 and 16; 15 and 16; and

4    what these numbers are, these are those allele numbers I was

5    talking about before.

6            So, it's describing the DNA at those locations.   At

7    this location he had 15 repeats of some DNA sequence.   Let's

8    say if you imagine the word cat, cat, cat, cat, cat, cat

9    repeated 15 times.   That is what he might have had at that

10   location.   That's a 15/16.

11           It's the same thing at this location.   He had some

12   sequence 8 times, but on one chromosome, 9 times from the

13   other; one is from mom and one is from dad.   So there's no

14   examples of it, but sometimes you see one number.   That doesn't

15   mean that the person only has one chromosome or anything.   That

16   means that their mom and dad both gave them the same DNA type

17   at that location.

18           He doesn't have anything like that.   He has two DNA

19   types at each one.   So we're looking at this.   It shows you

20   that the profiles are all the same.   So they came from the same

21   person.   Since we tested a person, we see that it came from

22   Dennis Colon.

23       Q.   Could you indicate on the chart what profile was

24   obtained from the swab that was given from Dennis Colon?

25       A.   This is the profile, this whole series of numbers.

1    That's his profile.

2         Q.   Could you also indicate on the chart what profile came

3    from the anal swab of the rape kit of Vera Krioutchkova?

4         A.   That's here, anal swab and sperm fraction.

5         Q.   When you compare anal swab to the suspect profile,

6    what does it indicate?

7         A.   It shows that they are exactly the same.

8         Q.   Could you also please point out where on the chart it

9    indicates the profile obtained from the duvet cover?

10        A.   That's right here from the sperm fraction of that

11   sample.  It's right there.

12        Q.   When that compares to the suspect profile of Dennis

13   colon, what does it indicate?

14        A.   That the two types were the same.  The profiles were

15   the same.  So they came from the same person.

16        Q.   Did your lab do -- you can have a seat.

17             Did your lab do any statistical analysis to determine

18   how rare this profile of Dennis Colon within the earth's

19   population is?

20        A.   Yes.  We did a statistical calculation, and it showed

21   that you would only expect to find this profile once in greater

22   than one trillion Caucasian people; once in greater than one

23   trillion Asian people; once in greater than one trillion

24   Hispanics; and one in greater than one trillion blacks.

25             I'll just explain what a trillion is.  A trillion is a

Direct - Keblish/Channapati

720

1    thousand times a billion.  So it's one and then twelve zeroes.

2    So, currently on the planet earth, we only have about six

3    billion people.  So if you imagine how many people would be,

4    how many earths would be a trillion people, you would be able

5    to look at 160 planet earths, each with six billion people, and

6    you would still only find this profile once.

7        Q.    So in your expert opinion, is Dennis Colon's sperm on

8    the anal swab of the rape kit?

9        A.    Yes.

10       Q.    Is it Dennis Colon's sperm that was on the duvet or

11   the comforter cover that was recovered?

12       A.    Yes.

13                 MS. CHANNAPATI:  Nothing further, your Honor.

14                 THE COURT:  Thank you.

15                 Defense.

16   CROSS EXAMINATION

17   BY MR. GREENBERG:

18       Q.    Can you explain to me again the negative control, what

19   Maya Saxon did with the negative control?

20       A.    She performed an extraction which at the beginning of

21   the extraction, you'll create a negative control which is a

22   tube that's empty as opposed to every other tube in your set

23   that has a swab in it or a cutting of something, and then she

24   took that through the whole procedure and then discarded it,

25   and created a new one.

Cross - Keblish/Greenberg

721

1    Q.   So you're telling me that there was nothing in the

2  tube?

3    A.   Which tube?

4    Q.   In the negative control tube?

5    A.   She -- I believe she replenished it.

6    Q.   At the beginning, was there anything in the tube?

7    A.   No.

8    Q.   Nothing, it was empty?

9    A.   Right.

10    Q.   Okay.  Then she discarded the tube?

11    A.   Yes.

12    Q.   And put it in a new tube; is that correct?

13    A.   Yes.

14    Q.   That raised concern for your office; correct?

15    A.   Yes.  Any time anybody does not follow the protocol,

16  it raises concern.

17    Q.   That's because it's important for your lab to be found

18  reliable; correct?

19    A.   Yes.

20    Q.   As a result of Ms. Saxon's conduct, your office

21  decided to take certain steps to ensure the reliability of the

22  tests; correct?

23    A.   Yes.

24    Q.   However, that was done internally; correct?  In other

25  words -- I'm sorry.  Withdrawn.

Cross - Keblish/Greenberg

722

1          Your investigation was an internal investigation;

2   correct?

3      A.   Yes.

4      Q.   There was no outside agency to oversee what your

5   procedures were in your investigation; is that correct?

6      A.   There actually was.  No, it's not correct.

7      Q.   All right.  Was there any outside independent agency

8   conducting the tests?

9      A.   No.

10     Q.   And Ms. Saxon was -- you were Ms. Saxon's supervisor?

11     A.   No, I wasn't.  On certain -- if you look through the

12  paperwork, my initials might be on the same page as hers,

13  because I was a supervisor.  So if she happened to do something

14  and I was supervising her that day, yes, but not, I wasn't, you

15  know, solely responsible for her.

16     Q.   But you needed to rely on data that she provided to

17  you?

18     A.   Not data.

19     Q.   Samples?

20     A.   Yeah, samples.

21     Q.   In fact, you don't know what Ms. Saxon did in terms of

22  her examination of the DNA submitted to you with respect to

23  this case; is that correct?

24     A.   Well, she didn't examine it.

25     Q.   Well, whatever her function was; is that correct?

Redirect - Keblish/Channapati

723

1    A.    I didn't watch her the whole, you know, do it.  So I

2    don't know exactly what she did no.

3              MR. GREENBERG:  Judge, I have no further

4    questions.

5              THE COURT:  People, you have anything?

6              MS. CHANNAPATI:  Very briefly, your Honor.

7    REDIRECT EXAMINATION

8    BY MS. CHANNAPATI:

9    Q.    What did the outside agency do when the Office of the

10   Chief Medical Examiner was reviewing Maya Saxon's performance?

11   A.    The outside agency was our accrediting agency, which

12   is called the American Society of Crime Laboratory Directors

13   Laboratory Accreditation Board.

14             We had given them, like, a plan to show them -- we

15   told them what happened, and we told them our plan for how to

16   address the problem.  They were satisfied with that plan, and

17   then after we finished the investigation, we submitted all the

18   results to them, and they were satisfied with that also.

19   Q.    So, Maya Saxon handled the second cutting of the swab

20   from the suspect sample; correct?

21   A.    Yes.

22   Q.    Do you always do a second cutting of a suspect swab?

23   A.    No.

24   Q.    In what situations do you do a second cutting of a

25   suspect's swab?

Redirect - Keblish/Channapati

724

1      A.   We will do a second cutting if it matches something;

2  or let's say the first cutting didn't give any DNA, we'll cut

3  it again, but in this case we cut it for a second time, because

4  it matched this case.

5      Q.   So, is it fair to say you did a second cutting to

6  confirm the first results?

7      A.   Yes.

8      Q.   Now, in throwing out a negative control, did it affect

9  the outcome of the results in this case?

10      A.   No, not the DNA profile of Dennis Colon.  No.

11      Q.   So, in throwing out the second cutting of the suspect

12  profile, did it affect whether the suspect profile matched the

13  anal swab from the rape kit?

14      A.   Throwing out the negative control?

15      Q.   I'm sorry.  Throwing out the negative control.

16      A.   No, it didn't affect it.

17      Q.   In throwing out the negative control, the second

18  cutting, did it affect whether the suspect swab matched the

19  duvet cover stain from the property recovered, from the

20  property that was given to the Medical Examiner's Office?

21      A.   No, it didn't.

22              MS. CHANNAPATI:  Nothing further, your Honor.

23          THE COURT:  Defense, anything further?

24          MR. GREENBERG:  I have nothing further.

25          THE COURT:  The witness may step down.

Redirect - Keblish/Channapati

725

1    The attorneys may approach.

2    (Brief discussion held off the record.)

3    THE COURT:  Ladies and gentlemen, we are

4    adjourned now until tomorrow morning, 9:30.  Please do not

5    discuss the case.  My usual discussion -- do not read

6    anything; do not do research; you know the drill, but I

7    have to say it.  So we don't forget it and have it clearly

8    in mind.  Form no opinion regarding guilt or innocence.

9    We'll see you tomorrow at 9:30.  Please leave

10   your books in the seats so we may collect them

11   (Whereupon, the jury has exited the

12   courtroom.)

13   THE COURT:  The jury has left the room.  The

14   witness had previously exited.  As discussed in our bench

15   conference, we are adjourning now having no other witnesses

16   today.  We'll be back tomorrow at 9:30.

17   MS. CHANNAPATI:  Thank you, your Honor.

18   (Whereupon, the case on trial was adjourned to

19   June 6th, 2006.)

20

21

22

23

24

25

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS - CRIMINAL TERM - PART:  3
 2  ----------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3
                                        INDICTMENT NO.
 4            -against-                  2518/2003

 5
    DENNIS COLON,
 6                   Defendant.
    ----------------------------------------X
 7                               320 JAY STREET
                                 BROOKLYN, NEW YORK 11201
 8                               JUNE 6, 2006

 9
    B E F O R E:
10
                    HONORABLE JAMES P. SULLIVAN,
11                           Justice and jury
    A P P E A R A N C E S:
12
13                  CHARLES J. HYNES, ESQ.
                    District Attorney, Kings County
14                  BY:  ANITA CHANNAPATI, ESQ.
                    BY:  LOUISE COHEN, ESQ.
15                  Assistant District Attorney

16
17                  HARLAN GREENBERG, ESQ.
                    DENNIS PETRE
18                  30 Vesey Street, 15th Floor
                    New York, New York
19                  Attorneys for the Defendant

20
                            William Cardenuto
21                          Senior Court Reporter

22
23
24
25
```

-WC-

Direct - Didonna/Channapati

727

1          THE COURT:  All right.  We're back on the case

2      on trial.

3          People, you have your witnesses?

4          MS. CHANNAPATI:  Yes, your Honor.

5          THE COURT:  Now, we have some jury issues that

6      I've been informed of.

7          Juror No. 6, let's see who that is.  That's

8      Ross Israel.  He has a problem for Friday.  I don't know

9      what exactly it is.  I don't know if it's an all day

10     problem, but he'll let us know.  He has a scheduling

11     problem for Friday, and we'll figure that out.

12         Alternate No. 2, Ms. Miello has gotten a job

13     and needs to start right away.  I take it she wants to be

14     discharged.

15         What we hear is that Mr. Israel is going to a

16     9/11 memorial on Friday.  He would be out all day, but

17     Alternate No. 2, as far as I understand, has been asked to

18     start a job and wants to start it.

19         MS. CHANNAPATI:  Well, with respect to Juror

20     No. 6, Ross Israel, I anticipate the People resting today.

21         THE COURT:  I heard that.  I'm just letting

22     you know what I know.  So we can factor it in.  I have no

23     idea.  The defense may have a long case.  I don't know.  So

24     I'm letting you know.

25         Let's focus first on -- we can deal with

1      Friday as we move along, but Alternate No. 2, defense?

2                  MR. GREENBERG:  I would hate to see her lose a

3      job, your Honor.

4                  THE COURT:  How do you want me to handle it?

5                  MR. GREENBERG:  I have no objection to

6      discharging her.

7                  MS. CHANNAPATI:  That's fine.

8                  THE COURT:  Then on the record, we have

9      discussed Alternate No. 2, her issues for wishing to be

10     discharged, and the defense consents and the People

11     consent.  So she is discharged.

12                 That would leave in terms of alternates,

13     Alternate No. 1 has been Mr. Hudenfrend, and then Alternate

14     No. 3 is Ms. Lavender, and she becomes Alternate No. 2, and

15     we'll deal with Mr. Israel's issue as we move a long.

16                 With that, and hearing nothing else --

17                 MS. CHANNAPATI:  Well, your Honor, there's one

18     issue.

19                 THE COURT:  Oh, what is it?

20                 MS. CHANNAPATI:  With respect to Detective

21     Harvin's testimony, the People will not be bringing up the

22     Miranda or the defendant's statement on their case in

23     chief; and as such, it's the People's position that the

24     defense should be precluded from bringing it in as well as

25     it is rank hearsay.

Direct - Didonna/Channapati

729

1        It's not a statement against penal interest.

2  It's a self-serving statement, and it's hearsay, your

3  Honor.  We believe that the defense should be precluded

4  from bringing the statement in as it would make the People

5  seem unfair, your Honor, if we didn't bring the statement

6  in on our case in chief, and if the defense attorney

7  brought it up --

8        THE COURT:  Defense.

9        MR. GREENBERG:  Your Honor, I believe I can

10  bring that in.  I don't believe there's any -- in terms of

11  hearsay, there's a whole slew of exceptions.

12        THE COURT:  A whole slew.

13        People, I don't see why they couldn't bring it

14  in if he takes the stand.

15        MS. CHANNAPATI:  I'm not talking if the

16  defendant takes the stands.  I'm talking about the

17  detective.

18        THE COURT:  We're talking about Detective

19  Harvin and cross.  Well, you wouldn't have covered it.  How

20  would he get it in?

21        She's saying that if they didn't cover it,

22  how --

23        MR. GREENBERG:  I'm cross examining whether or

24  not he made a statement to the police.

25        THE COURT:  They are not going to raise it.

Direct - Didonna/Channapati

1    MR. GREENBERG:  I can cross examine.  It's

2    certainly within the purview.  It's all over the notes.

3        MS. CHANNAPATI:  There's no exception -- it's

4    not an exception to any of the hearsay exceptions.  It

5    doesn't fall into any of those categories.  It's not a

6    statement against penal interest.  It's self-serving.

7        THE COURT:  Let met stop a minute.  I was

8    focusing on if he took the stand.  The issue is when the

9    arresting officer gets in, how would he get the statement

10   in, but, certainly, he can cross examine her about what she

11   did, and just because the People have chosen, for whatever

12   reason that you have chosen, not to put the statement in,

13   he certainly can cross examine her about what she did, and

14   in that course of cross examination, it will probably come

15   up that she took a statement from him.

16       Do you have the statement, would be the

17   question.  Yes, she has it in her paperwork.

18       I don't see how it's not going to come in.

19       MR. GREENBERG:  Not only that, I believe the

20   statement, first of all, is against penal interest.

21       THE COURT:  Well, the statement is a

22   complicated statement.  Unless you all want to litigate

23   that issue, when I say complicated, it's not like, I didn't

24   do it, or I did do it.  It's a mixed statement.

25       MS. CHANNAPATI:  So, your Honor --

Direct - Didonna/Channapati

731

1            THE COURT:  I'm saying that I'm not going to

2     preclude it.  I'm not going to preclude the defense.  If

3     the issue comes up, you want to object, I'll deal with it.

4     I'll not preclude it.

5            MS. CHANNAPATI:  Your Honor, may I have a

6     moment?

7            THE COURT:  All right.

8                (Brief recess taken.)

9            THE COURT:  We want to discharge Alternate No.

10    2 on the record.  So we'll just bring her in.

11           THE COURT OFFICER:  Ready for the alternate?

12           THE COURT:  Yes, thank you.

13           THE COURT OFFICER:  Alternate juror entering.

14           (Whereupon, Alternate Juror No. 2 enters the

15    courtroom and is seated.)

16           THE COURT:  Ms. Miello, we understand that you

17    have gotten a job.

18           ALTERNATE JUROR NO. 2:  Yeah.

19           THE COURT:  And you are needed to go start

20    right away.

21           ALTERNATE JUROR NO. 2:  Yes.

22           THE COURT:  Well, congratulations on your

23    getting the job.  We have discussed it, and both sides have

24    agreed.  So you are now discharged with the thanks of the

25    Court.

Direct - Didonna/Channapati

732

1          ALTERNATE JUROR NO.2:  Okay.  Thank you.

2          (Whereupon, Alternate Juror No. 2 exits the

3    courtroom.)

4          THE COURT OFFICER:  Ready for the jury?

5          THE COURT:  We are.  Thank you.

6          THE COURT OFFICER:  Jury entering.

7          (Whereupon, the jury enters the courtroom and

8    is properly seated.)

9          THE CLERK:  All jurors are present.

10         Do both sides waive the reading of the roll?

11         MR. GREENBERG:  Yes.

12         MS. CHANNAPATI:  So waived.

13         THE COURT:  We know that Alternate No. 2

14   needed to take care of business.  So she's been discharged

15   with the thanks of the Court.  So Alternate No. 3 becomes

16   Alternate No. 2.

17              People.

18         MS. CHANNAPATI:  Your Honor, the People at this

19   time call Silvana Didonna

20   S I L V A N A   D I D O N N A,  called as a witness, after being

21   duly sworn, testified as follows:

22         THE COURT:  She's a Verizon representative.

23         Proceed, People

24         MS. CHANNAPATI:  Thank you, your Honor.

25

-WC-

1    DIRECT EXAMINATION

2    BY MS. CHANNAPATI:

3        Q.   Ms. Didonna, where are you employed?

4        A.   I'm employed by Verizon Corporation.

5        Q.   How long have you worked at Verizon?

6        A.   27 years.

7        Q.   What is Verizon?

8        A.   It's a communication company.

9        Q.   What kind of services do you provide?

10       A.   Local, long distance, and also Internet services.

11       Q.   What is your position at Verizon?

12       A.   I'm an investigator.

13       Q.   How long have you been an investigator at Verizon?

14       A.   Last ten years.

15       Q.   What are your duties and responsibilities as an

16   investigator at Verizon?

17       A.   We do internal investigation within Verizon, and from

18   time to time we also testify as to company records.

19              MS. CHANNAPATI:  At this time I would ask if

20       the following documents could be marked as People's 14, 15

21       and 16.

22              THE COURT:  Has defense had a look?

23              MR. GREENBERG:  I've looked at them before.

24              THE COURT:  So that's People's 14, 15, and 16

25       being marked for identification.

Direct - Didonna/Channapati

1      Q.    Have you had an opportunity to look at them, Ms.

2   Didonna?

3      A.    Yes, I have.

4      Q.    What is No. 14, the first document?

5      A.    The No. 14 is subscriber information indicating a

6   phone number and also who the subscriber is.

7      Q.    What is No. 15?

8      A.    It's also subscriber information for a customer and

9   also has a list of phone calls from that customer's phone

10  number.

11     Q.    What is No. 16?

12     A.    16 is an in-file search.  It's a computer report that

13  indicates the originating and terminating calls from a specific

14  number.

15               THE COURT:  You call this an in-file, in,

16        hyphen, file?

17               THE WITNESS:  Yes.

18               THE COURT:  What does it have on it?

19               THE WITNESS:  A time that a call was made; the

20        date; where the call originated from; where the call

21        terminated; how long did it last; and then there's also

22        some other columns where it's basically for internal use

23        only.

24               THE COURT:  Thank you.

25     Q.    Now, are these the originals or photocopies?

-WC-

1   A.   They are photocopies.

2   Q.   Are they exact reproductions of the originals?

3   A.   Yes, they are.

4   Q.   Is the information contained therein kept in the

5   regular course of business by Verizon?

6   A.   Yes.

7   Q.   Is it in the regular course of business for Verizon to

8   make and keep such records?

9   A.   Yes.

10  Q.   Are the entries and the information in those records

11  made at or near the time of the phone calls that are indicated?

12  A.   Yes.

13  Q.   Does the person who prepared the information contained

14  in those files have a business duty to do so truthfully and

15  accurately?

16  A.   Yes.

17              MS. CHANNAPATI:  Your Honor, at this time I

18       would ask what's previously been marked as People's 14, 15,

19       and 16 be received into evidence as People's 14, 15, and

20       16.

21                   THE COURT:  Is there any objection?

22              MR. GREENBERG:  No.

23                   THE COURT:  The items are received into

24       evidence.

25              MR. GREENBERG:  Your Honor, may I just look at

1    them.

2             THE COURT:  The defense attorney would like to

3    take a look.  You may.

4             Both lawyers may approach.

5             (Brief discussion held off the record.)

6             THE COURT:  All right.  Ladies and gentlemen,

7    there's one small issue, and I'm going to ask you to step

8    out for a while.  Leave your books.  Do not discuss the

9    case, please.

10            (Brief recess taken.)

11            THE COURT:  All right.

12            The People, we are ready to proceed, and the

13   defense, we are ready to proceed.

14            We can call the jury book back in.

15            THE COURT OFFICER:  Ready for the jury?

16            THE COURT:  Yes.

17            THE COURT OFFICER:  Jury entering.

18            (Whereupon, the jury enters the courtroom and

19   is properly seated.)

20            THE CLERK:  The jurors are present.

21            Do both sides waive the reading of the roll?

22            MR. GREENBERG:  Yes.

23            MS. CHANNAPATI:  So waived.

24            THE CLERK:  The witness has resumed the stand

25   and is still under oath.  Direct examination is resumed.

Direct - Didonna/Channapati

737

1          THE COURT:  People.

2      Q.   Ms. Didonna, I'm going to ask you to direct your

3  attention to Exhibit No. 14.  Could you please describe what it

4  is?

5      A.   It's a subscriber information.

6      Q.   For what number is the subscriber information?

7      A.   Telephone No. 718-787-1125.

8      Q.   Do you know who the subscriber was for that phone

9  number in March of 2003?

10     A.   The phone service was listed to a Vera -- I can't

11  pronounce the last name.

12          THE COURT:  You could spell it.

13          THE WITNESS:  K-r-i-o-u-t-c-h-k-o-v-a.

14          1711 East 15th Street, Brooklyn, New York,

15  Apartment 1-A.

16     Q.   Now, was her number listed or unlisted?

17     A.   It was a listed telephone number.

18     Q.   What does it mean that the number is listed?

19     A.   It appears in the phone book, and, also, if you call

20  information, you would be able to get a phone number.

21     Q.   So, it's available to public access?

22     A.   That's correct.

23     Q.   I'm going to direct your attention now to Exhibit 15?

24     A.   It's also subscriber information.

25     Q.   For what number?

Direct - Didonna/Channapati

738

1      A.   It's for telephone No. 718-376-7178.

2      Q.   Do you know who the subscriber was for that phone

3  number in March of 2003?

4      A.   It was listed to a Mr. Colon, Dennis; address, 1323

5  East 16th Street, Brooklyn, 11230, Apartment C-3.

6      Q.   Was that also subcriber information for April of 2003?

7      A.   That's correct.

8      Q.   Now, was that number listed or unlisted?

9      A.   It's non-published.

10      Q.   What does it mean, "it's non-published"?

11      A.   It doesn't appear on the phone directory, and also, if

12  you call information, you would not be able to get the phone

13  number.

14      Q.   Now, again, looking at Exhibit 15, directing your

15  attention to March 26th, 2003, at 8:01 a.m., is there an

16  indication of a phone call being made from Dennis Colon's

17  number?

18      A.   Yes.   At March 26th, 2003, at 8:01 in the morning,

19  there was a phone call from 718-376-7178 to 718-787-1125.

20      Q.   And that number, the 1125 number belongs, the

21  subscriber information for that is?

22      A.   Vera.

23      Q.   Krioutchkova?

24      A.   Yeah.

25      Q.   Now, I'm going to direct your attention to April 5th,

-WC-

1    2003.  This is Exhibit 15, April 5th, 2003, at 12:38 a.m.

2         A.   There was a phone call made from 718-376-7178 to

3    718-787-1125.

4         Q.   So there was -- the records indicate that a phone call

5    was made from the number that has the subscriber of Dennis

6    Colon?

7         A.   That's correct.

8         Q.   To the number that has the subscriber as Vera

9    Krioutchkova?

10        A.   That's correct.

11        Q.   Now, I'm going to direct your attention to Exhibit No.

12   16, and what is Exhibit No. 16?

13        A.   As I said before, it's telephone records which

14   indicates originating calls, or it's a telephone records which

15   indicate any calls terminating to a specific number.

16        Q.   What number is this in?

17        A.   The terminating number in this case is 718-787-1125.

18        Q.   And that number has subscriber information of Vera

19   Krioutchkova?

20        A.   That's correct.

21        Q.   Now, I'm going to direct your attention to March 26th,

22   2003, at 8:01 a.m.

23        A.   That's correct.  There was a phone call from

24   718-376-7178 to 718-787-1125.

25        Q.   How long did that phone call last?

-WC-

Direct - Didonna/Channapati

740

1      A.   Two minutes and 13 seconds.

2      Q.   So there was a phone call made from the phone number

3   that has a subscriber information of Dennis Colon to the phone

4   number that has the subscriber information for Vera

5   Krioutchkova at 8:01 a.m. on March 26th, 2003?

6      A.   That's correct.

7              MS. CHANNAPATI:  Nothing further.  Thank you.

8              THE COURT:  Anything further of the witness,

9      defense?

10             MR. GREENBERG:  Yes.

11  CROSS EXAMINATION

12  BY MR. GREENBERG:

13     Q.   I'm going to ask you to look at the document that has

14   the terminating calls to 787-1125?

15     A.   Okay.

16     Q.   How many phone calls on March 26th were from

17   718-376-7178, which is Mr. Colon's number, how many phone calls

18   were made to Vera Krioutchkova's number, 787-1125?

19     A.   There was only one phone call.

20             MR. GREENBERG:  I have no further questions.

21             THE COURT:  No further questions.

22             Anything further from the People?

23             MS. CHANNAPATI:  Your Honor, just one moment.

24             Nothing, your Honor.

25             THE COURT:  The witness may step down.

Direct - Det. Harvin/Channapati

741

1    People.

2             MS. CHANNAPATI:  At this time, your Honor, the

3    People call Detective Joyce Harvin.

4    DETECTIVE   J O Y C E   H A R V I N,  Shield No. 801, Brooklyn

5    Special Victims Squad, called as a witness, after being duly

6    sworn, testified as follows:

7             THE COURT:  People, you may proceed.

8             MS. CHANNAPATI:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MS. CHANNAPATI:

11        Q.   Detective Harvin, by whom are you currently employed?

12        A.   New York City Police Department.

13        Q.   How long have you been a member of the New York City

14   Police Department?

15        A.   19 and a half years.

16        Q.   What is your current assignment?

17        A.   Detective/Investigator.

18        Q.   How long have you been a Detective/Investigator with

19   the Brooklyn Special Victims Squad?

20        A.   Four years.

21        Q.   What are your duties and responsibilities as a

22   Brooklyn Special Victims Squad detective?

23        A.   Investigate allegations of sexual assaults.

24        Q.   How long have you -- withdrawn.

25             Directing your attention to March 26th, 2003, how long

-WC-

Direct - Det. Harvin/Channapati

742

1    had you been in the Brooklyn Special Victims Squad at that

2    point?

3         A.    One year.

4         Q.    Now, were you working on March 26th, 2003?

5         A.    Yes.

6         Q.    Were you alone or with a partner?

7         A.    A partner.

8         Q.    And who was your partner?

9         A.    Detective Figueroa.

10        Q.    Did there come a time that day when you became

11   involved in an investigation of an incident that occurred at

12   1711 East 15th Street, Apartment 1-A?

13        A.    Yes.

14        Q.    Where is that location?   Is it in Brooklyn?

15        A.    It's in Brooklyn.

16        Q.    How did you come to be involved?

17        A.    I was notified by a uniformed police officer from the

18   61st Precinct.

19        Q.    When you were notified, what did you do?

20        A.    I responded to the Coney Island Hospital to interview

21   the victim.

22        Q.    Did you speak with anyone there?

23        A.    Yes.

24        Q.    Who did you speak with?

25        A.    A Ms. Vera -- I'm not sure of the pronunciation of the

Direct - Det. Harvin/Channapati

743

1    last name, Krioutchkova.

2        Q.   Vera Krioutchkova?

3        A.   Yes, Krioutchkova.

4        Q.   What did Ms. Krioutchkova tell you?

5        A.   That she was raped inside her residence by an unknown

6    person.

7        Q.   How did she appear when you talked to her?

8        A.   Upset.

9             MR. GREENBERG:   Objection.

10            THE COURT:   Overruled.

11       Q.   When you say "upset," how did she appear?

12       A.   As in disbelief that something would happen to her in

13   her home.

14       Q.   How did she appear physically?

15       A.   Physically, okay.

16       Q.   Was she in shock?

17       A.   Yes.

18            MR. GREENBERG:   Objection.

19            THE COURT:   Overruled.

20       Q.   Now, did she tell you there was any weapons involved?

21       A.   Yes.

22       Q.   What did she tell you?

23       A.   That the perpetrator displayed a knife.

24       Q.   Did she describe a knife to you?

25       A.   Yes, she did.

Direct - Det. Harvin/Channapati

744

1     Q.   How did she describe it?

2     A.   She said it had a funny design, a pocket knife with a

3   funny design.

4     Q.   Did she give you a description of the person who came

5   into her apartment?

6     A.   Yes, she did.

7     Q.   Do you remember what that description was?

8     A.   Yes.

9     Q.   What was it?

10    A.   A male Hispanic, husky built, anywhere from 25 to 30

11  years old, and five-eleven, light goatee, and was wearing a

12  black cap.

13    Q.   Now, after speaking with her, what did you do next?

14    A.   I responded to her residence, the place of occurrence.

15    Q.   What did you do when you got there?

16    A.   As far as the apartment?

17    Q.   Yeah.

18    A.   I went inside the apartment, looked around the

19  location.  Then I notified the New York City Police Department

20  Crime Scene Unit to respond to the location.

21    Q.   Why did you do that?

22    A.   So they could have the purpose of gathering any type

23  of evidence at the scene.

24    Q.   Now, did you talk to anyone else?

25    A.   Yes.

Direct - Det. Harvin/Channapati

745

Q.   Who else did you talk to?

A.   I spoke to several people in the building, and I spoke to the landlord's business partner.

Q.   Now, when you said you talked to several people in the building, is that called a canvass?

A.   Yes.

Q.   What is the purpose of a canvass?

A.   To try to ascertain if anyone in the building seen anything unusual or seen the suspect come in and out of the building.

Q.   What do you actually do during the canvass, if you could describe it for the jury?

A.   You knock on people's apartment doors, get their information, and you explain to them what happened in the building and find out if they were around at that particular time or did they notice anything suspicious in the building.

Q.   Did your canvass yield any results?

A.   No.

Q.   Then you said you spoke to the landlord's business partner?

A.   Yes.

                    THE COURT:  Do you remember his name?

                    THE WITNESS:  Guy.  I don't remember the last name.

Q.   Do you need something to refresh your recollection?

Direct - Det. Harvin/Channapati

746

1    A.   Yes.

2         THE COURT:  The witness may look at her

3    paperwork in an effort to refresh her recollection.

4         THE WITNESS:  Guy Gasibson (phonetic).

5    Q.   Why did you speak to Guy Gasibson (phonetic)?

6    A.   To try to find out if there was a problem in the

7    victim's apartment.

8    Q.   What kind of problem?

9    A.   Plumbing problem.

10   Q.   Did you learn if there was a problem?

11   A.   No.

12   Q.   Did you get to speak to Guy?

13   A.   Yes.  I spoke to him, but he told me he wasn't aware

14   of any problems.

15   Q.   After speaking to Guy Gasibson (phonetic), did you

16   speak to anyone else?

17   A.   Yes.  I spoke to the landlord of the building.

18   Q.   Who was that?

19   A.   Guy Schebovitz.

20   Q.   After speaking to Guy Schebovitz, who did you speak

21   to?

22   A.   I spoke to the plumber of the building, Mr. Hollis

23   Christopher.  I attempted to speak with the electrician of the

24   building, Mr. Robert Meade, but his location at the moment was

25   unknown.

-WC-

Direct - Det. Harvin/Channapati

747

1    Q.   What was the purpose of speaking to Hollis

2 Christopher?

3    A.   To find out if he was made aware of any plumbing

4 problems in the victim's location, apartment, and did he

5 respond to the apartment to fix the plumbing problem.

6    Q.   What did you learn?

7    A.   No, he did not respond.

8    Q.   You said you spoke -- you tried to speak to Robert

9 Meade?

10   A.   Yes.

11   Q.   Why did you want to speak to Robert Meade?

12   A.   Because he was an electrician in the building, and he

13 was also staying in Apartment 1-C located on the first floor

14 next to the victim's apartment.

15   Q.   So after you did all this investigation, what happened

16 next?

17   A.   I went to another location, 901 Avenue H, because the

18 last telephone call on the victim's phone came back to that

19 address of that phone number.

20   Q.   What happened as a result of that, going to 901 Avenue

21 H?

22   A.   I spoke to the super of the building, and he told me

23 the phone number came back to Apartment 4-C, but he wasn't

24 familiar with the tenant of the location.  I attempted to

25 interview the people at the location, but there was no answer

Direct - Det. Harvin/Channapati

748

1    at the door.

2         Q.   What happened next?  What did you do next?

3         A.   I responded back to my office, and I notified Verizon

4    telephone company.

5         Q.   Why did you notify Verizon?

6         A.   I wanted to get the victim's telephone numbers,

7    incoming and outgoing calls.

8         Q.   Why did you want to do that?

9         A.   To try to ascertain where the phone call came from to

10   the victim's apartment.

11        Q.   At this point did you have any leads as to who

12   attacked Vera Krioutchkova on March 26th, 2003?

13        A.   No.

14        Q.   Did there come a point when you were at the hospital

15   that you spoke to a Ms. Alice Olosunde?

16        A.   Yes.

17        Q.   Who was Alice Olosunde?

18        A.   The nursing assistant at Coney Island Hospital.

19        Q.   How was she related to this case?

20        A.   I think she did the examination of the victim.

21             MR. GREENBERG:  Objection.

22             THE COURT:  Overruled.

23        Q.   I'm going to direct your attention now to --

24             THE COURT:  Let me just say this, with regard

25   to his objection, we are using the word "complaining

-WC-

Direct - Det. Harvin/Channapati

749

1    witness" rather than the word "victim" consistently in the

2    case, and the witness is so advised.

3    Q.   Directing your attention to April 5th, 2003,

4    approximately after midnight, were you working at this time?

5    A.   Yes.

6    Q.   What, if anything, happened at that time?

7    A.   I received a phone call from the complainant's

8    daughter.

9    Q.   What did you learn?

10   A.   That the subject was on the telephone call with her

11   mother.

12   Q.   Did you give the complainant's daughter any

13   instruction?

14   A.   Yes.

15   Q.   What instruction did you give her?

16   A.   To tell her mother to keep him talking as long as

17   possible and try to get any information from him about himself.

18   Q.   Why did you do that?

19   A.   So maybe we can find out any information.

20              MR. GREENBERG:  Objection.

21              THE COURT:  Overruled.

22              THE WITNESS:  To gather information about the

23   subject.

24   Q.   Now, did there come a point where you got off the

25   phone with Vera Krioutchkova's daughter?

-WC-

Direct - Det. Harvin/Channapati

750

1    A.    Yes.

2    Q.    What did you do next?

3    A.    Respond to the complainant's apartment.

4    Q.    When you say "respond," you mean you went to her

5    apartment?

6    A.    I went to her apartment.

7    Q.    What did you do when you got to the apartment?

8    A.    I canvassed the area around the apartment building,

9    and I sat inside her apartment with my partner, Detective

10   Figueroa, for approximately two hours.

11   Q.    Why were you doing that?

12   A.    The subject told her that he was coming back to her

13   location.

14   Q.    Now, directing your attention to later that day, what

15   did you do next?

16   A.    Information was received from Verizon phone company

17   regarding the phone number, and members from the Special

18   Victims Squad responded to the location from the information

19   that was received from Verizon phone company.

20   Q.    What information did you receive from Verizon?

21   A.    We got the person's subscriber information.

22   Q.    What name and subscriber information did you receive?

23   A.    Dennis Colon, 1323 East 16th Street, Apartment C-3,

24   Brooklyn, New York.

25   Q.    So when you learned the subscriber information for the

-WC-

Direct - Det. Harvin/Channapati

751

1    phone number, what did you do next?

2        A.   We notified members of the Brooklyn Special Victims

3    Squad that was out in the area canvassing the area for a

4    possible subject.

5        Q.   What happened next?

6        A.   We gave them the information, and they responded to

7    1323 East 16th Street, Apartment C-3.

8        Q.   After they responded to the location, what happened

9    next?

10       A.   They brought the subject back to the Brooklyn Special

11   Victim Squad.

12       Q.   Where did you first see Dennis Colon?

13       A.   At the Brooklyn Special Victims Squad.

14            MS. CHANNAPATI:  With the Court's permission,

15   I'm going to ask the witness to look around the courtroom

16   and if she sees the person that she saw at the Brooklyn

17   Special Victim Squad on April 5th, 2003, Dennis Colon, and

18   if she could point to him and describe an article of

19   clothing.

20            THE COURT:  All right.

21            THE WITNESS:  Yes.  The black suit, but he

22   looks like he lost a lot of weight from the last time I

23   seen him.

24            THE COURT:  Seated at the table to the right

25   in the black suit?

-WC-

Direct - Det. Harvin/Channapati

752

1          THE WITNESS:  Yes.

2          THE COURT:  Identifying the defendant.

3     Q.   Does his appearance today differ from when you saw him

4     on April 5th, 2003?

5     A.   Yes.

6     Q.   How does it differ?

7     A.   The weight, it looks like he lost, maybe, about 20, 30

8     pounds.

9          MS. CHANNAPATI:  Your Honor, I'm going to show

10    People's No. 17.

11         THE COURT:  All right.  People's 17, sheets of

12    paper being shown to the defense.

13         MS. CHANNAPATI:  Your Honor, if this could be

14    shown to the witness, People's 17-A and 17-B

15         THE COURT:  Sheets of paper which the People

16    have identified as 17-A and 17-B are being marked for

17    identification and shown to the witness.

18    Q.   Do you recognize those, 17-A and B?

19    A.   Yes.

20    Q.   What are they?

21    A.   Photos of the defendant.

22    Q.   Do they fairly and accurately depict how the defendant

23    looked on April 5th, 2003?

24    A.   Yes, it does.

25         MS. CHANNAPATI:  Your Honor, at this time I

-WC-

Direct - Det. Harvin/Channapati

1    would ask what's previously been marked as 17-A and B be

2    moved into evidence.

3              THE COURT:  Any objection?

4              MR. GREENBERG:  No.

5              THE COURT:  Into evidence as People's 17-A and

6    B.

7              MS. CHANNAPATI:  Your Honor, if they could be

8    posted for the jury.

9              THE COURT:  They will be posted.

10   Q.    Now, when you saw him at Brooklyn Special Victims

11   Squad office, was he handcuffed at that point?

12   A.    No.

13   Q.    Was he under arrest at that point?

14   A.    No.

15   Q.    When he got there, what did you do?

16   A.    When I got to --

17   Q.    When the defendant got to Brooklyn Special Victim

18   Squad office, what did you do?

19   A.    I went -- they placed him into a holding cell, and I

20   went into the holding cell with my partner, Detective Figueroa.

21   Q.    Could you describe the make up of this cell?

22   A.    It's an eight by ten room with a window, gates on the

23   window and gates on the door.

24   Q.    When you say there are windows, where are the windows?

25   A.    One window inside the room.

Direct - Det. Harvin/Channapati

754

1    Q.   Does that window face the outside of the building, or

2  does it face the interior of the building?

3    A.   Outside of the building.

4    Q.   Was there anybody else in the room with you?

5    A.   Detective Figueroa.

6    Q.   Now, at that point, did you read him what is commonly

7  referred to as his Miranda rights?

8    A.   Yes, I did.

9    Q.   Did you do it from memory or a sheet of paper?

10   A.   From a sheet of paper.

11         THE COURT:  Yes, People.

12         MS. CHANNAPATI:  At this time I would ask if

13  the following piece of paper could be marked as People's

14  No. 18.

15         THE COURT:  All right.  That piece of paper is

16  handed up as People's Exhibit 18 for identification.

17   Q.   Detective Harvin, do you remember that?

18   A.   Yes, I do.

19   Q.   What do you recognize it to be?

20   A.   A Miranda warning sheet that I read to defendant

21  Dennis Colon, 4/5/03.

22   Q.   How do you recognize it?

23   A.   His signature and my handwriting, and Detective

24  Figueroa signed it as a witness.

25   Q.   Is it in the same or substantially the same condition

-WC-

1    as it was on April 5th, 2003?

2        A.   Yes, it is.

3                MS. CHANNAPATI:   Your Honor, I would ask that

4    People's No. 18 be moved into evidence.

5                THE COURT:   Any objection?

6                MR. GREENBERG:   No.

7                THE COURT:   Into evidence as People's 18.

8        Q.   Could you please describe how you advised the

9    defendant of his Miranda rights, if you could go through it.

10       A.   I read each one, 1 through 6, and asked him did he

11   understand.

12       Q.   Did he respond to each question?

13       A.   Yes, he did.

14       Q.   How did he indicate that he understood?

15       A.   He wrote the word, yes, and signed his initials, D.C.,

16   next to each question.

17       Q.   Could you please read the Miranda rights now as you

18   did on that day?

19       A.   "You have the right to remain silent and refuse to

20   answer questions.

21            "Do you understand a that?"

22       Q.   Did he respond to that?

23       A.   Yes.

24       Q.   How did he respond?

25       A.   Yes, he wrote the word, "yes."

Direct - Det. Harvin/Channapati

756

1      Q.   What's the next question there?

2      A.   "Anything you do say may be used against you in a

3  court of law.

4           "Do you understand?"

5      Q.   What did he indicate?

6      A.   Yes.

7      Q.   What's the next question?

8      A.   "You have the right to consult with an attorney before

9  speaking to the police" --

10     Q.   What did he indicate?

11     A.   -- "and to have an attorney present during any

12  questioning now or in the future.

13          "Do you understand?"

14          He wrote the word, yes, and signed his initial, D.C.

15          "If you cannot afford an attorney, one will be

16  provided for you without cost.

17          "Do you understand?"

18          He wrote the word, yes, and signed his initials, D.C.

19          "If you do not have an attorney available, you have

20  the right to remain silent until you have the opportunity to

21  consult with one.

22          "Do you understand?"

23          He wrote the word, yes, and his initial D.C.

24          "Now, that you have been advised of your rights, are

25  you willing to answer questions?"

-WC-

Direct - Det. Harvin/Channapati

757

1          He wrote the word, yes, and his intitials D.C., and he

2    signed the form, Dennis Colon.

3          Q.   Any other signatures on there?

4          A.   My signature and Detective Figueroa's signature.

5          Q.   While you were speaking to him, did he seem alert?

6          A.   Yes.

7          Q.   Did he make eye contact with you?

8          A.   Yes.

9          Q.   Did he appear to have any difficulty understanding

10   English?

11         A.   No.

12         Q.   Now, as a police officer, have you had experience

13   dealing with people who are intoxicated on alcohol or drugs?

14         A.   Yes.

15         Q.   How often is that?

16         A.   Very often.

17         Q.   Did you form an opinion as to whether the defendant

18   was intoxicated?

19                    MR. GREENBERG:  Objection.

20                    THE COURT:  Overruled.

21                    MR. GREENBERG:  Your Honor.

22                    THE COURT:  You may approach.

23                    (Whereupon, the following proceedings were

24         held at sidebar.)

25                    THE COURT:  Yes, Counsel?

-WC-

Direct - Det. Harvin/Channapati

758

1     MR. GREENBERG:  She's trying to give expert

2 testimony as to whether or not the detective is able to

3 determine --

4     THE COURT:  It's not expert.  It's her view.

5 You can attack that.

6     MR. GREENBERG:  She's giving an opinion.

7     THE COURT:  That's her opinion.  It's not an

8 expert opinion.  You can attack it on cross.

9     (Whereupon, the following proceedings were

10 held in open court in the presence of the jury.)

11     THE COURT:  The objection is overruled.

12 Q. Did you form an opinion as to whether or not the

13 defendant was intoxicated?

14 A. Yes.

15 Q. What was that opinion?

16 A. He wasn't intoxicated.

17 Q. Now, when you were reading his Miranda rights to him,

18 how were you situated?

19 A. He was sitting in the holding cell area.  I was

20 situated to his right.  Detective Figueroa was to his left, and

21 he was in the middle.

22 Q. What kind of furniture was there in the room?

23 A. It says one desk and three chairs.

24 Q. Were you sitting across from him or next to him?

25 A. Next to him.

Direct - Det. Harvin/Channapati

759

1    Q.    Now, after you gave him his Miranda warnings, did you

2    tell him why he was there?

3    A.    Yes.

4    Q.    What did you tell him?

5    A.    I told him there was a home invasion rape that

6    happened, the location, he fit the description of the suspect,

7    and we wanted to take a DNA swab.

8    Q.    Now, before you took the DNA swab, did you ask him if

9    he wanted to speak to you?

10   A.    Yes.

11   Q.    Did he indicate that he wanted to speak to you?

12   A.    Yes, he did.

13   Q.    Did you have a conversation with him?

14   A.    Yes.

15   Q.    During the course of that conversation, did you take

16   what is commonly referred to as pedigree information?

17   A.    Yes, I did.

18   Q.    Could you please explain to the jury what is pedigree

19   information.

20   A.    Name, date of birth, address, social security number,

21   phone number.

22   Q.    What address did he give?

23   A.    1323 East 16th Street, Apartment C-3.

24   Q.    Did you get his phone number?

25   A.    Yes, I did.

-WC-

Direct - Det. Harvin/Channapati

760

1    Q.   Do you remember what his phone number was?

2    A.   I don't recall offhand.

3    Q.   If you would refer to your notes, would that refresh

4    your recollection?

5    A.   Sure.

6              THE COURT:   The witness is again referring to

7    notes in an effort to refresh her recollection.

8              THE WITNESS:   718-376-7178.

9    Q.   After he gave his pedigree information, did he say

10   anything else?

11   A.   Yes.

12   Q.   What did he say?

13   A.   I asked him if he knew a young lady by the name of

14   Vera who lived at 1711 East 15th Street, a Russian female, and

15   he told me, no, he didn't know anyone by the name of Vera, and

16   he didn't know anyone at that location.   I asked him if he

17   raped anyone at the location, and he told me, "No."

18             MR. GREENBERG:   Objection.

19             THE COURT:   Overruled.

20             MR. GREENBERG:   Your Honor, may I?

21             THE COURT:   Yes.

22             (Whereupon, the following proceedings were

23   held at sidebar:)

24             MR. GREENBERG:   Those are not the statements

25   that I was given notice of.

-WC-

Direct - Det. Harvin/Channapati

761

1          THE COURT:  That's true, and the Court agrees.

2   I've seen that statement many times.

3          MS. CHANNAPATI:  Okay.

4          (Whereupon, the following proceedings were

5   held in open court in the presence of the jury:)

6          THE COURT:  Ladies and gentlemen, there was an

7   objection, and the nature of the objection or the thrust of

8   the objection was this, the statement that the witness just

9   testified to was not the statement that the defense was

10  given notice of, and the Court has looked at what the

11  defense was given notice of, and, therefore, that statement

12  which was just made by the witness is ordered stricken from

13  the record and to be disregarded by the jury.

14          MR. GREENBERG:  Can you give the jury brief

15  information as to when a subject is stricken?

16          MS. CHANNAPATI:  Objection, your Honor.

17          THE COURT:  We'll cover that, Counsel.

18          We have already covered stricken from the

19  record, and we can re-enforce it.

20  Q.   Detective Harvin, would something refresh your

21  recollection as to what the defendant said to you that day?

22  A.   Yes.

23  Q.   Would a Statement Notice refresh your recollection?

24  A.   Yes.

25          MS. CHANNAPATI:  Your Honor, if this could be

Direct - Det. Harvin/Channapati

762

1    handed up to the witness.

2                    THE COURT:  Any objection, Counsel?

3                    The People want to hand up a statement notice

4    to refresh the witness's recollection.

5                    MR. GREENBERG:  As long as it's the same one I

6    received.

7                    THE COURT:  Why don't you check and make sure

8    that we're looking at the, that is, you and the People and

9    the witness will be looking at the same thing.

10                   That's now being handed up to the witness.

11   Q.    Is your recollection refreshed?

12   A.    Yes.

13   Q.    What else did the defendant say to you that day?

14   A.    That he did not know the victim, but he does patronize

15   Russian massage parlors in the area.

16   Q.    Now, did there come a point when you discussed with

17   him the taking of an oral swab?

18   A.    Yes, I did.

19   Q.    Could you please explain to the jury what an oral swab

20   is?

21   A.    An oral swab, it's similar to a Q-tip, a long version

22   of a Q-tip, and it's placed into the subject's mouth and

23   swabbed around for several minutes.

24   Q.    What is the purpose of taking an oral swab?

25   A.    For DNA comparison.

-WC-

Direct - Det. Harvin/Channapati

763

Q.   Now, in connection with this case, did you ever show him -- excuse me.   In connection with this discussion, did you ever show him a DNA consent form?

A.   Yes, I did.

MS. CHANNAPATI:   Your Honor, I'm showing it to defense counsel, and if this could be marked as People's No. 19 for identification.   It's a sheet of paper.

THE COURT:   The People are asking that that sheet of paper be marked as People's 19 for identification.

Q.   Have you had an opportunity to look at it, Detective Harvin?

A.   Yes, I have.

Q.   Do you recognize People's's 19 for identification?

A.   Yes.

Q.   What do you recognize it to be?

A.   The DNA consent form given to the defendant, Mr. Dennis Colon.

Q.   How do you recognize it?

A.   His signature and my information.

Q.   Is it in the same or substantially the same condition as it was on April 5th, 2003?

A.   Yes.

MS. CHANNAPATI:   Your Honor, I would ask that it be moved into evidence as People's 19?

THE COURT:   Any objection?

Direct - Det. Harvin/Channapati

764

1        MR. GREENBERG:  No.

2        THE COURT:  Moved into evidence, accepted and

3    admitted into evidence.

4    Q.    What did you do with this form?

5    A.    I gave the form to Mr. Dennis Colon to read, and I

6    explained to him the purpose of taking the DNA swab.

7    Q.    Did it appear to you that the defendant was reading

8    the form?

9    A.    Yes, he did.

10   Q.    Now, did you explain the purpose of the form?

11   A.    Yes.

12   Q.    What did you say?

13   A.    For consent of his DNA.

14   Q.    Did you explain the consequence of taking a swab?

15   A.    Yes.

16   Q.    What did you say?

17   A.    If his DNA is not found within the crime scene, then

18   he would be excluded as a subject in this case.

19   Q.    Did he ask you any questions at that point?

20   A.    No, he did not.

21   Q.    What did you do after you gave him the form?  What did

22   he do after you gave him the form?

23   A.    He read the form, and he signed the form.

24   Q.    Now, after he signed the form, what did you do?

25   A.    I took the DNA swab from Mr. Colon.

-WC-

Direct - Det. Harvin/Channapati

765

1   Q.   What did you do with the swab?

2   A.   I placed the swab into the corner of his mouth,

3   swabbed around for several minutes.  I did two swabs.

4   Q.   What did you do with the swabs afterward?

5   A.   I placed them back into the original envelope that

6   they came in, and I vouchered them at the Medical Examiner's

7   Office.

8   Q.   What number did you voucher it under?

9   A.   I don't remember the voucher number.

10   Q.   Would something refresh your recollection?

11   A.   Sure.

12          THE COURT:  The witness will look at paperwork

13   in an effort to refresh her recollection.

14          THE WITNESS:  One DNA swab was vouchered under

15   Larry-790223.

16   Q.   What did you do with it after you vouchered it?

17   A.   I vouchered it at the Medical Examiner's Office.

18   Q.   Now, did there come a point, after you talked about

19   doing the DNA swab, did there come a point where you talked to

20   the defendant about searching his apartment?

21   A.   Yes, I did.

22   Q.   Could you describe that conversation that you had with

23   him?

24   A.   I told him that the subject in this case had two items

25   that the victim can ID, and would it be okay if I get consent

Direct - Det. Harvin/Channapati

766

1   from him to search his residence.

2       Q.    In connection with this discussion, did you ever show

3   him a consent form?

4       A.    Yes, I did.

5               MS. CHANNAPATI:  I ask that this sheet of

6   paper be marked as People's No. 20 for identification and

7   shown to the witness.

8               THE COURT:  That sheet of paper is being

9   marked as People's 20 for identification.

10      Q.    Detective Harvin, do you recognize that?

11      A.    Yes, I do.

12      Q.    What do you recognize it to be?

13      A.    The form that was given to Mr. Colon on 4/5/03.

14      Q.    How do you recognize it?

15      A.    His signature, my signature, and the time and date.

16      Q.    Is it in the same or substantially the same condition

17  as it was on April 5th, 2003?

18      A.    Yes, it is.

19              MS. CHANNAPATI:  Your Honor, I would ask that

20  People's No. 20 be moved into evidence.

21              THE COURT:  Any objection?

22              MR. GREENBERG:  No.

23              THE COURT:  Into evidence.

24      Q.    What did you do with that form?

25      A.    Once he signed the form, I responded to his location.

-WC-

Direct - Det. Harvin/Channapati

767

```
 1      Q.   Well, did you -- you gave him the form?

 2      A.   Yes, I gave him the form.

 3      Q.   Did it appear to you he was reading the form?

 4      A.   Yes, he did.

 5      Q.   Did he ask you any questions?

 6      A.   No.

 7      Q.   What did you do after you gave him the form?  What did

 8 he do, I'm sorry, after you gave him the form?

 9      A.   He read the form, and he signed the form.

10      Q.   After he signed the form, what did you do?

11      A.   As far as?

12      Q.   With respect to after you had the consent, after you

13 had the consent to search.

14      A.   I went to his location.

15      Q.   What location was that?

16      A.   1323 East 16th Street, Apartment C-3.

17      Q.   Is that in Brooklyn?

18      A.   Yes, it is.

19      Q.   What did you do when you arrived?

20      A.   I arrived; his nephew answered the apartment door; I

21 showed him the consent form given by Mr. Colon; and he directed

22 me to the back bedroom.

23      Q.   Now, could you describe the appearance of the nephew

24 that you encountered at the location?

25      A.   His appearance as far as was he stable?
```

Direct - Det. Harvin/Channapati

768

1    Q.   No, can you give a description?

2    A.   Not basically, no.

3    Q.   Is there anything that would refresh your

4    recollection?

5    A.   Sure.

6              THE COURT:  Again, the witness will look at

7    paperwork in an effort to refresh her recollection.

8              THE WITNESS:  The only thing I have is that

9    the nephew's name was Mr. Nelson Santos, and he was present

10   at the location.

11   Q.   Now, did you go back to the bedroom that he indicated

12   to you?

13   A.   Yes, I did.

14   Q.   Why did you go to that bedroom?

15   A.   In search of the items that the victim described of

16   the perpetrator.

17             MR. GREENBERG:  Objection.

18             THE COURT:  The use of the word "victim."  The

19   complainant described of the perpetrator.

20   Q.   Now, did you see anything when you went into the

21   defendant's back bedroom?

22   A.   Yes, I did.

23   Q.   What did you see?

24   A.   I saw a knife and two black caps that was on the

25   dresser, top of the dresser.

Direct - Det. Harvin/Channapati

769

Q.   What did you do with that?

A.   I removed the items in the apartment.

Q.   Was it on top of the dresser?

A.   On top of the dresser.

MS. CHANNAPATI:  Your Honor, at this time I would ask if the witness could be shown People's 7-A, B, and C.

THE COURT:   7-A, B, and C are being gotten by the court officer, and it's being shown to the witness

Q.   Detective Harvin, do you recognize those?

A.   Yes, I do.

Q.   And what are they?

A.   These are the items that was removed from Mr. Colon's residence.

Q.   Do these photos fairly and accurately depict the items that you recovered from the defendant's apartment?

A.   Yes, it does.

Q.   Now, what did you do after you recovered these items?

A.   I responded back to my office, the Brooklyn Special Victims Squad.

Q.   Did there come a point that day that you conducted a lineup?

A.   Yes.

Q.   Could you please explain to the jury what a lineup is?

A.   A lineup consists of six people, the suspect and five

Direct - Det. Harvin/Channapati

770

1    other males that look similar in description to the subject.

2          Q.    When was that lineup conducted?

3          A.    At the Brooklyn Special Victims Squad.

4          Q.    At what time?

5          A.    At 21:10 hours.

6          Q.    What day was it?

7          A.    4/5/03.

8          Q.    Who viewed the lineup?

9          A.    The complainant.

10         Q.    Is that Vera Krioutchkova?

11         A.    Yes.

12         Q.    Where was the lineup done?

13         A.    At the Brooklyn Special Victim Squad.

14         Q.    Now, what are the other five people who were in the

15   lineup that are not defendants called?

16         A.    Fillers.

17         Q.    And who arranged this lineup?

18         A.    The lieutenant from the Brooklyn Special Victim Squad.

19         Q.    How did Vera Krioutchkova come to view the lineup?

20         A.    She was present at Brooklyn Special Victim Squad.

21         Q.    Was she brought there?

22         A.    Yes.

23         Q.    And who brought her there?

24         A.    I don't remember.

25         Q.    Was it members of the Special Victim Squad?

Direct - Det. Harvin/Channapati

1      A.   Yes.

2      Q.   Now, when Vera arrived at the Brooklyn Special Victim

3  Squad, where was the defendant?

4      A.   In the holding cell area.

5      Q.   Now, from the way Vera entered Brooklyn Special Victim

6  Squad, would she have been able to see the defendant in that

7  holding cell?

8      A.   No.  She was placed on the opposite side of the room.

9      Q.   Now, where were the fillers kept in the Brooklyn

10  Special Victim Squad?

11      A.   In the holding cell with the subject.

12      Q.   When she entered, would she have been able to see the

13  fillers?

14      A.   No.

15      Q.   Where was Vera when the defendant and the fillers were

16  being prepared?

17      A.   She was on the other side of the building, Special

18  Victim Squad.

19      Q.   Is it an open or closed area?

20      A.   Closed area.

21      Q.   Were the fillers and the defendant ever in the same

22  area as she was before she viewed the lineup?

23      A.   No.

24      Q.   Did you at any point record how the lineup appeared?

25      A.   Yes.

Direct - Det. Harvin/Channapati

772

Q.   How did you do that?

A.   By photo.

MS. CHANNAPATI:  Your Honor, at this time I would ask if the following two photos could be marked as People's 21-A and 21-B.

THE COURT:  21-A and 21-B are being shown to the defense.

MR. GREENBERG:  I've seen them.

THE COURT:  All right.  So they are being marked as 21-A and 21-B.

Q.   Detective Harvin, do you recognize those photos?

A.   Yes, I do.

Q.   What do you recognize them to be?

A.   That's the photos that were taken on 4/5/03 before the lineup.

Q.   Do these photos fairly and accurately depict what the lineup looked on April 5th, 2003?

A.   Yes, it does.

MS. CHANNAPATI:  At this time I would move to offer into evidence the photos of 21-A and B?

THE COURT:  Any objection?

MR. GREENBERG:  No.

THE COURT:  Admitted into evidence.

Q.   What position was the defendant in in the lineup?

A.   No. 5.

Direct - Det. Harvin/Channapati

773

Q.    How many fillers were there?

A.    Five.

Q.    If you know, why were those particular fillers chosen?

A.    Because they fit, basically, the same description as the subject.

Q.    Now, referring to the photos, are the men, did the men all have the same article of clothing on?

A.    No, they do not.

Q.    Do they have hats on?

A.    Yes.

Q.    Why are they all wearing hats, if you know?

A.    Because the victim was able to ID it.

MR. GREENBERG:  Objection

THE COURT:  The use of the word, it should be complainant.

THE WITNESS:  Complainant.  Excuse me.

THE COURT:  The testimony was because the complainant was able to identify the hat.

Q.    Now, how did Vera view the lineup?  Where was she situated?

A.    She was situated in a room adjoined to the holding cell.

Q.    How was she able to view the lineup?

A.    Through a small window.

Q.    Were you in the room with her?

-WC-

Direct - Det. Harvin/Channapati

774

1    A.    Yes, I was.

2    Q.    Was anyone else in the room with her?

3    A.    Yes.

4    Q.    Who else?

5    A.    My supervisor, Lieutenant Alonge.

6    Q.    Did you say anything to Vera?

7    A.    Yes.

8    Q.    What did you say?

9    A.    I explained to her that there was six males behind

10   through the window, and I needed for her to tell me if she

11   recognized anyone, and where would she recognize them from.

12   Q.    Did Lieutenant Alonge say anything to Vera?

13   A.    No, he did not.

14   Q.    How long did she view the lineup?

15   A.    Approximately two to three minutes.

16   Q.    Now, with respect to the property that you recovered

17   from the apartment, what did you do with it?

18   A.    I'm not --

19   Q.    With respect to the knife and the hats that you

20   recovered from the apartment, the defendant's apartment, what

21   did you do with that property.

22   A.    I took photos of the property, and I don't recall if I

23   showed the complainant the actual property or the photos of the

24   property.

25   Q.    What did you believe that you did?

-WC-

Direct - Det. Harvin/Channapati

775

1    A.   I think I showed her photos of the property.

2    Q.   Did she say anything to you when you showed it to her?

3    A.   Yes.

4    Q.   What did she say?

5    A.   She ID'd the hat and the knife.

6    Q.   Where did she ID them from?

7    A.   The items that the subject had when he responded to

8    the apartment.

9    Q.   Now, do you know what happened to the hat and the

10   knife since you vouchered them?

11   A.   I learned from the Property Clerk's Office that the

12   property was destroyed.

13   Q.   Do you know why it was destroyed?

14   A.   There was a mistake on the voucher.  Instead of arrest

15   evidence, investigation evidence was checked off.

16   Q.   And as a result of it being checked off as

17   investigation evidence, what happened?

18   A.   They said they only hold the property for two years.

19   After two years, it's destroyed.

20        MS. CHANNAPATI:  Nothing further, your Honor.

21        THE COURT:  All right.

22   CROSS EXAMINATION

23   BY MR. GREENBERG:

24   Q.   Good morning, Detective.

25   A.   Good morning.

-WC-

Cross - Det. Harvin/Greenberg

776

1          THE COURT:  Just a minute, Counsel.  We're

2     having that little interference.  Can the court officer see

3     if we can turn it down.  I think it's the mikes.

4          Go ahead, Counsel.

5     Q.   You indicated that you gave Mr. Colon his Miranda

6     rights; is that correct?

7     A.   Yes, sir.

8     Q.   During that process, was Mr. Colon cooperative with

9     you?

10    A.   Yes, he was.

11    Q.   When officers from or detectives from your unit went

12    to Mr. Colon's residence and they brought him back to your

13    office, was there any indication that he was not cooperative

14    with them?

15    A.   No, there wasn't.

16    Q.   You indicated that you took two swabs from the inside

17    of Mr. Colon's mouth; is that correct?

18    A.   Yes, it is.

19    Q.   You read him a consent form, or he read the consent

20    form; is that correct?

21    A.   He read the consent form.

22    Q.   After reading the consent form, did he consent?

23    A.   Yes, he did.

24    Q.   During that procedure, was Mr. Colon cooperative with

25    you?

-WC-

Cross - Det. Harvin/Greenberg

777

1     A.    Yes, he was.

2     Q.    You then indicated that you had a discussion with Mr.

3    Colon regarding the property that was allegedly used in this

4    incident; is that correct?

5     A.    Yes.

6     Q.    You asked whether or not you could search his

7    apartment; correct?

8     A.    Yes.

9     Q.    You asked for his consent; is that correct?

10    A.    Yes.

11    Q.    And he consented, didn't he?

12    A.    Yes, he did.

13    Q.    When he filled out the paperwork with respect to that

14   consent, he was cooperative; correct?

15    A.    Yes.

16    Q.    At some point you had a discussion with the building

17   manager, a Guy Gasibson (phonetic); is that correct?

18    A.    Yes.

19    Q.    You also spoke with the landlord who, I believe, was

20   Guy Schebovitz?

21    A.    Yes.

22    Q.    As a result of your conversation with Guy Gasibson

23   (phonetic), did you ever -- and throughout your

24   investigation -- did you ever learn any connection between

25   Mr. Colon and Guy Gasibson (phonetic)?

Cross - Det. Harvin/Greenberg

778

1    A.    No, I did not.

2    Q.    Did you ever learn whether or not Mr. Colon knew Guy

3  Gasibson (phonetic)?

4    A.    No.

5    Q.    Did you ever learn whether or not Mr. Colon had any

6  connection to the maintenance or running of the building at

7  1711 East 15th Street?

8    A.    No.

9    Q.    You spoke with, again, Detective, Guy Schebovitz, who

10  was the landlord?

11    A.    Yes.

12    Q.    Did you ever learn whether or not there was any

13  connection between Mr. Colon and Guy Schebovitz?

14    A.    No.

15    Q.    Did any of the maintenance people that you spoke with,

16  as a result of your investigation, indicate whether or not they

17  knew Dennis Colon?

18    A.    No, they did not.

19    Q.    The first time you spoke with Vera Krioutchkova was at

20  Coney Island Hospital; is that correct?

21    A.    Yes.

22    Q.    When you spoke with her, you took notes?  Did you take

23  notes?

24    A.    I can't recall.

25    Q.    Well, when you're conducting your investigation, do

Cross - Det. Harvin/Greenberg

779

1   you carry a note pad or spiral notebook?

2       A.   Sometimes I do.  Sometimes I don't.

3       Q.   Do you recall whether or not when you spoke with Vera

4   Krioutchkova at Coney Island Hospital whether or not you were

5   taking any notes?

6       A.   I don't recall.

7       Q.   As result of your conversation with Ms. Krioutchkova,

8   you filled out an initial complaint form?

9       A.   No.  The complaint, the police report form is filled

10  out by the uniformed police officers.

11      Q.   Did you fill out a complaint followup?

12      A.   Yes.

13      Q.   Which was your initial -- which was, basically, the

14  sum and substance of your initial interview with Vera

15  Krioutchkova?

16      A.   Yes.

17      Q.   Now, part of your job is documenting your

18  investigation; is that correct?

19      A.   Yes. it is.

20      Q.   It's important for you to be careful when you fill out

21  your notes; isn't that correct?

22      A.   Yes.

23      Q.   You try to fill out your notes accurately; isn't that

24  correct?

25      A.   Yes, it is.

-WC-

Cross - Det. Harvin/Greenberg

780

Q.   You know that at some point your notes are going to be
important, because they are going to help you refresh your
recollection possibly at trial; isn't that correct?

A.   Yes.

Q.   You try to make your notes as complete with detail as
possible; isn't that correct?

A.   Yes.

Q.   Do you recall writing down anywhere that Ms.
Krioutchkova told you that the knife had a funny design?

A.   I don't recall.

Q.   Is there something that might refresh your
recollection?

A.   Yes, there is.

Q.   Would that be the initial complaint?

A.   It's the initial complaint, but I don't recall if she
told me.

Q.   Will your initial complaint help refresh your
recollection as to whether or not you wrote it down?

A.   Yes, it would.

          THE COURT:  The defense is handing up a copy
of that item.  She's referring to.

Q.   Have you had an opportunity to review that document?

A.   Yes, I have.

Q.   Can I have that back.

          Did you write down anywhere that the knife had a funny

1    design on the handle?

2       A.   No, I did not.

3       Q.   Do you recall -- do you know who the initial District

4    Attorney who was assigned to this case was?

5                  MS. CHANNAPATI:  Objection, your Honor.

6                  THE COURT:  Let's approach.

7                  (Whereupon, the following proceedings were held

8        at sidebar:)

9                  THE COURT:  All right.  We're in the presence

10   of the jury, but out of the hearing of the jury.

11                 Now, defense is obviously going to go into

12   those areas that he raised before about Ms. Mason and Ms.

13   Colon.

14                 Where are you going?

15                 MR. GREENBERG:  Just whether or not she told

16   Ms. Mason that the knife was never identified.

17                 MS. CHANNAPATI:  How is that relevant?

18                 THE COURT:  He can ask that.

19                 (Whereupon, the following proceedings were

20       held in open court in the presence of the jury:)

21                 THE COURT:  The objection is overruled.

22      Q.   Do you recall the previous Assistant District Attorney

23   assigned to this case Heidi Mason?

24      A.   Yes, I do.

25      Q.   She was the person that you spoke with at the

-WC-

Cross - Det. Harvin/Greenberg

782

1    beginning -- withdrawn.

2            She was the assistant that you spoke with shortly

3    after the arrest of Mr. Colon; isn't that correct?

4        A.    No, it's not.

5        Q.    Did you speak with her at some point?

6        A.    Yes, I did.

7        Q.    Did you tell Ms. Mason that a weapon was recovered at

8    the time of the arrest, but was not identified by the

9    complainant?

10       A.    I don't recall.

11       Q.    Will something refresh your recollection?

12       A.    Sure.

13            THE COURT:   Again, the defense is handing

14    up -- what are you handing up?

15            MR. GREENBERG:   I'm handing up the notice

16    documents provided to me by the District Attorney's Office.

17            THE COURT:   Notice documents provided by the

18    People.

19            THE WITNESS:   I don't recall.

20       Q.    Have you had an opportunity to look at that?

21       A.    Yes, I have.

22       Q.    Do you recall now -- can I have that back, please.

23            Do you recall now telling Ms. Mason that a knife was

24    recovered at the time, but was not identified by the

25    complainant?

Cross - Det. Harvin/Greenberg

783

1      A.    No, I do not.

2      Q.    On March 26th after you interviewed Vera Krioutchkova,

3   did you go back to 1711 East 15th Street?

4      A.    Yes, I did.

5      Q.    Approximately what time did you, if you recall, what

6   time did you get there?

7      A.    I can't recall.

8      Q.    How long did you stay in that apartment?

9      A.    I can't recall.

10     Q.    When you arrived at that location, were there any

11  police officers there?

12     A.    Yes.  There was a uniformed cop guarding the crime

13  scene.

14     Q.    Do you know, when you left, was the uniformed police

15  officer still guarding the crime scene?

16     A.    Yes.

17     Q.    In your experience, how long do they stay at the

18  location?

19     A.    Until the crime scene is processed by the New York

20  City Crime Scene Unit.

21     Q.    How long does that usually take?

22     A.    It depends on how busy of a day it is for the Crime

23  Scene Unit.

24     Q.    Do you know how long they were there on March 26th,

25  2003?

Cross - Det. Harvin/Greenberg

784

1      A.    No, I do not.

2      Q.    Did you ever recover an answering machine from Ms.

3   Krioutchkova's apartment?

4      A.    No, I did not.

5      Q.    Did Ms. Krioutchkova ever tell you to listen to

6   anything on an answering machine?

7      A.    I don't recall.

8      Q.    After your initial conversation with Ms. Krioutchkova,

9   did you ever interview her again?

10      A.    Yes, I did.

11      Q.    When was that?

12      A.    Some unknown time on March 26th.

13      Q.    So sometime after the initial interview?

14      A.    After she was released from the hospital.

15      Q.    You spoke with her again.  Where did you interview

16   her?

17      A.    At the Brooklyn Special Victims Squad.

18      Q.    Did you fill out the voucher for the knife and the

19   hat?

20      A.    I don't recall.

21      Q.    After you went back to the apartment, you said you

22   went to another location; isn't that correct?

23      A.    Yes, I did.

24      Q.    And that was 901 Avenue H; correct?

25      A.    Yes.

Cross - Det. Harvin/Greenberg

785

1    Q.    You indicated that you investigated a particular

2  apartment in that building; is that correct?

3    A.    Yes.

4    Q.    If I'm correct, you indicated that no one was home at

5  that apartment; is that correct?

6    A.    Yes.

7    Q.    When you went to the apartment, did you knock on the

8  door?

9    A.    Yes, I did.

10   Q.    And no one approached?

11   A.    Nobody came to the door, yes.

12   Q.    No one came to the door.  Did you hear anybody in the

13  apartment?

14   A.    Yes, I did.

15   Q.    So there was somebody home; isn't that correct?

16   A.    Someone home, but nobody came to the door.

17   Q.    So when you said that nobody was home, you meant that

18  you didn't get a response; isn't that correct?

19   A.    Yes.  I was unable to interview anyone inside the

20  apartment.

21   Q.    So isn't it true that someone came and looked through

22  the peephole?

23   A.    I observed someone looking through the peephole, but

24  they didn't open the apartment door.

25   Q.    Did you ask them to open the apartment door?

-WC-

Cross - Det. Harvin/Greenberg

786

1    A.    No, I did not.

2    Q.    Did you tell them who you were?

3    A.    Yes.

4    Q.    Did you have a cellphone with you at the time?

5    A.    No, I did not.

6    Q.    Did your partner have a cellphone?

7    A.    No.

8    Q.    You didn't call the apartment?

9    A.    No, I did not.

10   Q.    From out outside the door?

11   A.    I don't recall.

12   Q.    Would something refresh your recollection?

13   A.    Yes.

14         THE COURT:  Again, the defense is handing up a

15   document to the witness to be reviewed.

16         THE COURT:  What is it defense?

17         MR. GREENBERG:  It's a complaint followup.

18         THE COURT:  All right.

19   Q.    Does that refresh your recollection as to whether or

20   not you made a phone call at the front door?

21   A.    Yes, it does.

22   Q.    And did you?

23   A.    I guess, I did.

24   Q.    Did you hear the phone ring on the other side of the

25   door?

Cross - Det. Harvin/Greenberg

787

1    A.    I don't recall.

2    Q.    Does it state that you heard the phone ringing?

3              THE COURT:   Again --

4    Q.    Let this refresh your recollection.

5              THE COURT:   -- the lawyer is handing that up.

6    Q.    Did you hear the phone ring on the other side of the

7  door?

8    A.    Yes, I did.

9    Q.    You heard voices on the other side of the door; isn't

10  that correct

11    A.    Yes.

12    Q.    After you got no response, what did you do?

13    A.    I don't recall.

14    Q.    Did you leave?

15    A.    No, I canvassed the building.

16    Q.    After you canvassed the building, did you then leave?

17    A.    I spoke to the tenants on the 4th floor.

18    Q.    Well, you said you canvassed the building.

19    A.    Right.

20    Q.    After you canvassed the building and spoke to the

21  tenants, did you leave?

22    A.    Yes, I did.

23    Q.    Did you ever return to that apartment?

24    A.    Yes, I did.

25    Q.    When did you return to that apartment?

-WC-

Cross - Det. Harvin/Greenberg

788

1    A.    That particular night.

2    Q.    At this time did you get a response from that

3    apartment?

4    A.    No, I did not.

5            (Whereupon, Deborah Rothrock replaced William

6    Cardenuto as the Official Court Reporter.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Whereupon, Deborah Rothrock replaced Bill

2     Cardenuto as the Official Court Reporter. )

3          THE COURT:   Continue counsel.

4     CROSS-EXAMINATION

5     BY MR. GREENBERG:

6          Q    When you went back to the apartment and knocked on

7     the door, did you get a response?

8          A    No, I did not.

9          Q    Did you hear anybody behind the door?

10         A    No, I did not.

11         Q    Did you do anything else with respect to that

12    apartment and place during the course of your investigation?

13         A    No, I did not.

14         Q    Could you tell me what a Nitro check is?

15         A    It's an address check of a location to find out if

16    any drug activity or any other type of criminal activity is

17    going on.

18         Q    I'm sorry?

19         A    An address check with the Nitro Unit, which consists

20    of a police drug unit in the police department to find out if

21    any activity at the location is going on.

22         Q    It is not only for drugs, is it?

23         A    No, any type of criminal activity.

24         Q    And did you run a Nitro check on 1711 East 15th

25    Street?

Cross/Det. Harvin/Mr. Greenberg                    790

1      A    I don't recall, but I think a member of Special

2  Victim's Squad.

3      Q    And at some point were you advised that --

4                MS. CHANNAPATI:  Objection, your Honor.

5                THE COURT:  He hadn't asked the question yet.

6  Let him finish the question.

7      Q    At some point were you advised that there was a

8  complaint for prostitution in 1711 East 15th Street?

9                MS. CHANNAPATI:  Objection, your Honor.

10                THE COURT:  Let's approach.

11                (Whereupon, a bench conference took place

12  between counsel and the Court.)

13                THE COURT:  Actually, it is time for a little

14  break anyway.

15                The jury can step out.

16                Please do not discuss the case.  We will have a

17  discussion off the record.

18                Have a seat counsel.

19                (Whereupon, the jury exits the courtroom and the

20  following is heard outside the presence and hearing of the

21  jury.)

22                THE COURT:  All right.

23                The jury has left the room.  The witness may

24  also step down.

25                The witness will still be under oath so please

-Proceedings-                                791

1    do not discuss anything with the People.

2            (Witness exits the courtroom.)

3            THE COURT:  Let the record show that the witness

4    has now left the room.  The jury previously exited.

5            The Court felt it better for us to hear-- I

6    don't know how lengthy this discussion will be, but it is

7    an issue that certainly the Court was not prepared for.

8    Let's hear about it.

9            Defense was asking with regard to the premises

10   where the complainant lived was there a report of

11   prostitution at that location and the People objected.

12           MS. CHANNAPATI:  Your Honor, it is not where the

13   complainant lived.  It is the building.

14           THE COURT:  I said the address.

15           MS. CHANNAPATI:  Right, the apartment.

16           THE COURT:  I did not say her apartment.

17           MS. CHANNAPATI:  Okay.

18           THE COURT:  I said the address, meaning the

19   building.

20           MS. CHANNAPATI:  That's why I think it is

21   irrelevant.  It is not her apartment.  It is another

22   apartment in that building.  I don't think it is probative

23   in any way.  I don't think it is relevant that he bring

24   out the fact there was a prosecution closed complaint for

25   an apartment that is not the victim's apartment.  It is an

DAR

1    apartment not related to anything in evidence.

2              THE COURT:   Fine.   Let me hear from the

3    defendant.

4              MR. GREENBERG:   Part of their investigation is

5    certainly relevant because it certainly was something that

6    the detectives were contemplating early in the

7    investigation.

8              It leads to potentially probative evidence that

9    there was at least prostitution within this building.   And

10   that that would be consistent with the statement that Mr.

11   Colon made to Detective Harvin.

12             THE COURT:   People.

13             MS. CHANNAPATI:   The statement says that he

14   frequents Russian Brothels.

15             THE COURT:   Massage parlor.

16             MS. CHANNAPATI:   I am sorry.   I apologize.

17   Massage parlor.

18             He says he did not know anyone at that location.

19   It is not consistent with the defendant's statement.

20   Purely inflammatory and not probative of anything.   It is

21   not relative to anything.   It is not about her apartment,

22   it is about another apartment in the building.

23             THE COURT:   Well, of course I don't know that

24   yet.

25             It appears to the Court that the defendant is

                            DAR

1    entitled to probe into these areas based upon what I have

2    heard.

3                    MR. GREENBERG:  Thank you.

4                    THE COURT:  So that is the ruling of the Court.

5    When the jury is ready we'll bring them out.

6                    Let me know when they are ready and we will get

7    the witness.

8                    We will take a longer minute.

9                    (Recess taken.)

10                   THE COURT:  Are we ready to proceed?  Hearing no

11   negative we can call the witness back.

12                   THE COURT OFFICER:  Witness entering.

13                   THE COURT:  Obviously we can coordinate and get

14   the jury.

15                   THE COURT OFFICER:  Yes, sir.

16                   (Pausing.)

17                   THE COURT OFFICER:  Ready for the jury?

18                   THE COURT:  Yes, we are.

19                   THE COURT OFFICER:  Jury entering.

20                   (Whereupon, the jury enters the courtroom and

21   the following is heard inside the hearing and presence of

22   the jury.)

23                   THE COURT OFFICER:  Case on trial continued.

24   Both sides waive the formal reading of the jury roll call?

25                   MS. CHANNAPATI:  Yes.

1        MR. GREENBERG:  Yes.

2        THE COURT:  Thank you.

3        We take up where we were.  The objection is

4    overruled.  Continue.

5        THE COURT OFFICER:  Detective, I remind you, you

6    are still under oath.

7        THE COURT:  Thank you.

8        THE WITNESS:  Yes.

9    CONTINUED

10   CROSS-EXAMINATION

11   BY MR. GREENBERG:

12   Q    During the course of your investigation, during the

13   course --

14        MR. GREENBERG:  I am sorry.  Could you read back

15        the last question.

16        THE COURT:  Defense is asking to read back the

17        last question.

18        (QUESTION READ.)

19   Q    Were you advised of a prostitution complaint in 1711

20   East 15th Street?

21   A    Yes.

22   Q    And did you investigate that complaint for

23   prostitution?

24   A    No, I did not.

25   Q    Did you become aware of any other -- through your

1    canvassing of the building, did you became aware of any other

2    complaints for prostitution in that building?

3        A    I don't recall.

4        Q    I am going to bring you back to when you went into --

5    when Mr. Colon consented for you to enter into his apartment.

6             After you obtained his consent, you then left your

7    office?

8        A    Yes, I did.

9        Q    And you arrived at his apartment, correct?

10       A    Yes.

11       Q    And when you entered the apartment, Mr. Colon's

12   nephew was there?

13       A    Yes.

14       Q    And you showed him Mr. Colon's consent form, correct?

15       A    Yes.

16       Q    And then he allowed you to search Mr. Colon's

17   apartment, correct?

18       A    Bedroom, yes.

19       Q    And when you found the knife and the hat, they were

20   on a dresser?

21       A    Yes.

22       Q    And they were on top of the dresser?

23       A    Yes.

24       Q    And they were opened for anyone who walked into that

25   room to see?

1     A     Yes.

2     Q     You did not have to search the apartment or the room

3   to find those items; is that correct?

4     A     That's correct.

5     Q     Now, when you interviewed Mr. Colon and he gave you

6   his pedigree information, his name and address, he was

7   cooperative with you, correct?

8     A     Yes.

9     Q     And then he made a statement to you that he

10  patronized Russian massage parlors in the area of 15th Street;

11  is that correct?

12    A     He didn't tell me in the area.  But he told me he

13  patronized Russian massage parlors.

14              MR. GREENBERG:  I have nothing further.

15              THE COURT:  Anything from the People on

16    Re-direct?

17              MS. CHANNAPATI:  Yes, your Honor.

18  RE-DIRECT EXAMINATION

19  BY MS. CHANNAPATI:

20    Q     With regard to the apartment at 901 Avenue H,

21  Apartment 4K, did you later ascertain through your

22  investigation whether anyone in that apartment had anything to

23  do with the attack on Vera Krioutchkova on March 26, 2003?

24    A     Yes, I did.

25    Q     What did you ascertain?

Re-Direct/Det. Harvin/Ms. Channapati                    797

1     A    Nobody in that apartment had anything to do with an

2     attack on Vera Krioutchkova.

3     Q    With respect to the Nitro check, with respect to what

4     defense was asking you about, questions about, did you

5     complete a complaint follow-up information with regard to that

6     Nitro check?

7     A    I did not complete it, but another member of the

8     Special Victim's Squad did.

9     Q    Would that refresh your recollection as to what you

10    learned?

11    A    Yes.

12         MS. CHANNAPATI:  Your Honor, at this time, I

13    would ask if this Witness Complaint Follow-up could be

14    handed up to the witness.

15         THE COURT:  Handing up is the Witness Complaint

16    Follow-up in an attempt to refresh the recollection

17    regarding the last question.

18         (Handing. )

19    Q    Does that refresh your recollection?

20    A    Yes, that form was typed by Detective Figeroua.

21    Q    Now, when the Nitro check was conducted, okay, what

22    did you specifically learn about anything about apartment 1-A?

23    A    Nothing.

24    Q    Nothing.

25         So there was nothing coming -- there were no

1    complaints or arrests?

2                    MR. GREENBERG:  Objection, your Honor.

3                    MS. CHANNAPATI:  For clarification.

4              THE COURT:  Leading form of question.

5        Q    Okay.  For clarification.

6              When you say that you learned nothing, what do you

7    mean by that?

8        A    No type of criminal activity from Apartment 1-A.

9        Q    No type.  Just so that everyone is clear, does that

10   mean no type of criminal activity was reported?

11       A    Yeah.

12       Q    And does it also mean no type of no arrests came out

13   of that apartment?

14       A    Yeah.

15       Q    Now, and what apartment again did Vera Krioutchkova

16   live?

17       A    1-E

18       Q    Now, with respect to that Nitro check and this

19   complaint of prostitution, what apartment did that complaint

20   pertain to?

21       A    Three Adam, 3-A.

22       Q    3-A.  And was it an open complaint?

23       A    I'm not sure.

24       Q    Would that refresh your recollection?

25       A    It doesn't state it here if it was open or not.