1     Q     If you could just take a look?

2     A     (Pausing).  It is a closed complaint.

3     Q     What does it mean when it is a closed complaint?

4     A     Either the allegation was unfounded or there was

5  no -- or there was an arrest made and the case is closed.

6     Q     Now, does it indicate there was an arrest made in the

7  Nitro check?

8     A     It did not have any arrests.

9     Q     Was it just a closed complaint?

10     A     Yes.

11     Q     Now, would there be any reason why you would have to

12  go and do an investigation on a closed complaint for

13  prostitution?

14     A     No.

15                 MR. GREENBERG:  Objection.

16                 THE COURT:  Overruled.  The answer was no.

17     Q     Now, the statement that the defendant made, he said

18  that he frequented Russian Massage parlors?

19     A     Yes, he did.

20                 MR. GREENBERG:  Objection to the form of the

21     question.

22                 THE COURT:  Overruled.

23     Q     I am directing your attention to the statement that

24  the defendant made to you.

25                 Do you remember defense attorney asking you the

1  question that the defendant said that he frequents Russian

2  massage parlors?

3      A    Yes, I do.

4      Q    Is that the only thing that the defendant said to you

5  that day?

6      A    No, it's not.

7      Q    What else did he say?

8      A    In regard to Russian massage parlors?

9      Q    No.  I am talking about the entire statement?

10     A    Okay.

11         He told me he did not know the complainant.  He

12  didn't know anyone that lived at that location.  He frequented

13  Russian massage parlors and sometimes he meets the females

14  for --

15              MR. GREENBERG:  Objection.

16              THE COURT:  Sustained.

17              MS. CHANNAPATI:  Thank you very much.

18              Nothing further.

19              THE COURT:  Anything from defense further.

20              MR. GREENBERG:  Yes, your Honor, one moment.

21  RE-CROSS EXAMINATION

22  BY MR. GREENBERG:

23     Q    Just drawing your attention to 901 Avenue H.

24         Once you went to the apartment for the second time

25  that day, did you ever discover who lived in that apartment?

**DAR**

Re-Cross/Det. Harvin/Mr. Greenberg                    801

1      A      I was informed by the super the first time of the

2  name of the tenant that resided at the apartment.

3      Q      And isn't it true that that super told you that the

4  tenant had sublet the apartment?

5      A      Yes.

6      Q      And that there were people who were living in that

7  apartment that were not the tenant?

8      A      Yes.

9      Q      And did you ever discover who those people were?

10     A      No.

11     Q      Did you ever discover what those people were using

12 that apartment for?

13     A      No.

14     Q      But you did discover that they spoke Russian

15 language; is that correct?

16     A      Yes.

17     Q      And that was the last phone call that came into Mr.

18 Krioutchkova's apartment prior to the incident; is that

19 correct?

20     A      Yes.

21     Q      You didn't investigate into the complaint, the

22 prostitution complaint, did you?

23     A      No, I did not.

24     Q      You didn't discover anything about what that --you

25 didn't discover anything with respect to that complaint, did

Case 1:10-cv-02173-NGG-LB   Document 4-7   Filed 07/27/10   Page 4 of 96 PageID #: 545

1    you?

2         A    No, I didn't.

3         Q    Did you ever discover the name of the person who the

4    complaint was about?

5         A    No.

6                   MR. GREENBERG:  No further questions.

7                   THE COURT:  People.

8                   MS. CHANNAPATI:  One moment, your Honor.

9                   (Pausing).

10                  MS. CHANNAPATI:  Nothing your Honor.

11                  THE COURT:  Nothing further.  The witness may

12   step down.

13                  (Witness exits the courtroom.)

14                  THE COURT:  Would the attorneys approach.

15                  (Whereupon, a bench conference took place

16   between counsel and the Court.)

17                  THE COURT:  People, you have a witness.

18                  MS. CHANNAPATI:  Yes, your Honor.

19                  The People call Alice Olosunde.

20                  THE COURT OFFICER:  Witness entering.

21                  THE CLERK:  Raise your right hand.

22                  A L I C E  O LO S U N D E, called as a witness,

23   having been first duly sworn by the clerk of the court,

24   was examined and testified as follows:

25                  THE WITNESS:  Yes.

**DAR**

1        THE CLERK:  Please be seated.

2        In a very loud clear voice, please state your

3    full name and occupation.

4        THE WITNESS:  My name is Alice Olosunde.  I am a

5    certified nurse mid-wife.

6        THE CLERK:  Could you spell your last name?

7        THE WITNESS:  O L O S U N D E.

8        THE COURT:  People, you may proceed.

9        MS. CHANNAPATI:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. CHANNAPATI:

12   Q    Ms. Olosunde, what is your occupation?

13   A    I'm a certified nurse mid-wife.

14   Q    And where are you currently working?

15   A    I'm wringing at Coney Island Hospital.

16   Q.   How long have you worked there?

17   A    I've worked for there since 1994.

18   Q    What is your current position there?

19   A    Director of Mid-Wife Services.

20   Q    And where did you work previously?

21   A    Well, I began my career as a mid-wife from New

22   Jersey, the University of Medicine and Dentistry where I

23   worked as clinical staff and taught mid-wifery for five years.

24   Q    And what years?

25   A    From 1979 through '84.

1      Q      And after that where did you work?

2      A      I worked at Columbia University UFCC Neighborhood

3   Family Care Center/Wood haul Hospital as a certified nurse

4   mid-wife also.

5      Q      What are your duties and responsibilities?

6      A      I examine --I provided women's health, which included

7   gynecology and obstetrics, took care of them through

8   pregnancy, delivered their babies at times.

9      Q      After that where did you work?

10      A      I went on to work at Coney Island Hospital from 1984

11   through -- excuse me from 1988 through 1991.

12      Q      And what was your responsibility?  What was your

13   position and responsibility?

14      A      Certified nurse mid-wife also.

15      Q      And what were your responsibilities?

16      A      Provided woman's health care, OB-GYN, family planning

17   care.

18      Q      After that where did you work?

19      A      I worked at St. Mary's Hospital and Interfaith Group

20   which is part of the Catholic Medical Center.

21      Q      What is your position?

22      A      Staff mid-wife also/chief mid-wife.

23      Q      And what was your responsibility there?

24      A      Also providing woman's health care, which included

25   OB-GYN, family planning.

1        Q      Okay.

2               And after that where did you work?

3        A      I returned to Coney Island Hospital as Director of

4    Mid-Wife Services.

5        Q      What are your responsibilities as the Director of

6    Mid-wife Services?

7        A      My responsibilities included -- include at this point

8    taking care of patients.  I'm in the clinical situation as

9    well as handling a bunch of mid-wives.

10       Q      Are you responsible for supervising the mid-wives?

11       A      Yes, I do.

12       Q      Do you train them on occasion?

13       A      Yes.

14       Q      Now what schools did you attend?

15       A      I had my Bachelor of Science Degree from the Long

16   Island University Brooklyn campus 1972 through '76.

17       Q      Okay.

18       A      I attended Columbia University Teacher's College from

19   '76 through '77.  And then --

20       Q      I am sorry.

21              Before you go on, what degree did you receive at

22   Columbia?

23       A      Master of Arts in teaching of nursing.

24       Q      And what else?

25       A      Then I went to Columbia University School of

1   Mid-wifery where I received my Master of Science in

2   Mid-wifery.

3        Q    What year was that?

4        A    1979.

5        Q    Now, where did you do your internship or your

6   clinical integration program?

7        A    Well, the integration program was at Downstate

8   Medical Center.

9        Q    Okay.

10        And after graduating with these degrees, did you take

11   up further specialized training?

12        A    Yes.  As a certified nurse mid-wife I am expected to

13   have continuing education credits, which I did.  And then of

14   course I received training for forensic examination.

15        Q    And what do you mean forensic examination?  What

16   specifically did you receive training in?

17        A    I received training in sexual assault forensic

18   examination.

19        Q    Now, are you licensed as a nurse practitioner in the

20   state?

21        A    Yes, I am.

22        Q    When did you receive that license?

23        A    I believe it was 1990.

24        Q    Are you board certified?

25        A    Yes, I am.

```
1       Q      When did you become board certified?

2       A      1979.

3       Q      In what field?

4       A      In mid-wifery.

5       Q      Now, in the course of your professional career, have

6   you ever had cause to treat patients whose chief complaint was

7   rape?

8       A      Yes.

9       Q      And approximately how many patients?

10      A      I would say about 20.

11      Q      And when did you become -- when did you receive the

12  specialized training for the sexual assault examination?

13      A      2002.

14      Q      So you have seen-- the number that you just gave,

15  approximately 20, is that since 2002?

16      A      Yes.

17      Q      Do you teach?

18      A      Yes, I do teach.

19      Q      Where did you teach?

20      A      Right now I am teaching as clinical receptor within

21  the hospital, teaching various mid-wife students, PA students,

22  medical students.

23      Q      And what topics do you teach?

24      A      Clinical OBGYN, family planning, woman's health.

25      Q      Now, you continued to take classes as continuing
```

1    education?

2        A    Yes.

3        Q    Do you do anything else to keep current in your

4    field?

5        A    Yes, I read medical journals, mid-wifery journals,

6    medical journals.

7        Q    Now, did you ever receive additional certification as

8    a sexual assault forensic examiner?

9        A    Yes, I am currently certified by the New York State

10   Department of Health Sexual Assault Forensic Examiner.

11              MS. CHANNAPATI:  One moment, your Honor.

12              (Pausing).

13              MS. CHANNAPATI:  Your Honor, at this time, I

14       would offer Alice Olosunde as an expert in the field of

15       Nurse Mid-wifery and Sexual Assault Forensic Examination.

16              THE COURT:  In the field of.

17              MS. CHANNAPATI:  Nurse mid-wifery and Sexual

18       Assault Forensic Examination.

19              THE COURT:  Any objection?

20              MR. GREENBERG:  Yes.

21              THE COURT:  Come here.

22              (Whereupon, a conference took place outside the

23       hearing of the jury.)

24              THE COURT:  What's the objection.

25              MR. GREENBERG:  The objection is, based upon the

1    fact that number one if she's going to testify about her

2    opinion with respect to whether or not the complainant was

3    raped, I don't think she's qualified to do that.

4           She's clearly a well-trained certified mid-wife

5    and has certainly had a lot of experience doing that.

6           I don't believe there's been any testimony that

7    she's been previously qualified to testify as an expert.

8           MS. CHANNAPATI:  It is irrelevant.

9           MR. GREENBERG:  Furthermore, there is –– she

10   hasn't indicated any high degree of scholarship with

11   regard to rape, rape victims.  She is examined since 1992

12   20 patients.

13          MS. CHANNAPATI:  2002.

14          MR. GREENBERG:  2002.  This incident happened

15   2003, which is one year after she started seeing those

16   types of patients.  I don't know how many patients she had

17   seen at that point.

18          THE COURT:  People.

19          MS. CHANNAPATI:  Your Honor, I don't understand

20   how a high degree of scholarship.  The woman has two

21   degrees from Columbia University which to everyone would

22   indicate it is a higher degree.

23          Nonetheless, she has extensive nursing

24   experience.  She has more experience with woman's health

25   and Gynecology and Obstetrics for over 25 years.

–Proceedings–

1        THE COURT:   I am listening counsel.

2        MR. GREENBERG:   Your Honor, she has certainly

3    not specialized, certainly not a gynecologist and

4    certainly not as someone who has specifically trained

5    with, at least I have heard, trained with a gynecologist

6    and specifically in the area of rape and sexual assault

7    with respect to trauma.   I didn't hear any of that.

8        I certainly heard from someone who has very

9    general, general amount of experience.

10       It appears to me that she treated Ms.

11   Krioutchkova and certainly she can testify about her

12   treatment and what she observed.

13       But in rendering an opinion, I don't believe

14   she's qualified to do so.

15       MS. CHANNAPATI:   Your Honor, she is board

16   certified.   And if the State itself is finding she's

17   certified to make such a determination, I don't think it

18   is beyond the Court to find that same conclusion.

19       Just because she's a nurse she's not qualified;

20   that is unheard of.

21       MR. GREENBERG:   Certainly what I said she's

22   clearly someone with experience, but in terms of rendering

23   opinion as to whether or not she can say that there's been

24   trauma as a result of a rape, I don't think the People

25   have met and proved with qualification.

**DAR**

1            THE COURT:  The Court has listened to both

2     sides.  She will be qualified as an expert in the areas.

3            The Court has listened to both sides and the

4     court rules that she will be qualified in both areas.

5            (The following is heard inside the presence and

6     hearing of the jury.)

7            THE COURT:  We have had our discussion, the

8     objection is overruled.  The witness is admitted as an

9     expert in the field of nurse mid-wifery and sexual assault

10    examination.

11    DIRECT EXAMINATION

12    BY MS. CHANNAPATI:

13            MS. CHANNAPATI:  I am showing to the defense

14    attorney what would be marked People's number 21, which is

15    a 20 to 30 page document.

16            THE COURT:  Say what?

17            MS. CHANNAPATI:  It is a 22 page document.  It

18    is the medical records, your Honor.

19            (Handing.)

20            At this time, your Honor, we're asking that it

21    be marked as People's number 22 for identification.  And

22    if it could be moved in pursuant to CPLR 45:18, these are

23    the medical records for Vera Krioutchkova with the

24    certification attached

25            THE COURT:  Counsel.

Direct/A. Olosunde/Ms. Channapati                    812

1          MR. GREENBERG:  They are certified documents,

2     your Honor.

3          THE COURT:  I take it that is not an objection.

4          MR. GREENBERG:  No.

5          THE COURT:  Into evidence as People's Exhibit

6     number 22.

7          (Whereupon, document is so marked People's

8     Exhibit #22 in evidence.)

9          MS. CHANNAPATI:  If she could be shown

10          THE COURT:  They are being shown.

11          (Shown).

12     Q     Ms. Olosunde, directing your attention now to

13     March 26, 2003, were you working at Coney Island Hospital on

14     that date?

15     A     Yes.

16     Q     Did you examine a patient by the named of Vera

17     Krioutchkova?

18     A     Yes.

19     Q     And how did she appear to you at that time?

20     A     She was weepy, crying hysterically, and she was

21     really shaken.

22     Q     Now, did you conduct a physical examination of her at

23     that point?

24     A     Yes.

25     Q     And could you please explain to the jury how that was

                              DAR

1    done?

2         A    Well, my physical examination includes a complete

3    visual examination looking at her from head to toe.  And then

4    of course palpating her various parts from head down to her

5    toes.  And it eventually included a pelvic examination.

6         Q    Now, when you do a pelvic examination, what do you

7    do?

8         A    Well, I start with visualizing the external

9    genitalia, what we call the outside of the female sexual

10   organ.  The female sexual organ from the outside to the

11   inside.  I then visualize the external genitalia.  Then I use

12   a speculum to go through the vagina to look at the internal

13   genitalia.

14        Q    Could you please explain what a speculum is?

15        A    A speculum is a device.

16        Q    And what does it do?

17        A    It is a device that we use, it's shaped in such a way

18   as to be able to go through, like a tunnel-like structure of

19   the body and go into the vagina, open it up to look at the

20   walls of the vagina from top to bottom, and then the back of

21   the vagina and the mouth of the womb.

22        Q    And so what was the result of that internal

23   examination?

24        A    Well, there was a bruise mark on the right side

25   according to as I see in the notes.  A bruise on the right of

1    the patient's introitals, that is the entry introitals, the

2    entry into the vagina.  The entrance part of the vagina and

3    the walls were intact, the cervix was not there.

4                    MS. CHANNAPATI:  Your Honor, at this time I am

5        going to show defense counsel a poster containing a

6        diagram which I would ask to be marked as People's number

7        23 for identification.

8                    THE COURT:  People's number 23 marked for

9        identification.

10                   (Whereupon, item is so marked People's

11       Exhibit #23 for identification.)

12                   MS. CHANNAPATI:  If it could be shown to the

13       witness.

14                   (Shown.)

15                   THE COURT:  It is being shown to the witness.

16   Q    Ms. Olosunde, do you recognize that?

17   A    Yes.

18   Q    What is it?

19   A    That is the external female, external genitalia.

20   Q    Does it fairly and accurately depict what the female

21   genitalia looks like?

22   A    Yes, it does.

23                   MS. CHANNAPATI:  Your Honor, at this time I ask

24       it be moved into evidence as People's 23.

25                   THE COURT:  Any objection.

**DAR**

1          MR. GREENBERG:  None.

2          THE COURT:   Into evidence as People's number 23.

3          (Whereupon, item is so marked People's

4     Exhibit #23 in evidence.)

5          MS. CHANNAPATI:  And could it be posted for the

6     jury, your Honor.

7          THE COURT:  Yes.

8          (Posted.)

9     Q    And if the witness could approach and be given a red

10    marker, your Honor?

11         THE COURT:  All right.  The witness is

12    approaching the exhibit.

13         (Witness complies.)

14    Q    Ms. Olosunde, if you could please indicate where you

15    saw the bruise on Ms. Krioutchkova?

16    A    Right there (indicating.)

17         THE COURT:  The witness is marking a spot on the

18    exhibit.

19    Q    Okay.

20         And again, what area is that that you saw?

21    A    The introital, the entry part into the vagina.

22         MS. CHANNAPATI:  Thank you, very much.  You

23    could have a seat.

24    Q    Now, in your expert opinion, to a reasonable degree

25    of medical certainty, is that finding consistent with a

1   complaint of forceable vaginal sexual intercourse?

2        A    Yes.

3        Q    Could you please explain the basis for that opinion?

4        A    It is an abnormal finding.  It is not usually there.

5   When I examine a patient I don't see a bruise mark.

6        Q    Okay.

7             And is there any other indications as to why that is

8   consistent with a forceable sexual -- forceable vaginal sexual

9   intercourse?

10       A    No.  Could you repeat the question.  I don't

11  understand exactly.

12       Q    You said that it is not -- it is an abnormal finding.

13       A    It is abnormal finding.

14       Q    Now, besides the fact it is an abnormal finding, is

15  there anything about a bruise mark on the introital that would

16  be consistent with a complaint of forceable vaginal sexual

17  intercourse?

18       A    There must have been an impact on that area for there

19  to be a bruise mark there.

20       Q    And would such an impact be consist with forceable

21  vaginal sexual penetration?

22       A    Yes.

23       Q    Now, in connection with your examination and

24  treatment of Vera Krioutchkova, did you consult with any other

25  doctors?

1    A    Yes, I consulted with an attendant physician.

2    Q    What did that doctor do?

3    A    She saw the patient and corroborated my findings.

4    Q    Now, did you order any tests for Vera Krioutchkova?

5    A    Yes.

6    Q    What tests did you order?

7    A    I ordered a test for sexually transmitted diseases

8  which included HIV, Hepatitis.

9    Q    Did you recommend any follow-up visit?

10   A    Yes.

11   Q    And for what purpose?

12   A    Well, we have to see that the bruise healed, we have

13 to give a follow-up GYN care, paps smear, all of that.

14   Q    Did you provide any other treatment for her?

15   A    She was given post-exposure prophylactic.  It is a

16 medication we give for HIV prevention.

17              MS. CHANNAPATI:  At this time if the witness

18       could be shown People's number 9, the rape kit.

19              THE COURT:  All right.  The court officer is

20       getting that.

21              (Shown)

22   Q    Ms. Olosunde, do you recognize that?

23   A    Yes, I do.

24   Q    What do you recognize it to be?

25   A    It is the package containing the evidence collection

1   rape kit.

2        Q    How do you recognize it?

3        A    I have my handwriting there and the dates that I

4   wrote.

5        Q    Does it appear any differently now as you last saw it

6   on March 26, 2003

7        A    There are extra writings on it and extra tape that

8   was not there.

9        Q    Okay.

10            Now, could you explain to the jury what the rape kit

11   is?

12        A    It is a devise that we use to collect evidence.

13        Q    Okay.

14        A    Of sexual assault.

15        Q    Did you prepare this rape kit on March 26, 2003?

16        A    Yes.

17        Q    For Vera Krioutchkova?

18        A    Yes.

19        Q    Could you please explain what you did to collect the

20   samples?

21        A    Follow the guidelines that is contained in the box,

22   which include --

23        Q    Would you need to open the box?

24        A    Yes.

25            THE COURT:  All right.

1      Then we will just get you some gloves.

2              THE WITNESS:  Okay.  Thank you.

3              (Handing.)

4              THE WITNESS:  Okay.

5      Q    If you could explain to the jury what do you do?

6      A    We follow the-- I follow the guidelines.  It tells

7  you step by step what steps to take, steps one, two, three,

8  four, for certain things.

9      Q    What are those steps?

10     A    Well, some -- one of the steps is to pull patient's

11  hair from the head.

12     Q    Yes.

13     A    From certain parts in the middle, the sides, the

14  back.

15     Q    Okay.

16     A    Another step to take a sample from the oral part, the

17  mouth.

18     Q    How is that done?

19     A    From the side of the gum we use a Q-Tip to collect

20  samples from the patient's mouth and from the patient's gums.

21     Q    Yes.

22     A    There's a little structure that looks like a little

23  comb.  We scrape the patient's side of the mouth.

24     Q    What else?

25     A    That's for the mouth.

1          Then we collect, we pull the pubic hair.

2          We take evidence from any secretions that we might

3     see -- any secretions that I might see on the vaginal area.

4          We start from the top and get to the pelvic

5     examination.

6          The pelvic examination includes smears from the

7     outside, from the inside, from the anus.

8     Q     When you say "outside," outside of what?

9     A     Outside of the vagina.

10    Q     And when you say "inside," you mean?

11    A     The vagina itself.  The inside of the vagina, the

12    internal genitalia.

13    Q     Now, did Vera Krioutchkova indicate that she was

14    anally penetrated by her attacker in any way?

15    A     No, she did not.

16    Q     Why then did you do and swab of Vera Krioutchkova?

17    A     For one thing, it is a requirement as part of the

18    evidence collection kit.  And also there is chances of semen

19    or any liquid seeping from the vagina into the anal area.

20    Q     And in your expert opinion, is it not uncommon for

21    semen to be found in the anal area even when a woman has not

22    had anal sex?

23    A     Yes.

24    Q     It is not uncommon?

25    A     It is not uncommon even for ejaculation to take place

1   outside of the depth of the vagina.

2        Q     Now, after collecting all the samples for the kit,

3   did you seal it?

4        A     Yes, I did.

5        Q     And how did you seal it?

6        A     With a little tape provided in the kit itself.

7        Q     After you sealed the kit, what did you do with it?

8        A     It was handed over to NYPD Officer Esposito.

9              MS. CHANNAPATI:  Thank you, very much.

10             THE COURT:  All right.  Now defense.

11  CROSS-EXAMINATION

12  BY MR. GREENBERG:

13       Q     Good morning.

14       A     Good morning.

15       Q     You had indicated that you had received certification

16  in sexual assault?

17       A     Forensic examination.

18       Q     Forensic examination?

19       A     Yes.

20       Q     And that certification is an education in how to

21  collect semen and bodily fluids --I should say part of the

22  certification and schooling is how to collect and preserve

23  evidence; isn't that correct?

24       A     Yes.

25       Q     You got that certification in 2002, correct?

Re-Cross/A. Olosunde/Mr. Greenberg                    822

1       A    Yes.

2       Q    And --

3       A    I got the training in 2002, yes.

4       Q    When did you get your certification?

5       A    2006.

6       Q    2006?

7       A    Yes.

8       Q    You did the examination of Ms. Vera Krioutchkova in

9    2003; is that correct?

10      A    Yes, right.

11      Q    You also indicated that you discussed your findings

12   with a doctor; is that correct?

13      A    Yes.

14      Q    And which doctor was that?

15      A    Dr. Morat, Yasmin Morat.

16      Q    When you say "your findings," you're saying that it

17   was the fact that there was a one centimeter bruise?

18      A    Yes.

19      Q    And that's when you say "findings" that's what you

20   are referring to, correct?

21      A    Yes.

22      Q    There were -- there was no trauma to the inside of

23   Ms. Krioutchkova's vagina, correct?

24      A    Yes.

25      Q    There was no damage to the walls of her vagina,

1    correct?

2        A    Yes.

3        Q    And the one centimeter bruise is on the outside of

4    the vagina, correct?

5        A    Yes.

6        Q    And you said that is a result of forceful

7    penetration, correct?

8        A    Yes.

9        Q    And isn't it true that that could happen as a result

10   of forceful and vigorous sex?

11       A    I wouldn't -- perhaps, yes.

12            MR. GREENBERG:  I have no further questions.

13            THE COURT:  Any further re-direct?

14            MS. CHANNAPATI:  Yes, re-direct examination.

15   RE-DIRECT EXAMINATION

16   BY MS. CHANNAPATI:

17       Q    MS. Olosunde, what do you mean by trauma?  When

18   defense attorney asked that there was no trauma to Ms. Vera

19   Krioutchkova in her vagina, what did you mean by trauma?

20       A    Well, I should have asked him what he meant by trauma

21   to start with.

22            My definition is my response is the fact that there

23   was no injury in the internal genitalia.  There was injury on

24   the external genitalia.

25       Q    All right.

Re-Direct/A. Olosunde/Ms. Channapati                              824

1           And that injury was the bruise?

2      A    Is the bruise, yes.

3      Q    And in your expert opinion -- expert opinion, in a

4  case where a woman says that she had forceable vaginal

5  intercourse --

6      A    Right.

7      Q    And has no visible injuries --

8      A    Right.

9      Q    -- is that lack of injuries still consistent with

10 forceable vaginal intercourse?

11     A    Yes.

12          MR. GREENBERG:  I am going to object to the

13     question.

14          THE COURT:  Overruled.

15     Q    I am sorry.

16     A    Yes.

17     Q    Is it possible to have forceable vaginal intercourse

18 and have no injuries?

19     A    Yeah.

20     Q    And why how is it possible?

21     A    Well, it depends on the structures we're talking

22 about.  It depends on the woman's vaginal elasticity, the give

23 and take.  It depends on the man's-- the male organ, the size

24 and --

25     Q    Does lubrication have anything to do with it?

**DAR**

1    A    Yes, absolutely.

2    Q    Okay.

3         And have you seen that in your experience people who

4    -- patients who have given you a history of being forcibly

5    raped and having no injury?

6    A    I have seen that, yes.

7    Q    And so does the fact that Ms. Krioutchkova had

8    vaginal injuries, does it make it more consistent or less

9    consistent with it being forceable?

10   A    More.

11   Q    With forceable more?

12   A    More consistent, yes.

13        MS. CHANNAPATI:  Thank you.

14        THE COURT:  Defense.

15   RE-CROSS-EXAMINATION

16   BY MR. GREENBERG:

17   Q    Isn't it true, really what it is more consistent with

18   is forceable entry?

19   A    Say again.

20   Q    Isn't it more consistent with forceable entry?  It

21   could be from a consensual sexual relationship?

22   A    I wouldn't -- I wasn't there.  But I wouldn't say

23   that either.

24   Q    You wouldn't say that.  But you just said earlier

25   that forceful vigorous sex would -- could potentially lead to

-Proceedings- 826

1    a bruise mark?

2        A    Injury, yes.

3        Q    And really the issue that you can't testify to is

4    whether or not that was consensual or not; is that correct?

5        A    You know, from experience, consensual sex would be--

6    mean preparation for sex and the anticipation for sex.

7        Q    Isn't it true that people have sex in all different

8    kinds of way?

9        A    I don't know.  I can't answer that.

10       Q    You can't answer what other people do with their

11   sexual relationships?

12       A    Yes, exactly.

13           MR. GREENBERG:  Thank you.  No further

14   questions.

15           MS. CHANNAPATI:  Thank you.

16           THE COURT:  Thank you.

17           The witness may step down.

18           (Witness exits.)

19           THE COURT:  Would the lawyers approach.

20           (Whereupon, a bench conference took place

21   between counsel and the Court.)

22           THE COURT:  People.

23           MS. CHANNAPATI:  Your Honor, at this time the

24   People rest.

25           THE COURT:  All right.

**DAR**

–Proceedings–                              827

1           Ladies and Gentlemen, the People have rested and

2     it is getting towards lunch time.  We will take our break

3     now.

4           We will be back at our normal time, 2:15, and

5     then we'll continue.

6           Please do not discuss the case and form no

7     opinions whatsoever regarding guilt or innocence.

8           Please follow the officer out.

9           (Whereupon, the jury exits the courtroom and the

10    following is heard outside the hearing and presence of the

11    jury.)

12          THE COURT:  The People have rested.

13          The jury has left the room.  We are about to be

14    on break for lunch.  I am sure defense would have motions

15    and we'll deal with that at 2:15.

16          MR. GREENBERG:  All right.

17          THE COURT:  2:15

18          (Whereupon, a lunch recess was taken.)

19

20

21

22

23

24

25

**DAR**

1           MR. GREENBERG:   Judge, I'm going to make a

2    motion.   The People have failed to prove or bring forth any

3    prima facie evidence, and I'm asking you to dismiss the

4    case against Mr. Colon.

5           THE COURT:   People?

6           MS. CHANNAPATI:   Your Honor, the Court has

7    heard the testimony.   I think the People have made a prima

8    facie case, and it should be presented to the jury to

9    decide.

10          THE COURT:   All that is on the record, and the

11   Court reserves decision regarding that motion.

12          Anything else to discuss?

13          MR. GREENBERG:   No.

14          THE COURT:   Is the defense putting on a case?

15          MR. GREENBERG:   No.

16          THE COURT:   Well, let's now look at logistics.

17          We can do a preliminary charge conference now.

18          This is a preliminary discussion.   The place

19   the Court is looking at first is the indictment with regard

20   to the charges.   So we might as well go over that.

21          In that indictment are seven counts.   One

22   Burglary in the First Degree, B, as in boy, voilent felony,

23   Penal Law 140 -- well, I've re-ordered these a little bit

24   so when I say Count 1, it's possibly Count 1, but anyway,

25   Penal Law 140 Sub 30, Sub 2.   That burglary, in essence,

1    says the defendant entered and remained unlawfully and

2    caused physical injury.

3             Then the second count, burglary in the second,

4    Penal Law 140.3.  That's also a B, as in boy, felony, and

5    that says the defendant entered or remained unlawfully with

6    the intent to commit a crime and used or threatened the use

7    of a dangerous weapon, in this case, a knife.

8             Then, there's a charge of Rape in the First

9    Degree.  The felony in that charge alleges the defendant

10   engaged in sexual intercourse -- and that's defined -- with

11   the complainant by forcible compulsion.

12            Then there's two charges of Sex Abuse in the

13   First Degree.  That's a D, as in David, felony.  Both are

14   under Penal Law 130.65, Sub 1.

15            One of the charges alleges sexual contact,

16   penis to vagina, by forcible compulsion.  The other charge

17   alleges sexual contact finger to vagina by forcible

18   compulsion.

19            There's a charge of Assault in the Second

20   Degree, D as in David, felony, and that requires that the

21   defendant in the course or in the furtherance of a crime or

22   in an attempt to commit a crime caused physical injury to

23   the complainant.

24            Finally, there's a charge of Criminal

25   Possession of a Weapon in the Fourth Degree, A Misdemeanor.

1    In that sense, it says the defendant knowingly and

2    unlawfully possessed the weapon, namely, a knife, and I

3    think it says with the intent to use it.

4              So, those are the charges.  So the only

5    question is:  Is there anything that anyone suggests the

6    Court would not charge out of those seven counts?

7              I'm not hearing a thing from the lawyers.

8              MR. GREENBERG:  One minute.

9              Your Honor, with respect to the sixth count --

10             THE COURT:  Assault?

11             MR. GREENBERG:  Yes.  The physical injury,

12   statutorily, I don't believe the People have proved that

13   the injury to the complainant, which I would presume is a

14   bruise, is physical injury.

15             THE COURT:  I'll hear from the People.

16             MR. CHANNAPATI:  Your Honor, there's testimony

17   from the witnesses that she felt extreme pain from the

18   vagina, and there was a bruise there, accordingly, and I

19   think the People have met their burden in at least

20   establishing a prima facie case for physical injury with

21   regard to that count, and it should be presented to the

22   jury.

23             THE COURT:  Right.  That issue would come up

24   as well with regard to the burglary count.

25             MR. GREENBERG:  Correct.

1          THE COURT:  It uses physical injury, and the

2     Court believes -- either side can point me to a case, but

3     the Court believes the cases would not support a finding by

4     this Court that the People have, as a matter of law, not

5     established an injury.  Therefore, the Court believes that

6     it goes to the jury.

7          Let me ask you all this:  What about that

8     charge of Sexual Abuse in the First Degree, penis to

9     vagina?  Isn't that covered under rape?

10          MR. CHANNAPATI:  Your Honor, if the Court

11    is -- I don't know --

12          THE COURT:  I'm asking.  I'm not saying a

13    thing.

14          MR. CHANNAPATI:  Well, if there is a

15    suggestion being made about that, if the jury finds the

16    defendant guilty of Rape in the First Degree, they can

17    thereby bypass sexual abuse in the --

18          THE COURT:  What the People are saying is they

19    are saying it should be charged, but it could be charged in

20    the alternative.

21          MR. GREENBERG:  It just seems to me, your

22    Honor, that it's really an extraneous charge.  It's giving

23    the jurors an alternative.

24          THE COURT:  The People are saying, if they

25    found him guilty of rape, then they are going to pass that

1      one.

2                    MR. GREENBERG:  If they find him guilty of

3      rape.

4                    THE COURT:  Then they pass.  If they find him

5      not guilty of rape, it will still be there.

6                    MR. GREENBERG:  I just think it's setting up

7      confusion.

8                    THE COURT:  Well, of course, the Court is

9      always concerned about confusion, and I don't have to rule

10     on it, because it's preliminary, but it seems to me I need

11     a stronger reason not to charge it then I've heard.

12                   Those are our preliminary discussions

13     regarding the charges.

14                   I'll look at them again.  That is the charges

15     regarding the law.

16                   The next thing I look at is -- that's sort of

17     the alpha.  Now, we'll have the Omega.

18                   Can I have a printout of the verdict so we're

19     all on the same page.

20                   Then we'll set those up as a list, but we

21     might as well do it now

22                   I have received a printout which the clerk

23     keeps a record of the exhibits.  So let me read from them.

24     There's 23 Exhibits, 23 numbered items on the list, and

25     these were all introduced by the People.

- Charge Conference -

833

1                    Exhibit 1 is a diagram, a copy of a summons, a

2       Civil Court summons.  Is that the People's?

3                    MR. CHANNAPATI:  No.

4                    MR. GREENBERG:  I --

5                    THE COURT:  Did you introduce it in evidence?

6                    MR. GREENBERG:  No.

7                    THE COURT:  It's not in evidence.

8                    THE CLERK:  Marked for ID.

9                    THE COURT:  So that's not --

10                   MR. GREENBERG:  I marked it.

11                   THE COURT:  What is Exhibit 1?

12                   MR. GREENBERG:  I just marked that for

13      identification.

14                   THE COURT:  It's not in evidence.

15                   What is Exhibit 1?

16                   MS. CHANNAPATI:  It's a schematic drawing of

17      her apartment.

18                   THE COURT:  That's what it is.

19                   No. 1 is a diagram, the schematic of the

20      apartment, that's People's 1; and then 2 is A through E,

21      five photographs on a board; 3-A through H, eight

22      photographs on a board; 4-A through F, six photographs on a

23      board; 5, the duvet; 6, the bath robe; 7 consists of A, B,

24      and C, three photographs.  Those are, I think, the things

25      found in his apartment.  8-A, C, D, and that was the 911

- Charge Conference -

834

1     call; 9, the rape kit; 10 is a large bag.

2              Remind me what was in it.

3              MR. CHANNAPATI:  The bag, that vouchered the

4     duvet cover.

5              THE COURT:  Vouchered the duvet cover.

6              Let me put that in.

7              11 is a street map; 12 consists of 12-A and

8     12-B.  These are medical records or what.

9              MR. CHANNAPATI:  No, DNA files.

10             THE COURT:  DNA files.

11             13 is a diagram of what?

12             MR. CHANNAPATI:  It's a chart of the DNA

13    results.

14             THE COURT:  Then there's something in

15    parenthesis.  I am looking for 14 and 15.  So 14, 15, and

16    16 are Verizon records.

17             MR. CHANNAPATI:  Yes.

18             THE COURT:  17 is two photographs.  That's the

19    lineup; is that correct?

20             MR. CHANNAPATI:  No.  That's pictures of the

21    defendant, photos of the defendant.

22             THE COURT:  18 is the Miranda warnings; 19 is

23    the DNA Consent Form; 20 is the Consent to Search Form;

24    21-A and B, lineup photographs, there's two; and 22 is

25    medical records; and 23 is a diagram of the female

1    genitalia.

2              So, that's our record of what the exhibits

3    are, and that's what -- at some point in my charge I read

4    to the jury what the exhibits are.

5              So, if there's no objection, then I'll work

6    from this list.

7              All right.  Then, now, I'll go to my general

8    charges, and then we'll figure out whether there's any

9    other kind of charges that would be needed.

10             THE COURT:  There is a part that's

11   pre-summation instruction, and that essentially tells the

12   jury that "both sides have rested, and we reach the part

13   where you're going to hear summation of counsel, and after

14   that the Court will give you instructions under the law.

15   Defense counsel makes his summation first."

16             You're going to make a summation, Counsel?

17             MR. GREENBERG:  I would like to.

18             THE COURT:  Thank you.

19             Well, I don't want to presume, and the

20   prosecution follows, and it says, "in making their

21   summations, both the lawyers will review the evidence which

22   you have heard and seen during the course of the trial and

23   will suggest to you certain inferences or conclusions which

24   each lawyer believes may, in his or her opinion, be

25   properly drawn from the evidence in the case.  If you find

1    either one persuasive, you can follow it, but it's not

2    evidence."

3             And then after that, after the closings, then

4    we come to the final instructions.  The first part is an

5    introductory paragraph telling them that my instructions

6    will be in three parts.

7             In other words, I'm going on down, the first

8    then is tell them they just heard the summation of counsel

9    and to repeat, essentially, what I said before.

10             Next, is the review of the law.  That is the

11    essential principles of law from the preliminary charge.

12             Then next is questions of witnesses, but the

13    thrust of that instruction is not -- "Do not give anymore

14    weight to an answer elicited from the question asked by the

15    Judge than you give to my other answer."

16             Then it goes pack into the safeguards.

17    "Defendant is presumed to be innocent.  The People have the

18    burden of proof."  There is another paragraph there, "the

19    defense is not required to put on a defense."

20             You want this, Counsel?

21             MR. GREENBERG:  Absolutely.

22             THE COURT:  All right.  The burden never

23    shifts; the standard of proof, the standard of proof is

24    beyond a reasonable doubt; if you have a doubt, then the

25    defendant is entitled to the benefit.

- Charge Conference -

1   "Reasonable doubt, if instead of being based

2 on the nature and quality of the evidence, it's based on a

3 whim or something else, that's not reasonable doubt."

4   The final paragraph there tells them that I

5 will be instructing them concerning the law as it relates

6 to the charges in those instructions.

7   I'll tell you about each element of the

8 offenses charged, what you need to know.  Now, the burden

9 of proof, beyond a reasonable doubt attaches to each

10 charge, et cetera; consideration of punishment; no concern

11 about possible punishment; then it goes into evidence,

12 somewhat repetitive of what we said before; "evidence

13 consists of oral testimony under oath, stipulations by the

14 parties, and physical exhibits which during the trial were

15 either introduced by the Assistant District Attorney and by

16 the defense and which were allowed in evidence."

17   "Questions by them themselves are not

18 evidence; any testimony stricken from the record, any

19 exhibits marked for identification, but not allowed into

20 evidence are to be disregarded."

21   Counsel, here we can talk about the issue of a

22 curative instruction.  You said at one point -- and that

23 was the issue about Detective Harvin's answer which was not

24 consistent with what was in the discovery.

25   We did give a curative instruction, and this

-WC-

1      charge here does say, "Anything that was ordered stricken

2      from the record is not to be looked at by the jury."

3                  Do you want something more?

4                  MR. GREENBERG:  I just want your Honor to

5      stress to them that they need to put that out of their mind

6      and that whatever was said cannot be deemed as testimony or

7      evidence.

8                  THE COURT:  We'll stay with this, unless

9      there's different language.

10                 Each side can call witnesses.  There's no duty

11     on the defense to call witnesses.  Credibility, that's up

12     to the jury to decide credibility.

13                 MR. GREENBERG:  Your Honor, at that point --

14     may I just jump in?  Do you have a police officer's --

15                 THE COURT:  It's coming.

16                 Gives them the test; they may use the common

17     sense test; is the witness interested or disinterested;

18     then falsus in uno; there's an interested witness charge,

19     but I don't believe there's an interested witness.

20                 Is there anybody asking for a charge?

21                 MR. CHANNAPATI:  I'm sorry?

22                 THE COURT:  Interested witness, we don't have

23     any.

24                 MR. GREENBERG:  Well, your Honor --

25                 THE COURT:  Yes.

1      MR. GREENBERG:  I would just say that the -- I

2  would ask with respect to the complainant that she's an

3  interested witness.  She's testified that she's a party to

4  a lawsuit, and she does have an interest in this outcome.

5      MR. CHANNAPATI:  Your Honor, as a matter of

6  law, the witness is not -- the complainant is not an

7  interested witness in this case.

8      THE COURT:  Defense; I think as a matter of

9  law, she's not.  So I don't think I'll give that.

10      There's a charge about the defendant

11  testifying, but he did not testify.  So I'll give that, and

12  there's a charge, if he does not testify, and I'll give

13  that.

14      It says, "The defendant did not testify in

15  this case.  I charge you that the fact that the defendant

16  did not testify is not a factor from which any inference

17  unfavorable to the defendant may be drawn."

18      Then police officer witnesses, "Police

19  officers have testified in this case.  You should use the

20  same tests in evaluating the testimony of such police

21  officers as you will use in evaluating the testimony of any

22  other witness.  The mere fact that the witness was a police

23  officer does not require you to give that testimony any

24  greater or lesser credibility than that of any other

25  witness."

1         Then there's a charge about the exhibits

2  where -- I just read what they are.  I'll tell them that

3  "any exhibits which were marked for identification, but not

4  received into evidence cannot and must not be considered by

5  you."

6         During your deliberation, "if you wish during

7  your deliberation to exam any exhibit, it will be brought

8  to you, just give the Court a note."

9         In here, I usually insert a photograph charge,

10  and that charge just says, "Among the exhibits received

11  into evidence were photographs.  These photographs intend

12  to portray various locations or objects relevant to the

13  issues in this case.  These photographs were received into

14  evidence to assist you in making your evaluation of the

15  testimony relating to locations, scenes, or objects

16  depicted in them.

17         "You are the sole judges of the accuracy of

18  these photographs, and you are the sole judges of the

19  weight to be given to these photographs."

20         Then there comes the charges about specific

21  offenses, and I will let you see what I'm proposing to give

22  before I finalize it.

23         Yes?

24         MR. GREENBERG:  One other thing, I believe, I

25  have on my list, the inference that if there's a piece of

1    evidence it goes to the inference in favor of the defendant

2    towards innocence as opposed to guilt.

3                    THE COURT:  You have to give me that.

4                    MR. GREENBERG:  All right.

5                    THE COURT:  You will produce it.  I've seen

6    it.  The People will want to look at it.  They are looking

7    as if they haven't seen it.  Counsel will produce it.  I

8    have seen it.  I can't say how I've ruled in the past, but

9    I'll look at it.

10                   MR. CHANNAPATI:  Just so I'm clear, what is

11   the charge?

12                   THE COURT:  It's a charge along the lines when

13   you have a doubt, the inference goes their way, and he'll

14   produce the language.

15                   MR. CHANNAPATI:  With respect to the evidence,

16   not exhibits.

17                   THE COURT:  Yes, evidence, but they will show

18   us what they want.

19                   Now, after the Court gives the charges

20   regarding the specific offenses, there's charges regarding

21   their duty to deliberate.

22                   You all know that language, but I'll just read

23   it.

24                   "In order to return a verdict, each juror must

25   agree to the verdict.  You, as jurors, have the duty to

1    consult with one another, to deliberate with a view to

2    reaching an agreement, if it can be done, without giving up

3    individual judgment.

4         "As jurors, each one of you must decide the

5    case for yourself, but only after an impartial

6    consideration of the evidence with your fellow jurors.

7         "No juror should give up any honestly held

8    conviction as to the weight or effect of the evidence

9    solely because of the opinion of your fellow jurors or for

10   the mere purpose of returning the verdict.

11        "During the course of your deliberation, you,

12   as individuals, should not hesitate to re-examine your own

13   views and change your opinion if convinced it is

14   erroneous."

15        Then the charge is, if they, if their

16   recollection fails or they want to get instruction

17   regarding the law, they have the option of returning to the

18   courtroom to have that testimony or instructions read back

19   to them.

20        The foreman should fill out a note, and we'll

21   respond to the note.  Exhibits, again, are referred to, and

22   they are told to get the exhibits, make a note and ask for

23   it.

24        Unanimous verdict; all 12 members must agree.

25   Let the Court know when you have reached a verdict;

1    instructions to alternate jurors is the part where they are

2    told they will be in a separate room.  After I give that

3    instruction, I call you up and decide what we're doing with

4    the alternates and concluding remarks.

5                   "I'm submitting the case to you.  The law and

6    your oath require that you render a fair and impartial

7    verdict without fear, favor, or sympathy; therefore, take

8    the case and render a true and impartial verdict."

9                   Now, there would also be -- let me take a

10   look.  There would also be an expert witness charge, and we

11   have drafted one so you can both look at it.  It's straight

12   from the CJI.

13                  MR. CHANNAPATI:  That's fine, your Honor.

14                  THE COURT:  So both sides have looked at that.

15   As I said, it's straight from the Criminal Jury

16   Instructions.

17                  Any other charge other than the one that the

18   defendant indicated that they would want to add?  Any other

19   suggestive charges?

20                  All right.  I'm hearing nothing.  So that then

21   concludes our preliminary --

22                  MR. CHANNAPATI:  Your Honor, in the event that

23   I do think of something, can we re-visit the issue tomorrow

24   morning?

25                  THE COURT:  This is preliminary.  I thought we

- Charge Conference -

844

1   were going to go through and get it done today, but in any

2   event --

3                   MR. CHANNAPATI:  As of now, there's nothing.

4   I just want to make sure the door is still open,

5   nonetheless.

6                   THE COURT:  Well, with that, then it sort of

7   raises the issue of scheduling.

8                   THE COURT OFFICER:  Jury entering.

9                   (Whereupon, the jury enters the courtroom and

10  is properly seated.)

11                  THE CLERK:  All jurors are present.

12          Do both sides waive the reading of the roll?

13          MR. GREENBERG:  Yes.

14          MR. CHANNAPATI:  So waived.

15          THE COURT:  Defense.

16          MR. GREENBERG:  Your Honor, the defense rests.

17          THE COURT:  Thank you.

18                  Ladies and gentlemen, both the People and the

19  defendant have rested.

20                  In terms of scheduling, we're going to adjourn

21  now, and in the morning we're going to have summation by

22  the lawyers and final charges from me, and you will be

23  deliberating.

24                  So that means, now, we are adjourning for the

25  evening, and, of course, there's no discussion.  My same

1   instructions to you -- do not discuss the case with anyone;

2   do not allow anyone to discuss the case in your presence;

3   do not visit any of the locations which you have heard

4   referred to; do not attempt to research any point by any

5   means regarding any issues that come up during the trial;

6   you must, of course, promptly report to me any attempt by

7   anyone to influence you, and you must form no opinion

8   whatsoever about the guilt or innocence of the defendant.

9           You will determine all those matters when you

10  begin your deliberations.

11          Anybody have any questions?

12          Therefore, then, 9:30 tomorrow.  You will

13  report into the jury room.  We'll see you then.  Please,

14  leave your books.

15          You need to be on time, ladies and gentlemen.

16          (Whereupon, the jury exits the courtroom.)

17          THE COURT:  The jury has left the courtroom.

18          Is there anything else that either side wants

19  to bring to the Court's attention before we adjourn?

20          Both lawyers are shaking their heads in the

21  negative.

22          See you tomorrow at 9:30.

23          MR. CHANNAPATI:  Thank you, your Honor.

24          (Whereupon, the case on trial was adjourned

25  to June 7th, 2006)

846

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS - CRIMINAL TERM - PART:  3
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3

 4                                      INDICTMENT NO.
              -against-                 2518/2003
 5
     DENNIS COLON,
 6                       Defendant.
     -----------------------------------------X
 7                                      320 JAY STREET
                                        BROOKLYN, NEW YORK 11201
 8                                      JUNE 7, 2006

 9

     B E F O R E:
10
                          HONORABLE JAMES P. SULLIVAN,
11                               Justice and jury
     A P P E A R A N C E S:
12

13                       CHARLES J. HYNES, ESQ.
                         District Attorney, Kings County
14                       BY:  ANITA CHANNAPATI, ESQ.
                         BY:  LOUISE COHEN, ESQ.
15                       Assistant District Attorney

16

17                       HARLAN GREENBERG, ESQ.
                         DENNIS PETRE
18                       30 Vesey Street, 15th Floor
                         New York, New York
19                       Attorneys for the Defendant

20
                                   William Cardenuto
21                                 Senior Court Reporter

22

23

24

25


              William Cardenuto, CSR, Senior Court Reporter
```

- Proceedings -

847

1           THE CLERK:  Case on trial, Indictment 2518 of

2      2003, Dennis Colon.

3           All parties are present and the defendant is

4      present.

5           MS. CHANNAPATI:  Anita Channapati for the

6      Office of the District Attorney.

7           MR. GREENBERG:  Harlan Greenberg on behalf of

8      the defendant.

9           THE COURT:  Good morning.

10          Yesterday, we had a preliminary charge

11     conference, and we went through and we discussed the

12     charges.  Defense had a proposed charge.  I don't think the

13     People had any additional charges.

14          So, defense, do you have your --

15          MR. GREENBERG:  Your Honor, I looked for the

16     charge.  I couldn't find it.  The charge, essentially, is

17     that if there's an item in evidence that has an inference

18     to guilt and innocence, they must find that piece of

19     evidence, they must give the benefit of the doubt --

20          THE COURT:  Counsel, I suggest you write it.

21     It could be handwritten, and we'll examine it and decide.

22          Now, there's an issue that we need to discuss.

23     There's an issue about burglary in this case, and my

24     understanding, and I'll tell you what my understanding is,

25     is that the cases require -- the New York cases require a

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

848

1   clear direction to leave.

2              I don't recall hearing that.

3              MR. GREENBERG:  I'm sorry.  A clear direction

4   to?

5              THE COURT:  To leave.

6              MR. GREENBERG:  To leave.

7              THE COURT:  If there is not that, I don't

8   recall hearing it, then, as I understand the cases, the

9   People's theory could be trickery, but I do not recall

10  being in evidence either --

11             MS. CHANNAPATI:  Your Honor, could I have a

12  moment?

13             THE COURT:  Yes.

14             MS. CHANNAPATI:  I found it.  Page --

15             THE COURT:  I'm not looking at it.  I'm going

16  to listen, and then I'll look at it.

17             MS. CHANNAPATI:  For the defense attorney's

18  benefit, Page 547, Line 16:

19             "QUESTION:"  Ms. Krioutchkova, did the

20  defendant have your permission to stay in your apartment at

21  that point?

22             "ANSWER:  When I saw this, I was saying, 'Get

23  out', and I was screaming for help."

24             All right.  There's one more.

25             THE COURT:  Go ahead.

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

849

1          The People have cited the line where the

2     complainant said, "Get out."

3          MS. CHANNAPATI:  Page 548, Line 4:

4          "QUESTION:  You said he pushed you.  How did

5     he push you?

6          "ANSWER:  I was saying, 'Get out from here.

7     Help me.  Help me.'  And he pushed me very hard.  He pushed

8     me, and I was falling, like, backwards.  He was following

9     me."

10         THE COURT:  The People have cited another line

11    where the complainant testified she said, "Get out."

12          So, the Court is satisfied that that direction

13    was given.  So, we've crossed that hurdle.  We then move to

14    looking at other cases, and all of these have to be typed

15    up, that is, looking at the other charges.

16          Now, with respect to -- we have seven counts,

17    and we might as well just go there, and I want to just get

18    my copy of the indictment

19          Looking at the indictment there, the first two

20    counts are Burglary in the First Degree.

21          The Court has discussed the question that we

22    just raised, and the Court is satisfied that the direction

23    to leave was given.  Then the Court is now satisfied that

24    it must give, at least, one of the burglary counts, but it

25    doesn't have to give both of the burglary counts, and at


William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

1   this point, I'm inclined not to give both of the burglary

2   counts.

3          So, we'll have a discussion about that.

4          MS. CHANNAPATI:  Your Honor, the People's

5   position is that both burglary counts should be given,

6   because it's entirely reasonable that the jury could find

7   that she was injured as a result of the rape during the

8   course of the burglary, and, therefore, suffered a physical

9   injury, but, you know, there is, you know, a question in

10  the evidence about the knife that was used during the

11  attack, and it's conceivable they could find that the knife

12  was used, and they didn't believe there was an injury or

13  vice versa.

14          So, the People would request that both charges

15  be presented to the jury.

16          THE COURT:  The defense may answer, but the

17  Court will agree that injury has been questioned, and the

18  knife has been questioned.

19          Defendant.

20          MR. GREENBERG:  Your Honor, I'm just

21  reading -- I'm going to ask that you preclude one of the

22  burglary charges.

23          It just seems to me that if the jury is going

24  to find the complainant credible, they are going to find

25  that he used a knife, and I don't think the physical injury

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

851

1    is necessary for them to prove their case at that point, if

2    she's found credible, and I think it would be duplicative.

3                THE COURT:  I don't know if I would go that

4    far, but I do lean to Charge 1 and not both, and I do lean

5    to charge Count 1, which cites the knife.

6                If I do that, then we'll have to look at the

7    assault issue, and since injury has been raised and there

8    is a question about it, my inclination is to charge the

9    assault, but then I'll still have to look at it later with

10   regard to whether there was an injury.

11               So my leaning is to charge the assault.

12               Then Rape in the First Degree, that gets

13   charged, it would seem to me, under any circumstance.

14               Next, we come to two counts of Sexual Abuse in

15   the First Degree.  The Court believes that it must charge

16   the finger to penis, but will not -- I'm sorry -- the

17   finger to vagina, but will not charge the penis to vagina,

18   because it is covered.

19               So, just based on what I just said, I was

20   looking at Count 4 and Count 5.  Count 4 is penis to vagina

21   Count 5 is finger to vagina.  I would not be charging Count

22   4.  I would be charging Count 5.

23               MS. CHANNAPATI:  Your Honor, from yesterday's

24   discussion, so you're not going to give an --

25               THE COURT:  Well, I'm telling you what my

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

852

1    leanings are.

2          MS. CHANNAPATI: Because the People would

3    request that there would be an instruction that if the

4    defendant is found guilty of Rape in the First Degree, then

5    they would skip Count 4 and just proceed to Count 5.

6          THE COURT: We talked about that yesterday,

7    but the Court has thought about it and doesn't believe it

8    should be charged at all.

9          So that would be Count 5, but not Count 4.

10          Count 6 is the assault. We talked about it.

11   It now gets charged with the understanding that I'm not

12   charging the Assault 1 in the burglary, and the Count 7,

13   rather, I'm not charging the burglary which relates to an

14   injury.

15          Count 7 is Criminal Possession of a Weapon in

16   the Fourth Degree. The Court believes that should not be

17   charged.

18          Therefore, the Court's leaning -- and I want

19   to go back and check on this, and I have to write some

20   stuff up. The Court's leaning is to charge -- I'll just

21   make a little chart here for myself.

22          All right. I've just made my own charts, and

23   this is, again, I said leanings, and I'll adjourn for a few

24   minutes.

25          Count 1, Burglary in the First Degree and that

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

853

1   allegation, the use of a knife, that would be charged.

2            Count 2, Burglary in the First Degree, that

3   alleges an injury in the course of the burglary, that would

4   not be charged.

5            Count 3 is Rape in the First Degree.  That

6   would be charged.

7            Count 4, Sexual Abuse in the First Degree.  It

8   alleges penis to vagina contact.  That would not be

9   charged.

10           Count 5, Sex Abuse in the First Degree, that

11  alleges finger to vagina contact.  That would be charged.

12           Count 6, Assault in the Second Degree, that

13  would be charged.

14           Count 7, Criminal Possession of a Weapon in

15  the Fourth Degree, alleging a knife, that would not be

16  charged.

17           Is there anything else before I adjourn,

18  briefly?

19           Counsel, you can write your charge up.

20           MS. CHANNAPATI:  Your Honor, I don't know if

21  this is now the appropriate time.  I am going to ask for a

22  brief recess in between the summation just after defense

23  counsel is done.

24           THE COURT:  How brief is brief?

25           MS. CHANNAPATI:  Five minutes.


William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

854

1    I want to be able to set up my exhibits

2  outside of the presence of the jury very briefly.  I have

3  to check the CD player and make sure it's working

4            THE COURT:  People, I don't like that kind of

5  break up.  I'm going to take an adjournment now.  I don't

6  know where the exhibits are.

7                     (Recess taken.)

8            THE COURT:  On the record.

9            Two things.  Defense counsel has given the

10  Court it's proposed language that we discussed the defense

11  was requesting.

12            People, did you look at it?

13            MS. CHANNAPATI:  Yes, your Honor.  The People

14  have had an opportunity to look at it.

15            THE COURT:  Yes.

16            MS. CHANNAPATI:  Your Honor, when defense

17  counsel mentioned the charge yesterday, I, myself, did a

18  search and didn't find anything in the CJI, and I would

19  think it's inappropriate for that language to be placed

20  when the reasonable doubt charge is more than sufficient in

21  terms of how the evidence should be taken in favor or

22  against the defendant depending on the weight they give it.

23            THE COURT:  All right.  The Court looked at

24  the charge, and the Court agrees with the People that the

25  reasonable doubt charge does cover it.  This charge invites

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

855

1      a piece meal approach which the Court does not believe is

2      proper.

3                  In the meantime, the Court has done some

4      further thinking, and it might be dangerous and has come up

5      with a slightly different platform, but let me find the

6      stuff here.

7                  Both counselors can approach.

8                  (Brief discussion held off the record at the

9      Judge's bench.)

10                 THE COURT:  With regard to what I said, the

11     Court has decided it will charge Attempted Assault in the

12     Second Degree as a lesser included of Assault in the Second

13     Degree.

14                 It's in the alternative, and that revised

15     verdict sheet has been given to both the People and the

16     defense.

17                 Just to go over it, well be charging Burglary

18     in the First Degree.  We already discussed that.  Rape in

19     the First Degree.  We discussed that.  Sexual Abuse in the

20     First Degree, which is the finger to vagina, and Assault in

21     the Second Degree, and then, 5, Attempted Assault in the

22     Second Degree.

23                 With all of that, is there anything else that

24     we need to discuss?

25                 Neither lawyer is saying there's anything else

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

856

1    we need to discuss.

2              MS. CHANNAPATI:  No, your Honor.

3              MR. GREENBERG:  No, your Honor.

4              THE COURT:  With that, give me about five

5    minutes so I can put all of this in my binder.  I'm trying

6    to get that attempted assault printed.  So I'll be right

7    back.

8                   (Brief recess taken.)

9              THE COURT:  Counsel, did you look at that form

10   and discuss it with your client?

11             MR. GREENBERG:  Yes.

12             THE COURT:  I'll receive it back.

13             Any issues, Counsel?

14             MR. GREENBERG:  No, your Honor.

15             With respect to the fifth one, is that as a

16   result of a reasonable view?

17             THE COURT:  No, the form regarding his not

18   testifying.

19             MR. GREENBERG:  I've discussed it with him.

20             THE COURT:  He's okay with it?

21             MR. GREENBERG:  We're okay with each other.

22             THE COURT:  It's in my file.

23             Thanks.

24             MR. GREENBERG:  Thank you, your Honor.

25             THE COURT:  We want him to sign it.


William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

1          MR. GREENBERG:  You wanted him to sign it?

2          THE COURT:  Yes.

3          MR. GREENBERG:  For you?

4          THE COURT:  It let's him know that he's

5     entitled to testify if he wanted to.

6          With all of that, there's one other thing that

7     I needed to go into which I did not mention, and I want to

8     take a look here.

9          I'm looking now at Burglary in the First

10    Degree, under Penal Law 140.30, Sub 3, and as indicated,

11    that I would be charging.

12         It has to be changed in the instruction.  It

13    references to knowingly entered unlawfully, because there's

14    no indication that the defendant knowingly entered

15    unlawfully.  The indication is that he remained unlawfully,

16    and so let's just continue where I would be going.

17         I'm looking at the instruction.  In the second

18    paragraph it says, "Under our law, a person is guilty of

19    Burglary in the First Degree when that person knowingly

20    enters or remains unlawfully in a dwelling with the intent

21    to commit a crime therein, and when in effecting entery or

22    while in the dwelling or immediate flight therefrom the

23    person uses or threatens the immediate use of a dangerous

24    instrument" -- I would strike "enters or," and then it

25    would be say, "When a person knowingly remains unlawfully

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

858

1    with the intent" -- I'm striking the words "enters or" in

2    that paragraph.

3              The second paragraph gives the terms

4    "dwelling," "unlawfully," "knowingly," "intent," "dangerous

5    instrument," that would apply.

6              "A dwelling is a building which is usually

7    occupied by a person lodging therein at night.  Where a

8    building consists of two or more units separately secured

9    or occupied, each unit shall be deemed both a separate

10   building in itself and a part of the building."

11             The next paragraph, "A person knowingly enters

12   or remains unlawfully" -- I'm going to strike "enters or."

13   And then it says, "When that person has no license or

14   privilege to enter or," I'm going to strike "enter or," to

15   remain, then it goes on about what a license or privilege

16   is.  I'm going to strike the "privilege to enter or" and

17   just privilege to remain.

18             Again, in the next paragraph, you have the

19   word "enters or."  I'm striking the words "enters or" and

20   then the next line in that paragraph, "he or she is

21   entering or," I'm striking "entering or." In each case it's

22   going to say, remaining, and it goes onto intent.

23             "The crime of burglary is distinct from any

24   other crime."  Then, in that phrase about the crime of

25   burglary, is complete in this case, it would be when the

William Cardenuto, CSR, Senior Court Reporter

- Proceedings -

1    person knowingly remains.  So I'm striking enters --

2    striking "enters or."

3                Then it goes onto talk about dangerous

4    instrument, which stands by itself.  Then in the elements

5    in one, it says, "unlawfully entered or."  I'm striking

6    "entered or."

7                So, it will say, remained; did so knowingly;

8    intent to commit a crime; and in the fourth element, "in

9    effecting entry," I'm going to say, that while in the

10   dwelling -- I'm strike the words "in effecting entery or,"

11   that while in the dwelling, he used or threatened to use,

12   namely, a knife, and then the language is as it is.

13               Any other comments on that?  Any other

14   reactions?

15               MR. GREENBERG:  No.

16               MS. CHANNAPATI:  No, your Honor.

17               THE COURT:  If there's nothing else, we're

18   ready for the jury.

19               THE COURT OFFICER:  Ready for the jury?

20               THE COURT:  We are.

21               THE COURT OFFICER:  Jury entering.

22               (Whereupon, the jury enters the courtroom and

23   is properly seated.)

24               THE CLERK:  All jurors are present.

25               Do both sides waive the reading of the roll?

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1        MR. GREENBERG:  Yes.

2        MS. CHANNAPATI:  Yes.

3        THE COURT:  Good morning, ladies and gentlemen

4    of the jury.  It's a little chilly in the building, I

5    agree, but it's a modern building.  We can't open any

6    windows.

7            Ladies and gentlemen of the jury, both sides

8    have rested in this case.  The presentation of evidence is

9    complete.  We have now reached the point in the trial where

10   you will hear summations of the lawyers.

11           Following those summations, I'll instruct you

12   as to the laws, rules, and principles of law which will

13   guide you during your deliberation and in rendering your

14   verdict.

15           Under the law, the defense attorney will make

16   his summation first, and the prosecution will follow in

17   making their summation.  Both attorneys will review the

18   evidence which you have heard and seen during the course of

19   this trial, and they will each suggest to you certain

20   inferences or conclusions which each of them believes, that

21   is, in their opinion, may be properly drawn from the

22   evidence in this case.

23           If you find that a particular lawyers's

24   analysis of the evidence is correct and accurate, then you

25   are at liberty to adopt such inference and conclusion,

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

861

1        either in whole or in part.

2               On the other hand, if you find that a

3        particular lawyer's analysis of the evidence is not correct

4        and not accurate, then you are at liberty to disregard such

5        inference and conclusion, either in whole or in part.

6               Either way, you, the jury, are free to draw

7        your own conclusions based upon your analysis of the

8        evidence that was presented.

9               Nothing said by either lawyer in their

10       summation is evidence in this case.  Nothing that I will

11       say in my final instruction to you will be evidence either.

12              As of yesterday when both sides had rested,

13       you have heard all of the evidence in the case.  It is you

14       and you alone, ladies and gentlemen, who are the exclusive

15       judges of the facts in this case.

16              Counsel.

17              MR. GREENBERG:  Thank you.

18              THE COURT:  They need pens.  Just a moment.

19              Proceed, Counsel.

20              MR. GREENBERG:  Thank you, your Honor.

21              Good almost afternoon.  When I first spoke to

22       you in voir dire, I tried to focus you on critical concepts

23       and things that are essential for a juror to have and to

24       use when they evaluate evidence.

25              I selected you, because I believed that each

- Closing Arguments -

1    of you possessed the ability and understood the critical

2    concepts that you're going to be presented with by Judge

3    Sullivan.

4              When you're in the jury room, you may need to

5    rely upon each other and remind each other of these

6    concepts and why they are important.  What I am really

7    telling you is that these concepts are what our whole

8    criminal justice system is based upon.

9              You took an oath that you would not expect the

10   defense to prove or disprove anything, and when you took

11   that oath at the beginning of the case, it runs straight

12   through to right now.

13             I do not have to present you with any

14   evidence.  In fact, I didn't.  I don't have to disprove any

15   of the evidence.  If there are any questions in your mind

16   with respect to the events that took place on March 26th,

17   2003, if there are any ambiguities, anything that needs to

18   be clarified, you cannot hold that against me and Dennis

19   Colon.

20             The sole burden of proof, a heavy burden of

21   proof, is at this table with the government.  Dennis Colon

22   did not testify, and the Judge will instruct you that you

23   cannot hold that against him.

24             You cannot speculate as to why he did not

25   testify.  You can't make an inference why he didn't

- Closing Arguments -

863

1    testify.  You can't make an inference, a negative inference

2    because of it.

3                 There's absolutely no obligation for us, the

4    defense, to give you anything.  It is the way our criminal

5    justice system, our constitution and the way our laws are

6    set up.

7                 It's done that way for a purpose.  Before

8    someone could be convicted of any crime, the People, the

9    government, must prove beyond a reasonable doubt all of the

10   evidence and the guilt of the defendant.

11                It's just the way it is, and as I said

12   earlier, you were selected, because we believed that you

13   had the abilities to follow those principles, those

14   critical principles that are part of this country's

15   criminal justice system.

16                If there's a failure, if there's proof

17   lacking, if you feel a desire that there's more proof, that

18   you need more proof, that rests here and not with the fact

19   that Dennis Colon didn't testify or that the defense didn't

20   present any evidence.

21                We rely -- when I say "we," I mean, the Court,

22   system, the defendants, prosecution, the community, the

23   State, and the country rely on juries like you and your

24   strength to uphold the principle no matter how difficult it

25   is.

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

864

1          You are the reason that this system runs, and

2     you are important.  You are the people.  You are the

3     community.  You are the peers.  You uphold the principles

4     of the criminal justice system.

5          You assured me and the Court that at the

6     beginning of this case, no matter how serious the charges

7     presented to you, you would not lower the standard of

8     proof, the burden of proof on the government.  No matter

9     whatever the enormity of the allegations, you assured us

10    and you took an oath that you would follow the law.

11         You also assured us that if you had a feeling

12    or a hunch whether you felt sympathy that that would not be

13    a basis for your decision, that the decision will be based

14    on proof.

15         The government's obligation is to present to

16    you credible, reliable, believable evidence to meet their

17    burden of proof.  There was only one witness that could

18    testify with respect to the encounter between Vera

19    Krioutchkova and Dennis Colon and that was Vera

20    Krioutchkova.

21         I submit to you that you cannot rely upon her

22    beyond a reasonable doubt.  I submit to you that she's not

23    credible, and as a result of that, you can reject her

24    testimony.  You can reject portions of her testimony, or

25    you can reject her testimony as a whole.  I submit to you

– Closing Arguments –

1    that you should reject her testimony in its entirety.

2    She's clearly a flawed person.

3              You have to ask yourself, when in your own

4    life when you have to rely upon someone to make an

5    important decision in your own life, is she someone that

6    you could trust?  Is she someone that you can rely upon?

7              I submit that you cannot.  I submit to you

8    that she's a manipulative, shrewd, unstable person willing

9    to seize an opportunity if it presents itself.  She's lived

10   in this country for approximately ten years and has been

11   involved in a number of civil litigation.

12             The first incident she was involved with was a

13   car accident which she told you about.  She can't tell you

14   what her injuries were, where it happened, what it was

15   about, who was involved.  She knew nothing about it.

16             The only thing she knew about that first

17   incident, if you recall the testimony, was the last thing

18   we brought out -- that she had a car accident and that she

19   got money from a lawyer.  That's all she knew.

20             She had a second car accident where she

21   couldn't recall whether she was a driver, a passenger, or

22   maybe she was a passenger or maybe she was a driver.  She

23   just couldn't remember.

24             What's interesting about that case and what's

25   problematic is that she had a serious allegation or she

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1    alleged that she had a serious injury and she had knee

2    surgery as a result of that accident.

3                I submit to you, if you looked into your own

4    experiences and you were required to have surgery as a

5    result of an accident, I submit to you that would you know

6    what took place; you would know where it happened; who was

7    in the car; and what was going on.

8                But she can't remember a thing, and I submit

9    to you that creates a lot of problems with her testimony

10   and whether or not you can believe her.

11               Why can't she remember an incident that

12   required her to see doctors and, ultimately, see a

13   specialist and have surgery?

14               There's two reasons -- A, she doesn't have a

15   good memory.  That is a problem if you apply it to this

16   case.  B, there was never an accident and she doesn't want

17   to tell you that.

18               I don't know about that, but someone who can't

19   describe any of those details is not someone who you can

20   rely upon, especially if you need to rely upon them beyond

21   a reasonable doubt

22               She had another lawsuit with her landlord.

23   Her ceiling fell on her head.  First, she testified that

24   she doesn't remember much about it, that she had memory

25   problems, and memory problems were better.

- Closing Arguments -

1    I submit to you that she was evasive about

2  that and that she had a long standing feud, issues with her

3  landlord.  She testified that she's currently in litigation

4  with that landlord; however, on direct examination when she

5  talked about the landlord, she said that she hardly

6  complained and that she trusted the landlord.  She trusted

7  him.

8    She was suing him.  She intended to have you

9  believe that there was never an issue between her and the

10  landlord and that she trusted him, believed in him, and

11  that he wouldn't harm her.

12    I submit to you, there's a lot more there that

13  meets the eye.

14    She brings a fourth lawsuit against the

15  landlord and Dennis Colon, and I submit to you that all of

16  that makes sense.  She, in her statement, says that the

17  landlord, Guy, he was sent over.  Guy is sending me over.

18    Who is Guy?

19    Guy is the landlord.  You heard that.

20    For her to have a valid lawsuit against the

21  landlord, there needs to be a connection.  The landlord

22  owns the building.  The landlord presumably has insurance.

23  There needs to be a connection between the landlord and

24  Dennis Colon.  It seems to me that the focus of her

25  attention and her ire is the fact she got a problem with

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1    the landlord.

2            Detective Harvin told you that during her

3    investigation she was never able to make any connection

4    between Dennis Colon, the landlord, Guy Schebovitz'

5    building, and Dennis Colon, and there's a reason why that

6    is, because there is no connection.

7            Vera Krioutchkova has made the connection.

8    She's the one that's made the connection.

9            Are her motives driven buy money?  Power?

10           I don't know.

11           Or are they driven by a psychiatric condition?

12           I don't know.

13           You, as people observing her, have to make

14   that determination.  I submit to you that it's clear from

15   the testimony that she takes a fair amount of medication to

16   keep herself stable, which gives rise to questions

17   regarding her mental condition, and don't get me wrong.  I

18   don't want to pick on somebody who has psychiatric

19   problems.

20           However, we're in a place where we need to

21   rely upon that person beyond a reasonable doubt.  This, as

22   we discussed, is an important serious decision, and can you

23   rely upon her beyond a reasonable doubt considering what

24   you know about her psychiatric condition and the fact that

25   she takes lots of medication during the course of the day?

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

869

1      When you look at the rest of the evidence, I

2  submit to you, there are gaps, things that don't make sense

3  and ambiguities and issues and problems.  When you exam

4  them, again, you can't hold that against the defendant.  It

5  lies at that table with the government.

6      She testified that she came home from the

7  hospital and there was a message on her answering machine,

8  and the message on that answering machine was -- I'm sorry.

9  I'm sorry -- which, I submit to you, would be a credible

10  piece of evidence and would be very important if true, and

11  it would have the voice of someone.

12      However, she claims she told the police

13  officer about it and that the police officer did nothing.

14  The machine was never recovered, the tape was never saved,

15  nothing.   Detective Harvin knew nothing about it

16      There's a reason why no one knew about it.

17      Because it doesn't exit.

18      The prosecutor introduced Verizon telephone

19  records and showed you what Dennis Colon's telephone number

20  was, what her telephone number was.  You will see that

21  there's no call, no second call on March 26th, 2003.

22      That was not the truth, and I submit to you,

23  if you believe that she did not tell you the truth with

24  respect to that particular item, you cannot believe

25  anything that she says.  You can reject her entire

- Closing Arguments -

870

1    testimony.

2           The knife.  Let's discuss the knife.  She

3    can't identify the knife.  She says because he was holding

4    it, she can't identify the handle.

5           The knife is critical.  It's a critical piece

6    of evidence.  It's not here.  There's photographs of the

7    knife.  You can't feel it.  You can't touch it.  You can't

8    examine it.

9           Why?

10          Because the government and the people that

11    work for them made a mistake.

12          MS. CHANNAPATI:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. GREENBERG:  They made a mistake.  They

15    checked the wrong box.  They destroyed it.  They destroyed

16    evidence that is relevant in this case.  It's not here.

17          That, ladies and gentlemen, is a problem.

18          Let's go a little further with the knife.  She

19    didn't identify the handle.  I can identify the blade and

20    the bottom.

21          Detective Harvin tells you, oh, yeah, she told

22    me she could identify the handle.  She said it had a

23    strange or weird design.  Vera tells us she can't identify

24    it on the stand a few days ago, that she couldn't identify

25    it, but Detective Harvin tells, oh, yeah, she can.

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1    I submit, you can believe that, and then when

2  pushed in cross examination, it became rather clear, I

3  submit to you, that Vera was never able to identify a

4  knife.

5    That gives rise to the question -- when did

6  she identify the knife?

7    Well, I submit to you that she was presented

8  with photographs -- is this the knife?

9    Yeah, that's the knife.

10    But then she doesn't really say that, because

11  she says she can't identify the handle.  I submit to you

12  that the truth is that she was never able to identify the

13  the knife, and I submit to you, there was no knife, because

14  it's not believable.  It's not credible that there was.

15    She also tells you that when he's in the

16  apartment and he's holding a knife, he's yelling, "I'm

17  going to kill you.  I'm going to kill you.  I'm going to

18  kill you."

19    How many times did she say it?  She said he

20  said it a lot.  "I'm going to kill you.  I'm going to kill

21  you."

22    The first police officer that arrives on the

23  scene has a conversation with her.  The only thing that she

24  told him that he wrote down was the perpetrator said, "Lie

25  on the bed."

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

872

1          Shortly after the encounter, notes were taken

2   by a police officer whose only involvement was showing up

3   and talking with her.  He spoke with her directly.

4          She testifies also that he hit me in the face.

5   So, as telling, Don't look at me, and he hits her in the

6   face.  Don't look at me.  Look away.

7          According to her testimony, she had been in

8   the apartment, and this is what she said, he was in there

9   for 10 to 15 minutes.

10          He walked in.  She looked at him through the

11   peephole.  He walked into the bathroom.  He walked into the

12   kitchen.  He asked her for a piece of paper, they had a

13   discussion.  They talked.  She showed him some other damage

14   to the apartment.  He's certainly not looking, if you

15   believe this, to secrete his identify.

16          Then when she goes to the hospital and is

17   asked, "Were you hit in the face or the body?"

18          She denies being hit in the face.  She flat

19   out denies it.  She testified she was slapped in the face.

20          You also need to understand that this case is

21   not about identification.  There was an encounter between

22   Vera Krioutchkova and Dennis Colon.  That is for sure.  We

23   know that for a number of reasons -- phone calls, two, not

24   three, two, and DNA.

25          We live in a time and society where everybody

William Cardenuto, CSR, Senior Court Reporter

1  knows that if you make a phone call there's going to be a

2  record of it.  We all know that.  We see it on our bills.

3       If you're going to have sex or rape somebody,

4  you're going to leave DNA, whether it be saliva or blood or

5  semen.  They are going to find you.  We know that.

6       Dennis Colon was not looking to secrete

7  himself.  Vera would have you believe that, but he didn't.

8       Let's go to the April 5th telephone call.  The

9  April 5th telephone call was over 15 minutes long.  The

10  substance of that telephone call, Vera gives a little bit

11  about that.  It was a phone call which appeared as someone

12  trying to make a date or have a conversation and try to see

13  a woman again.

14       If you were looking to hide and you were

15  looking to secrete yourself, would have you a 15 minute

16  long conversation with a woman?

17       I submit to you that that conversation in and

18  of itself shows you that there was a relationship between

19  Vera and Mr. Colon.

20       Now, bear in mind, I don't need to prove

21  anything.  I don't need to show you anything, but it

22  doesn't make sense.

23       If it doesn't make sense and the pieces don't

24  fit together, it's at this point that the government is

25  held to the burden and you must test the reasonable doubt,

- Closing Arguments -

874

1    because they haven't proven their case beyond a reasonable

2    doubt.

3            The People also introduced a rather impressive

4    array of evidence.  You've got large post boards with

5    pictures.  You've got bags that were sealed.  You're got

6    scientific tests.  You've got records, phone records,

7    hospital records, blanket, maps.

8            It's all in support and based upon Vera's

9    testimony.  Without Vera, none of those things would have

10   entered in support.  You have to believe her beyond a

11   reasonable doubt to get to the other stuff.

12           I submit to you, you can't.

13           Now, you're also going to say there's a lot of

14   evidence.  Remember what we talked about at the beginning.

15   It's not the quantity.  It's the quality, the quality of

16   the evidence, and I'm not telling you that the criminalist

17   that came in here didn't give you quality work.

18           It's what her work is based upon that is the

19   issue.  All it shows you is that Dennis Colon was there,

20   and I submit to you, that's not in dispute.  It's in

21   agreement, but this is not a case where it matters.  It's

22   used to prove that he was there.  All right.  He was there.

23   You've got to rely upon who started the ball rolling

24           You also heard a little bit that when the

25   police came to Dennis Colon and they interviewed him that

- Closing Arguments -

1    he consented to everything they asked him.  He cooperated

2    every step of the way.

3              He consented to the search of his apartment.

4    He consented to them obtaining DNA from him on that day.

5    He consented to speak with Detective Harvin.  It all goes

6    in line with making a phone call a few days later, having a

7    conversation, leaving DNA.

8              You're going to hear from Ms. Channapati, the

9    government, and I submit to you that she's going to replay

10   to you a significant portion of the evidence.  If you

11   couldn't rely on the evidence the first time you heard it

12   and it wasn't sufficient, you can't rely upon it and it's

13   not sufficient a second time.

14             Remember, she's going to replay for you or

15   inform you of things without cross examination.  I told you

16   when we started this case that at some point it would end

17   and we're here.

18             You, individually and collectively, gave the

19   Court certain promises, and I told you that at some point I

20   was going to ask you to find Dennis Colon not guilty of all

21   the charges presented to you.

22             The Judge is going to submit a number of

23   charges to you.  In those charges there are elements, what

24   makes up a charge.  You must bear in mind that the

25   government has to prove each and every element of each and

- Closing Arguments -

876

1    every crime for Mr. Colon to be found guilty of that

2    specific crime.

3              I submit to you when you evaluate the evidence

4    and you base it on what you heard and the fact that Vera

5    Krioutchkova cannot be found credible that you will find

6    Dennis Colon not guilty of each and every charge submitted

7    to you.

8              I thank you for your time, your energy, and

9    your attention.

10             THE COURT:  Now, the People.

11             Thank you, defense.

12             MS. CHANNAPATI:  Good afternoon.

13             On the March 26th, 2003, around 7:45 a.m. Vera

14   Krioutchkova was in her apartment at 1711 East 15th Street,

15   Apartment 1-A, in Brooklyn saying goodbye to her daughter

16   and her granddaughter who were going off to school.

17             Ms. Krioutchkova was getting ready for a

18   doctor's appointment and her phone rang at 8:01 a.m. and

19   the person who called was the defendant, Dennis Colon.

20             The defendant asked her if she was Vera

21   Krioutchkova, and she said, Yes.

22             He then asked, Do you have a problem with the

23   leak, and she said, Yes.

24             Ms. Krioutchkova had been having a lot of

25   problems with her apartment at that point and had told the

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1    landlord and business partners, two guys both named Guy,

2    about these problems, and we can see the problems in her

3    apartment.  You can see the leak.  You can see where the

4    tiles are coming out, because that is a leak in her

5    apartment, and she circled all the places where there were

6    problems in the apartment.  You can see how the water had

7    caused stains so badly in her bathtub.  In fact, you can

8    see that the pictures were taken the day of the incident

9    and that there was a leak in her apartment.

10           Now, the defendant said, I'm a plumber.  Guy

11   sent me to fix it.  Vera told him that she had to go to the

12   doctor.  So he can't come now, but the defendant insisted

13   he would come over now only to check it out and then come

14   back later to fix it.  So Ms. Krioutchkova agreed.  She was

15   happy to hear that the leak in her bathroom was going to be

16   fixed.

17           Fresh from the shower, she had on her robe,

18   and around five or ten minutes later she heard someone at

19   the door.  She went to the door, looked through the

20   peephole, saw the defendant, a man she had never seen

21   before.  The defendant said to her, I'm the one who called.

22           Believing it was the plumber and that he had a

23   legitimate reason to be in that apartment, Vera let the

24   defendant in, and now the defendant was wearing a black

25   leather jacket and a black hat.  He wasn't wearing a bag or

- Closing Arguments -

1   tool box, nothing else.

2            He was asking where was the problem.   Vera

3   showed him the leaks in the bathroom under the sink, the

4   bathtub, and the ceiling, all in the hope it was going to

5   get fixed.

6            The defendant asked for a pen and paper.   He

7   wrote one line of notes, she said, and told her he would

8   come back later in the evening to repair and started

9   walking towards the apartment exit.

10            When Ms. Krioutchkova followed him, as they

11   got to the door, she looked up and saw the defendant was

12   holding a knife and he said, "Lay down or I'll kill you.

13   Lay down or I'll kill you."

14            Ladies and gentlemen, I submit to you this is

15   the knife.   This is the knife that she recognized.   I'm

16   showing it to you very quickly now.   You can take all of

17   this back in the jury room during your deliberation and

18   take a look it very carefully, okay, and I suggest to you

19   that you do that.

20            Now, at this point when she saw him with the

21   knife, this is where the nightmare to end all nightmares

22   began.   Vera Krioutchkova tried to leave her apartment, but

23   the defendant pushed her away from the door.   He kept

24   saying with the knife in his hand, "Lay down or I'll kill

25   you.   Lay down or I'll kill you."

- Closing Arguments -

1           She started screaming for him to get out and

2  screaming for help.  The defendant pushed her backwards

3  into the bedroom.  The whole time he had the knife in his

4  hand pointing at her.  "Lay down or I'll kill you.  Lay

5  down or I'll kill you."

6           Ms. Krioutchkova begged for her life.  Don't

7  kill me.  She said, Don't kill me.  You can take whatever

8  you want, but don't kill me.

9           The defendant pushed her onto her daughter's

10  bed, and that's when Krioutchkova realized that the

11  defendant wasn't there to take anything.  The defendant was

12  there to rape her.

13           She tried telling him that she was sick, and

14  the defendant laughed.  He put her arms behind her back,

15  used his body weight to keep her on the bed; he spread her

16  legs and forced his hands into her vagina, and Vera felt

17  pain.

18           She thought she would have a chance to escape

19  if she asked him to wash his hands, but the defendant, when

20  he went to wash his hands held her against the sink,

21  between him and the sink, and washed his hands, took her

22  back to the bedroom, unzipped his pants, pulled out his

23  penis, and put his penis in her vagina and caused her to

24  feel an excruciating searing pain and Vera feared for her

25  life.

- Closing Arguments -

1    The defendant then got up and told Vera to

2    take a shower, don't call the police, and ran out of the

3    the apartment, but, again, Ms. Krioutchkova, she didn't

4    listen, she didn't listen to him.  That is why we're here

5    today.

6    I submit to you, ladies and gentlemen, that

7    these facts are not in dispute.  There's nothing in

8    evidence that contradicts these facts.

9    You heard the testimony directly from Ms.

10   Krioutchkova, directly from her.  You heard her respond to

11   my questions on direct examination, and you heard her

12   respond to the defense attorney's questions on cross

13   examination, and still at the end of this testimony,

14   there's nothing in evidence that contradicts the events as

15   I have just laid them out.  There's nothing in evidence

16   that contradicts that.

17   Now, the defense attorney would have you

18   believe that Ms. Krioutchkova is unreliable, that she's a

19   flawed person, and cites the questions of her other

20   litigation and civil lawsuits for her car accidents, not

21   being able to answer those questions, and he maintains this

22   is reason not to find her believable with regards to this

23   case.

24   Just because, ladies and gentlemen, I submit

25   to you, that she doesn't remember the details of those

- Closing Arguments -

1    incidents doesn't mean that she doesn't remember the

2    details of a rape.

3              The defense counsel would have you elevate a

4    car accident to a rape.  She does remember another

5    traumatic event that happened to her -- her hysterectomy.

6    She was able to testify as to the exact date that she had

7    her hysterectomy, the exact date, and I submit to you that

8    she's able to remember details of that, because it is

9    another traumatic event in her life, just like this rape.

10             Now, the defense attorney also talked a little

11   bit about the fact that there needs to be a connection

12   between the defendant and the landlord, and he is

13   speculating with you, ladies and gentlemen, I submit that

14   he's speculating as to what the connection could be.

15             We don't know what the connection is.  We

16   talked about this.  We don't know what the motive is, but

17   the People's burden, the burden that the People have does

18   not require us to prove the motive.

19             It's possible that because of this suit

20   against the landlord this defendant was hired by the

21   landlord to get rid of Vera from that apartment.  It's

22   absolutely possible.

23             MR. GREENBERG:  Objection.

24             THE COURT:  Overruled.

25             MS. CHANNAPATI:  And the defense attorney also

- Closing Arguments -

1   talked about her ire, that she was angry.

2              We were all here, ladies and gentlemen.  We

3   all saw her testify.  She was not an angry vindictive

4   woman.  I submit to you this was not a woman who was bitter

5   and angry.  This was a woman who was a victim of a sexual

6   assault.

7              Her psychiatric condition, ladies and

8   gentlemen, she is depressed, and she told you why she was

9   depressed.  She's depressed, because she had cancer, and as

10  a result of that cancer, she had a hysterectomy.

11             Being depressed, ladies and gentlemen, doesn't

12  make you delusional.  It makes you depressed, and

13  everything she said that happened is corroborated, all that

14  evidence.  She's clearly not delusional, because there are

15  things that don't come from her mouth that corroborate what

16  happened that day, and I'll get into that in a minute.

17             The defense attorney is also talking about

18  that there are gaps in the evidence.  He's asking you to

19  look for things that aren't there and focus your attention

20  on what is not there so you will ignore everything that is

21  there.

22             He's admitted what he can't deny, and he's

23  denying what he can't admit.  That second call could have

24  been made from anywhere.  It doesn't have to come from the

25  defendant's apartment where he lived, and the knife, the

1    defense attorney said that she can't identify the knife.

2              Ladies and gentlemen, I ask you if you need to

3    have your recollection refreshed, ask for a read back on

4    cross examination by the defense attorney.  She says, I

5    recognize the knife, the blade, and I recognize a portion

6    of the handle -- a knife that was found in the defendant's

7    apartment.

8              I mean, is that a coincidence?

9              She recognizes the knife that was found in the

10   defendant's apartment.

11             Getting hit in the face.  The defense attorney

12   brought that up, again, too.  I submit to you, ask for a

13   read back.  She says that they were asking about marks on

14   her body.  She wasn't withholding or lying like the defense

15   attorney was saying.  Ask for a read back of the evidence

16   if you need to hear it.

17             The different stories from police officers --

18   you've heard the language issues.  You've observed the

19   language issues that she has, and it's possible, I submit

20   to you, ladies and gentlemen, that the police officers only

21   were able to get bits and pieces, because of that language

22   barrier.

23             Now, with respect to the April 5th, 2003,

24   telephone call, the defense attorney had suggested why in

25   this day and age would someone call when we know there's

- Closing Arguments -

884

1    phone records.

2              Ladies and gentlemen, the defendant's phone

3    number was unlisted.  It was unlisted.  He never

4    expected -- I submit to you he never expected for it to be

5    traced back, because his phone number is unlisted.

6              We heard that testimony from the Verizon

7    representative.  It's not available for public access, and

8    no one said that he had to be smart.  I submit to you, by

9    making that second phone call, he was acting out of a

10   compulsion, a sick compulsion, to speak to the woman he

11   attacked afterwards.

12             The defense attorney also said that all this

13   evidence -- without Vera, none of this evidence would be

14   here.  Ladies and gentlemen, that's just not the case.

15   Without the defendant, none of this evidence would be here.

16             It's not Vera's DNA.  It's not Vera's DNA

17   we're looking at.  This isn't Vera's DNA that's in

18   evidence.  This is the defendant's DNA that's in evidence,

19   and it's not the telephone calls that Vera made to the

20   defendant.  It's the phone calls that the defendant made to

21   Vera.

22             It's the defendant who started the ball

23   rolling.  It's the defendant who started this when he

24   called and said that he was the plumber, and as far as his

25   cooperation with the police, ladies and gentlemen, I submit

- Closing Arguments -

1   to you, again, not an intelligent man, because he honestly

2   believed when he told Vera take a shower, because he knew,

3   he knew that there's a possibility that DNA could be left

4   over, he told her to take a shower, but he believed that

5   she would actually do that and that's why he so confidently

6   believed he could have gotten away with it.  So he said he

7   would take the swab.

8            Let's bring it back to Ms. Krioutchkova.

9            What do we know about her?

10           She's a 56 year old retired school teacher and

11  medical assistant.  She moved here from Russia and became

12  an American citizen in 2001.  She lives in that one bedroom

13  apartment, photos are in evidence, with her daughter and

14  granddaughter, and the apartment started falling apart in

15  disrepair, such disrepair that the ceiling fell on her

16  causing her injuries.

17           Ms. Krioutchkova is a woman who has chosen to

18  exercise her rights, the rights that all Americans have --

19  to hold responsible those people who are negligent and

20  cause injuries, and I submit to you, who among us would not

21  have done the exact same thing, and more importantly, even

22  though she has these lawsuits against her landlord, Ms.

23  Krioutchkova believed that the defendant is connected with

24  the landlord based on what he told her.

25           She believes they are connected.  Listen to

1   the 911.  She says in the 911, after she says it's the

2   plumber, at one point she says, It was Guy.  It was Guy.

3              So, of course, she wants to hold Guy

4   responsible.  Of course, she wants to hold Dennis Colon

5   responsible, but how does the fact that she has a lawsuit

6   pending change anything that Dennis Colon raped her?  How

7   does that change anything?  What does one have to do with

8   the other?

9              I submit to you, ladies and gentlemen, it has

10  nothing to do with the other.  That civil suit has nothing

11  to do with this.  This is the penal code.  It has all the

12  laws for New York State in here, and defense counsel is

13  asking you to believe that because she, Vera Krioutchkova,

14  has filed these civil lawsuits and because she's a woman

15  who is depressed, that she doesn't deserve the protection

16  of these laws, in fact, that she's below the law, and by

17  putting Vera Krioutchkova below the law, in that way he's

18  asking you to put the defendant above the law, that these

19  laws don't apply to the defendant, because Vera

20  Krioutchkova filed a civil lawsuit.

21             Now, we know that Ms. Krioutchkova suffered

22  from cancer, that she had to have a hysterectomy, and that

23  her depression from that became debilitating, and we know

24  that it was so debilitating and it so affected her so

25  severely, because she was able to testify to the exact date

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

887

1    of her hysterectomy.

2               I submit to you, Ms. Krioutchkova is credible.

3    You saw her.  You heard her words.  You saw her demeanor --

4    all the things we talked about in jury selection when you

5    were selected as jurors.

6               How about how would you determine whether

7    someone was credible, the common sense ways you would

8    decide whether someone was telling the truth.  You can

9    apply that to Ms. Krioutchkova, and I submit to you that

10   she's someone who is believable, and if the defense

11   attorney wants to hold it against her that she's a woman

12   who suffered from depression and that somehow makes her

13   less believable or less worthy of your belief, I submit to

14   you that's not right.  That's not right.

15               You heard her the day she was the attacked.

16   You her heard her voice and the fear in her voice in the

17   911 call.  I submit to you, the voice that you hear was the

18   sound of a woman who was in fear of her life, just as she

19   told you on the witness stand, and at one point you have to

20   think what woman would voluntarily submit herself to all of

21   this -- dealing with the police, going to the hospital

22   emergency room, having hairs plucked from her head, swabs

23   from every orifice of her body, combing for pubic hair, and

24   testifying and exposing herself in front of strangers.

25               What woman would subject herself to that

William Cardenuto, CSR, Senior Court Reporter

1    voluntarily?

2          We also discussed during jury selection

3    whether you could convict the defendant based upon the

4    testimony of one eyewitness, the complainant, and you were

5    all selected as jurors, because you said that you could and

6    that you could follow the law and the Judge's instruction.

7          We have a lot more than her testimony.   We

8    have a lot more.   You heard the expert testimony of Kyra

9    Keblish from the Medical Examiner's office.   She explained

10   how the defendant's DNA was found on the anal swab and the

11   duvet, the comforter holder, in the apartment.   She told

12   you that the likelihood of someone other than the defendant

13   matching the DNA found in Vera is one in a trillion.

14         As Ms. Keblish explained, the earth's

15   population is six billion.   If you looked at 160 earths,

16   you would still only find the defendant's DNA profile, only

17   one, and I submit to you from the DNA evidence we know two

18   things -- that the defendant was in Vera's apartment and

19   that he had sexual intercourse with her.

20         You also heard expert testimony from Alice

21   Olosunde from the Coney Island Hospital.   I submit to you

22   Ms. Olosunde has vast experience in the area as an examiner

23   and as a teacher of woman's health over 20 years and was

24   qualified as an expert in this court in sexual assault

25   forensic examination.

- Closing Arguments -

1    She told you she examined Vera the same day

2    she was attacked by the defendant.  She told you that Vera

3    was in shock.  She was tearful, that he was weeping, and

4    she was afraid, and she also observed that Vera had an

5    abnormal bruise in her vagina, the same place where Vera

6    had massive pain.

7    I submit to you that that bruise and that pain

8    is a physical injury, and, please, listen carefully to the

9    charges, because physical injury is going to come up during

10   your deliberation.

11   Ms. Olosunde told you that those vaginal

12   injuries are consistent with forcible vaginal sexual

13   intercourse.  It's consistent with rape.

14   I submit to you from the medical evidence we

15   know two more things -- that the sexual intercourse was

16   forcible, and as a result, Vera was physically injured.

17   You heard testimony from Silvana Didonna, an

18   investigator from Verizon.  She testified based upon the

19   phone records of the defendant and from Vera it shows that

20   the defendant called Vera twice, once when he said he was a

21   plumber and two weeks later when he told Vera he called her

22   to make sure she didn't say anything to anyone.  The fact

23   that he called her before he went there and afterwards

24   shows that the defendant preyed on Ms. Krioutchkova.

25   I submit to you one more thing from the

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1   records -- that the defendant knew exactly what he was

2   doing when he called and showed up at Vera's apartment.

3           Whether the defendant knew the apartment's

4   problems, because it was part of his job, whether he heard

5   about her problems around the neighborhood or looked her up

6   in the phone book or maybe was part of a setup between the

7   landlord and Mr. Colon to get Vera out of the apartment, we

8   don't know.  We don't know the motive, and we may never

9   know or understand, but I submit to you that it doesn't

10  matter, because we know what he does.  We know how he

11  operates.

12          Remember, like I said during jury selection, I

13  don't have to prove motive.  I only have to prove that he

14  raped Ms. Krioutchkova.

15          The defendant called Vera under the pretense

16  that he was a plumber.  He uses that rouse to gain access

17  to her apartment.  He calls her to confirm that she's not

18  an English speaker and that is good, because that would

19  make her someone less likely to go forward to the police.

20          He goes to her apartment.  He walks around

21  casing the apartment to make sure that she's the only one

22  there.  Again, no witnesses.  She's the only person there,

23  and he sees that she's an older Russian woman who doesn't

24  speak much English, someone who he thinks would not go to

25  the authorities, an older woman who would also be easy to

William Cardenuto, CSR, Senior Court Reporter

1    physically subdue, someone who would be afraid of getting

2    hurt, someone who would listen to what he told her to do,

3    but the defendant, ladies and gentlemen, I submit to you,

4    got cocky, because after it was all over, he had to call

5    her again.

6              That compulsion was there, ladies and

7    gentlemen.  That sickness was there, and that was his fatal

8    mistake, because it was that phone call that lead the

9    police back to Dennis Colon.

10             Now, with respect to the charges you're

11   going to hear, we talked in jury selection about what ideas

12   you may have about the crime of burglary, and you also said

13   you could follow the judge's instruction and apply the law

14   to the facts, even if it differs with what you believe a

15   burglary to be.

16             With that in mind, I submit to you, ladies and

17   gentlemen, that although Vera may have initially let the

18   defendant into her apartment, once he pulled out the knife,

19   he clearly no longer had her permission to stay or remain

20   in that apartment, and if you remember Vera's testimony,

21   she told him over and over, Get out, Get out.

22             I submit to you that you can convict the

23   defendant, Dennis Colon, beyond a reasonable doubt based on

24   all the evidence and the evidence in this case.

25             It answers the basic questions that we should

- Closing Arguments -

1    all be asking in any case -- who, what, when, where, and

2    how.

3              Who did this?

4              We know it's the defendant.

5              How do we know that?

6              Because Vera ID'd him in the lineup.  That was

7    done two weeks after the rape, and his DNA later came back

8    matching what was found on the swab, the anal swab, and the

9    duvet in Vera's apartment.  So we know her identification

10   was right.

11             What did he do?

12             We know that the defendant raped her.

13             How do we know that?

14             Because of the DNA.  The DNA is his.  DNA was

15   found on Vera Krioutchkova's body, and we know that from

16   the medical records there was an abnormal bruise found

17   inside her vagina.  So we know what happened.

18             When did it happen?

19             March 26th, 2003, between 8:01, maybe 8:03

20   a.m. and 8:45 a.m.  The testimony of the police officers as

21   well as the phone records that are in evidence, and we know

22   that from her, the 911 call, that happened in between, we

23   know it happened in that time frame.

24             Where did it happen?

25             We know it happened in the apartment, because

William Cardenuto, CSR, Senior Court Reporter

- Closing Arguments -

1    his semen was found in the apartment.  It was found on the

2    duvet in the apartment that was recovered by crime scene

3    and the police officers and then tested by the DNA lab.

4          How did he do all this?

5          We know, because he brought in a knife.  He

6    brought in the knife.  A knife that Vera recognized.  The

7    knife was recovered in the defendant's apartment and a

8    knife that has a very distinct handle and a very distinct

9    blade.

10          Ladies and gentlemen, the knife that was in

11   the defendant's apartment was shown to Vera Krioutchkova

12   and identified as a knife that he used to get into the

13   apartment, and how else did he do it?

14          He did it by using the rouse of I'm coming to

15   fix your leak, a leak that we know that she has, and he

16   called her before.  We have the phone records.  The

17   knife and the leak in her apartment is how he did it.

18          Each piece of evidence -- I know there was

19   a lot, and I appreciate your patience throughout the trial.

20   There was a lot to take in, but each piece of evidence is

21   like a puzzle.  It's a puzzle, and when you put each piece

22   together, the picture that you see is that this defendant

23   raped Vera Krioutchkova on March 26th, 2003, and based

24   upon the evidence, I ask you to render the only just

25   verdict -- guilty beyond a reasonable doubt of all charges.

- Judge's Final Charge -

894

1        With that, I'm going to leave you with

2   the words of Vera herself.

3        (Whereupon, People's Exhibit No. 8, the 911

4   call, was played for the jury.)

5        THE COURT:  People, continue, please.

6        MS. CHANNAPATI:  I know you've heard a lot of

7   words from myself, the witnesses, from the defense

8   attorney, even from the Judge, but there's one word, only

9   one word that matters in this entire process after you hear

10  the evidence, and it's the word that only you, the jury,

11  the jurors can utter, the word that only you the jury can

12  say that is the most important word of all and that is

13  guilty.

14       Thank you.

15       THE COURT:  Ladies and gentlemen, we have now

16  come to the part of the trial where I will instruct you

17  regarding the law.  After I am finished giving you these

18  instructions, you will retire to the jury room to reach a

19  verdict.

20       These instructions now will be made in three

21  parts -- the first is a general statement of the law which

22  is applicable to all jury trials in criminal cases.

23       The second part is a statement of the law as

24  it applies to this particular case.  Finally, I'll advise

25  you regarding the conduct of your deliberations.